Volume 31

Pages 5916 - 6120

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )   NO. CR **17-00533-EMC-2**
                               )           **17-00533-EMC-7**
  VS.                          )           **17-00533-EMC-9**
                               )
RAYMOND MICHAEL FOAKES,        )
CHRISTOPHER RANIERI, and BRIAN )
ALLEN BURKE,                   )
                               )
          Defendants.          )
_____)
                               San Francisco, California
                               Tuesday, May 2, 2023

                  <u>TRANSCRIPT OF PROCEEDINGS</u>

<u>**APPEARANCES:**</u>
For Plaintiff:
                         ISMAIL RAMSEY
                         United States Attorney
                         450 Golden Gate Avenue
                         San Francisco, California  94102
                    BY:  **KEVIN J. BARRY**
                         **LINA PENG**
                         **ASSISTANT UNITED STATES ATTORNEY**


For Defendant Foakes:
                         BORO LAW FIRM
                         345 Franklin Street
                         San Francisco, California  94102
                    BY:  **ALBERT J. BORO, JR.**
                         **ATTORNEY AT LAW**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
              Official Reporter, CSR No. 12219

1    **APPEARANCES**:   (CONTINUED)

2    For Defendant Ranieri:

                              LAW OFFICE OF JOHN G. WALSH
3                             63 Atlantic Avenue - 3rd Floor
                              Boston, Massachusetts 02110
4                        BY:  **JOHN G. WALSH, ATTORNEY AT LAW**

5                             LAW OFFICE OF ROBERT L. SHEKETOFF
                              One McKinley Square
6                             Boston, Massachusetts  02109
                         BY:  **ROBERT L. SHEKETOFF, ATTORNEY AT LAW**
7
                              METROPOLITAN COLLEGE/BOSTON UNIVERSITY
8                             63 Atlantic Avenue - 3rd Floor
                              Boston, Massachusetts  02110
9                        BY:  **MARK G. MILIOTIS, ATTORNEY AT LAW**

10                            APOSTLE LAW
                              One McKinley Square
11                            Boston, Massachusetts  02109
                         BY:  **CARLOS A. APOSTLE, ATTORNEY AT LAW**
12
     For Defendant Burke:

13                            LAW OFFICE OF ERIK G. BABCOCK
                              717 Washington Street - 2nd Floor
14                            Oakland, California 94607
                         BY:  **ERIK G. BABCOCK, ATTORNEY AT LAW**
15
     Also Present:            **Kevin Costello, USAO Paralegal**
16                            **William Harm, FBI Task Force Officer**
                              **Bryan Reuter, Defense Paralegal**
17                            **Lindsay Page, Defense Investigator**

18

19

20

21

22

23

24

25

1                          **I N D E X**

2    Tuesday, May 2, 2023 - Volume 31

3    <u>DEFENDANTS' WITNESSES</u>                        <u>PAGE</u>   <u>VOL.</u>

4    <u>O'BRIEN, JOHN</u>
       (SWORN)                                        5948   31
5    Direct Examination by Mr. Sheketoff              5948   31
     Cross-Examination by Mr. Barry                   5954   31
6    Redirect Examination by Mr. Sheketoff            5956   31
     Recross-Examination by Mr. Barry                 5958   31
7    Further Redirect Examination by Mr. Sheketoff    5959   31

8    <u>BRADY, SPENCER</u>
       (SWORN)                                        5959   31
9    Direct Examination by Mr. Boro                   5960   31
     Cross-Examination by Ms. Peng                    5974   31
10   Redirect Examination by Mr. Boro                 5983   31
     Recross-Examination by Mr. Miliotis              5993   31
11
     <u>FONG, DYLAN</u>
12     (SWORN)                                        6025   31
     Direct Examination by Mr. Boro                   6025   31
13   Cross-Examination by Ms. Peng                    6060   31
     Redirect Examination by Mr. Boro                 6064   31
14
     <u>AIELLO, STEVE</u>
15     (SWORN)                                        6070   31
     Direct Examination by Mr. Sheketoff              6071   31
16   Cross-Examination by Mr. Barry                   6076   31
     Redirect Examination by Mr. Sheketoff            6078   31
17
     <u>FORD, JIMMY</u>
18     (SWORN)                                        6078   31
     Direct Examination by Mr. Boro                   6079   31
19   Cross-Examination by Mr. Barry                   6086   31
     Redirect Examination by Mr. Boro                 6096   31
20
     <u>RUGAARD, DANA</u>
21     (SWORN)                                        6097   31
     Direct Examination by Mr. Boro                   6097   31
22

23

24

25

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1555 | | 6091 | 31 |
| 2036 | | 6040 | 31 |
| 2099 | | 6046 | 31 |
| 2100 | | 6053 | 31 |
| 2101 | | 6056 | 31 |

PROCEEDINGS

```
 1   Tuesday - May 2, 2023                            8:39 a.m.

 2                       P R O C E E D I N G S

 3                          ---o0o---

 4   (Proceedings were heard out of the presence of the jury.)

 5        THE CLERK:  All rise.  Court is now in session.  The

 6   Honorable Edward M. Chen presiding.

 7        THE COURT:  Good morning, everyone.  Have a seat.

 8        ALL:  Good morning, Your Honor.

 9        THE CLERK:  The court is calling the case USA

10   vs. Foakes, USA vs. Ranieri, and USA vs. Burke, Criminal Action

11   17-533.

12     Counsel, please state your appearance for the record,

13   beginning with the Government.

14        MR. BARRY:  Good morning, Your Honor.  Kevin Barry and

15   Lina Peng for the United States.

16        THE COURT:  All right.  Good morning.

17        MR. BORO:  And good morning, Your Honor.  Albert Boro

18   for defendant Raymond Foakes, who is present in court in

19   custody.

20        THE COURT:  All right.  Good morning.

21     Good morning, Mr. Foakes.

22        DEFENDANT FOAKES:  Good morning.

23        MR. MILIOTIS:  Good morning, Your Honor.

24   Mark Miliotis with John Walsh, Robert Sheketoff, and

25   Carlos Apostle for Mr. Ranieri, who's present.
```

PROCEEDINGS

1          **THE COURT:**  All right.  Thank you.

2       Good morning, Mr. Ranieri.

3          **DEFENDANT RANIERI:**  Good morning.

4          **MR. BABCOCK:**  Good morning, Your Honor.  Erik Babcock

5   for Mr. Burke, who's present as well.

6          **THE COURT:**  All right.  Thank you.

7       Good morning, Mr. Burke.

8          **DEFENDANT BURKE:**  Good morning.

9          **THE COURT:**  So let's talk about Mr. Dutton.  What's

10  the latest in terms of his availability?

11         **MR. BARRY:**  The latest that we have, Your Honor, I put

12  in the motion.  We don't know where he is or whether he's

13  available.  I don't think he's been served.  The latest that we

14  have is that there was an out-of-office message saying that he

15  was -- he's been out from the 22nd through, I think, the second

16  week of May.

17         **THE COURT:**  Out of office?  Is he -- remind me.  Is

18  he --

19         **MR. BARRY:**  I think he's at CDCR.

20         **THE COURT:**  Oh, okay.  So he's not retired?

21         **MR. BARRY:**  He's retired from the FBI.

22         **THE COURT:**  But he's at CDCR?

23         **MR. BARRY:**  Yeah, which is California state.

24         **THE COURT:**  And he's working in still the same area,

25  then?

PROCEEDINGS

1          **MR. BARRY:**  I -- I'm not sure.  I think he might be

2    some kind of gang consultant to the California Department of

3    Corrections, but I'm not positive.  I haven't spoken with him.

4          **THE COURT:**  Okay.  But he's in the Bay Area generally?

5          **MR. BARRY:**  He works in the Bay Area, but he may not

6    be in the Bay Area.  He could be -- he could in Ireland.  He

7    could be in New York.  He could be anywhere.

8          **THE COURT:**  All right.  So this is a phone message

9    that says he's out or e-mail?

10          **MR. BARRY:**  Automated e-mail response.

11          **MS. PENG:**  Your Honor, too, on the *Touhy* issue, our

12    understanding is that FBI counsel did try to contact Mr. Dutton

13    when we received the *Touhy* letter.

14       Oh.  So it's in the filing, I guess.

15       But the point is that FBI has tried to reach out to

16    Mr. Dutton since receiving the *Touhy* request and has not been

17    able to make contact with him.

18          **THE COURT:**  All right.  So, Mr. Boro, what do you --

19    what's your proposal, then, at this point?

20          **MR. BORO:**  My proposal, Your Honor, would be there --

21    that we hold the Defense case open until Mr. Dutton is found.

22    He lives in Windsor, California.  We didn't realize he worked

23    at the California Department of Corrections, but we did find an

24    address for him in Windsor.  We did not see him there.

25       If he truly were unavailable, then I move to strike the

1  testimony of Meghan Jaynes and ask the jury be instructed to

2  ignore it because I believe the testimony is completely

3  unreliable and is contrary to not only the interview reports

4  contemporaneous with the events in 2008, again in 2011, and

5  also with the testimony yesterday that showed, from a witness

6  who was there with Ms. Meghan Jaynes, that nothing had

7  occurred.

8      I believe the Government was notified in advance of

9  Ms. Jaynes' testimony, and they provided us right before her

10 testimony, a note from her doctor recommending that she not

11 testify, that she was not in a mental state to testify, and my

12 ability to cross-examine her was severely constrained by her

13 psychological instability and failure of memory.

14     And I believe she has conflated various events that

15 occurred in her life, including with the prior boyfriend whose

16 name, I believe, is Paul, I asked her about, with the events

17 with Mr. Foakes.  And so I think it's -- the testimony should

18 not be part of this trial record.

19         THE COURT:  Well, but this hinges on Mr. Dutton not

20 being available because if he were available, you wouldn't make

21 this motion; correct?

22         MR. BORO:  If he were available, then I would be able

23 to put in his interview -- question him about it and have him

24 confirm that he had interviewed her within two months of the

25 Redwood Run.  Actually six weeks.  There was never any report

PROCEEDINGS

1  of any sort of sexual assault, rape, serious crime being

2  committed.

3       He interviewed her another four times after July, in

4  August and November, never any report of being a victim of a

5  rape or other serious crime; and then, again, in 2011, her only

6  concern was a generalized fear of the reputation of the Hells

7  Angels motorcycle club, not even of the Hells Angels Sonoma.

8       **THE COURT:**  All right.  But let me ask:  When did you

9  issue a subpoena for -- or attempt to serve a subpoena on

10 Mr. Dutton?

11      **MR. BORO:**  I -- my understanding of the *Touhy*

12 requirements was to give the subpoena to the Government.  So on

13 April 19th, when I did the second letter that had the *Touhy*

14 request -- the refined request for Mr. O'Brien, Agent O'Brien,

15 that's when I also included the request for Agent Dutton.

16      We went by his house on Saturday to attempt to interview

17 him.  We did have a subpoena in hand, but he was not there.

18      **THE COURT:**  Well, I mean, the Government's point is

19 that this was late.  I mean, you can't sort of take advantage

20 of a last-minute attempt to subpoena and then the person's not

21 available, and then you want to strike testimony which you

22 claim would have been impeached by that testimony for a witness

23 that wasn't timely subpoenaed.

24      It was -- you knew what she was going to testify.  She

25 testified in the first trial.  You've had a year's notice; and

1    if you were going to impeach her with the theory that she

2    didn't report this earlier, I mean, there was no surprise.  So

3    the idea that we would, number one, postpone trial or grant a

4    mistrial because of the unavailability of a witness that was

5    just subpoenaed, you know, weeks into this trial, that's a

6    tough one to me.

7         **MR. BORO:**  Well, I think it -- and maybe -- well, I

8    was caught by surprise by Sergeant Harm's testimony that he had

9    not read the prior interview reports of Ms. Jaynes, who he took

10   over the handling of.  Those reports --

11        **THE COURT:**  Even if he had read it, that would have

12   been hearsay upon hearsay.  You were going to ask him what was

13   in the report and he wasn't there?

14        **MR. BORO:**  No.  I was just going to ask him to confirm

15   that those reports -- that the standard procedures for

16   preparing 302 reports are to have them be complete and accurate

17   and there was no mention of any rapes in those reports.

18        **THE COURT:**  Well, but for him to testify that there's

19   nothing in there would have been double or triple hearsay.  The

20   way to do it would have been to subpoena Officer Dutton and

21   say, "You know, did she say anything during these interviews?"

22   And you could refresh his recollection if he can't recall.

23   That's the normal way you would do it.

24        You don't get somebody else to read the report and then

25   say what's in there, what's not in there, written by somebody

1    else.  That's like at least double, if not triple, hearsay.

2        So I don't understand why, if Mr. Dutton was going to be

3    key to impeaching Meghan Jaynes, he wasn't subpoenaed earlier

4    so at least, you know, if he doesn't respond to a subpoena,

5    then we can take steps or whatever, but -- what does this

6    e-mail say when he's going to be back?

7        **MR. BARRY:**  The case agent had it, but I think it's

8    May 10th maybe.  I don't have a copy of the e-mail.  I just

9    talked to the case agent about it.

10       But there's an even bigger problem, Your Honor, is that

11   the person that they needed to ask was Meghan Jaynes and they

12   deliberately chose not to ask that.

13       **THE COURT:**  I understand that.  I understand that.

14   And there's a counterargument to that that may or may not be

15   meritorious, that it would have been futile to ask her.  You

16   know what she would have said, given her disposition and what

17   she's been saying on the stand.  She would have said, "I don't

18   remember.  I don't remember what I said to the agent."  And at

19   that point, that would have laid the foundation for a prior

20   inconsistent statement.

21       And, you know, one could argue the one -- this is one of

22   those somewhat rare situations where you can imply "We sort of

23   saw where she was going and she would have probably said that."

24   So the foundation for prior inconsistent statement is there.

25       There's still the threshold question, whether the silence,

1  her absence is an assertion.  That's the first point.  And one

2  could argue that if it happened just months after, you know,

3  perhaps, even though, you know --

4      **MR. BARRY:**  The Court may also recall, in the last

5  trial, some of the *Touhy* requests were a bit late, but it was

6  the Wendt team that worked with us to say, "Hey, are you okay

7  with serving these subpoenas on these even retired agents so we

8  don't show up at their houses?"  And we worked together with

9  them and we got it done.

10     But the Defense has -- in this trial has chosen to proceed

11  by ambush, doing everything at the last minute so we don't know

12  it, and here's the consequence.

13     **THE COURT:**  Well, let me ask.  Let me ask, Mr. Boro:

14  If we assume that Agent Dutton is not around, it certainly

15  seems that way, and it's unrealistic to expect to subpoena him

16  sort of last minute, can you think an exception to hearsay to

17  get in these reports themselves even without the agent

18  testifying?  So now we're all -- we are talking about a certain

19  level of hearsay here, but do you have any authority, I'm

20  talking about backup argument, that there's --

21     **MR. BORO:**  Well, you know, I -- there would be the

22  argument of a report that should have the information and it

23  doesn't have it, so that that would be indication that the

24  information did not exist.  I guess the fight would be:  Is a

25  302 report the type of report where information is regularly

**PROCEEDINGS**

1    recorded and you would expect to see it in it?

2         **THE COURT:**  Well, that's the argument and what I'm

3    suggesting is whether you are -- would make an argument, and I

4    want to make it for you, but the report itself should be

5    admitted in lieu of the testimony about the report or the more

6    direct hearsay testimony of Agent Dutton.

7         Would you -- would you seek to admit -- if there were an

8    exception, would you seek to admit the 302s themselves?

9         **MR. BORO:**  Your Honor, I would, both on a -- the

10   residual clause as well as the fact that it should have been in

11   the records and wasn't.  So I think it would be -- I would be

12   relying on 803(6), 803(7), and the residual clause.

13        The --

14        **THE COURT:**  And would you seek the admission of all

15   the Exhibit A that you -- both the 2008 and the 2011 reports?

16        **MR. BORO:**  I would seek admission of the 2008 reports

17   and of the 2011 reports.  I think they're all consistent.

18        **MR. BARRY:**  There are a couple of problems with that,

19   Your Honor.

20        **THE COURT:**  Yeah.

21        **MR. BARRY:**  One is that the residual hearsay exception

22   relates to the interests of justice here, and the interests of

23   justice here would not be met by admission of the report

24   because the Defense shut down any questioning about the

25   circumstances of how she reported the rape.  They can't have it

1    both ways.

2        And if the report comes in under some -- whatever

3    exception the Defense is able to come up with, the entire

4    report has to come in.  Because the notion that a person being

5    questioned about mortgage fraud and white collar crime would

6    all of a sudden talk about, "Oh, and, by the way, the person

7    that I helped concoct this fraud raped me," it's absurd and it

8    doesn't relate to how rape victims actually experience the

9    world.  That it's very, very common for women often never to

10   report it.

11       And the circumstance of how Ms. Jaynes reported it were

12   that over years, she developed trust with the FBI, she

13   developed rapport with the agents in this investigation, she

14   trusted them, and then after an interview was concluded, felt

15   that this was the right time to come forward because she

16   trusted us.  And none of that testimony was allowed because of

17   the Defense objections.  So, again, they can't have it both

18   ways.

19       **MR. BORO:**  Well, if there really was that long pattern

20   of developing rapport, certainly the Government must have

21   reports and documents showing that, between 2011 and 2020,

22   there were a series of sessions of building rapport as opposed

23   to her showing up out of the blue.

24       **THE COURT:**  Well, the way this is normally handled is

25   that is why, under 613, you've got to give the witness an

1    opportunity to then explain; and exactly what you explain, if

2    she were so willing, she could explain why it took so long, why

3    she didn't say anything in 2008 and 2011, et cetera, et cetera;

4    and, you know, she would have the opportunity, if she wanted

5    to, to come back on a rebuttal case or whatever and explain.

6        So I'm not sure that's dispositive.  You do -- you have to

7    give the witness an opportunity to explain.  Now, if they

8    choose not to explain, you know, then it is what it is.

9        But -- so let me just ask you, and I may need to look at

10   this or ask for, you know, during the break, some kind of

11   briefing if you have any case law about whether this could come

12   in; but it does seem to me that if you're relying -- and this

13   is going to be true with respect to the Hardisty thing, which

14   I'm going to get to in a second -- that if you're going to rely

15   on omission as assertion, which I think is necessary because if

16   it's not an assertion, it's irrelevant.  It's only because

17   there's a -- there's a natural -- it seems natural one would

18   have said something and that's -- well, that's the probative

19   value if they didn't say anything because that sort of arguably

20   suggests that it didn't happen; right?  That's the theory.

21       You do have to see the context, which I said yesterday.

22   And I think Mr. Barry has a point that if you're going to rely

23   on omission, you have to admit the whole thing to see the

24   context.  What was she talking about?

25       You know, because what she was talking about in 2011, it

**PROCEEDINGS**

1    seemed to me all that was about the mortgage fraud and who was

2    involved and who was in the grow and blah-blah-blah.  It's only

3    at the very end she makes a general statement about the

4    reputation of the HASC.

5         The earlier reports, it's a little more open ended,

6    perhaps one could; but the risk -- you might want to look at

7    this twice, Mr. Boro.  I mean, there's -- like every report,

8    there's -- for each side, there's good things and bad things.

9    You might want to weigh that.

10        But my view is that if there is an exception to hearsay

11   that allows this to come in even in the absence of

12   Agent Dutton, I think it all has to come in so the jury can see

13   the context of whether her silence really is probative or not

14   or how probative it is.

15        So you might want to look at that because I don't know if

16   you can just cherrypick and say, "Well, let's just look at this

17   section of the report.  She didn't say anything."  It's

18   context.

19        **MR. BORO:**  Well, Your Honor, we have -- we -- we

20   specifically reserved the right to call her in the Defense

21   case.  Your Honor did not excuse her, and so we can just call

22   her and ask her if she reported the alleged rape at the

23   Redwood Run in 2008.

24        **THE COURT:**  You don't have to call her because I'm

25   willing to assume that she's going to say "I don't remember

**PROCEEDINGS**

 1   anything.  I don't remember what I told the officers.  I don't

 2   remember what I said to Mr. Dutton."  I can almost assure you

 3   that's what she will say, and I'm willing to assume that.

 4        So the predicate problem, I'm not so concerned about.

 5   It's still a hearsay problem because we don't have

 6   Agent Dutton.

 7        It's possible to get through a second level of hearsay if

 8   she's -- if Agent Dutton is not here.  What I'm telling you is

 9   that if that happens and if I were to say "This is admissible

10   to make your point," it all comes in because, to Mr. Barry's

11   point, you need context to know how powerful this omission is

12   on her part, you know.

13        The more she was kind of talking about stuff in that zone,

14   perhaps the more probative it is.  The less she was talking

15   about that, the less probative it is.  But in order for the

16   jury to assess that, I think these reports -- if you don't have

17   Mr. Dutton, I think the entirety of the reports come in.

18   That's why I'm indicating to you, if that's the case, you might

19   want to, you know, make your -- make a decision whether that's

20   what you want.

21        **MR. BORO:**  Well, I understand that, Your Honor.  When

22   I read some of the reports, though, there were clearly

23   statements made by her for which she had no foundation, that

24   she just makes various assertions in these reports.  And I

25   understand the agents would be recording that to gather

1   potential leads and then run them down, but I don't think they

2   could be presented to the jury as if they were based on

3   foundation and fact.  So I'm a little concerned just saying

4   wholesale, these reports come in.

5          THE COURT:  Well, the problem is without context, you

6   know, if she's talking -- even if she doesn't have a basis, if

7   she's talking about X and then Y and the question is "How come

8   she didn't talk about Z," you kind of need to know what X and Y

9   was and what she was saying in order to weigh her silence.

10         Anyway, it sounds like Agent Dutton is not going to be

11   here today; but I do -- we need -- we may need to discuss this

12   later today and figure out what we're going to do.

13         But those -- I'm just throwing out some possibilities.  I

14   know the Government thinks it should not come in at all because

15   this is probably double hearsay at this point, but I'm just

16   suggesting a possibility but that each thing has consequences,

17   is what I'm suggesting, so...

18         MR. BORO:  And would -- if Agent Dutton were here,

19   would it still be the Court's view that he would be able to

20   testify about everything she said as opposed to just that he

21   had a complete and accurate report?

22         THE COURT:  I think on cross, he would be -- he could

23   be crossed -- so, for instance, and this is like the 2011

24   stuff, she's talking about the mortgage fraud, and the cross --

25   I would have to allow the cross:  What was she talking about?

1   What were you guys talking about?  And what was she" -- in

2   order to infer that she should have said something about the

3   alleged rape, you've got to know what she was talking about,

4   and -- I don't know.  That's what struck me when I read this.

5   I was like, "Well, even with Dutton, you can't exclude what she

6   was talking about."  And what she was talking about was the

7   mortgage fraud.  That opens that door that I had closed for

8   you.

9            MR. BORO:  Right.  No, I understand that, Your Honor.

10           THE COURT:  That's the problem.

11           MR. BARRY:  And speaking of that, Your Honor, there is

12   a witness -- there was another witness that the Defense

13   misspelled their name, so there were two on the final day who

14   was misspelled and prevented us from doing any research on

15   them.  Well, it turns out the person whose name was misspelled

16   is actually a retired police officer.  They were not identified

17   as a police officer and, again, their name was misspelled.

18        But what we were able to learn from this person -- about

19   this person is that, during the July 2010 search warrant, a

20   residential loan application and a credit report for this

21   person dated 2007 were found in the possession of Jacob

22   Moynihan, who is Raymond Foakes' codefendant and the architect

23   of the mortgage fraud.  So we have to be able to cross-examine

24   on that -- him on that.

25           THE COURT:  What's the relevance of that?

PROCEEDINGS

1          **MR. BARRY:**  The relevance of that:  Is this person

2    committing mortgage fraud with members of the Hells Angels?

3          **THE COURT:**  So, in other words, credibility?

4          **MR. BARRY:**  Absolutely.

5          **MR. BORO:**  Your Honor, there is no proof, I believe,

6    in the prior proceeding, and by that, I mean the mortgage fraud

7    proceeding, or here that every application that Mr. Moynihan

8    did was fraudulent.  He had a mortgage business.  That's how he

9    came about doing this.  He advertised in Sonoma, had large

10   billboards talking about, you know, how successful he was as a

11   real estate agent and a mortgage broker, and the Government

12   can't just assume, without proof, that an application that

13   happens to be found with a person's name on it --

14         **THE COURT:**  So in that instance, why can't the

15   question be asked?  If the assertion -- attack on credibility

16   has to do with perhaps involvement with mortgage fraud, is

17   there a need to mention Mr. Foakes?

18         **MR. BARRY:**  Yes, because --

19         **THE COURT:**  Why?

20         **MR. BARRY:**  -- this person also has deep connections

21   with the Hells Angels.  He is married to Herb Cody's former

22   spouse.

23         **THE COURT:**  But I mean, in terms of the actual

24   mortgage fraud charge.

25         **MR. BARRY:**  Yeah, the mortgage fraud was deeply linked

1    to the Hells Angels.  For example --

2         **THE COURT:**  No, I understand that, but why -- in the

3    cross-examination of this witness, does Mr. Foakes having been

4    charged and convicted of that, why isn't it enough to say -- to

5    suggest he was involved in mortgage fraud?  You could even say

6    "Did it involve Hells Angels," et cetera, et cetera.  I don't

7    know why you would have to necessarily --

8         **MR. BARRY:**  No, that's definitely -- that's true.

9    Yeah, so I could explore the fact that Jacob Moynihan was

10   convicted of mortgage fraud with a number of members of the

11   Sonoma County Hells Angels, he has deep connections to the

12   Sonoma County Hells Angels, and isn't it true that a

13   residential application for you was found in the possession of

14   Jacob Moynihan?

15        **THE COURT:**  Well, so it's a balance there, I think,

16   with the 403 concern.  If you can keep Mr. Foakes' name out of

17   it and if I find that that is a relevant means of impeaching

18   credibility, it may come in.

19        **MR. BARRY:**  And does the Defense still intend to call

20   Jason Batemon?

21        **MR. BORO:**  Jason Batemon, no.  I decided last night

22   I'm not going to call him.

23        **THE COURT:**  Okay.

24        **MR. BARRY:**  Can we -- and, through the Court, can we

25   get an updated list of today's witnesses?

PROCEEDINGS

1           **MR. BORO:**  Yes.  And let me --

2           **MR. MILIOTIS:**  Let me -- let me jump in for a second.

3           **MR. BORO:**  Sure.

4           **MR. MILIOTIS:**  Miliotis for Ranieri.

5      We anticipated calling Sergeant Harm today.  I understand,

6   in conversations with Mr. Barry, that he has a personal

7   situation.  So I'm wondering -- and he may not be available

8   tomorrow.  So I'm seeking some guidance to accommodate

9   Mr. Harm.  I'd -- we'd be calling him -- and what time of day

10  is best to accommodate his schedule in order to do that and fit

11  that into Mr. Boro's -- to the rest of the list that we have.

12       So I think I asked Mr. Barry earlier and told him that

13  we'd do our best to accommodate Sergeant Harm, but it sounds

14  like we need to get him on today if that's accurate.

15          **MR. BARRY:**  No.  We actually -- that's not accurate.

16  So let's -- can we do one thing at a time?  So, first, who are

17  the witnesses?

18          **THE COURT:**  All right.  So let's get to Mr. Boro's and

19  then we'll get to --

20          **MR. BORO:**  Yes.  But, Your Honor, I want to correct

21  one thing in the record.  The Government has made inconsistent

22  statements, in this proceeding, and then back in the mortgage

23  fraud proceeding.  And in the mortgage fraud, they did not

24  paint Mr. Foakes as any architect of this.  They pointed

25  Mr. Moynihan as an architect; but because of his prior criminal

PROCEEDINGS

1   record, he got a lengthy prison sentence because he had such an

2   extensive record.

3       The Government has in this proceeding tried to make it

4   appear as if Mr. Foakes was really the -- one of the prime

5   movers of the mortgage fraud, and --

6           **THE COURT:**  But it's -- I've already excluded that.

7   The jury is not hearing anything about it, so whatever

8   Mr. Barry says here is of no consequence in his

9   characterization.

10          **MR. BORO:**  I'm just concerned about how Mr. Barry

11  intends to cross-examine the witness who happened to file for a

12  loan application with Mr. Moynihan.

13          **THE COURT:**  Well, and I think I've already said that

14  mentioning Mr. Foakes is off limits; but mentioning Moynihan,

15  the conviction, involvement of members, you know, who happen to

16  be members of the HASC to which he may have had some

17  connection, that may be permissible but not to mention

18  Mr. Foakes.  So Mr. Foakes will not be mentioned on cross.

19          **MR. MILIOTIS:**  Miliotis for Ranieri.

20      There will be that instruction that Your Honor gives in

21  respect to any reference to HAMC members so that Ranieri is not

22  maybe grouped into that.

23          **THE COURT:**  He's not what?

24          **MR. MILIOTIS:**  He's not -- I think what Your Honor

25  just said was there was participation by Hells Angels members

PROCEEDINGS

 1    in that fraud.

 2              **THE COURT:**  The HASC, Sonoma.

 3              **MR. MILIOTIS:**  Was it SC?

 4              **THE COURT:**  Yeah.

 5              **MR. MILIOTIS:**  Okay.  I'm mistaken, Your Honor.  I'm

 6    sorry.

 7              **THE COURT:**  SC.

 8              **MR. MILIOTIS:**  Thank you.

 9              **MR. BORO:**  And, Your Honor, I even question if that's

10    a fair characterization because, again, Mr. Moynihan had a very

11    large business.  There are both legitimate loans and

12    illegitimate loans, is my understanding.  Yet the people

13    prosecuted were -- may be in a handful, and Mr. Barry would

14    know for sure, but my estimate of mortgage lendees might be in

15    the nature of 10 or 12, a high proportion of Hells Angels.  It

16    was clearly a case of selective prosecution because there were

17    so many loans written by that mortgage brokerage.

18         And now because the Government chose to target the Sonoma

19    Hells Angels, it wants to create the impression that this was a

20    Sonoma Hells Angel fraud or was done -- instigated by them.

21         The Government in its --

22              **THE COURT:**  Well, the Government should indicate in

23    its cross that there was no claim of enterprise involvement

24    here.  It just happens that some of the people who were

25    prosecuted were members of the HASC.

1      **MR. BORO:**  All right.  The way it was stated earlier

2  by Mr. Barry seems to be a bit broader.

3      **THE COURT:**  Well, I'll -- you can object and I will

4  correct him if he goes there.

