ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

KATHERINE L. WAWRZYNIAK (CABN 252751)
Chief, Criminal Division

KEVIN J. BARRY (CABN 229748)
LINA Y. PENG (NYBN 5150032)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6840
    FAX: (415) 436-7234
    Email: kevin.barry@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 17-CR-0533-EMC |
| Plaintiff, | |
| v. | **UNITED STATES' OPPOSITION TO MOTION TO POSTPONE SELF-SURRENDER DATE (ECF NO. 3469)** |
| DAMIEN CESENA, et al., | Hearing Date: June 7, 2023 |
| Defendants. | Hearing Time: 2:30 p.m. |
| | Hon. Edward M. Chen |

**INTRODUCTION**

The United States respectfully submits this opposition to Defendant Damien Cesena's motion to postpone his self-surrender date. On the eve of his date to begin serving his sentence of imprisonment, Defendant Cesena has moved the Court to delay it for a full year. The reason offered is to obtain routine medical care, which purportedly he will not be able to receive from his current health care provider for eleven months. Cesena offers no legal authority for this remarkable request, and he offers no basis to conclude that he will be unable to obtain the required care in Bureau of Prisons custody. The Court should deny the motion and order him to surrender as directed.

# STATEMENT OF FACTS

On January 19, 2023, Defendant was sentenced to a term of 52 months in custody following his guilty plea to a charge of RICO conspiracy involving members of the Sonoma County charter of the Hells Angels (HASC). ECF No. 3162 (Judgment). At that time, the Court permitted Cesena to remain out of custody and allowed him to self-surrender on June 12, 2023 (January 19, 2023 Criminal Minutes). ECF No. 3133. The Court maintained the non-association condition with respect to Hells Angels members that had been in place, with limited exceptions for specific HASC members for specific purposes. *Id.* at 2.

During the trial, Cesena violated that order by associating with HASC members and other Hells Angels during the Group Two trial, as he was a spectator in court for the testimony of key HASC insiders and others. During breaks in the trial day, Cesena routinely engaged in conversations with HASC members and other Hells Angels members, and he did so while wearing his Hells Angels cut.

He went even further, however, and attempted to intimidate at least one witness, Stevie Silva, the daughter of murdered HASC member Joel Silva. Stevie Silva was one of the witnesses whom Cesena came to court to watch. Ms. Silva interpreted Cesena's observation of her testimony as an effort to intimidate her, as demonstrated by her behavior when she finished testifying. As the Court may recall, rather than leave the witness stand and exit the courtroom through the door to chambers, Ms. Silva walked directly from the stand to the gallery. When she did so, she went right up to Cesena and told him, in effect, "If you want to have a staring contest, we can have one." She then sat down to watch her mother take the stand.

The fact that Stevie Silva perceived the stares of Cesena as an effort at intimidation can be seen in the transcript, as she directed a statement to the gallery during the shift between counsel on cross examination. Although it was likely sotto voce, the court reporter nonetheless captured what Ms. Silva said:

```
16   Q.   All right.  Thank you very much.
17   A.   You're welcome.
18        THE COURT:  All right.  Further cross?
19        MR. BABCOCK:  One second, Your Honor.
20            (Pause in proceedings.)
21        THE WITNESS:  You so ugly, bro, literally.
22                   CROSS-EXAMINATION
23   Q.   Good morning still, ma'am.
24   A.   Hi.
25   Q.   My name is Erik Babcock, and I represent Brian Burke.
```

RT 3152.  Although it is not clear from the transcript to whom Ms. Silva directed her comment, her interaction with Cesena when she went into the gallery indicates that he was the likely target.

With respect to Cesena's purported need to delay his self-surrender date to address a cataract, ECF No. 3469, the government notes that while the Amended Presentence Report details a number of health issues that he has, there is no mention of any cataract or other issues with his vision.  PSR ¶ 142.

## ARGUMENT

Defendant Cesena's motion to postpone his self-surrender date is remarkable for two reasons.  The first is the extraordinary relief he seeks.  Just three weeks before he is scheduled to serve a 52-month sentence, Cesena asks the Court to postpone his surrender for *a full year*.  The second is the complete lack of legal or factual support for this request.  There is no legal authority for the proposition that the Court can grant this relief; there is no claim that the routine medical care he needs—cataract treatment—is unavailable while he is in custody; and there is no evidence that he took any steps to obtain this treatment from anyone other than a single provider.  All Cesena offers for this eleventh-hour request to avoid custody is a one-paragraph note from a doctor.