5      **MR. BORO:**  Okay.  And --

6      **THE COURT:**  He can say that there were members who

7  were, but I think the jury should not be led to believe that

8  this was an enterprise prosecution.  It wasn't a RICO

9  prosecution.

10     **MR. BORO:**  And I would point out that the Government

11 represented -- in its filing Docket 84 in the mortgage fraud

12 case in front of Judge Alsup on January 6, 2012, the Government

13 stated that (as read):

14         "The defendant" -- referring to Mr. Foakes --

15     "was not the instigator of the conspiracy at issue in

16     this case; rather, he was one of many participants in

17     it, and his principal involvement was in signing his

18     names to documents (that others created) and were

19     false."

20     **THE COURT:**  I understand that.  Let's move on.  I

21 understand that.  You don't need to make a record anymore.

22 That's clear.

23     So who are your witnesses today?

24     **MR. BORO:**  Thank you, Your Honor.

25     **THE COURT:**  You're going to start off with whom?

PROCEEDINGS

1          **MR. BORO:**  Well, we're going to start off with

2    Mr. O'Brien, who I believe has arrived here.  I communicated

3    with him last night.

4          And -- I'm sorry, Your Honor.  Let me just -- then after

5    Mr. O'Brien, assuming -- and Ms. Page is downstairs, but we

6    would then proceed with Spencer Brady.

7          We had next Dale Dutton, but he is not here.

8          We had next, Steve Aiello.  I'm not sure if Mr. Walsh has

9    spoken to him.  He was subpoenaed to appear and was served with

10   a subpoena.

11         **MR. WALSH:**  Yes, good morning, Your Honor.

12         Sergeant Aiello was served in hand.  I have a copy of the

13   subpoena; I've yet to --

14         **THE COURT:**  Do you know if he's here?

15         **MR. WALSH:**  I have yet to hear from him.  I left

16   him -- my telephone number is on the return -- is on the

17   subpoena as well with the return, and I have yet to here from

18   him.  I've called the station and asked that he call me.

19         Here's a copy of the subpoena, Your Honor -- the return.

20         **THE COURT:**  All right.  Let me visit real quickly the

21   issue of Aiello and the interview.

22         If I were to allow the inquiry, because, again, it's the

23   same issue, was the silence and nonidentification of

24   Mr. Ranieri an implicit assertion that he was not involved, and

25   I think there's a very strong argument, at least looking at the

 1    transcript of the second interview, that the level of

 2    generality that Mr. Hardisty was describing what happened was

 3    not necessarily -- was not necessarily natural for him to have

 4    then identified everybody.  He didn't identify Nelson.  He

 5    didn't identify -- the only person he identified, I think, are

 6    Ott and Wendt as being involved.  He didn't go through everyone

 7    in that process.

 8         So I have doubts about whether or not that there -- that

 9    omission was an assertion, which you need in order to make an

10    inconsistent -- prior inconsistent statement.

11         On the other hand, out of an abundance of caution, I'm

12    willing to consider that since, you know -- one could argue

13    it's sort of a close call.  One could argue that, you know,

14    when going through this, he did mention people but he didn't

15    mention Mr. Ranieri; but we have the same problem, and that is

16    context.

17         Any time you deal with an omission, you have to have

18    context in order for a jury to figure out this is kind of weird

19    that he didn't mention this person.  You know, you have to know

20    what he said.  What was he talking about?  How general was he?

21    How specific was he?  What kind of things he said; and that,

22    again, suggests that -- and I can't remember, maybe that's why

23    we did this in the first trial, but I think -- did we play the

24    whole tape or --

25              MR. BARRY:  They redacted some of it, Your Honor, and

PROCEEDINGS

 1  then those redactions were removed because of counsel's

 2  argument during closing.

 3          THE COURT:  Okay.  But we played a substantial part of

 4  that interview so the jury could see the whole thing; and if

 5  we're going to go down that road, I would -- I feel like

 6  something similar should be done here.  You can't just say, out

 7  of context, he didn't mention it.  You've got to look at what

 8  he said throughout this thing.

 9      And, unfortunately, it's sort of like -- it's not just one

10  segment.  He talks about it, then he goes to something else,

11  then he talks about it again, and you have to kind of -- you

12  know, the jury will have to weigh that.

13      So my inclination is -- I don't know how long this tape

14  is.  Is it an hour or something?

15          MR. BARRY:  It's, I think, an hour, and the whole

16  thing is an hour and 40 minutes maybe.

17          THE COURT:  I don't know how the Government feels,

18  whether that can be redacted or just portions.

19          MR. BARRY:  No, Your Honor.  The Government's position

20  is that it shouldn't be admitted at all.  It's hearsay.

21          THE COURT:  I know that.  I know it shouldn't be

22  admitted at all; but if it is, what's your position about what

23  portion, if any, should be played for context?

24          MR. BARRY:  If it is, then the whole thing comes in,

25  but the point -- yeah, not the -- that's right, the portion

1  where he's talking about the Silva homicide should come in but

2  not the Knapp.  So there's like -- I think there's a 40-minute

3  chunk where O'Brien is speaking to --

4         THE COURT:  Right, and he wants information on the

5  Knapp thing, the PG&E thing.

6         MR. BARRY:  Exactly.  And he actually says "I don't

7  care about bombs and Hells Angels."

8         THE COURT:  All right.  So then that leaves about an

9  hour probably.

10        MR. BARRY:  Yup.

11        THE COURT:  So that would be my view about, you know,

12 if we go down that road.

13        But my view is, having read this, I don't think it's an

14 implied assertion within the meaning of the Second and

15 Ninth Circuit cases I cited yesterday; but out of an abundance

16 of caution, I'm willing to consider it because it's a close

17 enough call.

18        But if it is an assertion and it is deemed to be

19 inconsistent with this general allegation that Mr. Ranieri was

20 involved -- which, again, is a bit of a stretch because usually

21 the inconsistency is a square statement, you know, X and then

22 not X.  This is much more at a higher level generality, and I

23 don't know if there's very many cases that support that kind of

24 613 application.

25        But assuming that there is some leaping over two things to

1  kind of get there for the benefit of Mr. Ranieri, I do think

2  context matters when you're talking about omission; and I think

3  everything but the inquiry and the exchange about the Knapp

4  PG&E bombing would come in, as it did in the first trial.

5      And I assume the Defense has looked at it, and you might

6  want to think about whether that's what you want to do because,

7  frankly, when you look at it, I mean, some of this could have

8  come in as prior consistent statement because much of what he

9  says is very consistent with what he testified to.

10     So it's good with the bad.  The same kind of similar

11  problem with the -- that Mr. Boro is confronting.  When you do

12  an omission, you need context and that context sometimes is not

13  exactly everything you'd want it to be if you're an advocate,

14  but -- so in the interest of fair warning, that's where I'm

15  coming from.

16     **MS. PENG:**  Your Honor, if I could just really quick on

17  Spencer Brady because he's number two on their list.

18     I assume that Mr. Boro is going to adhere to the Court's

19  last ruling, which is Ms. Arianna Berg, which is the prior

20  prosecutor's reasons for making a request for dismissing the

21  assault charge for Mr. Verhagen, is not going to come in

22  because that's hearsay.

23     The only relevance of Mr. Brady's testimony is to impeach

24  Mr. Verhagen's testimony that he did not think that the federal

25  government was involved in the dismissal of that count.  So it

**PROCEEDINGS**

1    should be a very limited inquiry of Mr. Brady, and we should

2    also not have, you know, a recitation of his criminal history,

3    for example, through Mr. Brady.

4           **THE COURT:**  Well, I will be listening for that, so I

5    understand.

6           **MR. BARRY:**  Thank you, Your Honor.

7        So we're at O'Brien, Brady, possibly Aiello.

8           **THE COURT:**  And anybody else?

9           **MR. BORO:**  Yeah.  Dylan Fong, Jeremy Ford, Dana

10   Ruggard.  And that's all I have for today.

11          **THE COURT:**  Okay.  And what happened to -- Margaret

12   Chen is not going to testify?

13          **MR. BARRY:**  Yeah, I was informed that Margaret Chen

14   will not be testifying.

15          **THE COURT:**  Okay.

16          **MR. BARRY:**  And it appears that Jeronimo Jaco will not

17   be testifying as well.

18          **MR. BORO:**  Yes.  I think I'm leaning towards not

19   calling Mr. Jaco.

20          **THE COURT:**  Okay.  Okay.

21       All right.  We need to get going because, again, the jury

22   has been waiting.

23       Are they here?

24          **THE CLERK:**  They are.

25          **THE COURT:**  Okay.  Go get the jury.

PROCEEDINGS

1        You've got five minutes to --

2           MR. BARRY:  Five minutes?

3           MR. BABCOCK:  Take that five.

4           THE COURT:  Take that five.

5        Let's bring the witness in and then the jury.

6        (John O'Brien enters the courtroom and steps forward to be

7    sworn.)

8                    (Recess taken at 9:16 a.m.)

9                 (Proceedings resumed at 9:22 a.m.)

10          THE CLERK:  All rise for the jury.

11                 (The jury enters the courtroom.)

12   (Proceedings were heard in the presence of the jury.)

13          THE COURT:  Okay.  Please be seated, everyone.

14       And good morning once again, members of the jury.  Welcome

15   back.  I'm very pleased to see a sea of blue out there.

16   Strength in numbers; right?  That's what the motto is.  So,

17   great.  Thank you for your cooperation.

18       The Defense is still presenting its case -- their case,

19   and so it is their opportunity now to call their next witness.

20          MR. BORO:  Thank you, Your Honor.

21          THE COURT:  Okay.

22          MR. BORO:  The Defense calls John O'Brien.

23          THE COURT:  Okay.  Thank you.

24          THE CLERK:  If you could please stand.  Please raise

25   your right hand.

O'BRIEN - DIRECT / SHEKETOFF

1        <u>**JOHN O'BRIEN**</u>,

2    called as a witness for the Defendants, having been duly sworn,

3    testified as follows:

4              **THE WITNESS:**  I do.

5              **THE CLERK:**  Thank you.  Please have a seat.

6         Please speak clearly into the microphone.  State your

7    first and last name and spell your last name for the record.

8              **THE WITNESS:**  John O'Brien, O, apostrophe, B-R-I-E-N.

9              **THE COURT:**  Thank you, Mr. O'Brien.

10        You may proceed.

11             <u>**DIRECT EXAMINATION**</u>

12   BY MR. SHEKETOFF:

13   **Q.**   Good morning, Mr. O'Brien.

14        What did you do for a living before you retired?

15   **A.**   I was a special agent with the FBI.

16   **Q.**   And how long were you a special agent with the FBI?

17   **A.**   23 years.

18   **Q.**   And directing your attention to June of 2016, did you

19   participate in an interview of an individual by the name of

20   Joseph Hardisty?

21   **A.**   Yes, I did.

22   **Q.**   All right.  And how is it that you came to -- well, strike

23   that.

24        Where did you interview him?  Do you recall?

25   **A.**   It was -- he was in jail, but it wasn't Martinez.  I

1  forget.  It was a little farther north.  I think it was -- I

2  can't recall the jail, but it was up farther north than

3  Martinez.

4  **Q.**  CoCo County?

5  **A.**  I'm not sure.

6  **Q.**  Okay.  In any event, do you know if that interview was

7  tape recorded?

8  **A.**  Yes, it was.

9  **Q.**  And was that standard FBI practice in 2016, to tape record

10 interviews?

11 **A.**  No, it was not.

12 **Q.**  And why was this particular interview tape recorded?

13 **A.**  He was being interviewed by a District Attorney

14 investigator and a police officer, and I guess it was the jail

15 protocol to have it taped at that time.

16 **Q.**  All right.  And you participated in a portion of that

17 interview; is that fair to say?

18 **A.**  That is correct.

19 **Q.**  All right.  What was your purpose in being there?

20 **A.**  I was working another case.  A -- the PG&E substation

21 facility fire -- assault that happened in 2013, and the subject

22 that I had under investigation was someone that had known Jo Jo

23 for a short time before that period.

24 **Q.**  Okay.  And so was your purpose to see if Mr. Hardisty had

25 information and was willing to cooperate on the PG&E case that

1   you were investigating?

2   A.   That's fair to say, yes.

3   Q.   All right.  And during the course of your discussion with

4   him -- and I'm not asking for what he said, I'm asking for what

5   you said -- did you explain to him that if -- that you could do

6   right by him if he could help you out in your case?

7   A.   I did.

8   Q.   All right.  And did you tell him that you would need

9   something of evidentiary value in order to help him out in his

10  case?

11  A.   I used those words, yes.

12  Q.   So do you know what case, if any, he had pending at the

13  time you were having this discussion with him?

14  A.   A case that he had pending?

15  Q.   Yeah.

16  A.   The assault case?

17  Q.   He -- is it fair to say he had an assault case that, in

18  some fashion, you were involved in?

19  A.   I had investigated that, yes.

20  Q.   And had you, in connection with the Contra Costa District

21  Attorney's Office, brought charges against him for that assault

22  case that you had investigated?

23  A.   Against Jo Jo and the subject that I was investigating on

24  the PG&E case, yes.

25  Q.   Okay.  So both of them had been charged in a separate

O'BRIEN - DIRECT / SHEKETOFF

1   assault case, and you were investigating one of those two

2   people for the PG&E case?

3   A.   That's correct.

4   Q.   All right.  And did you, in fact, ever help him out on

5   that Contra Costa case?

6   A.   I did not.

7   Q.   And do you know what happened to that Contra Costa case?

8   A.   After the fact, I learned that it did get kicked -- on his

9   regard, it got kicked like four times over a year's period

10  because he was working with another federal agent.

11  Q.   Okay.  So you didn't personally do anything to help him

12  out with that case, but you learned that it kept getting

13  continued because of his work with another federal agent?

14  A.   Yes, and I kind of sponsored that.

15  Q.   All right.  Do you know -- what agent are you talking

16  about or agency?

17  A.   Agent Crumrine.

18  Q.   And he is also with the FBI?

19  A.   He was.

20  Q.   And he was -- how did you get him involved?

21  A.   After interviewing Jo Jo and feeling that he was

22  forthright with me but that he was cooperating on another

23  investigation, a gang investigation, I had learned that the DA

24  investigator that was working on that case had kind of lost

25  contact with Jo Jo.

1        And I was stationed out of the San Jose resident agency

2   office of the FBI; and I wasn't working those kind of gang

3   cases, but I had worked on a search warrant or something with

4   Agent Crumrine before, and a friend of mine was very good

5   friends with him, as they were both SWAT team members, and I

6   thought that it might be an opportunity for Agent Crumrine to

7   further that investigation, that -- and that gang case.

8   Q.   Okay.  So you had some contact with Agent Crumrine?

9   A.   I believe it was a telephone call.

10  Q.   And gave him the name of Joseph Hardisty?

11  A.   Yeah.

12  Q.   All right.  Who was at the interview that you did in June

13  of 2016 besides you?  Who were the local law enforcement?

14  A.   There was a DA investigator, his last name was Lynn; and

15  then there was a police officer.  I don't know if he was from

16  Antioch, but his last name, I believe, was --

17  Q.   Aiello?

18  A.   Yes, that's correct.

19  Q.   All right.  During your interview with Mr. Hardisty in

20  June of 2016, did you tell him that you had cell phone records

21  and you knew where his cell phone was hitting off of specific

22  cell towers in connection with the PG&E investigation?

23  A.   I did say that, yes.

24  Q.   All right.  And this was your first meeting with him;

25  correct?  And only meeting with him?

**O'BRIEN - DIRECT / SHEKETOFF**

1  **A.**   Correct.

2  **Q.**   And did you, in fact, have records, cell tower records,

3  for him?

4  **A.**   I did.

5  **Q.**   And for what period of time were those cell tower records?

6  **A.**   I did a court order in late 2013.  It would have been

7  November or December.  So it would have been from some time

8  period prior to the PG&E shooting up to that date.

9  **Q.**   All right.  Did you ever share those cell tower records --

10  or call detail records that you obtained for Joseph Hardisty

11  with Agent Crumrine?

12  **A.**   I did not.

13  **Q.**   Did he ever ask you for them?

14  **A.**   We did not collaborate on his investigation whatsoever.

15  **Q.**   Okay.  All you did was get him in touch with Mr. Hardisty?

16  **A.**   I didn't even go that far because I had no idea how to

17  contact him.

18  **Q.**   Okay.

19  **A.**   So it was on him to investigate.  I don't know how he came

20  to come in contact with Mr. Hardisty.

21  **Q.**   So all you really did was tell him about Mr. Hardisty's

22  existence?

23  **A.**   Yes.  I told him it might be a good opportunity for the

24  investigation.

25  **Q.**   Is there an expression called "get on the bus" that you're

O'BRIEN - CROSS / BARRY

1    familiar with?

2    **A.**    Yeah.  It's something I made up.

3    **Q.**    Okay.  And during the course of your interview with

4    Mr. Hardisty, did you, in fact, tell him something along the

5    lines of "You can get on the bus and we can help you out if you

6    get on the bus"?

7    **A.**    Words to that effect, yes.

8    **Q.**    What does "get on the bus" mean, at least to you?

9    **A.**    That he's going to cooperate with our investigation.

10   **Q.**    And get a benefit for doing that?

11   **A.**    Yes.

12   **Q.**    Thank you, sir.

13           **THE COURT:**  All right.  Any further -- any cross from

14   the Defense?

15           **MR. BORO:**  No, thank you, Your Honor.

16           **THE COURT:**  All right.  From the Government?

17                        **CROSS-EXAMINATION**

18   BY MR. BARRY:

19   **Q.**    Good morning, Special Agent.

20   **A.**    Good morning.

21   **Q.**    The "get on the bus" phrase, that bus was only related to

22   the PG&E investigation; isn't that right?

23   **A.**    Absolutely.

24   **Q.**    Did you have any interest in the Hells Angels

25   investigation at all?

```
1    A.    I did not.

2    Q.    And when you were indicating to Mr. Hardisty that it would

3    be good for him to give you something of evidentiary value, you

4    were only talking about the PG&E investigation; right?

5    A.    That is correct.

6    Q.    When Mr. Hardisty testified earlier, you weren't here, but

7    he described the Contra Costa assault case as flimsy.  Would

8    you describe that as accurate?

9    A.    Yes.

10   Q.    Did the DA's Office actually have any interest in

11   prosecuting that case at all?

12   A.    I had to beg them to file the complaint.

13   Q.    And then the PG&E shooting that you were focused on, that

14   was in 2013; is that right?

15   A.    That's correct.

16   Q.    And I think you -- well, let me ask you this first:  Did

17   Mr. Hardisty actually know anything about the PG&E shooting?

18         MR. SHEKETOFF:  Objection, Your Honor.

19         THE COURT:  Overruled.

20         THE WITNESS:  He did not.

21   BY MR. BARRY:

22   Q.    And did you describe him on direct as being forthright and

23   cooperative?

24         MR. SHEKETOFF:  Objection, Your Honor.

25         THE COURT:  Overruled.
```

1    THE WITNESS:  I did.

2    BY MR. BARRY:

3    Q.   Thank you, sir.

4        MR. BARRY:  Thank you, Your Honor.

5        THE COURT:  Okay.  Thank you.

6        Anything on redirect?

7                    REDIRECT EXAMINATION

8    BY MR. SHEKETOFF:

9    Q.   So what had Mr. Hardisty done that caused you to bring an

10   assault case against him in Contra Costa County?  What were the

11   underlying facts as you understood them?

12   A.   I had been monitoring jail calls of my subject on the PG&E

13   investigation; and through an investigation of those jail

14   calls, my subject mentioned that while he was in jail, another

15   individual showed up at jail and he told someone else, not

16   Mr. Hardisty, but he -- in speaking to somebody else, he had

17   mentioned this guy came into jail and he said, "Jo Jo and I put

18   such a beating on him that he wasn't" -- he didn't even look at

19   my subject.

20   Q.   All right.  So your understanding, from jail calls, not

21   Mr. Hardisty's jail calls but the subject of your investigation

22   on the PG&E shooting, was that that person and Mr. Hardisty had

23   put a severe beating on another individual?

24   A.   He and Matthew Knapp, yes.

25   Q.   Yeah.  So Matthew Knapp was the person that you were

 1    investigating for the PG&E.

 2         And what was the time frame of that severe beating?

 3    A.    It was April 1st, 2013.

 4    Q.    Okay.  Now, sir, as I understand your testimony, based on

 5    what Mr. Hardisty said to you that day, you concluded, in your

 6    mind, that he was being truthful with you about his lack of

 7    involvement in the PG&E shooting?

 8    A.    Yes.

 9    Q.    All right.  Did your phone records indicate that -- well,

10    did your phone record -- your call detail records lead you to

11    believe that he may have been involved, in some fashion, with

12    Mr. Knapp in the shooting up of this PG&E substation?

13    A.    That part of the investigation that involved the cell site

14    towers was in an area that I believe the potential weapon came

15    from that shot up that facility, and Jo Jo's cell phone towers

16    were in an -- his cell phone pinged off of towers that were

17    close to a resident that I had -- resident address that I had

18    under investigation.

19    Q.    All right.  And you believe that that residential address

20    was connected to the weapon that Matt Knapp had used to --

21              MR. BARRY:  Objection.  Leading.

22              THE COURT:  Overruled.

23              THE WITNESS:  I believe it was possible.

24    BY MR. SHEKETOFF:

25    Q.    Okay.  And so it was an investigative lead that you were

1  following up and that's why you wanted to talk to him?

2  **A.**   That is correct.

3       **MR. SHEKETOFF:**  Thank you, sir.

4       **THE COURT:**  All right.  Anything further?

5                    **RECROSS-EXAMINATION**

6  BY MR. BARRY:

7  **Q.**   Special Agent, you were just asked about your analysis of

8  Mr. Hardisty's phone records.

9  **A.**   Mm-hmm.  Yes.

10 **Q.**   Have you had the opportunity to review Mr. Hardisty's

11 phone number in 2013 versus his phone number in 2014?

12      Let me ask a better question.  Did he have the same phone

13 number?

14 **A.**   No, he did not.  It -- I can't remember when it -- but I

15 just looked at the number that I had for 2013.

16 **Q.**   And the number you had for 2013 is different than the

17 number he had in 2014?

18 **A.**   Yes.

19 **Q.**   Okay.  Thank you.

20      **MR. BARRY:**  Thank you, Your Honor.

21      **THE COURT:**  All right.  Anything further?

22      **MR. SHEKETOFF:**  Just one question.  Can I ask it from

23 here?

24      **THE COURT:**  You can do it from there.

25 \\\

1                     <u>FURTHER REDIRECT EXAMINATION</u>

2   BY MR. SHEKETOFF:

3   **Q.**   Did he have two phones?

4   **A.**   I don't believe so.

5              **MR. SHEKETOFF:**  Thank you, sir.

6              **THE COURT:**  Okay.  Anything further?

7              **MR. BARRY:**  No, thank you, Your Honor.

8              **THE COURT:**  All right.  Thank you.

9         Then, Mr. O'Brien, you are excused.  You may step down.

10  Thank you.

11                     (Witness excused.)

12             **THE COURT:**  All right.  Defense is ready to call their

13  next witness?

14             **MR. BORO:**  Yes, Your Honor.  The Defense is going to

15  call Spencer Brady.

16             **THE COURT:**  Okay.

17        (Spencer Brady enters the courtroom and steps forward to

18  be sworn.)

19             **THE CLERK:**  Please raise your right hand.

20                     <u>**SPENCER BRADY**</u>,

21  called as a witness for the Defendants, having been duly sworn,

22  testified as follows:

23             **THE WITNESS:**  Yes, I do.

24             **THE CLERK:**  Thank you.  Please have a seat.

25        Please speak clearly into the microphone.  State your

BRADY - DIRECT / BORO

1    first and last name and spell your last name for the record.

2              **THE WITNESS:**  My name is Spencer Brady.  Last name is

3    spelled B-R-A-D-Y.

4              **THE COURT:**  All right.  Thank you, Mr. Brady.

5         You may proceed, Mr. Boro.

6              **MR. BORO:**  Thank you, Your Honor.

7                         <u>**DIRECT EXAMINATION**</u>

8    **BY MR. BORO:**

9    **Q.**   Good morning, Mr. Brady.

10   **A.**   Good morning.

11   **Q.**   My name's Albert Boro.  I represent defendant Raymond

12   Foakes.

13        And we spoke previously on the telephone, haven't we?

14   **A.**   Correct.

15   **Q.**   And I provided -- you had testified in a prior proceeding,

16   had you not?

17   **A.**   I did, in this same courtroom.

18   **Q.**   Okay.  And I provided you a copy of your prior testimony

19   so you could take a look at that in advance?

20   **A.**   Correct.  I have a copy of that.

21   **Q.**   Great.

22        So let me ask you some questions.  First, just for

23   background for the jury, how old are you?

24   **A.**   I'm 59.

25   **Q.**   And what city do you live in?

**BRADY - DIRECT / BORO**

1   A.   Santa Rosa.

2   Q.   And what is your occupation?

3   A.   I'm a Chief Deputy DA in Sonoma County.

4   Q.   So you work for the Sonoma County District Attorney's

5   Office?

6   A.   Correct.

7   Q.   How long have you worked for them?

8   A.   Since January of 1993.

9   Q.   And how long have you been an attorney?

10   A.   Since October of 1992.

11   Q.   Was this your first job after graduating?

12   A.   No.  I worked briefly in Yolo County DA's Office as well.

13   Q.   And in the Sonoma District Attorney's Office -- well, let

14   me ask you this:  Your position of Chief Deputy District

15   Attorney, what is that position?

16   A.   I have general supervisory duties for the office.  It's an

17   office of about 130 people, approximately 50 attorneys.  I work

18   as part of a team of managers.  I supervise our felony trial

19   team along with other chiefs who supervise various divisions

20   within the office.

21   Q.   And how long have you held the position of Chief Deputy

22   District Attorney?

23   A.   Since 2006, I think.

24   Q.   So I want to focus your attention on the time period of

25   2013-2014 and ask if you recall the name Steve Verhagen.

**BRADY - DIRECT / BORO**

1   **A.**   I do.

2   **Q.**   And what -- do you recall that -- in that time period of

3   2013-2014?

4   **A.**   In 2014, in March, I first became aware that my office was

5   prosecuting Mr. Verhagen.  One of my felony prosecutors sent me

6   an e-mail and told me that the U.S. Attorney had expressed some

7   interest in that case.

8   **Q.**   And what was your understanding of the charges that your

9   office was prosecuting against Mr. Verhagen in 2014?

10  **A.**   So when I got that e-mail from my prosecutor, I looked up

11  Mr. Verhagen's cases.  He had two felony cases that were

12  currently pending; one involved a felony assault in the jail

13  and the other case involved possession of methamphetamine, a

14  firearm, and some ammunition.  Those were two separate cases,

15  the assault versus the methamphetamine and guns -- or gun,

16  single gun.

17  **Q.**   Was Mr. Verhagen in the Sonoma County jail at this period

18  of time?

19  **A.**   He was.

20  **Q.**   And did the assault case, the assault in a correctional

21  facility, did that occur while he was being held in jail on the

22  possession of methamphetamine and gun case?

23  **A.**   I think so, yes.

24  **Q.**   And did you, based on your experience as a District

25  Attorney or in the District Attorney's Office, did you have an

1  understanding of what sort of prison exposure Mr. Verhagen was

2  looking at for each of those cases?

3  **A.**   I did.

4  **Q.**   So first, for the case of the possession of

5  methamphetamine, possession of a firearm, what were the general

6  charges and the exposure faced by Mr. Verhagen?

7  **A.**   He had two charges involving a firearm.  It was the same

8  firearm.  They were sort of overlapping or alternate charges.

9  He had a -- another charge involving possession of ammunition,

10  and then he had a fourth charge of possession of

11  methamphetamine.  And those were all nonserious and nonviolent

12  felonies.  The maximum by law was three years for those counts

13  individually, but they don't aggregate.  You don't stack them

14  up one on top of the other under our sentencing laws.

15      He also had two strikes for prior convictions that he had

16  received, and that could have elevated his sentence in that

17  case as well.

18  **Q.**   So those two strikes for prior felonies, those would have

19  applied in the meth and gun case at the time?

20  **A.**   So right around that time, I think it was January of 2013,

21  Proposition 36 was passed, and it changed the way the three

22  strikes law applied to those charges.

23      Since they were nonserious felonies and nonviolent

24  felonies, the three strikes law would not apply.  He would not

25  have been exposed to 25 to life, which would have been the

1    sentence in the -- or potential sentence in the jail assault

2    case.

3         But because of the nature of these charges being less

4    serious and nonviolent, that law didn't apply.  It applied in

5    2013 -- well, it applied at the time that we charged the case,

6    but the law changed after that.  So --

7    **Q.**   Oh, I'm sorry.

8         So when he was originally charged in the meth and gun

9    case, they -- the prior strikes, the two prior strikes, were

10   alleged because the law allowed them to be alleged at that

11   time; and then by the time you were contacted in -- was that

12   February 2014?

13   **A.**   March.

14   **Q.**   March 2014.  By that time, the new -- the change in the

15   law had taken effect?

16   **A.**   Correct.

17   **Q.**   And so was it -- then it sounds like your assessment at

18   the time was that on the guns and meth case, his maximum

19   sentence probably would have been 3 years, but technically he

20   could be sentenced up to 12 years if the judge decided to do

21   so, if he ran them consecutively?

22   **A.**   Not quite.  So let me -- if I can clarify that.

23   **Q.**   Yes, please.

24   **A.**   So each of these charges has a maximum of three years; but

25   under the California -- what's called the determinate

**BRADY - DIRECT / BORO**

1  sentencing laws in the State of California, the way you would

2  calculate that sentence is that you could only get a maximum of

3  three years on a single felony in that case, and then the gun

4  charges would have -- and the ammunition charges would have

5  merged into a single sentence.  You couldn't be sentenced

6  consecutively on all those charges because they related to the

7  same gun, the same incident.

8      The methamphetamine theoretically could have been

9  sentenced consecutive to the maximum of three years, and that

10 methamphetamine maximum penalty would have been an additional

11 eight months that theoretically could be added consecutive.

12     So the maximum potential full sentence on that case was

13 three years, eight months.  The strikes no longer applied; and

14 that's not to say that the maximum would have been imposed, but

15 that's how I would have calculated the maximum at that time.

16 **Q.**   Okay.  Thank you.

17     And then on the second case for the felony assault in a

18 correctional institution, what was your understanding of the

19 potential maximum sentence he faced there?

20 **A.**   The assault was charged in two different ways, two

21 different felonies.  One was a felony assault.  The other was a

22 felony battery.  Those two charges would have merged for the

23 purpose of sentencing because it was a single incident and the

24 charges were essentially the same or similar charges.