Cesena does not even argue that this doctor is the only person who can address his cataract, as opposed to medical professionals within the Bureau of Prisons. Publicly available materials make it plain that this type of treatment is both routine and available while in custody. The BOP Health Management Resources webpage, https://www.bop.gov/resources/health_care_mngmt.jsp, has a specific guide on Ophthalmology: https://www.bop.gov/resources/pdfs/ophthalmology_guidance201810.pdf. With respect to cataract surgery specifically, that guide says the following:

> **The following are criteria for ophthalmologic surgery for BOP inmates:**
>
> • **Cataract Surgery**: Functional impairment resulting from the cataract is the primary factor in determining the need for surgery, as well as the likelihood of improved function following surgery. Most people function well with a best-corrected visual acuity of 20/60 or better. Documented best-corrected visual acuity of worse than 20/60 in both eyes with current (less than six-months-old) refraction is an indication for cataract surgery. Second eye surgery requires documented, best-corrected visual acuity of 20/60 or worse.
>
> *Exceptions (exempted from visual acuity criteria for cataract surgery):* Town drivers at camps; inmates working in UNICOR who require good stereoscopic vision (depth perception) for safety reasons; significant functional impairment from the cataract, even if 20/60 or better, and likely improvement with surgery. Occasionally, a retina specialist will request cataract surgery in a diabetic patient for retinal visualization (i.e., not for improvement in vision).

*Id.* at 6 (emphasis original). Thus, if Cesena is experiencing "significant functional impairment" as a result of a cataract, he is a candidate for surgery. *Id.*

More generally, the Bureau of Prisons carefully considers an inmate's health as part of the assessment to determine where to house him or her. *See* Legal Resource Guide to the Federal Bureau of Prisons, https://www.bop.gov/resources/pdfs/legal_guide_march_2019.pdf at 27. "In making determinations regarding the appropriate institution in which to house an offender, the BOP carefully considers the offender's health status. As the BOP provides extensive medical services, a defendant's medical condition generally will not preclude a sentence to BOP custody." The Bureau frequently addresses even complex medical issues for inmates who are incarcerated. When given sufficient time, BOP medical experts can inform the Court of a treatment plan for someone with significant medical challenges. A sample letter in such a case is attached as Attachment A.

Cesena, however, has given the Bureau, the government, and the Court no time to consider the issue he raises before he is to report to prison. Fortunately, his issue is routine, and it is directly addressed in the BOP Health Management Resource pages discussed above. Further, if Cesena is designated to a facility where cataract treatment is not available, the Bureau can send him to a local hospital for care. "Community medical professionals are consulted as needed, and inmates are sent to community hospitals should medically necessary care be unavailable at the institution." <u>Legal Resource Guide to the Federal Bureau of Prisons</u>, https://www.bop.gov/resources/pdfs/legal_guide_march_2019.pdf at 27. Thus, Cesena can get whatever treatment is necessary to address his cataract or any other health issue through the Bureau of Prisons, and there is no reason for the Court to delay his self-surrender date.

## CONCLUSION

The Court should deny Defendant's Cesena's motion, and it should direct him to report to his designated Bureau of Prisons facility as it ordered nearly six months ago.

DATED: May 31, 2023

Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney

/s/
KEVIN J. BARRY
LINA Y. PENG
Assistant United States Attorneys

**ATTACHMENT A**



U.S. Department of Justice
Federal Bureau of Prisons
*Western Region Medical Director*
303-338-6588

May 9, 2022

Via Email ▮

Shelley Weger
Assistant United States Attorney
United States Attorney's Office
501 I Street, Suite 10-100
Sacramento, CA 95814

RE: United States v. ▮

Health Issues/Medical Care available within the Federal Bureau of Prisons

Dear AUSA Weger:

    I am writing in response to the request from the United States Attorney's Office concerning the medical conditions of the defendant ▮, and the ability of the Federal Bureau of Prisons (BOP) to provide adequate medical care for defendant as an inmate. As I understand, defendant is pending sentencing but has pled guilty to Fraud in Connection with a Major Disaster or Emergency Benefits. In my role as the Regional Medical Director for the Federal Bureau of Prisons (Western Region), I am occasionally called upon to make pre-sentence reviews such as you have requested.

    I am a board certified internist employed by the Federal Bureau of Prisons. As the Regional Medical Director, I am responsible for overseeing delivery of medical care in the Region and advising other BOP physicians in the management of especially difficult or complicated cases. In addition, I am familiar with BOP's medical capabilities throughout its institutions. I received a BA from Duke University, attended medical school at the University of Southern California and completed a residency in internal medicine through the University of California, Los Angeles. I have been employed by the BOP since July of 1997. During this time, I have cared for many inmates with complex medical conditions. I am currently licensed to practice medicine in the States of California and Colorado.

    Although I have not reviewed any medical records concerning ▮, I have generally been informed she has a prior diagnosis of paranoid schizophrenia and bipolar disorder. I also understand she may have received treatment from 2020 to present for anxiety, schizoaffective disorder, bipolar type with hallucinations. Additionally, I understand she was diagnosed with obesity, gastroesophageal reflux disease, atrial fibrillation, hypertension, methamphetamine abuse, chronic obstructive pulmonary disease. As I understand, she requires an oxygen machine and walker to assist her with mobility. I further understand her November 2021 medical records indicate she was being seen

1

via telemedicine for COPD, HTN, Afib, and type 2 Diabetes Mellitus.  I understand these records also identified problem areas in additional items, such as: multifocal atrial tachycardia, microcytic anemia, hypokalemia, protein-calorie malnutrition, acute exacerbation of chronic obstructive airway disease, lupus, depression, hyperlipidemia, fibromyalgia, cirrhosis of liver due to chronic hepatitis C, cancer of the ovary, hiatal hernia, current smoker, and homelessness.  Records may also show she underwent testing for Lupus, fibromyalgia, and ovarian cancer in November 2021, but the conclusion of the tests might not be clear.  Finally, I also understand patient notes from October 2021 state defendant has a "known history of mild coronary artery disease".