25     So for that charge, it would have been 25 to life

 1  calculated as the plea to one or both of those felony charges;

 2  and then under the three strikes law with the two prior

 3  strikes, if they had been admitted or convicted at trial, it

 4  would have resulted in a 25 to life sentence.

 5       There were two additional allegations involving what we

 6  called prison priors, where he had previously served a prison

 7  term, and each of those prison priors was worth an additional

 8  year.

 9       So that would have resulted in a maximum potential prison

10  term of 27 years to life.

11  **Q.**   And so it seems that the assault, the felony assault in a

12  correctional institution, was the more serious of the two cases

13  Mr. Verhagen was charged with?

14  **A.**   Correct.

15  **Q.**   And did you -- in looking at Mr. Verhagen's case after you

16  got this inquiry, did you look at all of the underlying facts

17  of either case?

18  **A.**   My prosecutor did.  My prosecutor and I discussed it.  I

19  don't know that I went through and read the reports on the jail

20  assault.  I may have.  But I know that I discussed the facts

21  with my prosecutor, who -- I believe, he summarized the nature

22  of the case.

23  **Q.**   And in making a decision about this inquiry from the

24  U.S. Attorney's Office -- it was from the U.S. Attorney's

25  Office, the inquiry?

BRADY - DIRECT / BORO

1    **A.**   Correct.

2    **Q.**   And you would want to have a general understanding of the

3    underlying cases Mr. Verhagen was facing in order to assess?

4          **MS. PENG:**  Objection.  Leading.

5          **THE COURT:**  Overruled.

6          **THE WITNESS:**  I was familiar with the charges.  I

7    obviously understood, you know, what they -- what they mean in

8    terms of exposure.

9    **BY MR. BORO:**

10   **Q.**   Did you -- did you have an understanding on the felony

11   assault and correctional institution, that particular charge,

12   that Mr. Verhagen had put someone else up to participate in

13   this offense?

14   **A.**   I'm not familiar with that.  I don't think I was aware of

15   that at the time.

16   **Q.**   And the inquiry, then, that came in March 2014, what do

17   you generally recall about that?

18   **A.**   I got an e-mail from my prosecutor telling me that the

19   U.S. Attorney's Office had expressed interest in possibly

20   working with Mr. Verhagen, and that I'd be getting a call from

21   someone at the U.S. Attorney's Office.

22       Shortly after that, I got a call from Mr. Frentzen, who

23   was a supervisor -- I don't know what his title was -- in the

24   U.S. Attorney's Office.  He told me that one of his Assistant

25   U.S. Attorneys would be calling me shortly to discuss the case.

1    He said he would like me to talk with her and see if there was

2    some way to reach some kind of an agreement about a disposition

3    of Verhagen's cases.

4         Shortly after that, I got a call from an Assistant

5    U.S. Attorney and we had that conversation.

6    Q.   And what was the name of that Assistant U.S. Attorney?

7    A.   I believe it was Ms. Berg, Arianna Berg.

8    Q.   And when you had the initial conversation with

9    Mr. Frentzen, did he tell you why he wanted to work out

10   something with Mr. Verhagen -- or for Mr. Verhagen?

11             MS. PENG:  Objection.  Hearsay.

12             THE COURT:  Sustained.

13   BY MR. BORO:

14   Q.   Did you -- after that call with Mr. Frentzen, did you

15   have -- did you reach any understanding or conclusions as to

16   how it was appropriate to proceed in Mr. Verhagen's case at

17   that point?

18   A.   Well, it was just a request that I talk the case over with

19   his Assistant U.S. Attorney the next day, that they were

20   interested in possibly working with Mr. Verhagen.  So it was

21   more of an introductory phone call and a request for me to

22   discuss the case with his assistant.  We didn't get into a lot

23   of details at that time.

24   Q.   Okay.  And then Ms. Berg called you the next day?

25   A.   Well, shortly after.  It could have been the next day or a

BRADY - DIRECT / BORO

1    couple days later.

2    Q.    And there, did she -- did she make a request to you

3    concerning Mr. Verhagen?

4    A.    Well, it was more in the way of a conversation.  She asked

5    me questions about the case.  I talked with her about what her

6    goal was or what her expectations were.  So it was a back and

7    forth.  She didn't, you know, immediately start off by asking

8    me for anything in particular.

9          As the conversation evolved, we did get into some

10   specifics in terms of what I thought would be reasonable and

11   what she would prefer to see happen.

12   Q.    And when you were on -- just focusing on your end of the

13   conversation, when you were considering what was reasonable,

14   what do you mean by that?

15   A.    I mean that I wanted to do what I thought was just and

16   fair with regard to Mr. Verhagen, and I also wanted to be of

17   assistance to the U.S. Attorney's Office's investigation and

18   help that to be productive, if that was possible.

19   Q.    And did you reach -- did you come to an understanding that

20   the U.S. Attorney was reaching out to you because they wanted

21   Mr. Verhagen's cooperation in an investigation?

22   A.    Yes.

23   Q.    And did you reach -- did you, in your mind, form the view

24   that in order to obtain that cooperation, that they were

25   looking for you to make some sort of accommodation to

1    Mr. Verhagen on the two pending state charges?

2    **A.**   Yeah, exactly.  There was a goal to reach some kind of a

3    plea agreement.  This was prior to a preliminary hearing.  The

4    proceedings hadn't gone very far.  And I understood exactly,

5    you know, what the nature of the request was.

6        It's not uncommon for me, as a chief, to weigh in on plea

7    bargains in my office, particularly in cases involving,

8    you know, serious or violent felonies, three strikes cases,

9    things like that.  So I understood the general request.

10       After that phone call, I talked with the prosecutor on the

11   case to get some more background.

12   **Q.**   And did you -- did you come up with a proposal to resolve

13   Mr. Verhagen's case for his cooperation?

14   **A.**   I did.

15   **Q.**   And how did you come up with that proposal?

16   **A.**   It was in discussions with Ms. Berg and with the

17   prosecutor that was assigned to the case, and just evaluating

18   his history, the facts, and his proposed cooperation with the

19   U.S. Attorney's Office.  I took all of that into account.

20   **Q.**   And was it your view then, when you came up with a

21   proposed resolution for Mr. Verhagen, that this would give an

22   incentive for Mr. Verhagen to cooperate with federal

23   prosecutors?

24   **A.**   I think, if I remember correctly, that was explicit in the

25   terms of the agreement.

**BRADY - DIRECT / BORO**

1          What I wanted out of the case was to make sure that he

2    received a prison commitment as a result of our County's

3    prosecution and that we secured his agreement to be cooperative

4    with the investigation by the U.S. Attorney's Office.

5    **Q.**   So for coming to this accommodation with him, part of the

6    calculus was it's important that he actually give some benefit

7    back to the Government, albeit the U.S. Government, if he's

8    going to be getting this break from your office; is that fair

9    to say?

10          **MS. PENG:**  Objection.

11          **THE COURT:**  Overruled.

12          **THE WITNESS:**  Yeah.  I would -- if you want to call it

13   a benefit, that he would cooperate with their investigation.

14   **BY MR. BORO:**

15   **Q.**   And what was the resolution then that you approved of the

16   two pending cases against Mr. Verhagen in 2014?

17   **A.**   So he was ultimately sentenced to two years in prison as a

18   result of a plea to the methamphetamine charge, and the gun

19   charges in that methamphetamine case were dismissed and the

20   jail assault case was also dismissed.

21   **Q.**   And -- did you -- do you have an understanding if -- at

22   the time that Mr. Verhagen was sentenced to the two years on

23   the meth charge, if that would result in any additional prison

24   time beyond the time he had already served in county jail?

25   **A.**    I've looked at the date of the offense on that, and it

1   hadn't even been a year from the time of that offense until the

2   time that he entered his plea.

3       On a two-year prison sentence, generally you would serve

4   at least half that.  You'd get credits, conduct credits,

5   potentially, against that prison sentence.  So I haven't

6   calculated day for day what his credits would have been, but

7   I -- I don't think he would have served his entire term by the

8   time he entered his plea, just based on the dates of the

9   offense and the date of his plea.

10  **Q.**  And the -- was -- do you recall if the date of that

11  offense was roughly in July 2013?

12  **A.**  I can look at the complaint itself.  I brought it with me.

13  **Q.**  That would be helpful, if you could.

14  **A.**  (Witness examines document.)  Yes, that's correct, in July

15  of 2013.

16  **Q.**  And so if Mr. Verhagen went in for a final resolution of

17  this meth and gun case in July of 2014, is it reasonable to

18  assume that he probably would have already served enough time

19  with credit for time served, for good time credit, to be able

20  to be released?

21  **A.**  I can't tell you for sure that that's correct.  I think

22  it's possible.  It's certainly possible.

23      I don't know if his disposition was in July, but this

24  conversation that I was involved in was in March.  So that's

25  why I'm saying it was less than a year at the time that at

1    least in my mind, I had arrived at that offer.  It was close to

2    a year but not quite a year.

3          So, yes, if he had been sentenced around July of 2014,

4    then he probably would have been very close to serving his

5    ultimate period of incarceration on that two-year sentence

6    because you would normally serve about a year of that two

7    years.  So that's -- that's close.

8    **Q.**   Okay.  And your expectation then in -- when you approved

9    this resolution in March, you had an expectation that he

10   probably would have to serve at least another four or five

11   months?  Is that fair to say?  As of March 2014?

12   **A.**   June -- July -- well, he would have had a prison

13   commitment; and how much time he actually served in prison, I

14   didn't calculate that.  I didn't really have a number of months

15   in mind.  I just wanted to make sure that he didn't get a

16   probation sentence, that he got a prison sentence.

17         And the -- the two years is the middle term of the

18   sentencing triad or the options that the Court has.  There's a

19   low term, a middle term, and a high term.  Two years was the

20   middle term.  I didn't really calculate how many actual days

21   he'd serve in prison, but I did expect that he would serve at

22   least some time in prison.

23   **Q.**   Well, did he -- do you know if he served the remainder of

24   his term in the Sonoma County jail or if he was sent somewhere

25   else?

BRADY - CROSS / PENG

1    **A.**    I don't know the answer to that.

2    **Q.**    And do you know if he started cooperating with the federal

3    prosecutors while in the Sonoma County jail?

4    **A.**    I don't know the answer to that.

5    **Q.**    And as part of this resolution, then he was -- you

6    dismissed the felony assault in a correctional institution

7    charge, didn't you?

8    **A.**    I did.

9    **Q.**    And that was the most serious charge he was facing of the

10   three?

11   **A.**    Correct.

12   **Q.**    And so by entering this resolution with you to cooperate

13   with the U.S. Attorney's Office, is it fair to say that he

14   avoided exposure on a case that was 27 years to life?

15   **A.**    That's the maximum potential exposure; that's correct.

16          **MR. BORO:**  Thank you very much.

17          **THE COURT:**  All right.  Any further cross by the

18   Defense?

19          **MR. MILIOTIS:**  No, Your Honor.

20          **THE COURT:**  Okay.

21          **MR. BARRY:**  Cross by the Government?

22                    <u>CROSS-EXAMINATION</u>

23   BY MS. PENG:

24   **Q.**   Good morning, Mr. Brady.

25   **A.**   Good morning.

**BRADY - CROSS / PENG**

Q.    So you and I don't work at the same office; correct?

A.    Correct.

Q.    So what is the difference between my office and your office, generally speaking?

A.    So my office is the District Attorney's Office for the County of Sonoma.  There are 58 counties throughout the state of California.  The District Attorney is an elected official, elected locally, and we have a general responsibility for prosecuting criminal offenses that occur within Sonoma County. So our jurisdiction ends at the county borders.  And we prosecute basically street crimes; and we use, for the most part, the California Penal Code.  It's state law.

      Your office and my office don't work together frequently. We have different bosses, different chain of command.  The U.S. Attorney is appointed, so it's a whole different office.

Q.    So is it fair to say that you prosecute state crime within Sonoma County, generally speaking, and the U.S. Attorney's Office prosecutes federal crime?

A.    That's correct.

Q.    And they are two independent agencies?

A.    Completely independent.

Q.    And you've not worked with the Prosecution team on this case; correct?

A.    Not at all.

Q.    Or you've not been involved, except for the Verhagen

1   aspect of it, in any of the investigation in this case?

2   **A.**    That's correct.  I don't -- I don't know anything about

3   this case that you're currently prosecuting.

4   **Q.**    And is it fair to say, though, sometimes if there's

5   overlap between our two offices, there might be consultation

6   amongst the prosecutors?

7   **A.**    Sure.  It's not common, but it does happen.

8   **Q.**    And that is what happened with respect to Mr. Verhagen, it

9   sounds like.

10  **A.**    That's right.

11  **Q.**    And so if you have a conversation with the U.S. Attorney's

12  Office, how do you take kind of that conversation into account

13  in terms of your cases?

14  **A.**    Well, our -- you know, our goal is to do justice, to do

15  what we think is right under the law.  And so to the extent

16  that the U.S. Attorney's Office reached out to me to talk to me

17  about the possibility of plea bargaining my case to facilitate

18  further investigation of criminal matters at the federal level,

19  I think we had a parallel interest in trying to, you know,

20  prosecute crime.

21       So it was a friendly conversation, a professional

22  conversation, but there's no chain of command or authority.  I

23  wasn't taking directions or orders from anybody.  It was just

24  more of a -- I guess, an agency -- cooperative relationship.

25  **Q.**    Right.  Because if somebody potentially is cooperating for

BRADY - CROSS / PENG

1    the federal government, you would consider that, you know, part

2    of the consideration of what's just in a particular case;

3    right?

4    A.    Exactly.

5    Q.    And in your capacity now as Chief Deputy District

6    Attorney, you've also taken into consideration if a particular

7    defendant might be cooperating; you would take that into

8    consideration in terms of coming up with what is a just

9    resolution?

10   A.    Yeah, I've done that hundreds of times, both as a line

11   prosecutor and as a chief; and it's very normal for me to make

12   an offer to a defendant in exchange for either their testimony

13   or their agreement to cooperate with law enforcement in some

14   other way.  That's a normal part of what we do.

15   Q.    And so it's fairly routine, when someone cooperates, that

16   they would get some consideration even in the sentencing or the

17   charges or the resolution?

18   A.    That's absolutely correct.

19   Q.    Now, I want to ask you a little bit about the maximum

20   exposure that we've been talking about.

21         So can you just tell me first, what is a maximum exposure?

22   A.    Yeah.  So it's a -- it's a number that you come up with to

23   tell a defendant that basically if they go to trial and they're

24   convicted of everything at trial, that the worst-case scenario

25   for them, if the judge wanted to lock them up for as long as

BRADY - CROSS / PENG

1    possible, that's the number.

2        So I do that calculation.  Frequently when I'm plea

3    bargaining a case with a Defense attorney, I'll tell them what

4    my calculation is for their client's maximum exposure; and it's

5    certainly a possibility, but I wouldn't say that getting the

6    maximum term is common.

7    Q.   Right.  And you just described it as the worst-case

8    scenario?

9    A.   Correct.

10   Q.   So how frequently -- how common is it for someone to

11   actually get the worst-case scenario?

12   A.   You know, sometimes the statutes mandate a sentence, the

13   worst-case scenario.  For example, murder is statutorily

14   defined, what that sentence is.

15       Three strikes is also statutorily defined in terms of 25

16   to life, which was the maximum but plus those two prison

17   priors.

18       There are two ways that that maximum would not be imposed,

19   and one is if my office decided to strike one or two or more

20   strikes in the interest of justice, which is something we did

21   frequently.

22       And the judge also has that same discretion.  So if a

23   defendant were to plead to everything that he was charged with

24   and go to sentencing before the Court, the Court had authority,

25   and would frequently exercise its authority, to strike one or

**BRADY - CROSS / PENG**

1  more of those strikes, which would then reduce the maximum

2  sentence from 25 to life to something as low as potentially

3  even probation or some single term in prison of anything from a

4  couple years to more than a couple years.

5  **Q.**   So it's actually not uncommon for someone facing three

6  strikes on paper to actually get probation or just a couple of

7  years when everything is said and done?

8  **A.**   Yeah.  It totally depends on the case, the nature of the

9  case.  I've struck the strikes in three strikes cases many

10  times, for a whole variety of reasons.  Sometimes it has to do

11  with the strength of the case.  Maybe the case has problems

12  with proof, we just don't have the witnesses that we need, that

13  kind of thing.

14      Sometimes it's just in the interest of justice because the

15  nature of the underlying offense wasn't egregious or serious or

16  the prior strikes were distant in time.

17      So there are a lot of variables that go into deciding

18  essentially what -- when we talk about it, we say:  What is

19  this case worth?  So in terms of deciding what the case is

20  worth, there are a number of factors that go into that.

21  **Q.**   And when you're -- so is it fair to say that outside of a

22  mandatory sentencing situation, that it's fairly uncommon for

23  someone to actually get the maximum exposure?

24  **A.**   That's -- that was true in 2013.  That's even more true

25  now.

1  Q.   And when you're describing what a case is actually worth,

2  so you're not talking, then, about the maximum exposure, but

3  that's more what the person actually might receive as a

4  sentence; is that -- is that true?

5  A.   Right.  So, you know, more than 90 percent of our cases in

6  Sonoma County result in some type of plea agreement.  We can't

7  go to trial on every case.  We prosecute thousands of cases

8  every year.  So the vast majority of our cases are plea

9  bargained to something less than the maximum term, including

10  three strikes cases.

11  Q.   And so when you're negotiating with Defense counsel with

12  respect to a plea bargain, you're most of the time talking

13  about what the case actually is worth and not the maximum

14  exposure; is that fair to say?

15  A.   Yeah.  Well, what it's worth and what we can prove.  I

16  mean, the whole back and forth between me and a Defense

17  attorney is, you know, they may have defense issues that they

18  plan to raise and they think that maybe I can't prove one or

19  more of these charges.

20      Just because they're charged, you know, we still have to

21  go to trial, we still have to prove them beyond a reasonable

22  doubt.  So we have those kinds of discussions about what is

23  realistic.  Not in terms of just what maybe I think this

24  particular defendant should receive as a sentence, but what can

25  my office actually prove beyond a reasonable doubt.  So we have

**BRADY - CROSS / PENG**

1  those discussions back and forth.  Eventually we end up at some

2  kind of a compromise in the vast majority of cases.

3  **Q.**   And in terms of that compromise, though, like, if there's

4  a number in terms of a range of years that's being offered,

5  that is not the maximum penalty usually?

6  **A.**   That's absolutely right.  Yeah, oftentimes it's far less

7  than the maximum.

8  **Q.**   And so let me ask you about Mr. Verhagen in particular.

9  You mentioned that, I think it was in 2013, that Prop. 36 was

10  passed?

11  **A.**   I think that's right.

12  **Q.**   And so the charge for the meth possession and the guns for

13  him would not have counted, in 2014, as a third strike for him?

14  **A.**   That's correct.

15  **Q.**   And so the actual maximum penalty for that charge that he

16  was facing on the state side, I think you said, was three years

17  plus eight months?

18  **A.**   Yeah.  You -- you could get probation.  You could get a

19  maximum of three years for one of those felonies and then an

20  additional potential eight months consecutive.  That would be

21  the maximum.

22      It would be very common, in a case like that, to run the

23  eight months concurrent or -- the math is a little different,

24  but basically it would be very normal for a case like that to

25  result in a maximum of actually three years, not three years,

**BRADY - CROSS / PENG**

1    eight months.

2    **Q.**   I see.  So on that case with the meth and the gun on the

3    state side, at most, he was looking at 36 to 44 months?

4    **A.**   Yes.

5    **Q.**   And so like we just talked about, that's the maximum

6    sentence.  So the actual sentence he would have served on that

7    charge would have been even less than that, most likely?

8    **A.**   That's correct.

9            **MR. BORO:**  Objection.

10           **THE WITNESS:**  Yeah, the strikes would have gone away

11   by operation of Proposition 36, and then we would have been

12   left with just the possession of a gun and some

13   methamphetamine.

14       And in some cases, that's going to result in a grant of

15   probation with some local county jail; and in some cases,

16   that's going to result in a prison term of either 16 months, 2

17   years, or 3 years.

18   **BY MS. PENG:**

19   **Q.**   And so what happened in that case, though, is the federal

20   government took over that gun case; is that correct?

21           **MR. BORO:**  Objection.

22           **THE COURT:**  Overruled.

23           **THE WITNESS:**  My understanding was that they intended

24   to file a federal gun charge.  I didn't personally follow up to

25   see that that's what happened; but when Ms. Berg and I were

BRADY - REDIRECT / BORO

 1  discussing the case, we agreed -- or I told her that I would be

 2  willing to plead him out to the methamphetamine charge alone.

 3  **Q.**   So you don't know actually what happened on the federal

 4  side with respect to the gun case?

 5  **A.**   I never followed up to see what the U.S. Attorney's Office

 6  did with that.

 7  **Q.**   And so if he ended up getting 58 months on the federal gun

 8  case, that would have been more than what he was looking at on

 9  the state side for that case?

10  **A.**   A lot more.

11          **MS. PENG:**  Thank you.

12          **THE COURT:**  All right.  Any redirect?

13          **MR. BORO:**  Yes, Your Honor.

14                  <u>**REDIRECT EXAMINATION**</u>

15  **BY MR. BORO:**

16  **Q.**   Mr. Brady, just to clarify on that last point, I think

17  there was a concept used of the federal government taking over

18  the state gun charge.

19      You would agree with me that that's not quite how it

20  works, that the state gun charge is a separate statute and

21  separate offense from any federal gun charge.  Isn't that the

22  case?

23  **A.**   You know, I'm really not an expert in federal law, but I

24  can tell you that generally, you know, the charges that we file

25  are State Penal Code, California Penal Code; and, yeah, that is

1  different than the United States Code and the sections that the

2  U.S. Attorney's Office would charge.  You know, they're

3  different statutes.  They have different penalties.

4  **Q.**   And are you also aware that, under principles of double

5  jeopardy, a person like Mr. Verhagen potentially could face a

6  state gun charge as well as a federal gun charge for the

7  possession of the same weapon?

8  **A.**   Yeah.  I'm not sure exactly what you mean by the

9  "principle of double jeopardy," but what you said is correct.

10 You can have a charge that could be filed either in my

11 department, my court, or in the federal court, and it could go

12 either way.  I'm not sure what you were referring to as far as

13 double jeopardy.

14 **Q.**   Let me clarify.  That was imprecise.

15     There is no -- is it your understanding there is no double

16 jeopardy bar against both a state prosecution entity

17 prosecuting somebody like Mr. Verhagen for possession of that

18 firearm and then the federal government turning around and also

19 filing, under the federal statute, a federal firearm offense

20 again for the same firearm?

21         **MS. PENG:**  Objection.  Leading.

22         **THE COURT:**  Overruled.

23         **THE WITNESS:**  You know, I am -- I'm not a hundred

24 percent clear on that.  That may be true.  I wouldn't dispute

25 it if you're telling me that it is, but honestly I don't know

1   the answer to that question.

2   BY MR. BORO:

3   Q.   Fair enough.

4        And you described, I think, the gun and the meth charges

5   as, I think you called them, nonserious, nonviolent?

6          **MS. PENG:**  Objection.  Beyond the scope.

7          **THE COURT:**  Sustained.

8   BY MR. BORO:

9   Q.   Well, let me ask you about the line of questioning that

10  the prosecutor just went through with you about assessing the

11  charges and the possible sentence that would be imposed.

12       So the -- in doing that assessment, one thing you would

13  look at is whether or not the charge would be characterized as

14  either nonserious or nonviolent; is that correct?

15         **MS. PENG:**  Same objection.

16         **MR. BORO:**  This is their line of questioning.

17         **THE COURT:**  Overruled.

18         **THE WITNESS:**  I'm not sure I understand your question.

19  Could you give me a --

20  BY MR. BORO:

21  Q.   Okay.

22  A.   -- better idea?

23  Q.   Well, in deciding, when you come up with what you think is

24  a fair resolution and you're discussing, let's say, with a

25  Defense attorney what a proposed sentence would be, one factor

BRADY - REDIRECT / BORO

1  you would look at is do you view this as a serious or

2  nonserious felony?

3  **A.**    Sure.  That makes sense.  Yeah, that's a factor that would

4  be of some importance to the Defense.

5  **Q.**    And how about to the prosecutor?  Would it also be

6  important whether it's a violent felony or nonviolent felony?

7  **A.**    Well, so the violent felony phrase that I'm referring to

8  is actually defined statutorily in the California Penal Code;

9  and there's a list of crimes that are defined as violent

10  felonies, and there's a separate statute that defines serious

11  felonies.  There's two separate lists in the Penal Code.

12      So, you know, a layperson, a common person, would think of

13  a violent felony one way, and the law might define it a

14  different way.  So when I'm talking about violent felonies or

15  serious felonies, I'm talking about those two lists of crimes

16  within the California State Penal Code.

17      And, yeah, those felonies have different legal

18  implications for the defendant in terms of custody credits, in

19  terms of future prior-ability for subsequent cases they may

20  pick up.

21  **Q.**    And how about in terms of your decision on what is the

22  potential exposure?  Do you take in account, or does it impact

23  that potential exposure, the fact that a crime might be

24  charged -- might be classified as a nonserious or nonviolent

25  felony versus serious or violent felony?

1   A.   Correct.  Serious and violent felonies typically have

2   greater prison exposure than the nonserious and nonviolent.

3   Q.   Is it less common to get probation if someone's charged

4   with a serious and violent felony as opposed to

5   nonserious/nonviolent felony?

6   A.   Correct.  There's a presumption of prison for those cases

7   that's frequently overcome by the Court's findings at

8   sentencing or the DA's Office will -- there are what we call

9   mitigating factors that we will look at that will allow us to

10  grant or stipulate to probation for somebody who had committed

11  one of those types of offenses.

12       So we do agree to probation in those cases involving

13  serious and violent felonies when it's in the interests of

14  justice to do so, when we have difficulty proving up those

15  cases factually to a judge or to a jury.

16       But there is a -- the general idea that you're getting at

17  is correct, that the serious and violent felonies on those

18  lists have more exposure, and there is a presumption of prison

19  time associated with them.

20  Q.   And was the -- the case against Mr. Verhagen of the felony

21  assault in a correctional institution, was that classified as a

22  serious or a violent felony?

23  A.   Yes.  The -- well, that's a -- a difficult question to

24  answer.

25       There were two charges.  One involved an assault,

1    I believe -- if I can have a second to refresh my memory?

2    Q.   Yes.

3    A.   (Witness examines document.)  One involved an assault with

4    a weapon and the other involved what we call a felony battery

5    with serious bodily injury.  And it was the same incident; and

6    because it was the same incident and the same class of crime,

7    basically assault or battery, it would have been punished as a

8    single offense.

9         And -- I'm sorry.  Now I've forgotten your question.

10   Q.   Well, for example, the felony battery with serious bodily

11   injury, is that classified -- that offense against

12   Mr. Verhagen, was that classified as a serious or violent

13   felony?

14   A.   So that -- that charge itself is not on the list.  The

15   list that -- the Penal Code defines it as an assault resulting

16   in great bodily injury; and the law equates great bodily injury

17   and serious bodily injury, which is what this alleges, as

18   essentially the same thing, but it also requires, in order for

19   it to qualify as a serious felony, that the defendant be the

20   one to personally inflict that injury.

21        In other words, if there's more than one -- in this case,

22   there was a codefendant.  So I just don't know who was

23   responsible for personally inflicting that injury, whether it

24   was Mr. Verhagen or the codefendant.

25        And so to answer your question, it would be a serious

 1   felony if he personally inflicted those injuries; but if he did

 2   not, then it would not be, if that makes sense.

 3   Q.   It does.

 4        So hypothetically, if Mr. Verhagen jumped into the assault

 5   on the inmate because the first inmate was unable to complete

 6   the assault, was too weak, that potentially would be a set of

 7   facts that might suggest Mr. Verhagen was the person who caused

 8   the great bodily injury?

 9              MS. PENG:   Objection.

10              THE COURT:   Overruled.

11              THE WITNESS:   Well, it kind of -- I'm not comfortable

12   saying yes to your question because I'd have to kind of

13   speculate.

14        What the legal standard is, is you have to personally be

15   the person that causes the great bodily injury, not just engage

16   in the assault.

17        So, for example, if he was kicking somebody in the leg

18   that did not result in a broken leg but his accomplice was,

19   say, hitting someone in the head with something that did result

20   in serious bodily injury, then he would not be guilty of a

21   serious felony.  His accomplice would.

22        For purposes of the statute, if that make -- it's a little

23   complicated, but I'm trying to simplify it.

24   BY MR. BORO:

25   Q.   I understand that.

BRADY - REDIRECT / BORO

1          And the assault with a weapon, the other charge --

2   A.    Yes.

3   Q.    -- is that a serious and violent felony?

4   A.    I believe it's on the violent felony list.

5   Q.    And that would be -- because that offense is on the

6   violent felony list, that would be a factor that would tend

7   towards a higher sentence --

8   A.    Correct.

9   Q.    -- and another charge?

10  A.    Well, than the general felony.  A general felony in

11  California, an ordinary felony, is a maximum of three years and

12  so the maximum on that is four years.

13  Q.    And then how about the -- you mentioned another reason why

14  Mr. Verhagen, or someone in his position, might get less than

15  27 years to life would be if there were problems of proof.

16  A.    Correct.

17  Q.    And based on your review of the record at the time in

18  2014, had you identified any problems of proof?

19  A.    There was just -- the factor that I recall discussing with

20  the trial deputy that I was supervising -- that the alleged

21  victim was also in jail for some criminal offense and there was

22  some question about whether he would be cooperative with the

23  Prosecution.

24          We didn't go to a preliminary hearing where he was asked

25  to testify.  We never subpoenaed him.  So I don't know whether

BRADY - REDIRECT / BORO

1    he was or was not going to be cooperative with us.

2         But just the fact that he was an inmate at the jail, had

3    his own cases or case, it was a question in our mind about

4    whether we would gain his cooperation for the purpose of

5    proving up that case.

6    **Q.**   And you would have -- if you chose to do so, you would

7    have subpoena power to compel him to testify?

8    **A.**   Correct.

9    **Q.**   And how about the fact that Mr. Verhagen had two prison

10   priors?  Is the idea of that state sentencing factor -- that

11   that means a person needs more -- a longer sentence for

12   deterrence because of those priors?

13              **MS. PENG:**  Objection.  Asked and answered.

14              **THE COURT:**  Overruled.