As for her medications, I understand it is noted she has been or is taking Aristada, cetylcysteine, albuterol, amlodipine, aripiprazole, atorvastatin, azelastine, budesonide, Vitamin D, digoxin, diltiazem, diphenhydramine, famotidine, fluticasone, folic acid, formoterol, furosemide, gabapentin, metformin, pantoprazole, prednisone, risperidone, rivaroxaban, spironolactone, sulfamethoxazole, and valacyclovir.  I am not sure if this medication list represents medications she was merely prescribed at various times in the past, or whether this list represents a current list of medications she is actively taking.  However, the BOP has a Formulary, which provides a standardized list of approved, appropriate medications.  The national Formulary is available on the Bureau's public website: https://www.bop.gov/resources/pdfs/2020_winter_formulary_part_1.pdf.  Additionally, there is a mechanism available to our local health care providers to obtain non-Formulary medications when they determine that it is medically appropriate.  Accordingly, through this procedure and the national Formulary, the Bureau has a broad range of medications available to its inmate population.  If admitted into a BOP facility, medical personnel will conduct a thorough medical assessment and a review of all listed medications to determine an appropriate course of treatment for defendant consistent with the BOP Formulary and medical guidance.

The Bureau of Prisons is committed to providing inmates in its custody with quality medical care that is consistent with community standards. The BOP classifies its institutions according to the medical resources available on a one-to-four scale. Level-1 institutions house essentially healthy inmates.  Level-2 institutions accept inmates with chronic, but stable medical conditions.  Level-3 institutions manage inmates with potentially unstable medical problems. Level-4 institutions are medical centers (FMCs). These resources are more specifically described in the *Legal Guide to the Federal Bureau of Prisons* (2019) at pages 27-32, which is available on the Bureau's public website: https://www.bop.gov/resources/pdfs/legal_guide_march_2019.pdf.  Based on an inmate's medical needs, they are assigned to one of these four care levels.  All institutions, regardless of care level, are operating under modified conditions in an effort to mitigate the impacts of COVID. https://www.bop.gov/coronavirus/index.jsp.

Every institution maintains a Health Services Unit to provide medical, dental, and mental health care.  BOP policy regarding medical care and procedures for caring for inmates with medical needs is set forth in federal regulations at 28 C.F.R. §549 and applicable Bureau policy, such as Program Statement (PS) 6031.03, *Patient Care*: https://www.bop.gov/PublicInfo/execute/policysearch?todo=query&series=6000. Service is provided by a variety of health care professionals, including psychiatrists, physicians, nurses, physician assistants, dieticians, dentists, and pharmacists. BOP health care staff is also augmented by assigned United States Public Health Service personnel. Community medical professionals are consulted as needed, and inmates are sent to community hospitals should medically necessary care be unavailable at the institution. See PS 6010.02, *Health Services Administration*.

If the defendant is sentenced to a term of imprisonment, when the designation request is forwarded to the BOP from the U.S. Probation Office and the U.S. Marshal, medical records can be forwarded to the BOP with a request for the designation to be forwarded to the BOP Medical Designator. Designation decisions take into consideration multiple factors, including security level and medical treatment needs. Initial designations are made for inmates who have recently been sentenced by the Court. Inmates with an acute medical/psychiatric problem(s), or those with chronic care requirements, are referred by the Designation and Sentence Computation Center (DSCC) to the Medical Designator (OMDT) for an initial designation. The mission of OMDT is to effect the timely and efficient designations and movements of inmates with health care needs from initial commitment or from current institution to locations that possess the required health care resources while meeting the community standard of medical care. This includes the determination of appropriate security assignment of the inmate and type of transportation to be used. The Medical Designator makes designations, referrals, and denials based on urgency of need, cost-effectiveness, Bureau institution capabilities, expected service period, including recuperation, current bed space availability, security requirements, and consultation with Bureau physicians at the sending and receiving institutions.

Based upon my understanding of defendant's medical issues and my expertise as a physician with knowledge of BOP medical facilities, it is my opinion the BOP can provide appropriate medical care for defendant. BOP has inmates with the same or substantially similar medical conditions that are designated and appropriately cared for. Given my understanding of defendant's medical issues, she would most likely be assigned as a Care Level 3 or Care Level 4 inmate, which would allow for the care of the conditions with which I understand she has been diagnosed.

I trust this information satisfies your concerns. Please feel free to contact me if I may be of further assistance in this matter.

Sincerely,

JAMES PELTON
Digitally signed by JAMES PELTON
Date: 2022.05.10 09:29:25 -06'00'

James Pelton, M.D.
Western Region Medical Director
Federal Bureau of Prisons