15              **THE WITNESS:**  If -- it's not because of the priors per

16   se, but we do look at their entire history to see, you know,

17   have they been convicted previously, what have they been

18   convicted of.  It does increase the exposure.

19         And if I can just clarify, I talked about how they add an

20   additional year exposure.  Since that time, January of 2022,

21   those prison priors were rejected by the legislature and

22   they're no longer valid.

23         So just hypothetically, if Verhagen had been serving his

24   sentence, he would have been entitled to have those two years

25   eliminated from his sentence because they're no longer legally

1    valid.  But at the time in 2013, they were, and at the time, I

2    was aware that he'd gone to prison twice before.  And that was

3    something that we took into account when we reached our plea

4    agreement.

5    Q.   And in assessing the worth of his case and his realistic

6    exposure, the fact that he had gone to prison twice before,

7    isn't that a factor you would take in account and view it as a

8    more serious case?

9    A.   I would view the underlying conduct, the conviction

10   itself -- the sentence can range.  Sometimes people get

11   probation even on a very serious case; and the fact that they

12   get probation wouldn't be very influential to me.  What I would

13   be looking at is what their conduct was, what the underlying

14   charges were that they were convicted of.

15   Q.   And what was your understanding of the underlying charge

16   that Mr. Verhagen had been convicted of?

17          MS. PENG:  Objection.

18          THE COURT:  Well, this is beyond the scope at this

19   point.  So sustained.

20   BY MR. BORO:

21   Q.   But those underlying charges would influence, then, where

22   you would view the value of that case?

23   A.   Right.  We look at the entire history of the person that

24   we're dealing with, what types of prior convictions, if any,

25   how serious they are.  All of that's relevant to our analysis.

BRADY - RECROSS / MILIOTIS

1  Q.   And then I assume also the fact that Mr. Verhagen was

2  alleged to have committed the felony battery with serious

3  bodily injury and the assault with a weapon while he was

4  incarcerated, being held on another sentence, you would view

5  that also as another aggravating factor that would warrant a

6  higher sentence than just that -- other circumstances, wouldn't

7  you?

8  A.   Yeah.  That was one reason why I wanted him to receive a

9  prison sentence.  He had been to prison before.  He committed

10 another crime while he was in a custodial setting.  I didn't

11 think probation was appropriate.

12 Q.   And it's fair to say, although, you know, we know the

13 maximum, and I guess we know there's plenty of discretion to

14 get down to a minimum sentence, you had ruled out probation,

15 but you would -- you had a lot of discretion where to go; but

16 it's fair to say that, in giving Mr. Verhagen a deal or benefit

17 to resolve the state cases so that he would cooperate with the

18 federal government, you arranged to dismiss the most serious

19 charge he was facing?  Isn't that true?

20 A.   Correct.

21      MR. BORO:  Thank you very much.

22      THE COURT:  Thank you.  Any recross?

23                    RECROSS-EXAMINATION

24 BY MR. MILIOTIS:

25 Q.   Still the morning.

1          Sir, you seem to be -- you've included that strength of

2    the case is an important factor in how you make a determination

3    of giving somebody a bargain, a plea bargain; correct?

4    **A.**    It's one factor, for sure.

5    **Q.**    Okay.  And in this particular case -- you're familiar with

6    prosecutions of people committing assaults in prison, are you

7    not?

8                **MS. PENG:**  Objection.  Beyond the scope.

9                **THE COURT:**  Sustained.

10               **MR. MILIOTIS:**  It was just opened up by my brother,

11   Your Honor.

12               **MS. PENG:**  No.

13               **MR. MILIOTIS:**  I'm allowed to follow up.

14               **THE COURT:**  Sustained.

15   **BY MR. MILIOTIS:**

16   **Q.**    Now, in prison -- prison is monitored closely; correct?

17               **MS. PENG:**  Objection.  Beyond the scope.

18               **THE COURT:**  I haven't heard the question yet.

19   **BY MR. MILIOTIS:**

20   **Q.**    So in terms of the strength of your case, videotape of

21   activities within a prison would be a factor in your

22   determination as to the strength of the case; correct?

23               **MS. PENG:**  Objection.  Beyond the scope.

24               **THE COURT:**  Overruled.

25               **THE WITNESS:**  So you're referring to prison.  This

1   assault happened in the county jail.  Is that what you're

2   referring to when you say "prison"?

3   **BY MR. MILIOTIS:**

4   **Q.**   I'm sorry.

5        Somebody in custody, the prisoners are monitored pretty

6   closely in terms of their activities within the jail; correct?

7   **A.**   That depends on the module that they're in.  And I'm not

8   sure where he was; but, yeah, prisoners in a custodial setting

9   are definitely monitored by the correctional officers.  It

10  varies depending on how they are classified in terms of their

11  dangerousness.

12       I don't know what the video camera setup is throughout the

13  jail, and I don't know what module within the jail Mr. Verhagen

14  was located.

15  **Q.**   And in this particular case, it's fair to say that you've

16  alluded to the fact that this didn't even get to the

17  preliminary stages of your activity with the case?

18  Prosecution, I'm referring to.

19  **A.**   Right.  So in state court, there's what we call a

20  preliminary hearing, where we present evidence to a judge.  We

21  call witnesses.  They testify about the facts of the case.

22  It's not a full trial.  It's kind of a mini trial.  And that's

23  the first step before you go to a jury.  We had not gone to

24  that first step.  We had simply filed the charges.

25  **Q.**   So I'm focusing on your assessment of the strengths of the

BRADY - RECROSS / MILIOTIS

1  case that you just alluded to by references to cooperation by

2  the alleged victim.  And that's what I'm referring to, your

3  assessment.

4      And did you make an assessment as to the strength of your

5  case based on either those modules that they might have been

6  in, who might have witnessed the event?  Had you made any of

7  those assessments prior to your making the bargain that you

8  ultimately did?

9  A.    Personally I assessed the fact that the victim was an

10 inmate and that -- and, my experience, often does influence

11 them in a negative way.  They typically don't want to testify

12 against other inmates.  That's what my thought process was.

13     My prosecutor who was familiar with the case had developed

14 a better understanding about the strengths or weaknesses of

15 proving up that case.

16     I discussed briefly with him what his view of the case

17 was.  I don't remember what he told me in terms of the

18 strengths or weaknesses of the case, but he was much more

19 familiar with that case in particular than I was.

20 Q.    All right.  And in respect to your assessment of the

21 strength of the case, in a prison -- in a jail environment, do

22 you bring certain factors into how important the security of

23 inmates in jails may be in terms of your -- the value -- and

24 when I say "value," I mean how much time should this person do

25 in addition to whatever they're doing -- did you make that

BRADY - RECROSS / MILIOTIS

1   assessment in this case?

2          MS. PENG:  Objection.

3          THE COURT:  Overruled.

4          THE WITNESS:  I want to make sure I understand your

5   question.  Did I consider the fact that it was in a custodial

6   setting and was that an important factor in my assessment?

7   BY MR. MILIOTIS:

8   Q.   Yes.  The security of prisoners, to secure them from

9   assaults, and in the justice that you've referred to, it's

10  important, in your occupation, to ensure the security of

11  inmates while they're incarcerated and in cells, exposed to

12  other criminals.  That's an important factor in your

13  assessment, is it not?

14         THE COURT:  I'm not sure I understand the question

15  now.

16  BY MR. MILIOTIS:

17  Q.   All right.  Maintaining security in jails is an important

18  function in your responsibilities as a Chief District Attorney;

19  correct?

20         MS. PENG:  Objection.  Beyond the scope.  403.

21         MR. MILIOTIS:  Well, he just wanted me to -- I'm

22  explaining.  Your Honor wanted to know where I'm going with

23  this thing.

24         THE COURT:  Rephrase the question.

25  \\\

BRADY - RECROSS / MILIOTIS

1   BY MR. MILIOTIS:

2   Q.   So part of your occupation is ensuring the safety and

3   security of people that are in -- awaiting trial in a case.

4   That's one of your duties as an Assistant District Attorney;

5   correct?

6   A.   Correct.

7   Q.   All right.  And in terms of this, there are certain extra

8   security situations involved in people that are awaiting trial

9   or prosecution in a jail; correct?

10          MS. PENG:  Objection.  Beyond the scope.

11          THE COURT:  Sustained.

12  BY MR. MILIOTIS:

13  Q.   Well, you had -- there's two things going on.  You're

14  assessing the strength of your case.  You're assessing the

15  value.  And when I say "value," how much time is this case

16  worth.

17      Those are common balances that you've just described a

18  number of times today; correct?

19  A.   Correct.

20  Q.   And part of the things that you want to do is make sure

21  that people are safe while they're awaiting trial in jail;

22  correct?

23  A.   I want to make sure everyone's safe, whether they're in

24  jail or not in jail.  I don't know if the victim in this case

25  was awaiting trial.  I don't know anything about his status.

1    But generally, yes, I'm very concerned with the safety of
2    potential victims, whether they're in the jail or not in the
3    jail.
4    **Q.**    And in this particular case, is it fair to say that
5    presently, right now, you don't know a lot about the
6    circumstances of -- the facts of the case in this assault in
7    the jail?
8    **A.**    That's true.
9    **Q.**    Okay.  And when you speculated that the witness or the
10   victim might not have cooperated, there are certainly other
11   factors, witnesses, videotapes, things that would have went
12   into your assessment as to the strength of your case; correct?
13   **A.**    Yeah.  I never got into witness interviews.  Like I said,
14   I don't recall reading the reports in this case, but I do have
15   experience prosecuting cases that have occurred within the
16   jail; and from that, I inferred that there may be difficulty
17   getting cooperation from other witnesses or the victim because
18   they are incarcerated.
19   **Q.**    But you wouldn't have any difficulty getting cooperation
20   from Sheriff's Department correction officers, would you?
21   **A.**    Typically, no.
22   **Q.**    All right.  So if there were witnesses to this, you
23   wouldn't have had trouble getting their cooperation?
24          **MS. PENG:**  Objection.  We're way beyond the scope.
25          **THE COURT:**  Overruled.

BRADY - RECROSS / MILIOTIS

1          **THE WITNESS:**  Typically correction officers show up

2    and testify.

3    **BY MR. MILIOTIS:**

4    **Q.**   Thank you.

5          And if there were videotapes, according to what module

6    they might have been in, those, in your experience, can be

7    very, very helpful in prosecuting a case, can they not?

8    **A.**   They -- they can be.  They don't -- they don't show

9    everything that happens.  Not everything is seen in videos; but

10   if you have a video, you're glad to have it for sure.

11   **Q.**   Okay.  Now, would it affect your determination as in terms

12   of this case if you were to be aware that a White Supremacy

13   gang might have been involved in this altercation?  Would that

14   affect your assessment of the case?

15   **A.**   It would be relevant.  I'd want to know how they were

16   involved and in what way.

17   **Q.**   You'd be concerned about that, would you not?

18   **A.**   It would be an important factor.  I'm concerned anytime

19   there's a serious assault on someone in the jail or out of the

20   jail.  If it's a White Supremacist assault, that's an important

21   factor to consider.  I'm concerned about that, yes.

22   **Q.**   And that would enhance your determination as to the value

23   of that case, would it not?

24   **A.**   Would it enhance my --

25   **Q.**   Assessment of the --

BRADY - RECROSS / MILIOTIS

1    **A.**   -- assessment of the --

2    **Q.**   -- penalty.

3    **A.**   We do allege gang enhancements, and there was no gang

4    enhancements in this case.  If there had been, that would have

5    been something that would have stuck out to me in terms of,

6    well, this is a gang case and it does increase the amount of

7    potential time in jail.  There was no gang enhancement in this

8    particular assault.

9    **Q.**   You weren't aware of one?

10   **A.**   No.  I mean, we didn't charge it.

11   **Q.**   Okay.  But in terms of the facts of the case, you're not

12   declaring that this didn't involve a gang?

13           **MS. PENG:**  Objection.

14           **THE COURT:**  Sustained.

15   **BY MR. MILIOTIS:**

16   **Q.**   In any event, I'm not sure what term you would use for

17   what you did with this case, but you punted on the assault in

18   the jail, did you not?

19           **MS. PENG:**  Objection.

20           **THE COURT:**  Sustained.  Rephrase.

21   **BY MR. MILIOTIS:**

22   **Q.**   Well, you didn't prosecute it, fair to say?

23   **A.**   No, it's not fair to say.  We filed it.

24   **Q.**   I'm sorry.

25   **A.**   I evaluated --

1   Q.   Strike that question.  I'm sorry.

2        The resolution of the case was what?

3   A.   We dismissed the jail assault case in exchange for a plea

4   in the other case and a prison term.

5   Q.   Okay.

6   A.   I wouldn't describe that as punting it.

7   Q.   All right.  I apologize.

8        But it got dismissed?

9   A.   Yeah.  I considered it and took it into account in the

10  overall plea bargain.

11  Q.   Thank you very much.  Thanks for your service.

12  A.   You bet.

13           THE COURT:  All right.  Thank you.

14      Any further questions by the Defense?

15           MR. BABCOCK:  No, Your Honor.

16           MR. BORO:  No, Your Honor.

17           THE COURT:  Any recross?

18           MS. PENG:  No, Your Honor.  Thank you.

19           THE COURT:  All right.  Then that will conclude this

20  testimony.  Thank you, Mr. Brady.  You may step down.  You're

21  excused.

22           THE WITNESS:  Thank you, Your Honor.

23                    (Witness excused.)

24           THE COURT:  We'll go ahead and take our morning break

25  for 20 minutes.  Thank you.

PROCEEDINGS

```
 1          THE CLERK:  All rise for the jury.

 2                 (The jury leaves the courtroom.)

 3      (Proceedings were heard out of the presence of the jury.)

 4          THE COURT:  All right.  Thank you.

 5          MR. BARRY:  Just a quick question on prior

 6  inconsistent statements, Your Honor, for Detective Aiello,

 7  who's coming in.

 8       Did Your Honor say that you had read something?  Is that

 9  something where the Defense said "These are the inconsistencies

10  we're going to go over"?  Or was that just the transcript?

11          THE COURT:  No, I didn't read anything.  I was making

12  a general --

13       So what -- so it looks like he is coming, I see from the

14  e-mail, and so what is the -- let me forecast what the scope of

15  the examination is going to be then.

16          MR. WALSH:  Well, I'll defer to Mr. Sheketoff.

17          THE COURT:  Somebody needs to come to the mic.

18          MR. WALSH:  Excuse me.

19       I'll defer to Mr. Sheketoff.  It's his witness.

20          THE COURT:  Okay.

21          MR. WALSH:  Aiello, scope.

22          MR. SHEKETOFF:  So, Your Honor, you're basically

23  asking me do I want to play the tape or not?

24          THE COURT:  Well, if you get into -- if you're going

25  to elicit the fact that, in his interview, he did not bring up
```

PROCEEDINGS

 1  Mr. Ranieri's name, then that raises this whole question that

 2  we talked about earlier.

 3         **MR. SHEKETOFF:**  Yeah, which I think is fair.

 4      So I think the decision that I have to make is whether I'm

 5  going to get into it.

 6         **THE COURT:**  Okay.

 7         **MR. SHEKETOFF:**  And if I get into it, I think the way

 8  I'd get into it is just offer the tape, minus the PG&E section

 9  of it.  Because I agree with Your Honor that it -- I can't just

10  pick out a little part of it.

11      So I think that's the decision I have to make, which I

12  haven't made yet, because you just told us this morning that

13  that was your -- and I have to caucus with the other members of

14  the Defense team.

15         **THE COURT:**  All right.

16      Okay.  I assume you have the ability to have Mr. Reuter

17  help you out with that editing, if we get to that.

18         **MR. REUTER:**  Sure.  In order to edit it, I would just

19  need a little bit of time and then notations of the time in and

20  the time out to excise.

21         **THE COURT:**  Okay.  It's kind of a middle section

22  there.  It's about halfway through.

23         **MR. BARRY:**  For -- again, Your Honor, we don't concede

24  that it's admissible at all.

25         **THE COURT:**  I understand.

1          **MR. BARRY:**  For the editing purpose, if Mr. Reuter

2   checks the transcript, it indicates a time when certain --

3          **THE COURT:**  Yeah.  That should facilitate.  It's clear

4   when Mr. O'Brien comes in and starts talking about the PG&E

5   thing.

6          **MR. BARRY:**  That's correct.  So it says when he enters

7   the room and when he steps out.

8          **THE COURT:**  Yeah.

9          **MR. WALSH:**  And Aiello told me he could be here by

10  about 12:30 or so.

11         **THE COURT:**  Okay.  Perfect timing for the last

12  segment.

13         **MS. PENG:**  Well, Your Honor, are we -- so is the way

14  we're proceeding that the video is going to come in?  Because

15  you've -- there's been many opportunities for them to identify

16  an actual prior inconsistent statement and they haven't done

17  that, so I'm not sure how we're in the world of --

18         **THE COURT:**  The prior inconsistent statement, as the

19  theory goes, is that his not mentioning Mr. Ranieri when what

20  would have -- or could have expected him to naturally mention

21  it in the context of this is an implied assertion.  And they're

22  interpreting that implied assertion as saying Mr. Ranieri was

23  not involved.  That would be inconsistent with his testimony

24  that Mr. Ranieri was involved.

25         I understand it's not the usual kind of pairing that we

1  get where I said X, and then he said not X, but that's the

2  general theory, as I understand the inconsistency.

3      And as I've already indicated, I don't think that the

4  silence is necessarily an assertion here.  So that could end

5  the inquiry, but I'm being -- exercising an abundance of

6  caution in favor of the Defense given the stakes involved here

7  and given the gravity of these proceedings.

8      And so I'm going to call up the doubts or resolve that

9  doubt in defendants' favor; but having found that there is an

10  assertion, and also an implied prior inconsistency, that it has

11  to be done in full context.  And that's why, as we did in the

12  first trial, I would allow the entire tape to be played so the

13  jury sees the whole interview, minus the PG&E thing.

14      **MS. PENG:**  Does that --

15      **MR. BARRY:**  But that doesn't overcome the 613 problem,

16  Your Honor, in that they didn't ask the witness a single

17  question about the interview, and they can't just have that

18  laying out there with no context from his statement.

19      So they had the opportunity.  He was here at great expense

20  and great effort from the Government.  He was brought here in

21  handcuffs.  We were lucky we were able to get him here.  He

22  testified under oath.  He was subject to cross-examination.

23  The Defense had that transcript and that video for years, and

24  they elected not to ask him about it so he couldn't explain why

25  he didn't bring up that -- any more specific names in the

1    interview.

2         So that -- the reason 613 is there, if we are having these

3    kind of, "Well, you didn't mention that," he was right here.

4    They could have asked him that and he could have explained it.

5              THE COURT:  All right.

6         MR. BARRY:  Now they can't, and we're stuck with, "Oh,

7    you" -- you know, the argument "He never mentioned it" with no

8    explanation.  That's unfair to the Government.

9              THE COURT:  So it brings up the question of -- under

10   613.  I understand that 613, the predicate's not there.  I

11   think there's an argument that there is a predicate if broadly

12   construed.

13        Your argument is that now there's not a chance for the

14   witness to comment, which is required by 613.  The response to

15   that would be he can -- he can testify further and come back

16   and explain why he didn't say anything to Detective Aiello at

17   the time.

18        MR. BARRY:  That's procedurally improper, Your Honor.

19   He was here, and they can't sort of sandbag and then force the

20   Government to bring people back when they're missing the

21   opportunity, especially in these kind of circumstances when

22   there's security concerns, when there are witness availability

23   issues.

24        You know, in some ways, if they want to introduce the

25   statement, then they would have to call him back in order to

1    set the 613 predicate, and there's no way he's coming back.

2    There's no way they're going to be able to serve him.  There's

3    no way he's going to agree to service.  There's no way he's

4    going to come here in the next day and a half.

5        And so, again, they are trying to shoehorn this in

6    improperly because they strategically decided not to ask the

7    question, and so now they're getting the benefit of the tape

8    without the ability of the Government to address it in any way.

9            THE COURT:  You're getting the benefit and the burden

10   of the tape because when I reread that tape, a lot of what he

11   says is -- confirms what he had said on the stand and what he

12   has said previously, so...

13           MR. BARRY:  But the key that they want the tape for is

14   to say he never mentioned Ranieri in that tape, and he can't

15   explain why.

16           THE COURT:  All right.  Response?

17           MR. SHEKETOFF:  We could bring him back by Zoom just

18   like you did the last time.  He doesn't have to physically come

19   to the courthouse.

20           THE COURT:  Okay.  What about that?

21           MR. BARRY:  Again, we are not -- he is not our

22   witness.

23           THE COURT:  Well --

24           MR. BARRY:  He could ignore our texts.

25           THE COURT:  -- but if the stipulation is as a

**PROCEEDINGS**

1  condition of letting this all in, that he could testify by Zoom

2  and, therefore, all the security concerns, the logistic

3  concerns might be obviated, you could call him by Zoom.

4         MR. BARRY:  Yeah, but he could say, "No, I'm not going

5  to do it."

6         MR. WALSH:  Your Honor, I believe, in your pretrial

7  ruling, Mr. Hardisty remains under Government subpoena until --

8  for the Defense case as well.

9         MS. PENG:  Well, he was arrested and the arrest

10  warrant has been executed already.

11         MR. WALSH:  Well, the subpoena still stands.

12         MS. PENG:  Well, he showed up for --

13         THE COURT:  Well, we don't know whether he's --

14         MR. BABCOCK:  Agent Lane's in the courtroom,

15  Your Honor.  She could text him now and find out his status.

16         MS. PENG:  So --

17         THE COURT:  All right.  I understand the Government's

18  argument, but I -- if -- if the Defense so chooses, I will

19  allow that inquiry; but the entirety, except for the O'Brien

20  exchange, will be admitted, good and bad.  That's what you're

21  going to have to weigh.

22      And I will also give him an opportunity, as you

23  stipulated, that if the Government can get a hold of him and he

24  wants to testify and further elaborate as to why he didn't say

25  anything in that first -- or in that interview, that he'll be

 1    allowed to do so by remote.

 2           MS. PENG:  So, Your Honor, in terms of that procedure,

 3    I think they should not be allowed to ask Steve Aiello what's

 4    said in that interview.  If they're going to go to there and

 5    they elect to do so, it will just be the video.  So their

 6    questioning of Steve Aiello should not include hearsay

 7    statements of Mr. Hardisty.

 8           MR. SHEKETOFF:  So I agree with that.

 9           THE COURT:  Yeah.  It can be very short.  Just "Was

10    there a video?"  And then you just play it.

11           MR. SHEKETOFF:  And anything else I ask him about will

12    not be contained in the video.  Like, "How did you get his

13    name?  Why were you there?  Who invited you?"

14           THE COURT:  I understand.

15       All right.  Well, you've got 90 minutes to make up your

16    mind what you want to do, so...

17           MS. PENG:  Who's the next witness?

18           MR. BORO:  I guess Dylan Fong will since Mr. Aiello is

19    not here.

20       There was one logistic issues that's come to my attention.

21    Yesterday we had asked for Sergeant Harm to be available in the

22    Defense case, and he had told me that he'd be available today

23    but not Wednesday; and I told him that's fine, we'll fit him in

24    today.  I understand he has a family emergency, so he's not

25    here now, but it's not clear to me he's going to be here

1    tomorrow.

2           THE COURT:  Okay.  So what is the situation with

3    Sergeant Harm then?

4           MR. BARRY:  He is in the hospital with a family

5    member, Your Honor.  He went there in the middle of the night,

6    and I don't -- he's not available.  Even if he were out of the

7    hospital, which I don't know if he's going to be, he's not

8    available tomorrow anyway.

9           The -- Sergeant Harm was called, was identified as a

10   witness for Friday.  The Defense didn't call him.  And so

11   he's -- he is unavailable probably for the remainder of the

12   trial, if they're going to rest on Wednesday.

13          And, again, they had the opportunity to -- and it's

14   unclear what they would even ask him because every question

15   they could ask him has been asked and answered.

16          THE COURT:  What is the subject of his further

17   examination?

18          MR. MILIOTIS:  Well, Your Honor, I would suggest that

19   he hasn't answered every question that's been asked him along

20   the way; but since he testified last and, you know, I dealt

21   with him on four or five occasions, other developments have

22   occurred.

23          One is that Hardisty's testified; two, there are factors

24   in terms of things that he's learned now.  To wit, when

25   inquired about the July 12th, he didn't seem to acknowledge --

1    because he had to authenticate whether or not there was, in

2    fact, a July 12th meeting.  So I will cover what -- what's

3    changed since his last testimony in respect to his adoption of

4    there being an anniversary party, how that impacts the

5    investigation.

6         THE COURT:  I'm not sure I see how that's relevant.

7    You've got in many facts now about the actual date and the fact

8    that there were two meetings.  For him -- I don't understand

9    the value of his commenting.  Is it just to show a shoddy

10   investigation or what?

11        MR. MILIOTIS:  Well, that's obviously -- we've had

12   three handlers, case agents, all showing a strong propensity to

13   not recall with specificity and not answer questions and

14   including, you know, what investigation there was that led to

15   an expectation that there was a June 28th celebration, not a

16   July 12th celebration.  The relevance of that event is that

17   Wendt and Nelson --

18        THE COURT:  I understand the relevance, and there's

19   been a lot of testimony now, and you've brought up the fact --

20   and the fact that he may well have been in error is now

21   apparent from the e-mail that you got in, from the testimony

22   you got in, and all that sort of stuff.  I'm not sure what the

23   value of calling him back saying "See, I told you so."  What's

24   the point?

25        MR. MILIOTIS:  It would be more to the fact that in

1   the opening, the Wendt visit all of a sudden had heightened

2   interest.  I've got one -- one page of Mr. Barry's opening and

3   the outline of the expected evidence that was to be presented.

4        And this is the case agent.  We don't have any officers

5   that are involved in the investigation except the three that

6   have testified, all of which have declined to do with any

7   specificity what it is that they have for proof in terms of

8   Mr. Ranieri.

9        Right now, what proof is there that Wendt and/or Nelson

10  met with Mr. Ranieri on July 12th?

11       **THE COURT:**  I understand argument.  That's why we've

12  been here for the last seven weeks, and I understand that.

13  You've had plenty of opportunity to present evidence, and you

14  have presented evidence on your client's behalf.

15       **MR. MILIOTIS:**  I agree, Your Honor.

16       **THE COURT:**  What I'm asking is:  What's the value of

17  calling back Sergeant Harm?  He's not going to remember

18  anything more.  It's not going to refresh his recollection,

19  "Oh, yeah, I guess maybe it didn't happen.  It wasn't just the

20  June meeting."

21       I mean, you've already got out implicity and you'd be able

22  to argue to the jury that he didn't even look into it and

23  didn't realize, didn't even bother to subpoena to try to find

24  the East Coast minutes.  You have plenty of ammo.  So I'm not

25  sure what the point of --

1    **MR. MILIOTIS:**  That's not as critical as the 81 chain

2  around Mr. Hardisty's neck, that to this moment, we don't know

3  where that chain is, when Mr. Hardisty got it.

4        **THE COURT:**  That has been asked.  I mean, I don't know

5  what -- that was asked I don't know how many times.

6        **MR. MILIOTIS:**  Well, Hardisty answered "I don't

7  remember.  I have lots of jewelry."

8        **THE COURT:**  But what's he going to --

9        **MR. MILIOTIS:**  But the Government has some

10  responsibility.  They've spent seven weeks making their case.

11  I want about an about hour with Mr. Wendt [sic], Sergeant Wendt

12  [sic], to go through what it is specifically that the

13  Government has determined is their proof against Mr. Ranieri.

14      I think I'm entitled to do that, and I think I'm entitled,

15  given the length of the trial, to have the jury understand,

16  from the mouth of the Government investigator, who's

17  responsible, as he's determined to find the truth, that we find

18  out what truth there is right now against Mr. Ranieri.

19      Your Honor's indicated, on many occasions, the paucity of

20  evidence against Mr. Ranieri, and I think it's important to

21  make it crystal clear that right now, they don't know where the

22  chain is.

23        **THE COURT:**  Essentially you want to reiterate points

24  that have already been made --

25        **MR. MILIOTIS:**  Exactly.

**PROCEEDINGS**

1          **THE COURT:**  -- in advance of your closing argument so

2    you can doubly emphasize that on your closing argument.

3          **MR. MILIOTIS:**  I think I'm entitled to do that,

4    Your Honor.  I think I need to have the opportunity; and if --

5    and if Kassandra Lane had maybe been able to recall more

6    things, but she had a disadvantage of coming into the

7    investigation late so wasn't able to talk about many of these

8    items.  We have hearsay problems --

9          **THE COURT:**  Well, all right.  So what we're left with,

10   based on that proffer, is -- I don't know what you're asking

11   for.  I don't know if you want me to -- what else I can do.  Do

12   you want me to --

13         **MR. MILIOTIS:**  Let me tell you something that's also

14   important, Your Honor, and I'm -- and I'll tee this up

15   because -- I apologize.  I thought I'd get it filed.

16       Your Honor made a ruling in respect to the invocation of

17   the Fifth Amendment by Mr. Hardisty in response to a specific

18   question about how he got the Filthy Few patch.

19       The Filthy Few patch is a very, very critical part of this

20   case, the Government's case, not necessarily our case.  But the

21   Government has made a big deal.  He took the Fifth.

22       I think Your Honor may have been -- had to be hasty given

23   the circumstances, but I intend to provide Your Honor, by the

24   end of the day or tomorrow morning, a motion -- a remotion to

25   strike his testimony because it was relevant.

PROCEEDINGS

1          **THE COURT:**  All right.  You can do that.

2          **MR. MILIOTIS:**  So I'm just saying that.  So I also

3     want to crystallize that.

4          **THE COURT:**  Hold on.  Hold on.

5        You can do that.  We're now going to keep the jury

6     waiting.  This is not the time to argue that.

7        I'm talking about what do we do about Sergeant Harm.  And

8     the question is:  What do you want me to do?  What are you

9     asking me to do about Sergeant Harm?  Do you want me to order

10    him here out of the hospital or what do you want me to do?

11         **MR. MILIOTIS:**  They -- I said, because I understood

12    that he wasn't going to be available tomorrow, that we'd put

13    him on today.

14         **THE COURT:**  Right.  And the agreement was that he

15    would come on today, and now there's a family emergency.

16         **MR. MILIOTIS:**  I'm trying to accommodate.

17       Obviously it's an important witness to us.  We'd expect

18    that he'd be available.  He's been available.  I don't want to

19    intrude upon his private matters, but I think he's a very

20    important witness for us and it's not just to tee up for a

21    closing argument, Your Honor.  I think there are going to be

22    some other important things.

23         **THE COURT:**  Let me ask this question:  Why isn't he

24    available tomorrow?  I understand why he's not available today.

25    There's a family medical emergency.

1      **MR. BARRY:**  Yeah, I think that will persist until

2   tomorrow; and if weren't tomorrow, he's gone for training,

3   which is something that's been at issue for a long time.

4      But the --

5      **THE COURT:**  When is he gone for training?

6      **MR. BARRY:**  All day on Wednesday.  Again, but I think

7   that's been back-burnered because he's going to be in the

8   hospital.

9      But the point, Your Honor, is that the Court put your

10  finger on it, in that there is nothing that they want from this

11  witness other than questions that have been asked and answered.

12  It's a preview of the argument.  There's nothing there.

13     **MR. BABCOCK:**  That's not true.  Their very last

14  witness, Michelle Conte, Agent Harm is the only one that can

15  testify to the differences between what she said five, six

16  years ago about my client's alleged threat against her and her

17  testimony.  He's the prior -- he's the one -- only one that can

18  testify to the prior inconsistency.

19     **MS. PENG:**  That's not true.  Agent Harm never

20  interviewed Michelle Conte.  Michelle Conte was interviewed by

21  Travis Menke.  He was responsible for that investigation.

22     And I think the other --

23     **MR. BABCOCK:**  Harm's name is on the report, so

24  obviously he was there.

25     **MS. PENG:**  So he's not the only witness who can -- I

PROCEEDINGS

1   don't know what --

2           THE COURT:  Why not call -- recall Menke, then, since

3   he was there?

4           MR. BABCOCK:  That's fine.  I don't care.

5           THE COURT:  Is Menke available?

6           MR. BARRY:  He's more available than Sergeant Harm.  I

7   don't know what his schedule is.

8       But, again, this is --

9           THE COURT:  Can you --

10          MR. BARRY:  -- this is the kind of thing we're getting

11  at literally the last minute.

12          THE COURT:  Right.  Then you should indicate that you

13  want to impeach Michelle Conte with the prior statement to

14  whoever the investigator was.  And Mr. Menke was there.  In

15  fact, I think he was the primary one there.  I think Harm said

16  he just signed off on it because -- like the supervisor or

17  something; but the main investigator was Menke, the main

18  contact was Menke.

19      So you should make the request, and I'm going to enforce

20  that request that Mr. Menke be available tomorrow so you can

21  cross-examine him on that point.

22          MR. BARRY:  And I don't know what his schedule is

23  because this the typical thing that's happened throughout this

24  entire trial.

25          MS. PENG:  Your Honor --

PROCEEDINGS

1              **THE COURT:**  Well, I need you to use --

2              **MR. BABCOCK:**  It's not typical, when we thought Harm

3    would be here today.

4              **THE COURT:**  I need you to use --

5                   (Official Reporter interruption.)

6              **THE COURT:**  Hold on.

7         So the request for Menke or somebody to be here could have

8    been made earlier, but it is incumbent upon the Government to

9    make every effort possible to get Mr. Menke here.

10             **MS. PENG:**  Okay.  And that excuses Sergeant Harm?

11             **MR. BORO:**  No.  Your Honor, I have a problem also with

12   Sergeant Harm.  Sergeant Harm was on the list.

13        I was -- in the presentation of the Conte assaults, I was

14   frustrated by what turned out to be Sergeant Menke claiming he

15   was pigeon-holed to deal just with Troy Conte and, in fact,

16   didn't really do anything and waited a year; and that all of

17   the Mrs. Conte investigation was relegated to Santa Rosa.

18        The Government -- I'm sorry, to the Sonoma County

19   Sheriff's Department.

20        The Government had several Sonoma County Sheriff's

21   Department people on their witness list.  They never called

22   them.

23        I had to then scramble to try and get those witnesses.

24   Two of them are retired, dodged my subpoena.  One called us on

25   the telephone, refused to accept it.  The other closed his

1   garage door when the process server was there.  That's Regan

2   and Newton.

3        We did get Mr. Dylan Fong.  Last night, in interviewing

4   him, I found out, not disclosed in the reports, that

5   Sergeant Harm was present during the inspection of Mrs. Conte's

6   car.  That will come up in the testimony today.

7        I believe he may have -- be informed about other things

8   that were done by -- as part of the investigation by the

9   Sheriff's Department that I've been frustrated about because

10  the key people, I haven't been able to find because they were

11  never called by the Government.

12       **THE COURT:**  This is about the car, then?

13       **MR. BORO:**  Well, this is about the assault on

14  Mrs. Conte.

15       **THE COURT:**  What involvement would Sergeant Harm --

16  other than apparently his being present at the search of the

17  car where there was another agent present?

18       **MR. BORO:**  Right.  There were two things that I wanted

19  to ask him if he was involved in, since I just found out.  He

20  was involved in the DNA swab of the car.  That's the new

21  information I found out.

22       There was also an inspection of the car for semen.  I want

23  to know if he had received information on that as part of his

24  investigation.

25       And then there was also a search for photographs that were

1    allegedly taken by my client during the assault, which were

2    never found.

3        And I believe Sergeant Harm was involved at the time,

4    contemporaneously with the Sheriff's Department, but I'm unable

5    to ask him that because now he's not here.

6        MR. BARRY:  None of this is new, Your Honor.  They're

7    going to have the witness who actually conducted the search of

8    the car and the swabbing here.  There's no need to bring back

9    Sergeant Harm, especially when he's unavailable and especially

10   when he's been available on the day they indicated they wanted

11   him to testify.  He was right here.  They chose not to bring

12   him -- put him on the stand.  And now because's unavailable,

13   all of a sudden, he's the most important witness in the case.

14       THE COURT:  Well, let's see what the need is on the

15   examination of the -- if there is an agent who's going to

16   testify who was there, I don't -- why do we need a second

17   agent?

18       MR. BORO:  The problem was I asked Mr. Fong if he had

19   information on the first search of the car.  He said he didn't,

20   that he wasn't involved.  He knew it occurred, but could not

21   tell me about it.  So he can't put in the evidence that there

22   was no semen found.  He claims he doesn't know that as part of

23   the investigation.

24       MS. PENG:  Sergeant Harm wasn't present for that first

25   search either.  That was a different officer.  You can call

1    that other officer.

2           MR. BORO:  Well, that's the officer who called us and

3    refused to accept the subpoena.

4           THE COURT:  Okay.  But if Sergeant Harm wasn't there,

5    then what good is he?

6           MR. BORO:  I don't know if he wasn't there.  The

7    report doesn't say Sergeant Harm wasn't at the second search of

8    the car.  It doesn't say he was there.  It turns out he was.

9           MR. BARRY:  Again, Your Honor, this -- the only

10   purpose of this is to try to gin up an issue because a witness

11   is not available.  And, again, all of a sudden, he's important

12   for reasons that are entirely speculative for 403 issues.  It's

13   a waste of time.

14      The Court indicated that the Ranieri Defense just wants to

15   preview the closing arguments, which is an improper purpose,

16   and everything they want to ask him --

17          THE COURT:  Here's what we're going to do:  I'm going

18   to order the Government to inquire of Sergeant Harm whether he

19   can be here tomorrow.  If he can't, I want to know -- I want an

20   explanation why he can't.  If it's a medical emergency, I need

21   some verification of that.  If it's a matter of training, it

22   seems to me that the interests of justice, if he's going to be

23   called, even if it's for a purpose that seems to go nowhere,

24   the Defense has a right to call a witness and that takes

25   precedent over a training program.

1          **MR. BARRY:**  Yeah, but they can't -- they can't juggle

2   the schedule like this.  He was here on Friday.  They said --

3          **THE COURT:**  I understand that, Mr. Barry, but this

4   is -- this is what I'm ordering.  And if for some reason he

5   cannot come, I will indicate now I'm not going to continue this

6   trial just so that he can come.

7       If you want to move for a mistrial, as you guys often do

8   every day, you go ahead and move for a mistrial, and I'm going

9   to deny it.

10      Because so far, what I've heard, I'm not impressed by any

11  of the proffers.  However, I respect your right to call a

12  witness, and that's why I'm ordering the Government to use all

13  diligence to get Sergeant Harm here.

14         **MR. BARRY:**  And we'll check on Detective Menke too.

15         **THE COURT:**  And Menke because, at least for

16  Mr. Babcock's point, we do need Mr. Menke here.   Okay?

17         **MR. BABCOCK:**  Thank you, Your Honor.

18         **MR. BARRY:**  And how long, Your Honor?

19         **THE COURT:**  Well, 10 minutes.

20               (Recess taken at 11:10 a.m.)

21             (Proceedings resumed at 11:24 a.m.)

22      (Proceedings were heard out of the presence of the jury.)

23         **THE CLERK:**  Court is reconvened.

24         **MR. BARRY:**  And, Your Honor, Sergeant Harm is not

25  available.  He won't be at training.  He'll be at the hospital.

PROCEEDINGS

```
 1              THE COURT:  Okay.

 2              MR. BARRY:  So there's a surgery either scheduled for

 3    today or more likely tomorrow.  So that's where he's going to

 4    be.  So he will not be here.

 5              THE COURT:  Okay.  This was an emergency?

 6              MR. BARRY:  Yes.

 7              THE COURT:  This is of family?

 8              MR. BARRY:  Yes.

 9              THE COURT:  He's actually at the hospital?

10              MR. BARRY:  He's actually at the hospital.

11              THE COURT:  The surgery is tomorrow or today?

12              MR. BARRY:  Either today or tomorrow, but it's

13    involved.  It involves a drain and it's very serious.

14              THE COURT:  Okay.  Well, what else can I say?  I guess

15    we'll get a motion.

16              MR. MILIOTIS:  Is Monday morning out of the question,

17    Your Honor?

18              THE COURT:  At this point, it is.  Let's see how it

19    goes.  Let's see how it goes.

20        So let's get the next witness on the stand and call the

21    jury back.  It's been a half an hour for them.

22        (Dylan Fong enters the courtroom and steps forward to be

23    sworn.)

24                        (Pause in proceedings.)

25              THE CLERK:  All rise for the jury.
```

FONG - DIRECT / BORO

```
1              (The jury enters the courtroom.)

2         (Proceedings were heard in the presence of the jury.)

3              THE COURT:  Okay.  Please be seated, everyone.

4         Welcome back, members of the jury.  I'm sorry we had a

5    little bit of a delay; but there were some matters we had to

6    attend to, but we're ready to pick up again and continue with

7    the Defense case.

8         Mr. Boro, you may call your next witness.

9              MR. BORO:  Thank you, Your Honor.

10        The Defense calls Dylan Fong.

11             THE CLERK:  Please raise your right hand.

12                         DYLAN FONG,

13   called as a witness for the Defendants, having been duly sworn,

14   testified as follows:

15             THE WITNESS:  I do.

16             THE CLERK:  Thank you.  Please have a seat.

17        Please speak clearly into the microphone.  State your

18   first and last name and spell your last name for the record.

19             THE WITNESS:  Dylan Fong, F-O-N-G.

20             THE COURT:  All right.  Thank you, Mr. Fong.

21        You may proceed, Mr. Boro.

22                    DIRECT EXAMINATION

23   BY MR. BORO:

24   Q.   Good morning, Mr. Fong.

25   A.   Good morning.
```

**FONG - DIRECT / BORO**

1   Q.   Could you tell us, how old are you?

2   A.   I am 48 years old.

3   Q.   And are you -- what city do you live in?

4   A.   Santa Rosa.

5   Q.   And who do you work for?

6   A.   Sonoma County Sheriff's Office.

7   Q.   How long have you worked for the Sonoma County

8   Sheriff's Office?

9   A.   23 years.

10  Q.   And what is your current position with the Sonoma County

11  Sheriff's Office?

12  A.   I am a sergeant that's assigned to the Internal Affairs

13  Unit.

14  Q.   And what is the Internal Affairs Unit?

15  A.   It's -- we're responsible for investigating matters,

16  personnel matters, within the Sheriff's Office.

17  Q.   So that would be investigating complaints against members

18  of the Sheriff's Department?

19  A.   Correct.

20  Q.   And if I could take you back to the year 2016, what

21  position did you hold in the Sonoma County Sheriff's Department

22  at that point?

23  A.   At that time, I was a detective with the Crime Scene

24  Investigations Unit.

25  Q.   And what is the Crime Scene Investigations Unit?

FONG - DIRECT / BORO

1   A.   It's a team of five that are responsible for responding to

2   crime scenes, processing, protecting the evidence.

3   Q.   And how -- back in that 2016 period, how was the Crime

4   Scenes Investigation Unit used in criminal investigations?

5   A.   We would work in conjunction with other detective bureaus,

6   if they requested a crime scene to be processed or if they

7   requested any cell phones being downloaded, computer forensics,

8   fingerprint processing, photographs.  We would be responsible

9   for helping them out.

10  Q.   And you mentioned a few examples, I guess, of the types of

11  investigative activities you would be involved in.  One, you

12  said, was cell phone downloads?

13  A.   Correct.

14  Q.   And then would you be involved in DNA collection?

15  A.   Yes.

16  Q.   And how about searches for blood samples?

17  A.   Yes.

18  Q.   Semen samples?

19  A.   Yes.

20  Q.   And what sort of photography would you be involved in?

21  A.   If they requested, you know, us to document a particular

22  item, we would take photographs of the items that were of

23  importance.

24  Q.   And that unit, the CSI unit, that's similar to the

25  fictionalized one that's on TV, the various TV shows have been

**FONG - DIRECT / BORO**

1  about?

2  **A.**  Well, there's big differences in between TV and reality,

3  in my opinion, but generally, yes.

4  **Q.**  And what -- just so we're all thinking about the same

5  thing, what would be the big differences between how you would

6  do your job at CSI and Sonoma County Sheriff's versus how

7  people might think of it based on the television show?

8  **A.**  Well, I think the big myth is that we cannot complete a

9  crime scene within an hour.  It takes us very -- it's very

10  labor intensive, usually time sensitive as far as, you know,

11  taking your time and processing the scene and make sure you do

12  it thoroughly and with the right equipment.

13  **Q.**  And is it -- has it been your experience -- well, how long

14  have you been involved in the CSI unit -- were you involved

15  with it?

16  **A.**  About four years.

17  **Q.**  And about how many crime scenes do you think you processed

18  over the course of those four years?

19  **A.**  Hundreds.

20  **Q.**  And are there more -- was there more than just you in the

21  crime scene unit?

22  **A.**  Yes.  There was a team of five.

23  **Q.**  And is it -- was it your experience, based on those

24  hundreds of crime scene processing, that generally the sooner

25  the crime scene was processed in relation to when the crime was

FONG - DIRECT / BORO

1   alleged to have occurred, the more likely you were to find

2   useable evidence?

3   A.   Yes.

4   Q.   And why is that?

5   A.   The evidence can be lost in a number of ways.  Someone can

6   pick up evidence and carry it away.  It could be contaminated

7   by other sources.  It can lose its value based upon weather

8   conditions.  Those are some of the issues with collecting

9   evidence right away versus letting it sit for a long time --

10  period of time.

11  Q.   And in the period of November 2016 to December 2016, do

12  you recall being involved in a crime scene investigation

13  involving Michelle Conte?

14  A.   Yes.

15  Q.   And that was a case of an alleged sexual assault; is that

16  correct?

17  A.   That's correct.

18  Q.   And what was your role in that CSI investigation?

19  A.   I was asked to respond to a residence and process a

20  vehicle for DNA evidence.

21  Q.   And the -- do you recall the address of the residence?

22  A.   747 Mill Street in Santa Rosa.

23  Q.   And do you recall if that was Ms. Conte's residence?

24  A.   Yes, it was.

25  Q.   And on that occasion, what was the date that you were

**FONG - DIRECT / BORO**

1    called to respond to that crime scene?

2    **A.**    Would I be able to refer to my report?

3    **Q.**    Yes.

4    **A.**    (Witness examines document.)  It was December 6th, 2016.

5    **Q.**    And when you would do one of these CSI investigations of a

6    part of a case, would you and your fellow teammates tend to

7    write up a report describing what you did on your part of the

8    investigation?

9    **A.**    Yes.

10   **Q.**    And what was the purpose for putting together those

11   reports?

12   **A.**    To document and memorialize the actions taken during our

13   investigation.

14   **Q.**    And how were those reports relied upon?

15   **A.**    I'm not sure if I understand your question.

16   **Q.**    Oh.  Well, once you and your fellow CSI investigators have

17   documented various investigation steps, are those reports

18   relied on by others for any purpose?

19   **A.**    Yes.  It's relied on other -- by other detectives and

20   eventually, you know, by the court process.

21   **Q.**    And when you put together one of these reports, is it your

22   standard practice to try and make the report complete and

23   accurate?

24   **A.**    Yes.

25   **Q.**    And you would generally review it when you were done to

FONG - DIRECT / BORO

1  make sure that you felt that it was complete and accurate?

2  A.   Yes.  I would do that and a supervisor would approve it

3  after I was completed with the report.

4  Q.   And on December 6th, 2016, did you have an understanding

5  of how many days had passed since the incident that occurred

6  with Ms. Conte?

7  A.   I believe it was about a week.

8  Q.   And does the date November 26, 2016 -- does that sound

9  like the date of the alleged incident?

10  A.   Yes.

11  Q.   And so it was maybe -- at this point, maybe 10 days,

12  I guess, somewhere in that range?

13  A.   Yes.

14  Q.   And when you went to examine Ms. Conte's vehicle, what was

15  your understanding of the role of the vehicle in the

16  November 26 incident?

17  A.   It was my understanding that there was a sexual assault

18  that occurred in the vehicle and that DNA evidence was possibly

19  left behind.

20  Q.   And what was your understanding of how DNA evidence was

21  possibly left in the vehicle?

22  A.   I learned that the victim was forced to orally copulate

23  the suspect.  The suspect had ejaculated into the victim's

24  mouth, and the victim had spit the semen out in the vehicle

25  onto the suspect's lap.

FONG - DIRECT / BORO

1    Q.   So you were investigating, then, if DNA from the semen

2    could be located in the vehicle; is that fair to say?

3    A.   Yes.

4    Q.   And the -- and when -- was it -- had there been a prior

5    investigation or a prior examination of this vehicle?  Did you

6    understand that?

7    A.   Yes.

8    Q.   And were you involved in that prior investigation -- or

9    what would you -- I guess it was some sort of inspection of the

10   vehicle for CSI purposes?

11   A.   Yes.  Another CSI detective had processed the vehicle, I'm

12   not sure exactly when, but sometime prior to my investigation.

13   Q.   And do you know what he had processed it for?

14   A.   I believe he processed it for DNA as well.

15   Q.   And had anyone shared those results with you?

16   A.   No.

17   Q.   So when you came back, then, to do a second processing of

18   the vehicle, what was the investigative technique that you were

19   going to undertake?

20   A.   I was directed to focus my attention around the driver's

21   seat.  This area was believed to be the general area where the

22   semen was spit out and that it was possible that evidence could

23   have been located in that area.

24   Q.   And when you did this inspection of the vehicle, who else

25   was present?

**FONG - DIRECT / BORO**

1   **A.**   Bill Harm with CHP is who I remember being there.  I think

2   there were two other investigators there, but I don't recall

3   who that was.

4   **Q.**   Do you recall if those investigators were federal agents

5   or state agents?

6   **A.**   I don't recall.

7   **Q.**   Did you discuss with Sergeant Harm this investigation of

8   the vehicle?

9   **A.**   Yes.

10  **Q.**   Did you discuss with him what other investigation

11  techniques may have been undertaken in the case?

12  **A.**   I don't believe I did.

13  **Q.**   And besides the -- Sergeant Harm and two other

14  investigators, was Ms. Conte present?

15  **A.**   Yes.

16  **Q.**   And did Ms. Conte indicate to you where to search for the

17  semen?

18  **A.**   Yes.

19  **Q.**   How did she do that?

20  **A.**   She pointed to the general location where she believed

21  that she spit out the semen.

22  **Q.**   And did you then collect DNA swabs from that area?

23  **A.**   Yes.

24  **Q.**   And what is that process of doing that?

25  **A.**   You take a sterile cotton swab and you apply two drops of

**FONG - DIRECT / BORO**

1    distilled water onto the tip of the swab; and then you focus

2    your area where you want to collect the swab, and then you

3    rotate the swab as you swipe across the surface of the area.

4         Once the swab is -- once you complete the swab, you put it

5    into an aerated cardboard box for collection.

6    **Q.**   And do you -- do you also photograph this process as

7    you're going -- do you do some sort of photographic

8    documentation?

9    **A.**   Yes.  I take -- I generally take pictures before

10   processing a crime scene or an area where I'm going to collect

11   DNA swabs.

12   **Q.**   And did you do that in this case?

13   **A.**   Yes.

14   **Q.**   And how many DNA swabs did you collect?

15   **A.**   I collected five total.

16   **Q.**   And where did you collect -- in the car did you collect

17   those DNA swabs?

18   **A.**   I collected from the driver seat, the steering wheel, the

19   passenger door handle, and the gearshift.

20   **Q.**   And were those all areas that Ms. Conte had pointed to as

21   potential areas where the semen would have been spat at?

22   **A.**   No.  Those other areas I had mentioned with the steering

23   wheel, the gearshift, and the doorhandle, those were areas that

24   I collected for any possible DNA evidence that would

25   potentially result in a profile, a suspect profile.

**FONG - DIRECT / BORO**

1   **Q.**   And was it -- is one thing that those other samples might

2   pick up is, if the semen had been on someone's hand after it

3   was spat out and then they touched the gearshift or the

4   steering wheel, there might be a transfer of DNA to those

5   areas?

6   **A.**   Either that or it would just leave trace DNA as to show

7   the -- or prove the identity of who was in the car.

8   **Q.**   So that, just by holding the steering wheel or using the

9   gearshift, some of your skin cells would shed and potentially

10   leave DNA on those surfaces?

11   **A.**   Correct.

12   **Q.**   And that would help you identify who was occupants of that

13   car?

14   **A.**   That's correct.

15   **Q.**   And so then the -- the sample you have in your report,

16   DMF2, blind swab of driver's seat, is that the one that

17   Ms. Conte had pointed to?

18   **A.**   Yes.

19   **Q.**   And then the others that you had mentioned, the

20   doorhandle, gearshift, and steering wheel, those were just to

21   find DNA left by occupants on the car?

22   **A.**   Yes.

23   **Q.**   And then how about the fifth sample, blind swab of driver

24   seat lower front area?  Was that an area Ms. Conte had pointed

25   to?

1  **A.**   I don't believe it was.   I think I was just taking an

2  extra swab of the area.

3  **Q.**   In case there was some DNA there?

4  **A.**   Yes.

5  **Q.**   And then did you also take some swabs of -- I guess

6  control swabs of people who were in the car to identify DNA of

7  people who might be expected to be in the car?

8  **A.**   Yes.

9  **Q.**   And who was that?

10  **A.**   That was Brandy Conte and Virginia McCurdy.

11  **Q.**   And why did you take those samples?

12  **A.**   I had asked who had been driving that vehicle.   I know

13  that the vehicle had not been in a controlled environment, so I

14  was -- I wanted to determine who had been driving the car and

15  obtain reference samples for them for elimination purposes.

16  **Q.**   And would that be useful for the lab, if DNA was found, to

17  help identify if it was their DNA versus a suspect's DNA?

18  **A.**   Yes.

19  **Q.**   And did you know, as part of your investigation, that

20  after the initial CSI inspection of the vehicle was done, the

21  vehicle had been released back to Mrs. Conte?

22  **A.**   That's my belief, yes.

23  **Q.**   And so during that process, then, of the week or so that

24  the vehicle was driven, there's a chance that DNA evidence was

25  lost due to the use of the vehicle; is that the case?

FONG - DIRECT / BORO

1   **A.**   Yes, that's possible.

2   **Q.**   And the -- do you remember if you provided the results of

3   the DNA analysis to Sergeant Harm?

4   **A.**   I did not.

5   **Q.**   So once you collected the DNA, what did you do with those

6   swabs?

7   **A.**   I brought them back to our main office in Santa Rosa and

8   booked them into our property and evidence room.

9   **Q.**   And did you -- did you ever know if the DNA -- the swabs

10  were processed to try and identify whose DNA was present in the

11  car?

12  **A.**   I don't believe they were ever processed.

13  **Q.**   So as far as you know, it was never determined if the

14  suspect's DNA was present in the car?

15  **A.**   Correct.

16  **Q.**   And do you know why those swabs were never processed?

17  **A.**   They -- the swabs -- it's my belief that the swabs were

18  sent to -- or they were sent to our California DOJ lab, and

19  they were told that this case was being prosecuted federally,

20  so it was not -- they were not processed.

21  **Q.**   I see.  So because the federal government had taken over

22  the prosecution, then your office stopped the analysis of the

23  DNA evidence?

24  **A.**   It wasn't our office.  It was DOJ.

25  **Q.**   The California DOJ lab stopped their analysis?

**FONG - DIRECT / BORO**

1   **A.**   Yes.

2   **Q.**   Do you know if the federal government has ever processed

3   those DNA samples?

4   **A.**   I don't know.

5   **Q.**   Did you do anything else in regard to this attempt to

6   locate -- well, you understood my client, Raymond Foakes, was a

7   suspect at the time?

8   **A.**   Yes.

9   **Q.**   So did you do anything else to try and determine if

10   Mr. Foakes' DNA was actually present in Mrs. Conte's vehicle?

11   **A.**   Other than what I've stated, no.

12   **Q.**   And do you know if Sergeant Harm, or any of the federal

13   investigators, undertook any further steps to try and determine

14   if Mr. Foakes' DNA was present in Mrs. Conte's vehicle?

15   **A.**   I don't know.

16   **Q.**   What other investigation steps did you undertake with

17   respect to the alleged assault on Mrs. Conte?

18   **A.**   I also processed Ms. Conte's cell phone forensically.

19   **Q.**   And what does that mean, to process her cell phone?

20   **A.**   I used a software program called Cellebrite.  It's a

21   system that's designed to extract forensic data from cell

22   phones.

23   **Q.**   And so how does -- how does the -- just in a high

24   overview, how does the Cellebrite program work?

25   **A.**   We use a computer within our CSI crime lab that has a

FONG - DIRECT / BORO

1  software installed on it, and we have a -- we hook up the phone

2  to the actual computer, and the Cellebrite process will extract

3  all the data that's available on the phone and plug it into its

4  software and provide a detailed report as to what's on the

5  phone.

6  Q.   And in your experience, is the Cellebrite software able to

7  recover deleted items from a phone?

8  A.   Yes.

9  Q.   And then the report, what sort of output of data then is

10  produced from this process?

11  A.   It depends on how much data is on the phone.  If there's a

12  little data, it would generate a very small report.  If there's

13  gigabytes' worth of data, then it would generate a very large

14  report.

15  Q.   And then does it also segregate that recovered data by

16  type, such as phone calls or e-mails or text messages?

17  A.   Yes.  It generally breaks it down just like that.  It will

18  log all phone calls, all text messages, photographs, videos,

19  et cetera.

20       MR. BORO:  Mr. Reuter, could we please pull up, for

21  the witness and parties, Defense Exhibit 2036?

22  Q.   So, Sergeant Fong, I've -- I'm displaying, just to you,

23  not to the jury, Defense Exhibit 2036, which has a Government

24  Production Number HA-00053860.

25       And do you recognize the first page that's being shown

FONG - DIRECT / BORO

1   here?

2   A.   Yes, I do.

3   Q.   And is this a Cellebrite extraction report?

4   A.   Yes.

5            MR. BORO:  And, Mr. Reuter, if we could go to the

6   second page, which has Government Production Number 53861.

7   Q.   What is the second page showing?

8   A.   This is a -- it provides a summary of the extraction, the

9   source basically, what device I'm extracting the information

10  from, and then the particular descriptions of the device.

11  Q.   And by looking at this second page, are you able to

12  identify this extraction report as the one you prepared of

13  Ms. Conte's cell phone?

14  A.   Yes.

15           MR. BORO:  Your Honor, I'd like to move into evidence

16  DX 2036.

17           THE COURT:  Any objection?

18           MS. PENG:  No objection.

19           THE COURT:  Admitted.

20       (Trial Exhibit 2036 received in evidence.)

21           THE COURT:  You may publish.

22           MR. BORO:  Thank you, Your Honor.

23       So if we go back, Mr. Reuter, to the first page.

24  Q.   So this is just the cover showing that this is being done

25  by the Sonoma County Sheriff's Office?

1   **A.**   Yes.

2          **MR. BORO:**  And then, Mr. Reuter, if we go to the

3   second page.

4   **Q.**   What -- of the data shown on this summary report, what

5   allows you to identify this as the work product you did on

6   extracting data from Ms. Conte's cell phone?

7   **A.**   It provides the information at the top.  It provides the

8   fact that I'm conducting an extraction on a phone.  I provided

9   an item number to it that describes it as an Apple iPhone 6.

10  **Q.**   And do you see that in the second line there, there is a

11  date for the creation of the Cellebrite report?

12  **A.**   Yes.

13  **Q.**   And what is that date?

14  **A.**   December 1st, 2016.

15  **Q.**   So this step, you had done before doing that second

16  inspection of the car for DNA evidence?

17  **A.**   Yes.

18  **Q.**   And then do you see -- if you look down in the middle of

19  the bottom section where it talks about device information --

20  **A.**   Mm-hmm.

21  **Q.**   -- do you see there is a row for owner name?

22  **A.**   Yes.

23  **Q.**   And what does it show there?

24  **A.**   Michelle's iPhone.

25  **Q.**   And is that consistent with your interpretation of this

FONG - DIRECT / BORO

```
 1   report; this was for Michelle Conte's iPhone?
 2   A.   Yes.
 3   Q.   And then the pages that succeed, that follow this, this --
 4   I believe my count was this is about 106 pages.
 5           MR. BORO:  The last page of DX 2036, if we could go
 6   just to the last page, Mr. Reuter.
 7   Q.   Do you see there is a Government Production Number
 8   HA-00053965?
 9   A.   Yes.
10   Q.   And this -- but you notice above this page -- and I guess
11   if I were to quickly do my math, that's 106 pages.  965 minus
12   860.  I think that's 106.  But in that ballpark, you would
13   agree?
14   A.   Yes.
15   Q.   If you look at that last page, there, above the
16   Government's production number, there's a small number.  Do you
17   see that 457?
18   A.   Yes.
19   Q.   What is the 457?
20   A.   By looking at this by itself, I don't know.
21           MR. BORO:  Well, if you -- if we go back to the first
22   page, Mr. Reuter.
23   Q.   Do you see, on the first page, there's a small number 1
24   down in the bottom right-hand corner?
25   A.   Yes.
```

FONG - DIRECT / BORO

1    Q.   And if we go to the next page, the second page, with the

2    summary information, do you see there's a small number 2 in the

3    bottom right-hand corner?

4    A.   Yes.

5    Q.   So if we go again to that last page, does that -- would

6    that be the page number out of the Cellebrite extraction,

7    page 457?

8    A.   It appears so, yes.

9    Q.   Is it fair to say that this exhibit is just a subset of

10   the actual extraction, if there's only 106 pages?

11   A.   I don't know the answer to that.

12   Q.   Well, if a -- do you recall how large the Cellebrite

13   extraction was from Ms. Conte's cell phone?

14   A.   I do not.

15           MR. BORO:   Mr. Reuter, if we could go to the page

16   ending in Production Number 53943.

17   Q.   What is the small number in the right-hand corner?

18   A.   535.

19   Q.   And does that, again, just thinking about your experience

20   working with these extractions, suggest that this page was

21   originally page 535 of the Cellebrite extraction?

22   A.   By looking at that, that would lead me to believe that,

23   yes.

24   Q.   So is it again fair to say that this exhibit produced by

25   the Government is just a portion of the Cellebrite extraction

FONG - DIRECT / BORO

1   for Ms. Conte's cell phone?

2           MS. PENG:  Objection.  Assumes facts not in evidence.

3           THE COURT:  Rephrase the question.

4   BY MR. BORO:

5   Q.   This -- is it your assumption, having looked at the

6   numbers, including -- I think we looked at number 535?

7   A.   Yes.

8   Q.   -- that the original Cellebrite extraction was at least

9   535 pages?

10  A.   That would lead me to believe that would be a correct

11  statement, yes.

12  Q.   Now, in this report, I want to call your attention to a

13  few portions of it.

14       Oh, once you -- once you ran the report and got a download

15  of Ms. Conte's cell phone, what was the next thing you did with

16  it?

17  A.   I automatically transfer the download to a CDR disk and

18  then book it into evidence.

19  Q.   And so that -- so that CDR disk, then, would have the

20  electronic copy of the report as opposed to like the printout

21  I'm looking at here?

22  A.   Yes.

23           MR. BORO:  And if we could, Mr. Reuter, I believe it's

24  DX 2099, if we can pull that up.

25  Q.   And this -- I'm just going to have you verify that DX 2099

FONG - DIRECT / BORO

1    is just a portion of what's already been admitted, DX 2036.

2        We'll hold off showing it to the jury until we verify

3    that.

4        Do you see DX 2099 -- let me just make sure I'm on the

5    same page.

6        Thank you, Mr. Reuter.  Yes, I wanted to go to the first

7    page.

8    **Q.**   So if you look at the first page of DX 2099, you'll see at

9    the bottom, there's a Production Number 53862; and if -- and

10   you see it has a title there "Native 854" and then below that,

11   it says "Incoming 224"?

12   **A.**   Yes.

13       **MR. BORO:**  And, Mr. Reuter, for comparison, if we

14   could pull up DX 2036 and go to that same page.  And that page

15   was Government Production Number 53862.

16       Great.

17   **Q.**   Do you see here, now looking at the main subset of

18   documents in DX 2036, that that also is showing the same thing,

19   the 854 native calls and the incoming calls of 224?

20   **A.**   Yes.

21       **MR. BORO:**  Your Honor, I'd like to admit DX 2099, the

22   excerpt of incoming calls.

23       **THE COURT:**  Any objection?

24       **MS. PENG:**  No objection.

25       **THE COURT:**  Admitted.

 1          (Trial Exhibit 2099 received in evidence.)

 2          **THE COURT:**  You may publish.

 3          **MR. BORO:**  Thank you.

 4   **Q.**   Looking here at DX 2099, do you see, at the top of it, in

 5   call number 1 under incoming calls, it's a call with a date of

 6   November 30th, 2016?

 7   **A.**   Yes.

 8   **Q.**   And then it's -- it's showing a time, 7:13:44.  Am I

 9   reading that correctly?

10   **A.**   Yes.

11   **Q.**   And --

12          **MR. BORO:**  Oh, thank you, Mr. Reuter.

13   **Q.**   So this is a little larger.  It will be easier for both of

14   us.

15          And it looks like it's doing it in p.m.  So it's not

16   military time.  It's a.m. or p.m.?

17   **A.**   Yes.

18   **Q.**   And then that UTC minus 8, what is that referring to?

19   **A.**   It's a universal time code that applies to the specific

20   region.

21   **Q.**   So that would -- that would be the conversion of a

22   universal time code to the Pacific time zone?

23   **A.**   Yes.

24   **Q.**   So -- and then it has -- for that first call after the

25   time stamp, it has a duration, and what is that signifying?

FONG - DIRECT / BORO

1    **A.**   4 minutes and 17 seconds.

2    **Q.**   That's the length of the call?

3    **A.**   Yes.

4    **Q.**   And then the country code, is that the country where the

5    call was placed from?

6    **A.**   Yes.

7    **Q.**   And then the next three are blank, and then the last

8    column says "Deleted."  And for this particular call, it says

9    "Intact."  What does that signify?

10   **A.**   That the data is still on the phone and it's not marked

11   for deletion.

12   **Q.**   And here, the data would be what we're looking at, the

13   time stamp, the length of the call?

14   **A.**   Yes.

15   **Q.**   And if you look at the second entry, do you see how, there

16   in the "from," it actually identifies a number and a person's

17   name?

18   **A.**   Yes.

19   **Q.**   How is the Cellebrite software doing that?

20   **A.**   I don't know.

21   **Q.**   Does the Cellebrite software download the address book

22   also in the phone?

23   **A.**   Yes.

24   **Q.**   And here, would you expect that, if we look at the

25   Cellebrite download for the address book, that we would find an

FONG - DIRECT / BORO

1    address for Jason Jen's husband?

2    **A.**   I'm sorry.  Can you ask that question again?

3    **Q.**   Yes.  Just based on your experience with this software, if

4    we were to go to the section of the Cellebrite extraction that

5    had like the telephone address book of people's numbers and

6    names, would you expect to find an entry called Jason Jen's

7    husband?

8    **A.**   Yes.

9         **MR. BORO:**  Now, Mr. Reuter, if we could scroll down

10   until 11/26/2016.

11   **Q.**   And while Mr. Reuter is doing that, incoming calls, does

12   that just mean a call that the person receives on their phone?

13   **A.**   Yes.

14   **Q.**   So it would have been these are calls that Michelle Conte,

15   on the dates and time indicated, someone had called her and she

16   actually answered the phone?

17   **A.**   I believe so.  If it was not answered, it would show as a

18   missed call.

19   **Q.**   Okay.  And I'll show you that in a minute.

20        But do you recall Cellebrite does -- reports also for

21   outgoing calls?

22   **A.**   Yes.

23   **Q.**   Calls you place and then also missed calls that don't get

24   picked up?

25   **A.**   Correct.

**FONG - DIRECT / BORO**

1    Q.   So these are just the incoming calls where the persons

2    actually speak?

3    A.   Correct.

4    Q.   So -- and it looks like the calls in this report, they're

5    all numbered, and they're in reverse chronological order, going

6    from November 30th backwards.

7         Can you see that?  We're looking at page 53863 now.

8    A.   Yes, that's correct.

9         **MR. BORO:**  And, Mr. Reuter, if we could go to the next

10   page so we'll see where November 26 starts.

11   Q.   And looking at this page, we're now looking at a page with

12   Government Production Number HA-00053864, and do you see there,

13   all of these calls in the far column say "Intact"?

14   A.   Yes.

15   Q.   And that means the call hasn't been deleted by the user

16   from the phone; isn't that correct?

17   A.   That's correct.

18   Q.   And it looks like, at the top of the page, the last call,

19   incoming call, actually received was on November 24th, 2016, at

20   8:38 p.m. and three seconds.  Does that look right?

21   A.   Yes.

22   Q.   And it was a call of 41 seconds?

23   A.   Yes.

24        **MR. BORO:**  Now, Mr. Reuter, if we could go to the next

25   page.

1           And if we could go the opposite direction.  If we could go

2   back in time.  So it will be page 53863.

3   Q.   So that's the next call in order.  Do you see that call

4   number 53?

5   A.   I do.

6   Q.   And call number 53 -- we'll enlarge that -- that call is

7   placed on what date -- or received on what date?

8   A.   November 26, 2016.

9   Q.   And what time on November 26 is that received?

10  A.   9:38 p.m. -- I'm sorry.  9:38 and 45 seconds p.m.

11  Q.   And who is the phone -- the records here indicating call

12  53 is from?

13  A.   Josh.

14  Q.   And then it has a phone number (707)477-1807?

15  A.   Yes.

16  Q.   And what is the duration shown for this call?

17  A.   1 minute and 51 seconds.

18  Q.   And do you see how this call is marked deleted in the last

19  box?

20  A.   Yes.

21  Q.   So this is a call where the user of the phone, Ms. Conte,

22  had deleted this from her phone record?

23          **MS. PENG:**  Objection.  Lack of foundation.

24          **THE COURT:**  Lay a foundation.

25  \\\

FONG - DIRECT / BORO

1   BY MR. BORO:

2   Q.   The deleted in that column, where it shows deleted, what

3   does that signify from the Cellebrite software?

4   A.   It signifies that the user of the phone manually marked or

5   manually deleted this particular phone call and it was -- the

6   phone itself marked it for deletion.

7          MR. BORO:   And, Mr. Reuter, if we could screen back

8   out to show the full page.   And maybe let's start at the top,

9   from November 30th, this excerpt.

10  Q.   And I assume the calls start at November 30th because

11  presumably you were given the phone on December 1st, so that

12  might have been the last incoming call before you took

13  possession of the phone and ran the Cellebrite.

14  A.   Yes.

15  Q.   And then it would -- do you know how far back these go,

16  these iPhones, often in storage of calls?

17  A.   I'm sorry.   Can you ask that again?

18  Q.   Do you know, generally how far back do they -- does the

19  phone store a few days' worth of calls or a month of calls?

20  A.   I don't know the answer to that.

21  Q.   Okay.   But -- so we have there, under incoming calls, at

22  least, was captured 224 incoming calls; and on calls beginning

23  on November 30th and going backwards, calls 1 through 19, are

24  any of those calls noted as deleted by the user of the phone?

25  A.   No.

1           **MR. BORO:**  And then, Mr. Reuter, if we could go to the

2     next page, 53863.

3     **Q.**   These are calls 20 through 53, and you see call 53 is the

4     one from Josh at 9:38 p.m. on November 26.  On this page,

5     besides the call from Josh, are any others indicated deleted by

6     the user?

7     **A.**   No.

8           **MR. BORO:**  Mr. Reuter, if we could go to the next

9     page.

10    **Q.**   This shows incoming calls 54 to 94 from 11/24/2016 to

11    11/17/2016.  Do you see that?

12    **A.**   This is 54 to 84; is that correct?

13    **Q.**   54 to 84, yes.

14    **A.**   There is nothing deleted.

15    **Q.**   Thank you.

16          **MR. BORO:**  Mr. Reuter, if we can go to the next page.

17          **MR. REUTER:**  That's the last page of DX 2099.

18          **MR. BORO:**  Okay.  This is where the excerpt ends.

19          If we could pick up, then, Mr. Reuter, Defense

20    Exhibit 2100, the next excerpt from the record.

21    **Q.**   So -- and this is not yet published to the jury, but in

22    DX 2100, do you see, Sergeant Fong, that -- it's the first

23    production number is Government Production Number HA-00053868?

24    **A.**   Yes.

25    **Q.**   And this is entitled "Outgoing"?

**FONG - DIRECT / BORO**

1   **A.**   Correct.

2           **MR. BORO:**  And, Mr. Reuter, if we could go back to

3   DX 2036, to page 53868 just to verify.

4   **Q.**   This is the same?  Does that appear to be the same page,

5   the same number of outgoing calls, the 320?

6   **A.**   Yes.

7   **Q.**   Thank you.

8           **MR. BORO:**  Mr. Reuter if we could go back again to

9   DX 2100.

10      I would -- Your Honor, I'd like to move into evidence

11   DX 2100.

12          **THE COURT:**  Any objection?

13          **MS. PENG:**  No objection.

14          **THE COURT:**  Admitted.

15      (Trial Exhibit 2100 received in evidence.)

16          **THE COURT:**  You may publish.

17          **MR. BORO:**  Thank you, Your Honor.

18   **Q.**   And so this outgoing log, these are reflecting calls that

19   the user of the cell phone had placed to others?

20   **A.**   Yes.

21   **Q.**   And this one here, that first call, you see that is on

22   November 30th?

23   **A.**   Yes.

24   **Q.**   And then it has -- the first call has a duration of

25   22 seconds?

**FONG - DIRECT / BORO**

1   **A.**   Correct.

2   **Q.**   And the second call has a -- do you see the duration of

3   zero?

4   **A.**   Yes.

5   **Q.**   So does that signify to you that the person on the other

6   end of the call did not pick up the call?

7   **A.**   Yes.

8         **MR. BORO:**  And if we could zoom back out, Mr. Reuter.

9   **Q.**   On these outgoing calls, just looking at that first page,

10  which is calls 1 through 19, are all those call records intact

11  or any deleted?

12  **A.**   They're all intact.

13        **MR. BORO:**  And then, Mr. Reuter if we could go to the

14  next page, 69.

15  **Q.**   Here we have calls 20 -- outgoing calls 20 to 52, going

16  from November 28th down to November 19th, 2016.

17        Are any of those deleted or are they all intact?

18  **A.**   They're all intact.

19        **MR. BORO:**  And, Mr. Reuter let's see if there are any

20  more of these.

21        **MR. REUTER:**  No, sir.

22        **MR. BORO:**  That is it?  Okay.  Thanks.

23        Let's just look quickly at the last exhibit.  Oh, wait.

24        First -- I'm sorry -- one thing on this page, if we

25  could -- Mr. Reuter if you could enlarge right there at 11:24

FONG - DIRECT / BORO

1   and 11:27, which is lines -- calls 37, 38, 39, that area.

2        That's perfect.

3   Q.   And, Sergeant Fong, did the Cellebrite extraction indicate

4   that Mrs. Conte had placed any phone calls on November 26?

5   A.   I don't see any.

6   Q.   And then the first call placed after November 26, is that

7   call 37?

8   A.   Yes.

9   Q.   And when was that placed?  Or what time?

10  A.   2:40 and 48 seconds a.m.

11  Q.   So 2:40 in the morning basically?

12  A.   Yes.

13  Q.   Thank you.

14       **MR. BORO:**  Mr. Reuter then if we could pull up the

15  last set of documents, DX 2101.

16  Q.   And this has Government Production Number HA-00053865.

17       And you see there it refers to missed 310?

18  A.   Yes.

19       **MR. BORO:**  And, Mr. Reuter if we could just go -- one

20  last time back to DX 2036, to the same page, 865.

21  Q.   So DX 2036, does this appear to be an excerpt out of the

22  main production?

23  A.   Yes.

24       **MR. BORO:**  Your Honor, I'd like to move into evidence

25  DX -- oh, that's 2036.

**FONG - DIRECT / BORO**

1          Mr. Reuter, I wanted to be in DX 2101.

2                    **MR. REUTER:**  One moment, please.

3                         (Pause in proceedings.)

4    **BY MR. BORO:**

5    **Q.**   Does this appear to be the same page in DX 2101 of 310

6    missed calls?

7    **A.**   Yes.

8                    **MR. BORO:**  And, Your Honor, I'd like to move into

9    evidence DX 2101.

10                   **THE COURT:**  Any objection?

11                   **MS. PENG:**  No objection.

12                   **THE COURT:**  Admitted.

13           (Trial Exhibit 2101 received in evidence.)

14                   **THE COURT:**  You may publish.

15                   **MR. BORO:**  Thank you.

16   **Q.**   So in here again, the missed calls are calls that came to

17   Ms. Conte's phone but she didn't pick them up; isn't that

18   correct?

19   **A.**   Yes.

20   **Q.**   And do you see those -- the first call, in reverse

21   chronological order, is from December 1st, 2016?

22   **A.**   Yes.

23   **Q.**   And there, there is one call deleted.  Do you see that at

24   number 6?

25   **A.**   Yes, I do.

FONG - DIRECT / BORO

1    Q.   And that's on November 30th, 2016?

2    A.   Correct.

3    Q.   And it doesn't say who it's from?

4    A.   Correct.

5    Q.   Why -- why would that box be blank on the party's -- the

6    "from"?

7    A.   When items are deleted on cell phones, it's marked for

8    deletion by the phone and that data goes into what they call

9    unallocated space, and it's up to the phone to decide whether

10   or not that data is going to be overwritten or not; if there's

11   new data coming in, whether it would take up that space.

12   Q.   I see.  So it's possible that since this was deleted,

13   something else was saved over part of the information and the

14   party was lost?

15   A.   Correct.

16        MR. BORO:  If we could zoom back out, Mr. Reuter.

17   Q.   So do you see on this there's 19 missed calls and that's

18   the only one that's deleted?

19   A.   Correct.

20        MR. BORO:  And then if we could go to the next page --

21   oh, Mr. Reuter, if we could go back just one minute.

22        That one there, call number 6, if we could blow that up

23   again just for the time of that deleted call.

24        MR. REUTER:  Sorry.  One moment.

25        MR. BORO:  That's fine.  I see it.

**FONG - DIRECT / BORO**

1  Q.   Do you see there, Sergeant Fong, it was at 6:13 and 29

2  seconds in the evening?

3  A.   Yes.

4  Q.   All right.

5       MR. BORO:   Thank you, Mr. Reuter.   If we could just

6  zoom back out and then go to the next page.

7  Q.   Here, these look like there's missed calls from

8  November 28th down to November 27th.   Does that look right?

9  A.   Yes.

10  Q.   With none deleted?

11  A.   Correct.

12       MR. BORO:   If we could we go to the next page.

13  Q.   Here, do you see it starts with a November 27th and then

14  we have some calls on November 26th?

15       MR. BORO:   And if we could blow that up, Mr. Reuter.

16  Q.   So looking at November 26, do you see that, after that

17  call that, was received at 9:38 in the evening, there then is

18  another call from Josh?   And see it has the same phone

19  number (707)477-1807?

20  A.   I see it, yes.

21  Q.   And that was a missed call at 9:44?

22  A.   Yes.

23  Q.   And then do you see in -- that was in row 57 -- in row 56,

24  there's another call from the same number for Josh?

25  A.   Yes.

FONG - DIRECT / BORO

1    Q.   And that one is at 9:46, roughly, in the evening?

2    A.   Correct.

3    Q.   And then the next missed call, the last one on

4    November 26th, do you see that's again from Josh and that one's

5    at 11:16 in the evening?

6    A.   Correct.

7    Q.   And then after that, the next missed call is in the

8    morning of the 27th?

9    A.   Correct.

10   Q.   And so here, just based on what we looked at, your

11   Cellebrite analysis showed there were three missed calls from

12   Josh on November 26 between 9:44 and 11:16; isn't that correct?

13   A.   Yes.

14   Q.   And besides that, there's only one other missed call

15   earlier in the evening from a 323 number, maybe 20 minutes

16   earlier?

17   A.   Correct.

18   Q.   And then we saw, on the outgoing calls, no outgoing calls

19   were placed on November 26?

20   A.   Correct.

21   Q.   And then the analysis showed on the incoming calls --

22        MR. BORO:  Maybe we could go back to that, Mr. Reuter

23   just to be sure.  That was 2099, the first one we looked at.

24                  (Pause in proceedings.)

25        MR. BORO:  And then if we could go, this is on the

1   incoming, if we could go to the second page of 2099 and just

2   blow up the bottom there.

3   Q.   So on November 26, there was the one incoming call from

4   Josh at 9:38 in the evening that was deleted.  Do you see that?

5   A.   Yes, I see that.

6        **MR. BORO:**  And, Mr. Reuter if we go to the next page,

7   which would be line 54.

8   Q.   And it looks like that was the only incoming call that

9   Ms. Conte had on November 26.  Isn't that what the Cellebrite

10  extraction showed?

11  A.   That's what it showed, yes.

12       **MR. BORO:**  Thank you very much.

13       **THE COURT:**  All right.  Any further cross from

14  Defense?

15                   (No response.)

16       **THE COURT:**  Any cross from the Government?

17       **MS. PENG:**  Yes.

18                   <u>CROSS-EXAMINATION</u>

19  BY MS. PENG:

20  Q.   Good afternoon, Sergeant Fong.

21  A.   Good afternoon.

22  Q.   In your experience working for CSI, are you always

23  responding to a crime scene right away to process it?

24  A.   No, not generally.

25  Q.   And why is that?

1    **A.**    It takes time to write search warrants.

2    **Q.**    And let me ask you, so you testified just now that the

3    swabs that you took of the vehicle, was it that you assumed

4    that they had been submitted to the lab?

5    **A.**    Yes.

6    **Q.**    But you don't actually submit any swabs that you took to

7    any labs?

8    **A.**    Not that I recall, no.

9    **Q.**    And were you aware that there were actually DNA results

10   obtained in this case from a rapid sex assault kit?

11   **A.**    I don't recall that.

12   **Q.**    Okay.  And let me ask you, when you were processing the

13   car for DNA and swabbing it, were you aware that Michelle Conte

14   had spat out the suspect's semen onto his pants?

15   **A.**    Yes.

16   **Q.**    And so when you were processing the car, was it sort of

17   out of an abundance of caution to check if there might have

18   been any residual DNA?

19   **A.**    Yes.

20   **Q.**    Because if the DNA had landed on the suspect's pants, then

21   it wouldn't be in the car; is that fair to say?

22           **MR. BORO:**  Objection.  Speculation.

23           **THE COURT:**  Overruled.  If he has an opinion.

24           **THE WITNESS:**  If it was spat on the pants, there is

25   potential for it to be elsewhere, if it had splattered or were

1  able to come off the pants.

2  BY MS. PENG:

3  Q.   Right.  So but most of it would be on the pants?

4  A.   Yes.

5  Q.   And at some point, you testified that your understanding

6  was that the federal government had taken over the sex assault

7  case as part of a RICO prosecution?

8  A.   Yes.

9  Q.   Okay.  And so you were asked about some phone records as

10  well that you processed for Michelle Conte.  Do you remember

11  that -- those questions?

12  A.   Yes.

13  Q.   So if a call shows up as deleted in the Cellebrite record,

14  does that mean that the call had been made prior to the

15  deletion and the record was on the phone?

16  A.   Yes.

17  Q.   So for it to be deleted, it meant at some point, it was

18  made?

19  A.   If the call detail showed that there was a duration of a

20  call, then the call was made, and the deleted just shows that

21  the user deleted that particular phone call from the device.

22  Q.   And you have no idea, with respect to the call you looked

23  at, who or why that call might have been deleted from the

24  device?

25  A.   I do not know that.

1    **Q.**    Okay.

2              **MS. PENG:**  May I have use of the ELMO briefly?

3         So this is part of Defense Exhibit -- I believe it's 2036

4    that was admitted as the Cellebrite extraction.

5    **Q.**    So I'm going to show now on page 54, Government Bates

6    Number 53902.

7         Do you recognize this as a portion of the Cellebrite

8    extraction report that you were just discussing?

9    **A.**    Yes.

10   **Q.**    And do you see -- do you see that these are text messages

11   from Michelle Conte's phone?

12   **A.**    Yes.

13   **Q.**    Can you read the time and the message right over here

14   (indicating)?  These two (indicating)?

15   **A.**    This message I'm reading now is from November 30th, 2016,

16   12:33:51 p.m., from Michelle Conte.  The message states (as

17   read):

18              "Troy got kicked out of the club and Ray sexual

19         assaulted me, forced me to suck his dick."

20   **Q.**    What does the next message say?

21   **A.**    Again, this is from November 30th, 2016, 12:34:20 p.m.,

22   from Michelle Conte.  And the message states (as read):

23              "And Ray beat him really bad."

24   **Q.**    And looking at this message up here (indicating), is there

25   a reference to something in the paper?

**FONG - REDIRECT / BORO**

1   **A.**   Is there referencing something what?

2   **Q.**   Can you read actually this message as well?

3   **A.**   November 30th, 2016, 12:27:55 p.m. from Michelle Conte.

4   The message reads (as read):

5            "Did you read the paper yesterday?"

6   **Q.**   In your understanding, based on when this incident

7   occurred, that November 30th would have been three days

8   after -- or four days after, rather?

9   **A.**   Yes.

10           **MS. PENG:**  Thank you.

11           **THE COURT:**  All right.  Anything further?

12           **MR. BORO:**  Yes, Your Honor.  Just very quickly.  I

13   have to find my place.

14                   (Pause in proceedings.)

15           **MR. BORO:**  Mr. Reuter if you could pull up DX 2036,

16   Production Number HA-00053903.  And if we could publish it also

17   when it comes up.

18                   <u>**REDIRECT EXAMINATION**</u>

19   BY MR. BORO:

20   **Q.**   Sergeant Fong, could you read the third and fourth entry

21   that's shown here from the Cellebrite extraction?

22   **A.**   The third entry is from November 30th, 2016,

23   12:36:05 p.m., from Chrissy Callahan, and the message reads (as

24   read):

25           "Troy got kicked out of HA club."

**FONG - REDIRECT / BORO**

1    Q.    And then the fourth one?

2    A.    The fourth message, November 30th, 2016, at 12:37:25 p.m.,

3    from Michelle Conte.  The message reads (as read):

4             "Yes.  For sleeping with Des.  That whore.  But

5         yet when Brandy was 17 had a threesome with her, got

6         her pregnant that made her have an abortion."

7             MR. BORO:  And then if I could have the next page.

8                    (Pause in proceedings.)

9             MR. BORO:  Then, Mr. Reuter, if we could pull up,

10   please, page 53945.

11            MR. REUTER:  Could you say that one more time, please?

12            MR. BORO:  53945.

13        And if we could zero in on the entry 11/27 at 7:49 p.m.

14                    (Pause in proceedings.)

15            MR. BORO:  53951.  And then zoom in on the entry that

16   is 11/27 at 7:49 p.m.

17            MR. REUTER:  One moment.

18                    (Pause in proceedings.)

19            MR. BORO:  It's right there.  It's right there, 1:15.

20   Q.    Could you read that entry?

21   A.    Entry 115?

22   Q.    Yes.

23   A.    This is a message that states (as read):

24             "I don't think" -- or I'm sorry -- "I don't

25         remember.  18 I think."

PROCEEDINGS

1  **Q.**   And that was a message to a phone number identified as

2  Brat?

3  **A.**   Yes.

4  **Q.**   (707)477-1530?

5  **A.**   Yes.

6          **MR. BORO:**  Thank you very much.

7          **THE COURT:**  All right.  Anything further?

8          **MS. PENG:**  No, Your Honor.

9          **THE COURT:**  All right.  Then that will conclude this

10  testimony.  Sergeant Fong, you may step down.  You're excused.

11  Thank you.

12          **THE WITNESS:**  Thank you.

13                      (Witness excused.)

14          **THE COURT:**  We'll take our 20-minute break at this

15  point.

16          **THE CLERK:**  All rise for the jury.

17                  (The jury leaves the courtroom.)

18      (Proceedings were heard out of the presence of the jury.)

19          **MR. BARRY:**  Your Honor, I saw -- I don't know if it's

20  Detective or Sergeant or Officer Aiello out in the hall.  So

21  can we get an idea what the Defense wants to do?

22          **THE COURT:**  Yes.

23          **MR. SHEKETOFF:**  So it's my inclination, Your Honor,

24  not to offer the tape, but I -- I'm not sure exactly what he's

25  going to say.  Mr. Reuter has prepared a redacted version.

PROCEEDINGS

```
 1              THE COURT:  Okay.

 2              MR. SHEKETOFF:  And I may change my mind, but right

 3   now, my position is that I'm not going to offer it.

 4              THE COURT:  All right.  So you're going to ask him

 5   about procedure and what he said and that kind of stuff?

 6              MR. SHEKETOFF:  Yes, Your Honor.

 7              THE COURT:  All right.  Well --

 8              MR. BARRY:  What he said, "he" being Officer Aiello?

 9              THE COURT:  Yeah.

10              MR. BARRY:  Okay.

11              THE COURT:  To Mr. Hardisty and stuff, which I said

12   was okay.  Okay?

13          Now, if we do have to play, do we know the length of that?

14              MR. BARRY:  I think it's 41 minutes, Your Honor, and I

15   have transcripts available of just that portion.  I think

16   Mr. Reuter has prepared the video because there's almost

17   nothing after Special Agent O'Brien steps out.  There's --

18   like, there's one mention of Doughboy, but it's all about Knapp

19   and bombs and stuff like that.  So it's -- the meat of the

20   Doughboy and the Hells Angels incidents are in the first

21   41 minutes.

22              THE COURT:  And so you do have transcripts in case we

23   get there?

24              MR. BARRY:  Yes.  The counsel all have electronic

25   versions, but I have written versions for the jury, for the
```

**PROCEEDINGS**

1    clerk, and for Your Honor.

2            **THE COURT:**  Okay.

3            **MR. WALSH:**  Your Honor?

4            **THE COURT:**  Yeah?

5            **MR. WALSH:**  Walsh again.

6        In light of Mr. Fong's -- or Officer's Fong's testimony, I

7    ask that before Sergeant Aiello testifies that the jury -- that

8    you give the limiting instruction that you gave before Michelle

9    Conte testified, given the nature of Officer Fong's testimony

10   and the explicit nature of the text messages within the

11   Cellebrite extraction.

12           **THE COURT:**  You're talking about the instruction about

13   the evidence for each individual defendant should be considered

14   individually and not --

15           **MR. WALSH:**  Excuse me.  But, no.  Specifically I'm

16   asking for -- that if you find there was a sexual assault

17   involving Mr. Foakes and Ms. Conte, that it didn't involve

18   Mr. Ranieri, it didn't involve HASC or the Hells Angels, that

19   one.  I can give you the page in the transcript, Your Honor.

20   Again, it's the explicit nature of the text messages that were

21   pointed out.

22           **MS. PENG:**  Your Honor, there was one text message.

23   The majority of his testimony was about cell phone extractions

24   and DNA.  I'm not sure that there's a need to read the

25   instruction again, which was given before Michelle Conte's

PROCEEDINGS

1    testimony.

2              MR. WALSH:  Again, Your Honor, the texts speak for

3    themselves; but the references to the sexual -- the alleged

4    sexual acts --

5              THE COURT:  Give me the instruction again.

6              MR. WALSH:  Okay.  Thank you.

7              THE COURT:  Give it to me.  Thank you.

8              MR. WALSH:  Thank you, Your Honor.

9              THE CLERK:  Court is in recess.

10                  (Recess taken at 12:42 p.m.)

11                  (Proceedings resumed at 1:01 p.m.)

12        (Proceedings were heard out of the presence of the jury.)

13              THE CLERK:  Court is reconvened.

14       Do you want me to bring him?

15              THE COURT:  Yes.

16         (Steve Aiello enters the courtroom and steps forward to be

17    sworn.)

18              MR. WALSH:  Your Honor, I gave Ms. Ayala, as well as

19    Mr. Barry, a copy of the instruction for Detective Fong, which

20    is consistent with --

21              THE COURT:  I will give a version of that, yes.

22              MR. WALSH:  Thank you, Your Honor.

23                      (Pause in proceedings.)

24              THE CLERK:  All rise for the jury.

25                  (The jury enters the courtroom.)

**PROCEEDINGS**

 1        (Proceedings were heard in the presence of the jury.)

 2        **THE COURT:**  All right.  Please have a seat, everyone.

 3    Welcome back, members of the jury.  Thank you.

 4        Just a reminder that you, again, heard some testimony

 5    regarding -- that pertains to the alleged sexual assault of

 6    Michelle Conte by Mr. Foakes; and I'm instructing you again

 7    that if you conclude that Ms. Conte was sexually assaulted by

 8    Mr. Foakes, that that act was committed by Mr. Foakes alone and

 9    not with any of the other defendants here, including those that

10    are on trial, Mr. Ranieri and Mr. Burke.

11        And that if you conclude that this assault occurred by

12    Mr. Foakes, that this was not an act on behalf of the alleged

13    racketeering enterprise or the Sonoma County Hells Angels, but

14    was -- would have been his own.

15        So just a reminder on that point.

16        With that, I'm going to ask -- invite the defendants to

17    call your next witness.

18        **THE CLERK:**  Please raise your right hand.

19                            **STEVE AIELLO**,

20    called as a witness for the Defendants, having been duly sworn,

21    testified as follows:

22        **THE WITNESS:**  I do.

23        **THE CLERK:**  Thank you.  Please have a seat.

24        Please speak clearly into the microphone.  State your

25    first and last name and spell your last name for the record.

1      **THE WITNESS:**  Steve Aiello, A-I-E-L-L-O.

2      **THE COURT:**  All right.  Thank you, Mr. Aiello.

3   You may proceed.

4      **MR. SHEKETOFF:**  Thank you, Your Honor.

5                    <u>**DIRECT EXAMINATION**</u>

6   BY MR. SHEKETOFF:

7   **Q.**   Good afternoon, Sergeant.

8      Could you tell us what you do for a living?

9   **A.**   Yes.  I'm a patrol supervisor sergeant with the Antioch

10  Police Department.

11  **Q.**   And how long have you been with the Antioch Police

12  Department?

13  **A.**   24 years.

14  **Q.**   And now, sir, directing your attention to June 15th of

15  2016, do you recall participating in a tape-recorded interview,

16  videotaped and audiotaped interview, of Joseph Hardisty?

17  **A.**   I remember speaking with Mr. Hardisty.  I don't recall the

18  date, though.

19  **Q.**   Okay.  And do you recall that that was at a jail?

20  **A.**   I do.

21  **Q.**   And do you know which jail it was at?

22  **A.**   I believe it was Marin County jail.

23  **Q.**   And was that the first or second time that you interviewed

24  Mr. Hardisty?

25  **A.**   So I spoke with him on two occasions at that jail.  The

1  June 16th date, I don't recall if that was the first or second.

2  Q.   I see.

3       On both occasions, were the interviews audio and

4  videotaped?

5  A.   I know that the partner that I was with, requested the

6  very first time that we were there, to be recorded, and I know

7  the deputy was having some issues with the recording.  When we

8  left, we didn't have a copy of the CD, and I don't know if one

9  was produced later on or not.  I have no idea.

10 Q.   All right.  Would -- did you do an actual report of either

11 of the two meetings that you had with Mr. Hardisty?

12 A.   Like a documented report?

13 Q.   Yes.

14 A.   No.

15 Q.   And is it fair to say that the reason you didn't do a

16 documented report was, at the time, you believed both

17 interviews were, in fact, video and audio recorded?

18 A.   The partner I was with was -- I know was going to take

19 notes, and we were going to rely on the recording afterwards.

20 At least that was my understanding.

21 Q.   Okay.  Do you know how it was that you got Mr. Hardisty's

22 name and went to see him for the first time?

23 A.   Yes.

24 Q.   Could you explain that?

25 A.   Yes.  So at the time, I was part of our Gang

1    Investigations Unit, working in a patrol status, and the

2    sergeant of that gang team or that gang unit called me and said

3    he received a call from a deputy at Marin County indicating

4    that there was -- a Joseph Hardisty was there and wanted to

5    provide some information to an incident that happened in

6    Antioch, and if I'd be willing to go out and have a

7    conversation with him.  And that was the extent of the

8    information that I got.

9    **Q.**   All right.  And when you met Mr. Hardisty for the first

10   time, do you know what, if any, charges he was facing or what,

11   if any, sentences he was actually doing?

12   **A.**   So, yes.  I called the deputy to kind of set up a time

13   when I can go out and have a conversation and find out why he

14   was there, and I believe he was on a probation violation.  I

15   don't know what the original charges were or what the probation

16   was for.  I just know that he was there on a violation of

17   probation.

18   **Q.**   And did you come to learn that he had a second matter, a

19   pending case, in Contra Costa County?

20   **A.**   I didn't know of any -- at that time, I didn't know any

21   cases that he had in the county and -- let me back up a little

22   bit.

23       So when I was first told about his name, I looked in our

24   record management system, and we didn't have anything in

25   Antioch with Joseph Hardisty.

**AIELLO - DIRECT / SHEKETOFF**

1  Q.   Okay.  Were any promises made to him during the first

2  interview?

3  A.   No.

4  Q.   Were any promises made to him during the second interview?

5  A.   No.

6  Q.   Did you come to learn, after the second interview or after

7  the first interview, that he had another pending matter?

8  A.   Which matter are you referring to?

9  Q.   Some assault case having to do with, let's say, an

10  eviction.

11  A.   I had learned about an incident that occurred -- I'm going

12  off my memory here -- I think it was in the city of Baypoint,

13  if I'm not mistaken, and I had only learned about that before

14  the second interview.  I didn't know about that from the first

15  interview.

16  Q.   Okay.  Do you know whether or not the second interview was

17  actually successfully tape recorded and video recorded?

18  A.   I don't know because I've never received a copy or seen a

19  copy of it.

20  Q.   All right.  At some point in time, did the United States

21  Attorney's Office, or task force agents working with the United

22  States Attorney's Office, ask you to interview you about the

23  first interview that you did with Mr. Hardisty?

24  A.   Yes, I believe so.  I don't know when that was, but I

25  remember getting a phone call with regards to my conversation

**AIELLO - DIRECT / SHEKETOFF**

1    with him, yes.

2    **Q.**   Okay.  And did you actually have a meeting or was it just

3    a phone call?

4    **A.**   It was a phone call.

5    **Q.**   And were you asked questions about your memory of the

6    first interview?

7    **A.**   Yes.

8    **Q.**   And did anyone inform you that there was no tape recording

9    in their possession about the first interview?

10   **A.**   I recall speaking to one of the attorneys that asked the

11   same questions you did with regards to was it recorded, is

12   there a copy of the CD; and I have the same answer.  I didn't

13   know because we didn't -- I didn't leave with one.  I don't

14   know if one was ever produced later on.

15   **Q.**   All right.  So directing your attention to the first

16   interview, did the topic of a Hells Angel -- a high-ranking

17   Hells Angel from Washington state come up during the first

18   interview?

19   **A.**   I believe so, yes.

20   **Q.**   And was that something that you knew about before you

21   interviewed Mr. Hardisty or was it --

22   **A.**   No.

23   **Q.**   Okay.  And what, if anything, did Mr. Hardisty tell you

24   about this high-ranking member from Washington state?

25          **MR. BARRY:**  Objection.  Hearsay.

AIELLO - CROSS / BARRY

 1          THE COURT:  Sustained.

 2   BY MR. SHEKETOFF:

 3   Q.   Did the topic of Joel Silva's disappearance come up during

 4   the first interview?

 5   A.   Yes.

 6   Q.   And did the topic of someone -- a high-ranking Hells Angel

 7   from Washington state come up during the discussion of

 8   Joel Silva?

 9          MR. BARRY:  Objection.  Hearsay.

10          THE COURT:  Sustained.

11          MR. SHEKETOFF:  Thank you.

12          THE COURT:  All right.  Anything further?  Any other

13   cross?

14          MR. BABCOCK:  No, Your Honor.

15          MR. BORO:  No, Your Honor.

16          THE COURT:  Okay.  The Government?

17                    <u>CROSS-EXAMINATION</u>

18   BY MR. BARRY:

19   Q.   Good afternoon, Sergeant.

20   A.   Good afternoon.

21   Q.   You mentioned talking to one of the attorneys.  Was that

22   me?

23   A.   Honestly, I don't recall.  I'm sorry.

24   Q.   That's fair.  I'd say I'm forgettable, but it was on the

25   phone.

**AIELLO - REDIRECT / SHEKETOFF**

1   **A.**   I think it was almost a year ago, if not, so...

2   **Q.**   Yeah.

3         And the Washington state reference, that's your memory of

4   what was discussed; right?

5   **A.**   Correct.

6   **Q.**   Could you be wrong about that?

7   **A.**   So much time had passed, I could be wrong, definitely.

8   That was just based on my recollection at the time we had the

9   conversation.

10  **Q.**   But you didn't have the benefit of a recording, you didn't

11  have the benefit of a report, and you didn't have the benefit

12  of your notes; right?

13  **A.**   True.  Yes.

14  **Q.**   Yeah.

15        You just think that maybe there was a topic of a

16  Washington Hells Angel that was discussed?

17  **A.**   Correct.

18  **Q.**   But you could be wrong?

19  **A.**   I could be wrong.

20  **Q.**   Thank you, Sergeant.

21        **MR. BARRY:**  Thank you, Your Honor.

22        **THE COURT:**  All right.  Thank you.

23  Anything on redirect?

24        **MR. SHEKETOFF:**  Yes, Your Honor.

25  \\\

PROCEEDINGS

1       <u>**REDIRECT EXAMINATION**</u>

2  **BY MR. SHEKETOFF:**

3  **Q.**   And you could be right; correct?

4  **A.**   I could be.

5  **Q.**   Yeah.   Thank you.

6          **THE COURT:**  All right.  Anything further?

7          **MR. BARRY:**  No, nothing from the Government.   Thank

8  you.

9          **THE COURT:**  All right.  Thank you, Mr. Aiello.  You

10 may step down.

11         **THE WITNESS:**  Thank you.

12         **THE COURT:**  And you are excused.  Appreciate it.

13 Thank you.

14         **THE WITNESS:**  Thank you.

15                    (Witness excused.)

16         **THE COURT:**  The Defense may call the next witness.

17         **MR. BORO:**  Yes, Your Honor.  We're calling Jimmy Ford.

18         **THE COURT:**  Okay.

19    (Jimmy Ford enters the courtroom and steps forward to be

20 sworn.)

21                    (Pause in proceedings.)

22         **THE CLERK:**  Please raise your right hand.

23                    <u>**JIMMY FORD**</u>,

24 called as a witness for the Defendants, having been duly sworn,

25 testified as follows:

FORD - DIRECT / BORO

```
 1              THE WITNESS:  I do.

 2              THE CLERK:  Thank you.  Please have a seat.

 3         Please speak clearly into the microphone.  State your

 4    first and last name and spell your last name for the record.

 5              THE WITNESS:  Jimmy Ford, F-O-R-D.

 6              THE COURT:  All right.  Thank you, Mr. Ford.

 7         You may proceed, Mr. Boro.

 8              MR. BORO:  Thank you, Your Honor.

 9                        DIRECT EXAMINATION

10    BY MR. BORO:

11    Q.   Mr. Ford, my name is Al Boro.  We've spoken before,

12    haven't we?

13    A.   Yes.

14    Q.   But we've never met?

15    A.   No.

16    Q.   And I represent Ray Foakes.

17    A.   Yes, sir.

18    Q.   How old are you?

19    A.   54.

20    Q.   And where do you live?  What city?

21    A.   Excelsior.  San Francisco, Excelsior district.

22    Q.   And did you grow up in the Excelsior District?

23    A.   Yes, sir.

24    Q.   And are you married?

25    A.   No.
```

**FORD - DIRECT / BORO**

1    Q.    And did you -- have you -- do you know my client,

2    Mr. Foakes?

3    A.    Since I was like eight years old.

4    Q.    And how did you first meet Mr. Foakes?

5    A.    In the neighborhood.

6    Q.    The Excelsior neighborhood?

7    A.    Yes, sir.

8    Q.    And what sort of work do you do?

9    A.    I work for the San Francisco Water Department.

10   Q.    Doing what?

11   A.    I'm a painter.  I'm a painter.  I put paint where it

12   ain't.

13   Q.    And do you have any other work that you do besides that

14   job?

15   A.    A nonprofit for kids for the last 20 years.  So I got like

16   a little safe haven for kids for the last 20 years, teaches

17   them boxing.

18   Q.    And is this a gym for kids?

19   A.    Boxing gym.

20   Q.    A boxing gym?

21   A.    Yeah.

22   Q.    And are you a boxer?

23   A.    I've been in the boxing game since I was nine years old.

24   Q.    And did you used to box with Mr. Foakes?

25   A.    Yes, sir.

FORD - DIRECT / BORO

1   Q.   And is Mr. Foakes a good boxer?

2   A.   Yes, sir.

3   Q.   And your -- could you briefly describe your nonprofit?

4   A.   It's just a safe haven for kids.  It saved my life and

5   it's been my -- I guess you can say it's been my saving grace

6   all through life.  And it's a whole lot more than boxing, what

7   you get from a gym.  It's the camaraderie.  It's a friendship,

8   being able to talk to another boxer.  Just -- it's just been a

9   saving grace for me.

10  Q.   And is this a --

11        THE COURT:  Can you -- excuse me.  Maybe you can move

12  that microphone.  Yeah, you can sit back.  But not that far.

13       Yeah, right there might be good.  Right there.

14  BY MR. BORO:

15  Q.   And is -- what hours do you run this boxing gym for kids?

16  A.   So I've been kind of programmed for like the last 20

17  years; I do, like, a class, 5:00 in the morning.  I go hit the

18  church after, sit with the man upstairs.  Go get my work truck

19  and do my eight, hit the gate, go home, take a shower.  Back to

20  the gym from like a quarter to 4:00 to quarter to 8:00, and

21  that's what I've been doing the last 20 years.

22  Q.   And have you received any recognition awards for this gym?

23  A.   I just received, like two weeks ago, the Jefferson Award.

24  Q.   And what is that?

25  A.   That is like giving back to the community for the last

FORD - DIRECT / BORO

 1   20 years, the surrounding communities, the different

 2   neighborhoods.  It kind of stopped a little violence that's

 3   going on through the streets.

 4   Q.   And have you remained friends with Mr. Foakes over the

 5   years since you first met when you were kids?

 6   A.   I love Raymond Foakes to death.

 7   Q.   And have you had the opportunity to observe him in the

 8   community over the years?

 9   A.   Yeah.

10   Q.   And have you formed any --

11   A.   He will help anybody out.  You know, what I'm hearing

12   or -- I don't know.  I heard there's some allegations.  That, I

13   do not know anything like that of Ray, you know?  Ray has

14   always been like my big brother; right?  He looked out for the

15   kids in the neighborhood.

16   Q.   So did you have an opinion about --

17   A.   The bottom line is this:  But I don't -- as far as what's

18   going on here, I'm not too sure about; but, you know, I do know

19   I love Raymond Foakes and you can't stop love.  If he's been my

20   friend since I was eight years old, if I'm your friend, you're

21   still going to be my friend at the very end, period.

22   Q.   And seeing Mr. Foakes interact in the community and in the

23   neighborhood where you grew up, in the Excelsior, did you

24   form -- have you been able to form an opinion as to his

25   reputation in the community?

1          **MR. BARRY:**  Objection.  Vague.

2          **THE COURT:**  Why don't you be more specific reputation.

3   BY MR. BORO:

4   **Q.**   Have you formed an opinion as to whether Mr. Foakes has a

5   reputation of looking out and being helpful to people?

6   **A.**   Yeah.  He got a heart of gold.

7   **Q.**   And have you formed an opinion as to whether Mr. Foakes is

8   respectful of others?

9   **A.**   I -- I know that for a fact, and what is concealed right

10  now will be revealed, that my friend got a good heart and he's

11  good people.

12  **Q.**   And in -- you've boxed all your life, since eight or nine?

13  **A.**   Yes, sir.

14  **Q.**   And have you worked -- trained boxers over the years?

15  **A.**   I do that every day.  Every day.

16  **Q.**   And have you been involved in semi-professional or

17  professional fights?

18  **A.**   Yes, sir.

19  **Q.**   In your view, just based on your experience and

20  observations, when people are boxing, if they aren't wearing

21  headgear, is it possible for -- do you have an opinion whether

22  it's possible for a fist to break someone's orbital bone?

23          **MR. BARRY:**  Objection.  Foundation.

24          **THE COURT:**  Sustained.

25  \\\

FORD - DIRECT / BORO

1    BY MR. BORO:

2    Q.   Have you observed people get injured over the years

3    boxing?

4    A.   Yes, sir.  Yeah.

5    Q.   And then have you also trained boxers on the types of

6    injuries to be on the lookout for and to avoid?

7              MR. BARRY:  Objection.  Foundation.  Relevance.

8              THE COURT:  Well, I think there's a foundation problem

9    here.

10             MR. BORO:  Your Honor, it's a lay opinion based on his

11   observations.  I can develop more of his observations.

12             THE COURT:  You need to lay that foundation.

13             MR. BORO:  Okay.  Thank you, Your Honor.

14   Q.   How many -- how many years have you trained people to box?

15   A.   Like I said, I been doing this for the last 20 years, as

16   far as the training part of it.

17   Q.   And have you trained people to -- who were fighting in

18   semi-professional fights?

19   A.   I train people who were, you know, finalists in the

20   Olympic trials and then turned pro.  So I know about the whole

21   pro scene too.

22   Q.   And in the course of training people for those fights,

23   have you observed that, at times, injuries have occurred from

24   boxing?

25   A.   All the time.

**FORD - DIRECT / BORO**

1   **Q.**   And what sort of injuries have occurred from -- and like

2   injuries -- have you observed injuries occurring from fist

3   punches to the face?

4   **A.**   Cuts over the eyes, broken nose.  Especially you always

5   got to have a mouthpiece, missing teeth with a mouthpiece on.

6   **Q.**   Have you ever --

7   **A.**   Ears ripped.  Ears.

8   **Q.**   Have you ever observed, in any of those fights, an injury

9   to the eye socket?

10         **MR. BARRY:**  Objection.  Foundation.

11         **THE WITNESS:**  You see that all the --

12         **THE COURT:**  Overruled.

13         **THE WITNESS:**  You see that all the time.

14         **THE COURT:**  You need to lay a foundation, though, when

15   you say "eye socket" so he knows what we're talking about.

16   **BY MR. BORO:**

17   **Q.**   The -- this lower part of the eye, in your years of

18   training and working with professional boxers, have you seen

19   people injured from fist punches in the lower part of their eye

20   below the eyeball?

21   **A.**   Yes, sir.

22   **Q.**   And how about also that part of the eye socket that's on

23   the side of the nose?  Have you seen --

24   **A.**   Yes, sir.

25   **Q.**   -- boxers sustain injuries there?

**FORD - CROSS / BARRY**

1          And cuts, I assume, above the eyebrow, you've seen those

2   occur in boxing?

3   **A.**   All day.  All day.

4   **Q.**   And how about on the side of the face?

5   **A.**   All day.

6   **Q.**   Thank you very much.

7   **A.**   Thank you.

8              **THE COURT:**  All right.  Any cross from any defendants?

9                      (No response.)

10             **THE COURT:**  No?

11  From the Government?

12                      **<u>CROSS-EXAMINATION</u>**

13  BY MR. BARRY:

14  **Q.**   Good afternoon, Mr. Ford.

15  **A.**   Good afternoon.

16  **Q.**   My name is Kevin Barry.  I'm one of the prosecutors in the

17  case.

18  **A.**   Hello, Kevin.

19  **Q.**   Have you been following the trial?

20  **A.**   No, sir.

21  **Q.**   So you don't know what the charges are or what the

22  evidence is?

23  **A.**   No, I really fully don't.

24  **Q.**   The -- has Ray Foakes ever discussed club business with

25  you?

**FORD - CROSS / BARRY**

1    A.    No.

2    Q.    And do you know what I mean by "club business"?

3    A.    No.

4    Q.    You don't know what I mean?

5    A.    No.  People got their own business.  I mind my own

6    business.

7    Q.    Okay.

8    A.    I go about my own business.

9    Q.    But does the phrase "club business" have any significance

10   to you?

11   A.    No.

12   Q.    You don't know that that refers to the Hells Angels?

13   A.    It might.

14   Q.    Do you know that Ray Foakes is a member of the Hells

15   Angels?

16   A.    Yes, sir.

17   Q.    Okay.

18   A.    But I do know he's my friend before all that --

19   Q.    I --

20   A.    -- since I was about eight years old.

21   Q.    I do appreciate that, sir, I really do.

22         You had talked about the reputation that Ray Foakes has in

23   the community.  Does Ray also have the reputation of being

24   feared?

25   A.    I don't think so, feared.  I think more so, loved.

**FORD - CROSS / BARRY**

1    Q.   He's beloved in the community?

2    A.   Yeah.  We all grew up together.

3    Q.   And --

4    A.   We don't turn our backs on one another.

5    Q.   And that's part of the reason you're here; right?

6    A.   I'm here for the man upstairs and for Ray, period.

7    Q.   Is it fair to say that you and Ray were sort of running

8    around getting into a little bit of trouble when you were kids?

9    A.   At one time, yeah.

10   Q.   And is it fair to say that you got out of it and you're

11   working your eight?

12   A.   Yeah.  Yeah.

13   Q.   You're doing great work with the kids?

14   A.   Yeah.

15   Q.   So sort of you got out?

16   A.   Yeah.

17   Q.   But Ray didn't?

18   A.   I don't know if -- everybody has their own paths, I guess,

19   right?  So -- so -- but it didn't matter what a certain

20   individual used to do.  You know, some became cops.  Some

21   became lawyers.  Some became firemen.  And you just never turn

22   your back on your friend.  No matter what, you just love your

23   friend.

24   Q.   Because they're your friends?

25   A.   Yeah.

**FORD - CROSS / BARRY**

1  Q.   Part of Ray's path led him into prison for a while; is

2  that fair to say?

3  A.   Say that again.

4  Q.   Yeah.

5       You talked about everybody's got their own path?

6  A.   Yeah.

7  Q.   And unfortunately for Mr. Foakes, he wound up in prison

8  for a long time; is that right?

9  A.   Yes.

10  Q.   Did prison change who he was as a person?

11  A.   No.  No.  He's the same.  I could see Ray, I could see a

12  lot of my friends in the neighborhood, I could see -- the thing

13  about me and my friends, I could see you 30 years later and

14  it's exactly the same.

15  Q.   So if he was someone that the community respected before

16  he went into prison, he's somebody that they're going to

17  respect in prison?

18  A.   They're going to love him just the same.

19  Q.   But more than love, I mean, they look to him as someone to

20  look up to; right?

21  A.   I don't look at it like that.  I actually look at him as,

22  you know, a friend.  He's a friend.

23  Q.   But you can love somebody and not really respect them that

24  much; isn't that fair?

25  A.   You can love somebody from a distance, I guess you could

 1  say; but, me, if I love you, I love you, period.

 2  Q.   Did people look to Ray like a leader?

 3  A.   Yeah.  Ray is -- Ray -- Ray would come in this courtroom

 4  and if these lights weren't on, he would light this whole room

 5  up.  Anywhere Ray went and you felt safe with -- you know, you

 6  felt safe as a little kid around Ray, you know?

 7  Q.   And as an adult too; right?

 8  A.   Yeah.

 9  Q.   And so when Ray was in prison, did people also look at him

10  as a leader when he was in prison?

11  A.   I don't know about the whole prison stuff.  You've got to

12  talk to some prisoners, as far as that.  I have nothing to

13  talk -- I don't -- I don't have no answers for you as far as

14  what's going on in prison right now.  Is that what you're

15  saying?

16  Q.   But did you visit Ray or correspond with Ray when he was

17  in prison?

18  A.   No, not really.  You know, maybe one time.  You know, like

19  I was doing my thing, yeah, with the kids; and like I said, I

20  was programmed.  I've been programmed for 20 years to follow

21  the man upstairs.  I knew exactly what he wanted me to do.

22  Boxing's always been my passion.  I knew that when I left the

23  gym, I always got in trouble.  So I said, "You know what?  I'm

24  going to try to make something happen for these little ones."

25  And that's what I did.

FORD - CROSS / BARRY

1    Q.   And that's why you're on the path you're on?  You made

2    those choices?

3    A.   Yes.

4    Q.   Well, let me ask you, like in the last 15 years, how much

5    contact have you had with Mr. Foakes?

6    A.   Not much.

7    Q.   Not much?

8    A.   Yeah.

9    Q.   Now let me ask you a question about people following

10   different paths, and I'd like to show you a picture.

11        MR. BARRY:  Just for Mr. Ford, and this is exhibit

12   1555.

13   Q.   I apologize for the glare, Mr. Ford, but do you see who's

14   in the picture?

15   A.   Mm-hmm.

16   Q.   Do you recognize you on the far left?

17   A.   Yes, sir.

18        MR. BARRY:  Your Honor, I move to admit and to publish

19   Exhibit 1555.

20        THE COURT:  Any objection?

21              (No response.)

22        THE COURT:  All right.  Hearing none --

23        MR. BORO:  No objection, Your Honor.

24        THE COURT:  All right.  Admitted.

25        (Trial Exhibit 1555 received in evidence.)

**FORD - CROSS / BARRY**

1           **THE COURT:**  You may publish.

2           **MR. BARRY:**  Could we, yeah, publish?

3           **THE WITNESS:**  Do you want me to explain this?

4    **BY MR. BARRY:**

5    **Q.**   Sure.  Actually, first if you could identify everybody and

6    then we'll talk about it.

7    **A.**   I definitely can.  So that's me to the left.  That's Dom

8    and that's Michael Philpott.  And that's at the Irish Cultural

9    Center.  I put on fights that night at the Irish Cultural

10   Center for the Irish Cultural Center, and was putting away --

11   so I set up the ring and all that.  That was at -- later on in

12   the night.  I was taking down the ring, and we took a photo.

13   That photo could happen anywhere, so...

14   **Q.**   I appreciate it.  But who's the guy in the middle?

15   **A.**   That's Dom.

16   **Q.**   Dom who?

17   **A.**   That's Dom.  I'm not sure, sir.

18   **Q.**   Is his last name Guardado?

19   **A.**   I believe so.  Maybe.

20   **Q.**   Is he the son of Mark "Papa" Guardado?

21   **A.**   I'm not sure.

22   **Q.**   You don't know who his dad is?

23   **A.**   (Pause.)

24   **Q.**   I'm sorry.

25   **A.**   Do I know --

**FORD - CROSS / BARRY**

1    **Q.**   Do you know who his father is?

2    **A.**   Yeah, I know his father.

3    **Q.**   All right.  Who's his father?

4    **A.**   Mark.

5    **Q.**   Is he still alive?

6    **A.**   No.

7    **Q.**   What happened to him?

8    **A.**   He passed away.

9    **Q.**   Of natural causes?

10   **A.**   I'm not sure.

11   **Q.**   You're not sure?

12   **A.**   Huh-uh.

13   **Q.**   Okay.  If I told you that he was murdered by a Mongol,

14   would that jog your memory at all?

15   **A.**   I don't --

16   **Q.**   Is this picture kind of an example of what you talked

17   about of people going different paths?

18   **A.**   What do you mean going "different paths"?  Who's going a

19   different path here?

20   **Q.**   Well, we've got you volunteering in the community, we've

21   got a police officer, and then there's a Hells Angel, the son

22   of a murdered Hells Angel, in the middle.

23   **A.**   Because people might have knew his dad and, like I said,

24   we're all family.  It's just that.  Case closed.

25   **Q.**   Well, not yet, but we're --

**FORD - CROSS / BARRY**

```
 1   A.    I know, but I think -- yeah.

 2         MR. BARRY:  Thank you, Madam Clerk.

 3   Q.  So, Mr. Ford, this is just my last question.

 4        So I'd like to present some facts and then I'm going to

 5   ask if it changes your opinion about Ray Foakes being

 6   respectful of others.

 7        So on -- and so I'm going to present you some facts, and

 8   then I'll ask you the question.  So just hang on for just a

 9   second.

10   A.    Take your time.

11   Q.  So on July 20th, 1995, Petaluma Police Department officers

12   responded to a report of a suspect forcibly taking a female

13   from the sidewalk and placing --

14         MR. BORO:  Objection, Your Honor.

15   BY MR. BARRY:

16   Q.  -- her into a vehicle.

17         THE COURT:  All right.  Hold on.  Hold on.

18         MR. BORO:  403.

19         THE COURT:  Sustained.

20   BY MR. BARRY:

21   Q.  So would it change your opinion if you knew that Ray

22   Foakes took a woman who was trying to get away from him --

23         MR. BORO:  Objection, Your Honor.

24   Q.  -- and break up with him --

25         MR. BORO:  403.
```

**FORD - CROSS / BARRY**

1        THE COURT:  Sustained.

2    BY MR. BARRY:

3    Q.   Would it change your opinion to know that he was convicted

4    of violation of personal liberty and false imprisonment?

5        MR. BORO:  Objection, Your Honor.  403.

6        THE COURT:  Overruled.

7        MR. BORO:  Move to strike.

8        THE COURT:  Overruled.

9    BY MR. BARRY:

10   Q.   Would that change your opinion of whether Ray Foakes is

11   respectful of other people?

12   A.   I love Ray Foakes to death, period.  I known him since I

13   was eight years old.  I know Raymond.  He ain't -- he's not

14   that type of individual.

15   Q.   I'm sorry?

16   A.   He's not that type of individual.

17   Q.   He's not the type of person that would sexually assault

18   someone?

19   A.   No.  I don't believe so.  And you know what?  The bottom

20   line is this:  What is concealed will be revealed.  The man

21   upstairs knows all.  So it will eventually all come out.

22   Q.   And don't you agree that that's part of the purpose of a

23   trial?

24   A.   (Witness shrugs.)

25   Q.   Is that part of a purpose of a trial?  That getting what

1   happened, getting the truth out, that's what trials are for;

2   right?

3   **A.**   I guess.   I guess.

4   **Q.**   And then you talked about the injuries that boxers have

5   suffered.   Do boxers ever pistol whip each other?

6   **A.**   No.

7   **Q.**   Thank you, Mr. Ford.

8          **MR. BARRY:**   Thank you, Your Honor.

9          **THE COURT:**   All right.   Thank you.

10      Anything further on redirect?

11          **MR. BORO:**   Just a couple of brief questions.

12                          <u>REDIRECT EXAMINATION</u>

13   BY MR. BORO:

14   **Q.**   Over the years, Mr. Ford, when Mr. Foakes has been in

15   prison, have you spoken with him on the phone -- have you

16   spoken with him on the telephone?

17   **A.**   Yeah.   I have.   I have.

18   **Q.**   And has Mr. Foakes also sent -- over the years, while he's

19   been in prison, has he sent people to you to work with you to

20   box and change their lives?

21   **A.**   Yes, sir.

22          **MR. BORO:**   Thank you very much.

23          **THE COURT:**   All right.   Anything further?

24          **MR. BARRY:**   No, thank you, Your Honor.

25      Thank you, Mr. Ford.

```
 1              THE COURT:  All right.  Thank you, Mr. Ford.  You may
 2   step down.  You're excused.
 3              THE WITNESS:  Thank you.
 4                         (Witness excused.)
 5              THE COURT:  Next witness.
 6              MR. BORO:  Yes, Your Honor.
 7         We call Dana Rugaard.
 8         (Dana Rugaard enters the courtroom and steps forward to be
 9   sworn.)
10              THE CLERK:  Please raise your right hand.
11                         DANA RUGAARD,
12   called as a witness for the Defendants, having been duly sworn,
13   testified as follows:
14              THE WITNESS:  I will.
15              THE CLERK:  Thank you.  Please have a seat.
16         Please speak clearly into the microphone.  State your
17   first and last name and spell your last name for the record.
18              THE WITNESS:  My first name is Dana.  That's loud.
19   Last name is Rugaard, R-U-G-A-A-R-D.
20              THE COURT:  Okay.  Thank you, Mr. Rugaard.
21         You may proceed, Mr. Boro.
22              MR. BORO:  Thank you very much, Your Honor.
23                         DIRECT EXAMINATION
24   BY MR. BORO:
25   Q.   Mr. Rugaard, how old are you?
```

RUGAARD - DIRECT / BORO

1    **A.**   I'm sorry?

2    **Q.**   How old are you?

3    **A.**   I'm 68.

4    **Q.**   And what city do you live in?

5    **A.**   I live in Petaluma.

6    **Q.**   And you and I have spoken on the phone before, haven't we?

7    **A.**   We have.  You're Mr. Boro, I take it?

8    **Q.**   Yes.  I'm Al Boro, yes.

9            We've never met in person, though; right?

10   **A.**   Right.

11   **Q.**   And you know my client, Foakes, Ray Foakes?

12   **A.**   I do.

13   **Q.**   How do you know Mr. Foakes?

14   **A.**   I first met Ray in about 1991.  He was in his mid-to-early

15   20s.

16   **Q.**   And was that in Sonoma County?

17   **A.**   It was.

18   **Q.**   And how did you guys meet?

19   **A.**   I was an instructor at the Sonoma County Martial Arts

20   Center.

21   **Q.**   And what were you instructing?

22   **A.**   Kenpo karate and boxing.

23   **Q.**   And just briefly for your background, were you in the

24   U.S. military for a while?

25   **A.**   I was.

RUGAARD - DIRECT / BORO

1  Q.   About what years were you in the military?

2  A.   I was in the Navy active duty for two and a half years,

3  from '73 to '76, and I had about nine years of Reserves with

4  the Navy, and I was also in the National Guard Army for four

5  years.

6  Q.   And then have you ever been a police officer?

7  A.   I have.  I'm a retired police officer.

8  Q.   And what years were you a police officer?

9  A.   I worked for the Sonoma County Sheriff's Department for

10 two and a half years, from 2000 to 2002 and a half, and I spent

11 eight and a half years with the City of Rohnert Park, where I

12 was a police officer, firefighter, and EMT.

13 Q.   And then when did you retire from being a police officer?

14 A.   2010.

15 Q.   And why did you retire?

16 A.   I was injured in the line of duty and they medicalled me

17 out.

18 Q.   And did you also do work as a -- well, I think you

19 mentioned you were a trainer when you met Mr. Foakes?

20 A.   Yes.

21 Q.   So have you been involved in karate and boxing over the

22 years?

23 A.   Yes.

24 Q.   And could you describe that involvement?

25 A.   I've -- I was -- well, I boxed when I was in the Navy

1    briefly; and then when I got out, I -- in 1986, I started

2    training in Kenpo karate and picked up some boxing there as

3    well as kickboxing, and I did that until 1998.  I had a -- I

4    had my own school in Hawaii from '94 to '98; and then after

5    that, I took a short break and I started -- I got involved in

6    the Novato Boxing Club and started working as an amateur boxing

7    trainer and a professional trainer and cut man at fights.

8    Q.    And did you -- when you were working in martial arts, did

9    you meet a person named Herb Cody?

10   A.    Yes, I did.

11   Q.    And who is Herb Cody?

12   A.    Master Herb Cody was the owner the school, and he's pretty

13   much family to me.  We have an ex-wife in common.

14   Q.    You share a wife in common?

15   A.    An ex-wife, yes.

16   Q.    An ex-wife.  I see.

17   A.    Yeah.

18   Q.    And is Herb Cody a member of the Sonoma Hells Angels?

19   A.    As far as I know, yes.

20   Q.    And Mr. Foakes, when you met him, was he a Hells Angel at

21   the time?

22   A.    No, he was not.  Neither was Herb Cody.

23   Q.    So this was -- you met him first before he became a Hells

24   Angel?

25   A.    That's correct.

**RUGAARD - DIRECT / BORO**

1  Q.   And then did you continue to know Mr. Foakes while he was

2  a Hells Angel?

3  A.   I have, yes.  I've seen him sporadically over the years.

4  Q.   And so then did you -- after you retired with -- from the

5  police force, did -- is that when you started training amateur

6  and professional boxing?

7  A.   Yes.  I -- yeah.

8  Q.   And what does that involve?  How often are you training

9  people in boxing?

10 A.   I usually do about three days a week; and, like I said, we

11 train amateurs.  We have a couple pros.  We're down to one pro

12 now, so...

13 Q.   And where do the pros fight?  Like the pro you're fighting

14 now, where would those matches be?

15 A.   That could be just about anywhere, anywhere that she

16 contracts a fight.  It's a female fighter.

17 Q.   And how many -- well, are you a skilled boxer yourself?

18 A.   I'd like to think so.

19 Q.   And did you ever train Mr. Foakes in boxing or

20 martial arts?

21 A.   He got some kickboxing training while he was working with

22 martial arts, yes.  And I believe -- I think he was -- we had a

23 community -- what we called a community boxing club there, and

24 we dealt with at-risk youth.  And I think that he -- yeah, I

25 know he participated in a fight for them at one point.  So it

RUGAARD - DIRECT / BORO

1   was a fundraiser we had for the club.

2   Q.   This was an amateur fight to raise money?

3   A.   Pardon me?

4   Q.   This was an amateur fight to raise money?

5   A.   Yes.

6   Q.   And what -- well, how -- how many people do you think you

7   have trained in boxing skills over the years?

8   A.   I have no idea.

9   Q.   More than a hundred?

10  A.   Probably.

11  Q.   And how many professional boxers have you worked with over

12  the years?

13  A.   About three or four or five.

14  Q.   And besides training boxers, are you involved in

15  professional/amateur boxing matches in any other capacity?

16  A.   Yes.  I'm a -- in the professional capacity, I'm what they

17  call a cut man and a second.  My job as a cut man is to keep a

18  fighter together so they can finish their fight from cuts and

19  whatnot.

20  Q.   So by "cuts," what do you mean?

21  A.   You get punched, you know, depending on the framework of

22  your face and bone structure, some people cut a lot easier than

23  others from -- they don't wear headgear in professional boxing

24  so, you know, it could be a head-butt and they get a cut and

25  they get cuts over the eyes, around the cheeks, and I have to

**RUGAARD - DIRECT / BORO**

1    stop -- stem the bleeding the best I can so they can continue.

2    Q.   So like when we see those matches on TV, you're one of the

3    persons in the corner of the professional boxer?

4    A.   That is correct, yes.  Yeah.

5    Q.   And then you're the person who starts dabbing any of the

6    wounds?

7    A.   Exactly.  You'll see them putting Vaseline on their face,

8    and I have like long Q-tips that I put adrenaline on and I, you

9    know, use direct pressure and keep that thing from bleeding

10   and, you know, I'll put some more Vaseline on it.  I'd say

11   there's a trick to it.

12   Q.   And are you -- do you have to be registered or licensed to

13   be a professional cut man?

14   A.   Yes, you do.  I have to register with each commission I go

15   to.  Right now, I'm registered in about four states.

16   Q.   Which states are you registered as a cut man?

17   A.   It would be Rhode Island, Connecticut, Nevada, and

18   California.

19   Q.   And so in the course of being a professional cut man there

20   in the boxing ring, are you familiar with the type of facial

21   injuries that people can sustain from boxing?

22   A.   Yes.

23   Q.   As well as the cuts they can sustain, I assume?

24   A.   Yes.

25   Q.   And is it -- well, boxing, they're not wearing --

**RUGAARD - DIRECT / BORO**

1  professional boxing, they're not wearing headgear, but they

2  have gloves on, don't they?

3  A.    Yes, they do.

4  Q.    Now, does gloves make it less likely to get a cut than a

5  bare hand or more likely?

6  A.    Less likely.

7  Q.    Why is that?

8  A.    Because you're not having bone on bone.  You know, the

9  glove is there to actually protect the fighter's hands, but it

10 does dissipate any force that you would get a punch, you know,

11 against your face.

12 Q.    So it dissipates it across the surface?

13 A.    Yeah, across the surface of the glove.  And it's padded so

14 it's not -- like I said, it's not bone-to-bone contact.

15 Q.    But notwithstanding the padded glove, you've still seen

16 people get various lacerations or cuts on their faces?

17 A.    Oh, absolutely, yeah.  That happens quite frequently.

18 Also from headbutts, it can happen too.

19 Q.    And that's one of the reasons why you're in the corner?

20 A.    Yes.  Like I said, I'm there to keep that fighter

21 fighting.

22 Q.    So they -- basically the cuts have to be immediately

23 addressed so they can stay in the ring?

24 A.    Yeah.  Because not only is it just a cut, but there will

25 be swelling with that cut as well.  So I have to dissipate the

RUGAARD - DIRECT / BORO

1   swelling so their eye doesn't swole shut.

2   Q.   And how about -- have you observed, over your years

3   training boxers and working with boxers, boxers sustaining

4   injuries to the facial bones from punches?

5   A.   Absolutely.

6            MR. BARRY:  Objection.  Lack of foundation.

7            THE COURT:  Overruled.

8   BY MR. BORO:

9   Q.   And have you observed boxers sustaining injuries to the

10  eye bone right below the eye?

11  A.   Yes.  I've had it myself.

12  Q.   And this -- this orbital area, you've had that?

13  A.   Yes.

14  Q.   And like, for example, yours, how did you -- was that in a

15  boxing match?

16  A.   It was.

17  Q.   And how did you sustain that injury to your orbital floor

18  there?

19  A.   I caught a right hand.

20  Q.   So basically the hand caught you right in the eye there?

21  A.   Yes.  Yeah.

22  Q.   And how about in the -- have you observed, in your

23  experience as a cut man and professional trainer, injuries to

24  the nose here (indicating), the side of the nose from punches?

25  A.   Oh, absolutely.  Yeah.  I've broke my nose several times.

**RUGAARD - DIRECT / BORO**

1  Q.   And have you seen other fighters you've worked with, their

2  noses broken?

3  A.   Oh, yeah.

4  Q.   How about that part of the eye socket, I think they call

5  it mediale (phonetic), the thin part of the socket that runs up

6  towards the nose?

7           **MR. BARRY:**  Objection.  Foundation.

8           **THE COURT:**  Sustained.  You're going to have to lay a

9  foundation that he understands the medical.

10  **BY MR. BORO:**

11  Q.   Well, the -- and I'll -- I'm sorry.  Let me not do the

12  medical terminology, but the -- I think you testified that you

13  yourself sustained a fracture here (indicating) in the orbital

14  bone?

15  A.   I sustained a cut there, not a fracture.

16  Q.   Oh, a cut.

17  A.   Yes.

18  Q.   Okay.  Have you seen people actually break that bone below

19  their eye?

20  A.   Not in a boxing match.  Not the cheek.  You're talking

21  about the cheekbone here (indicating).

22  Q.   Well, no.  The eye socket.  So right above the cheekbone,

23  the little socket the eyeball sits in.

24  A.   Well, yeah.  That's what we call -- that's what we call a

25  blowout fracture.

**RUGAARD - DIRECT / BORO**

```
1    Q.    Okay.  And that's -- that's when that little thin --

2    A.    Yeah.  There's --

3          MR. BARRY:  Objection.

4          THE COURT:  All right.

5          MR. BARRY:  No foundation.  He's not a doctor.

6          THE COURT:  You need to lay a foundation.

7    BY MR. BORO:

8    Q.    So have you observed people suffering a blowout fracture

9    from boxing?

10   A.    Yes, and in baseball.

11   Q.    Well, how in baseball?

12   A.    That fracture happens when there's pressure against the

13   eye itself and the bones that surround the eyeball are very

14   thin, and so they get --

15         MR. BARRY:  Objection.  Foundation.

16         THE COURT:  Okay.  You need to lay a foundation for

17   his knowledge, otherwise I'm going to sustain the objection and

18   ask the jury to disregard that last remark until foundation is

19   laid.

20         MR. BORO:  Thank you.

21   Q.    As part of your training of boxers, do you -- do you train

22   them on the types of injuries they can sustain?

23   A.    Yeah, it's mentioned, but I really don't dwell on that.

24   Q.    Okay.  And do you -- as a trainer, do you -- do you do any

25   sort of research or observations on injuries that can be
```

RUGAARD - DIRECT / BORO

1   sustained in boxing?

2   A.   Yes.

3   Q.   And in your years of being a cut man, have you observed

4   facial injuries occur from people boxing?

5   A.   I have.

6   Q.   Have you observed -- what you call the blowout fracture,

7   have you observed that occur from a punch in boxing?

8   A.   Not in -- not in boxing.  I have observed one in baseball,

9   though.

10  Q.   And what was that?  A baseball or a bat?

11  A.   It was a baseball.  It was a hard ball.

12  Q.   So a ball hit right in that area?

13  A.   Yeah, a ball hit the eye, and -- yes.

14  Q.   And how about the nose?  Have you observed -- in your

15  years of working in boxing and in the ring, have you observed

16  that -- fractures to the nose bone from boxing from punches?

17  A.   Yes, but not the eye socket itself.  I just know that that

18  can happen.

19  Q.   Okay.  But you haven't observed it yourself?

20  A.   I've observed many broken noses.

21  Q.   Okay.

22  A.   Yes.

23  Q.   And how do you know that a fracture of the eye socket can

24  occur from boxing?

25          MR. BARRY:  Objection.  Misstates the testimony and

RUGAARD - DIRECT / BORO

1   foundation.

2           THE COURT:  Lack of foundation.  Sustained.

3   BY MR. BORO:

4   Q.   What -- what -- so do you -- in training people -- let me

5   ask you.

6        When you were at the -- working for the City of

7   Rohnert Park, you were trained as an EMT?

8   A.   That's correct.

9   Q.   And then you also were a police officer?

10  A.   Yes.

11  Q.   Did you, in those capacities, ever respond to situations

12  where people had been involved in fistfights?

13  A.   Yes.

14  Q.   And had you, during the course of that, observed injuries

15  to a person's face from fistfights?

16  A.   Absolutely.

17  Q.   What type of injuries did you observe in your capacity as

18  a police officer or EMT?

19  A.   Bruises.  Mostly bruising around the eye, you know, black

20  eye.  Broken nose -- you'd see that both eyes will get black

21  and blue from a broken nose.

22  Q.   Did you ever see any eye socket blowouts from fistfights

23  while you working as a police officer or EMT?

24  A.   No.  No, I haven't.

25  Q.   Thank you very much.

PROCEEDINGS

1   **A.**   Okay.

2          **THE COURT:**  Anything further from the Defense?

3                    (No response.)

4          **THE COURT:**  We've got a couple of minutes for the

5   Government.

6          **MR. BARRY:**  I'm not going to wrap up today,

7   Your Honor.

8          **THE COURT:**  Okay.  So you're going to have more than

9   one minute, I take it?

10         **MR. BARRY:**  Yes.

11         **THE COURT:**  All right.  Well, then it is 2:00.  That

12  clock is a little slow.

13      So I apologize for your having to come back tomorrow, but

14  we didn't get through, and I told the jury we'd let them out at

15  2:00, so I've got to keep my word.

16         **THE WITNESS:**  That's quite all right.

17         **THE COURT:**  So I'd appreciate it if you'd come back

18  tomorrow.

19         **THE WITNESS:**  Not a problem, Your Honor.

20         **THE COURT:**  Ladies and gentlemen, that will be the end

21  of today's session.  We'll be back tomorrow at 8:30.

22      Just a reminder, please do not discuss this case with

23  anyone.  Do not attempt to do any research on your own or form

24  any opinions until this case is submitted to you for

25  deliberation.

**PROCEEDINGS**

1        So have a good evening.  See you tomorrow.

2             **THE CLERK:**  All rise for the jury.

3                  (The jury leaves the courtroom.)

4        (Proceedings were heard out of the presence of the jury.)

5             **THE COURT:**  Okay.  You can step down.  We'll see you

6   tomorrow morning.  Thank you, Mr. Rugaard.

7             **THE WITNESS:**  Okay.

8             **THE COURT:**  So we've got the doctor tomorrow; right?

9             **MR. BARRY:**  Yeah, that's exactly what I was going to

10  ask, Your Honor, if we could have a rundown for tomorrow.

11            **THE COURT:**  Finish Mr. Rugaard and then the doctor.

12            **MR. BORO:**  We have -- if -- assuming that we're not

13  spilling over to Monday, then the doctor is on standby in

14  Tokyo --

15            **THE COURT:**  Okay.

16            **MR. BORO:**  -- ready to go.

17       Again, it's his preference to testify in person, but he

18  will be available at 9:00 a.m.  We would start with him and

19  then go to Mr. Rugaard to finish up just because it's 1:00 a.m.

20  Tokyo time.

21            **THE COURT:**  Oh, oh, oh, okay.

22            **MS. PENG:**  So he is definitely going to be called

23  first thing tomorrow, then?

24            **MR. BORO:**  If we are in -- yes, if we're closing

25  tomorrow, then he will be called first thing tomorrow.

1       **MR. BARRY:**  Okay.  So the doctor and then Mr. Rugaard.

2  And then who?

3       **MR. BORO:**  We have -- well, we're still attempting to

4  get under subpoena the two Sonoma County Sheriff's officers who

5  have been dodging our subpoenas, but that's Troy Newton and

6  Michael Regan.  So if we are able to get them, we will.

7       **THE COURT:**  Okay.

8       **MR. BORO:**  We have Cathy and Angela Serrano.

9  I believe my co-counsel wants Sergeant Menke back.

10       **THE COURT:**  Okay.

11       **MR. BORO:**  And it sounds like Sergeant Harm is not

12  going to be able to join us at any part during the day?

13       **MR. BARRY:**  That's correct, Your Honor.

14       **THE COURT:**  Have you contacted Sergeant Menke?

15       **MR. BARRY:**  We alerted him to it; but, again, it was a

16  possibility, but I'm hearing now that they want to put him on

17  the list, so we'll let him know.

18       **THE COURT:**  Okay.  Just tell him he should be here.

19       **MR. BARRY:**  Yeah.  And if we could get -- if we could

20  have him after the doctor, that would be helpful.

21       **MR. BORO:**  Well, Mr. Rugaard will finish first.

22       **MR. BARRY:**  Oh, yes.  Sorry.  After Mr. Rugaard and

23  then Detective -- Sergeant Menke, that would be great.

24       **THE COURT:**  Okay.

25       **MR. BORO:**  And I think there might be one other

**PROCEEDINGS**

 1  person -- let me just go to my list -- that I had noticed.

 2      There's two more.  So it does -- I mean, I guess it

 3  depends on if I get those Sonoma officers under subpoena -- or

 4  former officers.  There's also Mike Diaz and Adam McMaster.  I

 5  think they'll be short, but they were on our list.

 6          **THE COURT:**  Remind me.  Are they character witnesses

 7  or percipient witnesses?

 8          **MR. BORO:**  Those are percipient witnesses.  So we

 9  disclosed them with regards to basically the events with Meghan

10  Jaynes, and the Serranos are character witnesses.

11          **THE COURT:**  Okay.

12          **MR. BARRY:**  So we'd have a 403 objection to the

13  Serranos, Your Honor.

14      And I appreciate that there wasn't the character question

15  for Mr. Rugaard, but we've -- the jury's heard an awful lot

16  about toy drives and Mr. Foakes' reputation from 15 years ago.

17          **MR. BORO:**  The Government put on six weeks of evidence

18  decimating my client's character.  I could maybe choose one of

19  the two Serranos as a compromise.

20          **THE COURT:**  That may make sense if they're kind of

21  replicating each other.

22          **MR. BORO:**  Okay.  So we'll just use one or the other

23  of the Serranos.

24          **THE COURT:**  Okay.  Great.

25      And is that it at that point?

**PROCEEDINGS**

1          **MR. BORO:**  That is, Your Honor.

2          **MR. BARRY:**  And the Government -- Your Honor, I'm

3    sorry.  The Adam, what's Adam's last name?  I'm sorry.  I

4    missed that.

5          **MR. BORO:**  Oh, McMaster.

6          **MR. BARRY:**  McMaster.  Thank you.

7          **THE COURT:**  He's on the list, I think.

8          **MR. BORO:**  He is on the list.

9          **THE COURT:**  Yeah, I saw that.

10      And is the Government planning a rebuttal case?

11          **MR. BARRY:**  Not at this point, Your Honor.

12          **THE COURT:**  Okay.

13          **MS. PENG:**  We'll have to see.

14          **MR. BARRY:**  Yeah.

15          **THE COURT:**  Okay.

16      Okay.  Well, all right.  Let see if we can get through

17    tomorrow.

18          **MR. BARRY:**  Thank you.

19          **MR. BORO:**  Thank you, Your Honor.

20          **THE COURT:**  And then jury instructions, there were

21    supposed to be -- am I supposed to get something on jury

22    instructions?

23          **MR. BORO:**  Yeah, we -- I have -- I sort of got

24    sidetracked late last night, but I have a brief that's almost

25    done with a couple requested changes in the jury instructions

**PROCEEDINGS**

1  on Count 1 and the sentencing factor, and then I have also a

2  Rule 29 that I've received a draft on from Ms. Cooper Smith I

3  need to look at and get that also out today.

4       **THE COURT:**  Okay.  And you've made that.  You've

5  preserved that for the -- on the record.

6       **MR. BORO:**  Yeah, I already preserved that at the close

7  of evidence.

8       **THE COURT:**  Yup.

9       **MR. BORO:**  And then -- I will want to have read

10 tomorrow the Bill of Particulars, redacted Bill of Particulars

11 excerpt, to read that into the record.

12      And I can't remember if there was something else like that

13 to clean up on.

14      **THE COURT:**  Okay.  So you will file your instructions,

15 your comments on the instructions, today?

16      **MR. BORO:**  Yes, I will.

17      **THE COURT:**  Okay.  And it's close, but I'll give you

18 24 hours after he files to get me something.

19      All right.  So we're going to count on closings on Monday.

20      **MR. SHEKETOFF:**  Your Honor, Sheketoff for Ranieri.

21      If the evidence does not finish tomorrow and it rolls into

22 Monday, will you still want to do closings on Monday?  It

23 doesn't seem like the evidence would take much of Monday.

24      **THE COURT:**  Yeah, I think if it falls over, it can't

25 be more than an hour or something, I would assume; and if the

**PROCEEDINGS**

1   jury's here, we should --

2           **MR. SHEKETOFF:**  Okay.

3           **THE COURT:**  -- we should do it.  Okay?

4           **MR. SHEKETOFF:**  Okay.  Just asking.

5           **MR. WALSH:**  Are you done?

6       Walsh for Ranieri now, Judge.

7       Two things.  I'd ask that the Bill of Particulars as to

8   Mr. Ranieri be read, published to the jury.

9           **THE COURT:**  Which -- so did you give me --

10          **MR. WALSH:**  No.  I have to give that to Your Honor,

11  which leads me into my second point.

12      Also, the Bill of Particulars in the Lyles case, the '08

13  Willits grow, and Mr. Barry and I have spoken briefly about it,

14  I'm going to get a proposed stip on that Lyles/Willits Bill of

15  Particulars over to him today.

16      And Mr. Boro has to weigh in on that briefly.  He has to

17  weigh in on that.  I apologize.

18          **MR. BORO:**  Well, yes, and it should not -- either the

19  Bill of Particulars itself, if it's read to the jury, or the

20  stipulation should not mention Mr. Foakes.  The one that was

21  filed by the Government in -- on the Lyles indictment named

22  about four people, one of whom was Mr. Foakes as --

23          **MR. WALSH:**  Unindicted co-conspirators.

24          **MR. BORO:**  Right, unindicted co-conspirators.

25          **THE COURT:**  So you should submit to me whatever form

1    it is.  Hopefully you can stipulate.  If not, I need to see

2    where the differences are so I can --

3             MR. WALSH:  Yes.  Okay.

4             THE COURT:  Sooner -- so by first thing tomorrow

5    morning, if you can do that.

6             MR. WALSH:  Yes.  I appreciate it.

7             THE COURT:  Okay.

8             MS. PENG:  So the Bill of Particulars of Mr. Lyles,

9    I'm not sure what the relevance of that to Mr. Ranieri is.

10   There's already been a jury instruction that you are to

11   consider, you know, acts, which the Lyles marijuana conviction

12   is one, against -- for enterprise purposes.  It might not be

13   against defendants directly, but I don't think there should a

14   Bill of Particulars read unless it concerns Mr. Ranieri at all.

15            MR. WALSH:  Your Honor, I believe, again, you've ruled

16   on this issue on a pretrial basis, and you said that my

17   proposed exhibit, that bill, is admissible.  The Government

18   objected.  The Court overruled the Government's objection.  And

19   here we are, to paraphrase the Government --

20            THE COURT:  I'm just trying to remember now.  There's

21   been so many rulings.  What did I rule?

22            MR. WALSH:  You said that -- I identified the bill as

23   an exhibit, the Government objected, and you ruled that it came

24   in.

25            THE COURT:  I mean, what's in the bill that --

**PROCEEDINGS**

1    **MR. WALSH:**  Well, it's the Lyles '08 Willits grow.

2  He's the only one indicted in this court.

3      In the course of his case, his attorney moved for a Bill

4  of Particulars.  The Court ordered it.  The Government

5  responded that here are the unindicted -- Lyles is the

6  defendant.  Here are four or five unindicted co-conspirators.

7  None of those named unindicted co-conspirators include

8  Mr. Ranieri or Manny from Boston, as I had someone on the stand

9  at some point -- oh, no.  It was during the Rule 29 motion,

10  you know.

11      So the Government is offering the Willits grow against

12  Mr. Ranieri as evidence of agreement, evidence of a RICO --

13      **THE COURT:**  All right.  So it goes to the question of

14  the connection possibly through you're saying, Manny?

15      **MR. WALSH:**  Yes, Manny from Boston.

16      **THE COURT:**  Manny from Boston.

17      **MR. WALSH:**  Yeah.

18      **THE COURT:**  That sounds like a movie or something.

19      **MR. WALSH:**  That's the easiest way.

20      **THE COURT:**  So that -- the relevance -- so that's your

21  relevance.  And you're saying that there was a Bill of

22  Particulars that excludes him as an unindicted co-conspirator

23  and that's the relevance; correct?

24      **MR. WALSH:**  It excludes not only Manny from Boston but

25  Christopher Ranieri from Massachusetts.

PROCEEDINGS

```
 1          THE COURT:  So that's the relevance.

 2          MR. WALSH:  And you --

 3          THE COURT:  And if there's a truncated version of

 4   that, I'll consider it.

 5          MR. WALSH:  Thank you.

 6          THE COURT:  So --

 7          MR. BARRY:  The problem, Your Honor, is that it --

 8   I'll have to look at it, but I think it names Foakes.  So they

 9   can't have it both ways.

10          MR. WALSH:  Well, that's why we proposed the stip --

11          MR. BARRY:  Yeah.

12          MR. WALSH:  -- which wouldn't include Mr. Foakes.

13          MS. PENG:  Your Honor, the relevance of this is

14   minimal because the point -- this is from 2008.  I'm unclear

15   what they were looking at Mr. Christopher Ranieri at all.

16          THE COURT:  All right.  But then what's -- if there's

17   a stipulation that simply states not who the unindicted -- it

18   doesn't mention Mr. Foakes but simply states that there are

19   unindicted co-conspirators with Mr. Lyles, and neither Manny

20   from Boston nor Mr. Ranieri are included.  Simple.  One

21   sentence.

22          MR. WALSH:  Yeah, exactly.

23          THE COURT:  I don't know what the harm in that is.  So

24   I'd like you-all to see if you can just stipulate to that, and

25   rather than reading, trying to cut and paste a Bill of
```

PROCEEDINGS

1    Particulars.

2         **MR. WALSH:**  Yeah, that's fine.  I'll have it over to

3    Mr. Barry shortly.

4         **THE COURT:**  All right.

5      All right.  See you tomorrow morning.

6         **MR. WALSH:**  Thank you, Judge.

7         **MR. BORO:**  Thank you.

8         **THE CLERK:**  Court is adjourned.

9         (Proceedings adjourned at 2:12 p.m.)

10           ---o0o---

11         **CERTIFICATE OF REPORTER**

12      I certify that the foregoing is a correct transcript

13    from the record of proceedings in the above-entitled matter.

14

15    DATE:  Wednesday, May 3, 2023

16

17

18

19

20    _____
     Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
       Official Reporter, U.S. District Court

21

22

23

24

25