United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiffs,

v.

JONATHAN JOSEPH NELSON,

Defendants.

Case No. 17-cr-00533-EMC-1

**ORDER DENYING GROUP ONE DEFENDANTS' MOTION FOR NEW TRIAL**

Docket No. 3240, 3251

## I. INTRODUCTION

On June 22, 2022, a jury convicted Defendants Jonathan Nelson, Russel Ott, and Brian Wendt of conspiracy in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d) (Count One); conspiracy to commit murder in violation of the Violent Crimes in Aid of Racketeering Activity ("VICAR"), 18 U.S.C. § 1959(a)(5); and murder in violation of VICAR, 18 U.S.C. § 1959(a)(1). *See* Docket No. 2886 ("Jury Verdict"). In addition, Jonathan Nelson was convicted of assault with a dangerous weapon in aid of racketeering in violation of 18 U.S.C. § 1959(a)(3) (Count Six), and use of a firearm during a crime of violence in violation of 18 U.S.C. § 941(c) (Count Seven). *Id.*[1]

Now pending are Defendants' motions for new trial pursuant to Federal Rule of Criminal Procedure 33. See Docket No. 3240 ("Nelson-Ott Motion"); Docket Nos. 3251, 3253 (collectively "Wendt Motion"). For the following reasons, the Court **DENIES** Defendants' Rule 33 motions.

[1] This trial originally involved 11 defendants. *See* Superseding Indictment. The Court opted to try the case in groups due in part to difficulties caused by the COVID-19 pandemic and complexity of the case. *See* Docket No. 1110. Group One consisted of Mr. Ott, Mr. Wendt, and Mr. Nelson. *Id.* Group Two consists of Raymond Foakes, Christopher Ranieri, and Brian Burke.

## II. LEGAL STANDARD

Under Federal Rule of Criminal Procedure 33, a "court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "A district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal[.]" *United States v. Inzunza*, 638 F.3d 1006, 1026 (9th Cir. 2009) (quoting *United States v. Alston*, 974 F.2d 1206, 1211–12 (9th Cir. 1992)). Accordingly, a district court "'need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses.'" *United States v. Kellington*, 217 F.3d 1084, 1095 (9th Cir. 2000) (quoting *Alston*, 974 F.2d at 1211). While not as rigorous as the showing needed to satisfy Rule 29, it is a demanding standard nonetheless, and the Ninth Circuit has held that such motions "in exceptional circumstances in which the evidence weighs heavily against the verdict." *See United States v. Del Toro–Barboza*, 673 F.3d 1136, 1153 (9th Cir. 2012). There must be a serious risk of a miscarriage of justice. *See United States v. Favato*, 533 Fed. Appx. 127, 131 (3d Cir. 2013) (unpublished) (holding that the district court should grant a Fed. R. Crim. P. 33 new-trial motion if the jury's verdict is contrary to the evidence's weight; but that needs showing "a serious danger that a miscarriage of justice occurred, *i.e.*, that an innocent person has been convicted"); *United States v. Charles*, 949 F. Supp. 365, 368 (D.V.I. 1996) (holding that a miscarriage of justice may warrant order of new trial). Otherwise, whether to grant a motion for a new trial pursuant to Rule 33 rests within the broad discretion of the trial judge. *United States v. Nachamie*, 2000 U.S. Dist. LEXIS 16152, at *10 (S.D.N.Y. Nov. 3, 2000) (holding that a Fed. R. Crim. P. 33 motion for new trial rests within a trial judge's broad discretion).

## III. BACKGROUND

### A. Factual Background

The facts as presented at trial and consistent with the Court's view of the weight of the evidence are as follows.

#### 1. The Hells Angels Motorcycle Club and Hells Angels Sonoma County

The Hells Angels Motorcycle Club ("Hells Angels" or "HAMC") is what the Government refers to as an Outlaw Motorcycle Gang ("OMG"). *See* Trial Transcript ("TT") 3856. The Hells

Angels operate on a global scale. *Id.* Within the Hells Angels umbrella, there are various charters designated by location. *Id.* at 3855. Hells Angels charters in the United States are organized into West Coast and East Coast regions. *Id.* at 3864. Each charter acts semi-autonomously with its own set of rules; however, charters are still required to adhere to Hells Angels "world rules." *Id.* at 3867. With some variation, the world rules govern how an individual can become a member of a particular Hells Angels charter. *Id.* at 3859–60. Individuals begin as "hang-arounds" and are then required to "prospect" over a twelve-month period before they can become "full-patch" members. *Id.* at 3859, 3927–33. The term "full-patch" refers to the three-piece patch on members' vests, or "cut." *Id.* at 3878; *see, e.g.*, *id.* at 4041. The patch consists of a "top rocker," which states the name "Hells Angels"; the center patch has the Death Head logo, a skull with its mouth stitched shut; and below the Death Head is the "bottom rocker," which denotes the state the member is from. *Id.* at 3878, 3919. Only full-patch members are permitted to wear something that displays the Hells Angels name or the Death Head. *Id.* at 3878. Members can also earn tags that they wear on the front of their vests. Among these is the "Filthy Few" tag, which the Government argued (and supported with evidence) members earn by committing a violent act in furtherance of the club. *Id.* at 3923.

Charters have a standardized leadership structure. *Id.* at 3857–58. Typically, charter leadership consists of a president, vice president, secretary, treasurer, and a sergeant-at-arms. *Id.* Relevant here, the president is the leader of the charter, and the sergeant-at-arms is the enforcer of the charter, tasked with using violence, if necessary, to maintain respect for the charter and discipline charter members who fail to follow charter and world rules. *Id.* at 1996, 2275.

Charters hold mandatory weekly meetings referred to as "church." *Id.* at 3876. At church, members discuss and vote on significant charter issues. *Id.* at 3877. Most charter decisions are subject to a "one man, one vote" rule. *Id.* at 3858. While prospects are prohibited from participating in church, they are expected to provide security when church is held, specifically watching out for rival OMGs and law enforcement. *Id.* 4195–96.

Hells Angels Sonoma County ("HASC") is a charter that operates in Sonoma County. *Id.* at 5057. As the next section demonstrates, HASC has exhibited two purposes relevant to this trial.

First, HASC seeks to promote their reputation through violence. *See id.* at 3868, 3923, 4054, 5024–28. This purpose involves, *inter alia*, violence toward rival OMGs, *e.g.*, *id.* at 3868; violence toward non-members who "disrespect" Hells Angels members, *e.g.*, *id.* at 5024–28; and violence toward members who are kicked out of the club in bad standing. *E.g.*, *id.* at 3934, 4285. Second, HASC seeks to evade law enforcement scrutiny. *See id.* at 3919, 3924–26, 4054, 4229. This purpose involves, *inter alia*, strife with law enforcement, as well as violently enforced "no snitching" rules. *See*, *e.g.*, *id.* at 3535, 3919, 3924–26, 5021. The stitched shut mouth of the Death Head logo reflects the no snitching rules. *Id.* at 3919.

Defendant Russel Ott is one of HASC's founders. *Id.* at 4220. He was president of HASC for fifteen years and remains an influential member of HASC. *Id.*; *see id.* at 5289–91, 5413–16. Mr. Ott is referred to as "Chief," was "one of the most active Hells Angels ever," and would often spend time at the HASC clubhouse, living there at times. *Id.* at 2023–24, 2725, 4220. Defendant Jonathan Nelson is the most recent president of HASC. *Id.* at 4195–96. Mr. Nelson was highly respected in his role as president. *Id.* Testimony demonstrated that Mr. Nelson often used violence in response to perceived transgressions against himself and HASC. *See*, *e.g.*, *id.* at 4248, 4263–64, 4282. Defendant Brian Wendt was the president of Hells Angels Fresno and the Hells Angels Sergeant-at-Arms for the West Coast region. *Id.* at 3083, 4236. Testimony established that Mr. Wendt often engaged in violent conduct in carrying out his role as West Coast Sergeant-at-Arms. *Id.* at 2737, 4243–44.

In addition, HASC members were particularly close with members of the Fresno and Boston Hells Angels charters. *Id.* at 4235. Mr. Wendt was often present at the HASC clubhouse, Mr. Nelson and Mr. Wendt had a close personal relationship, and HASC and the Fresno charter often went on "runs" (*i.e.*, joint motorcycle rides) together. *Id.* at 1994, 4235–36. Mr. Nelson also displayed significant respect for and had a close friendship with Christopher Ranieri, the president of the Boston Hells Angels charter. *Id.* at 4238. For example, celebrations were held for Mr. Ranieri when he visited the HASC and Fresno clubhouses, and Mr. Ranieri spent time with Mr. Nelson and Mr. Wendt on multiple occasions while staying at HASC member Russel Lyles' residence. *Id.* at 4239, 2029–34. The Government also presented numerous photos of Mr. Ranieri

with HASC and Fresno members. *See, e.g.*, Gov't Ex. 1413 at 1272, 1274. Another photo depicted Mr. Ott, Mr. Nelson, and Mr. Wendt holding up a framed photo of Mr. Ranieri. Gov't Ex. 184. Mr. Ranieri even had a Sonoma County Death's Head tattooed on his forearm. Gov't Ex. 785. He also was seen on numerous occasions wearing the HASC patch. *See, e.g.*, Gov't Ex. 787, 798, 825.

The victim in this case, Joel Silva, was also an HASC member. *Id.* at 2161, 2245. Mr. Silva had a reputation for being a bully and reportedly created problems at the HASC, Fresno, and New Hampshire clubhouses. *Id.* at 2729–33. Mr. Ott, Mr. Nelson, and Mr. Wendt were convicted for his murder. *See* Jury Verdict.

2. <u>Overt Acts, Predicate Acts, and Uncharged Conduct</u>

a. <u>Murder of Joel Silva</u>

Among the RICO acts, and the basis for each Defendant's VICAR murder conviction, is the conspiracy to murder and murder of former HASC member Joel Silva.

In June 2014, Mr. Silva attended the annual Laconia Motorcycle Week in New Hampshire with Fresno charter members Robbie Huff, Mr. Wendt, Tio Bueno, and former Richmond charter member Joseph Hardisty. *Id.* at 2730–31. While there, Mr. Silva and Mr. Hardisty spent time at the Laconia charter clubhouse. *Id.* Mr. Hardisty testified that he and Mr. Silva were using meth, "tearing the clubhouse apart, terrorizing the prospects," and "picking on all the East Coast members." *Id.* at 2731–32. Mr. Hardisty explained that Mr. Silva engaged in this type of behavior often, and it was creating strife between Mr. Silva and other Hells Angels. *Id.* at 2730. At one point, a dispute arose between Mr. Silva and Boston charter member "Sweeney." *Id.* at 2733. Sweeney was the "right-hand man" to the Boston charter president, Christopher Ranieri, *see id.*; as noted, Mr. Ranieri was a close friend of Mr. Wendt and Mr. Nelson. *Id.* at 2759, 2800–11. According to Mr. Hardisty, Sweeney was upset that Mr. Silva was moving marijuana across the country, and Mr. Silva was upset that Sweeney had taken a Hells Angels chain from him and given it to Mr. Hardisty. *Id.* at 2733–34. As a result, Mr. Silva threatened to kill Sweeney, and asked Mr. Hardisty and Robbie Huff to help him do so. *Id.* at 2734. Mr. Hardisty explained that Mr. Silva's threat was a significant problem because "you can't kill other Hells Angels." *Id.* at

United States District Court
Northern District of California

United States District Court
Northern District of California

2735. Word of Mr. Silva's threat eventually reached Mr. Wendt, who became furious with Mr. Silva. *Id.* Mr. Wendt then gave Mr. Hardisty an ultimatum, "you're in with us or you stay here with [Mr. Silva]." *Id.* Mr. Hardisty chose to go with Mr. Wendt because "[Mr. Silva] had made a big mistake," and "it wasn't the safe choice to stay with [Mr. Silva]." *Id.* at 2735–36.

Mr. Hardisty testified that he and Mr. Wendt then went to Mr. Ranieri's house in Lynn, Massachusetts, where Mr. Wendt and Mr. Ranieri privately discussed Mr. Silva's threat. *Id.* at 2736. When Mr. Wendt returned from the discussion with Mr. Ranieri, he told Mr. Hardisty that Mr. Silva "had to go," *i.e.*, Mr. Silva had to be killed. *Id.* Mr. Hardisty and Mr. Wendt then flew back to California. *Id.* at 2737. The next day, Mr. Wendt, Mr. Huff, Mr. Hardisty, and HASC president Mr. Nelson met at Mr. Hardisty's residence in Antioch. *Id.* at 2738–40. Those present discussed Mr. Silva and concluded he "had to disappear." *Id.* Mr. Hardisty explained that they reached this decision because Mr. Silva was "causing too much problems . . . beating too many friends up. The threat to Sweeney's life . . . he was causing too much drama within different charters." *Id.* In addition to the evidence of problems Mr. Silva was causing with other charters, the Government presented evidence that Mr. Nelson perceived Mr. Silva was challenging his status as HASC president. Issues between the two began to arise in February 2013, when Mr. Silva struck Mr. Nelson in the forehead. *See id.* 2073–74. Mr. Verhagen testified that Mr. Nelson was generally sensitive about his status as president, *id.*at 4217, and Mr. Conte similarly noted Mr. Nelson's sensitivity. *Id.* at 5073. For instance, Mr. Conte explained that in the summer of 2014, Mr. Nelson came to his work and stated that "he had problems with [Mr. Silva] . . . That he didn't like the way [Mr. Silva] was badmouthing him; that [Mr. Silva] went back East and *said some stuff about him about being president*." *Id.* at 5073 (emphasis added). Mr. Nelson then told Mr. Conte, in reference to Mr. Silva, "I'll have that guy killed." *Id.* at 5074.

As a result of the meeting in Antioch, Mr. Nelson was given the responsibility of arranging Mr. Silva's murder; a few weeks later, at a meeting in Berkeley, Mr. Nelson gave Mr. Hardisty the responsibility of carrying out Mr. Silva's murder. *Id.* at 2740–41. Mr. Nelson further explained to Mr. Hardisty that the murder would have to take place in Fresno because the Fresno charter had access to a crematorium. *Id.* at 2742. At first, Mr. Hardisty agreed—he moved to Sonoma so he

could ease Mr. Silva's fears about spending time with Hells Angels. *Id.* at 2741–42. According to Mr. Hardisty, this was necessary because Mr. Silva was scared after the Laconia incident and was avoiding places where he believed he could be killed by Hells Angels. *Id.* at 2742. Other witnesses similarly testified that Mr. Silva was fearful. A friend testified that before his disappearance, Mr. Silva told him "if the club says I'm running from them, don't believe it[,]" *id.* at 2249, and Mr. Silva's stepfather testified that the day before his disappearance, Mr. Silva told him "if the club says I ran, I didn't run." *Id.* at 5681–82.

Eventually, Mr. Hardisty withdrew from the plan to kill Mr. Silva. *Id.* at 2743. However, the overall plan continued without him; Mr. Hardisty testified that he learned some of the details during a discussion with Mr. Huff and Mr. Wendt. *Id.* at 2745. Mr. Wendt told Mr. Hardisty they were going to tell Mr. Silva to come to the Fresno club house "for a fight and to grab a couple pounds of weed[.]" *Id.* The fight was meant to give Mr. Silva the impression that Mr. Wendt wanted to "squash the beef" stemming from the Laconia incident in a manner typical of the Hells Angels. *Id.* The weed "was just added incentive" because Mr. Silva was dealing. *Id.* at 2746. As noted, the plan also required dispelling Mr. Silva's fear of being killed by HAMC. Thus, the conspirators recruited a member Mr. Silva trusted to lure Mr. Silva to the Fresno clubhouse. *Id.* That responsibility fell to Mr. Ott. *Id.*

During this time, Mr. Hardisty remained in frequent contact with Mr. Silva until he received a text "letting [him] know that there was no point in calling [Silva] anymore." *Id.* at 2748. A few weeks later, Mr. Hardisty went to the Fresno clubhouse to meet with Mr. Wendt. *Id.* at 2749. When Mr. Hardisty arrived, Mr. Wendt gave him a ring Mr. Silva received from the Richmond charter. *Id.* Mr. Hardisty explained that "when someone gets killed in the club, all the property from another charter goes back to that charter[.]" *Id.* Because Mr. Silva received the ring from the Richmond charter and Mr. Hardisty was a member of the Richmond charter, Mr. Hardisty inferred that the ring was being given back to him because Mr. Silva had been killed. *Id.* at 2750.

Mr. Wendt then confessed to the details of how he killed Mr. Silva: after Mr. Silva arrived at the Fresno clubhouse, Mr. Wendt told him to grab marijuana from a cubby under a stage. *Id.*

When Mr. Silva bent down to grab the marijuana, Mr. Wendt shot Mr. Silva in the back of the head. *Id.* Mr. Wendt explained how he tried to cover-up the murder. Mr. Wendt told Mr. Hardisty that Mr. Silva's truck was "off in a field or desert somewhere and the body was never going to be found." *Id.* at 2751. According to Mr. Hardisty's testimony, Mr. Silva's body would likely never be found because he believed it had been taken to a nearby crematory with an incinerator large enough to fit a person. *Id.* Before Mr. Silva disappeared, Mr. Huff had pointed the crematory out to Mr. Hardisty and stated "this is where we're gonna bring him[.]" *Id.* at 2752.

Other evidence and testimony corroborated Mr. Hardisty's testimony. Consistent with Mr. Hardisty's testimony about what occurred during Laconia Motorcycle Week, cell-site data showed that from 12:00 a.m. to 3:00 a.m. on June 16, 2014, Mr. Wendt's, Mr. Bueno's, Mr. Huff's, and Mr. Silva's phone were in Laconia, New Hampshire. *Id.* at 3185. By 3:00 p.m. on June 16, 2014, Mr. Silva had separated from Mr. Wendt and Mr. Huff: cell-site data placed Mr. Silva's phone at the Manchester-Boston Regional Airport, whereas Mr. Wendt's and Mr. Huff's phones registered in Lynn, Massachusetts, near the residence of Mr. Ranieri. *Id.* at 3187–88; Gov't Ex. 127 at 73–74. By 6:00 p.m. that evening, Mr. Wendt's, Mr. Huff's, and Mr. Bueno's phones registered at the Boston Logan International Airport. *See* Gov't Ex. 127 at 75. The next day, June 17, 2014, cell-site data placed Mr. Wendt's, Mr. Huff's, and Mr. Nelson's phones in the proximity of Antioch, California, near the residence of Mr. Hardisty. TT 3188; Gov't Ex. 127 at 76.

Approximately one month later, on July 14, 2014—only one day before Mr. Silva's disappearance—cell-site data showed that Mr. Wendt's phone was again in the vicinity of Mr. Ranieri's residence in Lynn, Massachusetts from 8:00 a.m. to 4:00 p.m., ET. TT 3189. In that time, Mr. Wendt and Mr. Ranieri were in regular contact with Mr. Nelson. *Id.*; *see also* Gov't Ex. 127 at 12–14. From 5:00 p.m. to 5:55 p.m., cell-site records show that Mr. Wendt was at Boston Logan International Airport, where contacts between him, Mr. Nelson, and Mr. Ranieri continued. *See* Gov't Ex. 127 at 14. From there, cell-site activity for Mr. Wendt's phone is consistent with travel from Boston Logan International Airport to Los Angeles International Airport, with Mr. Wendt's phone connecting to towers near Los Angeles International Airport at approximately 10:00 p.m., PT. TT 3190.

Then, on the morning of July 15, 2014, the day of Mr. Silva's disappearance, cell-records show that Mr. Wendt was in regular contact with Mr. Silva, Mr. Nelson, and Mr. Ranieri. *Id.* at 3180–82. The same morning, Mr. Ott's phone made outgoing calls to Mr. Silva's phone at 10:23 a.m. and 11:06 a.m. *Id.* at 3173, 3181. Around an hour after the 11:06 a.m. call, Mr. Ott's phone and Mr. Silva's phone travelled in tandem from Santa Rosa to the vicinity of the Fresno clubhouse and remained there until the following day. *Id.* at 3208–3210. Cell-site data showed that after arriving in the vicinity of the Fresno clubhouse, Mr. Silva's phone made a series of outgoing contacts to Mr. Wendt's phone, the last of which was an outgoing call made at 4:36 p.m. Gov't Ex. 127 at 30. Despite numerous incoming contacts, no outgoing calls or texts were made from Mr. Silva's phone thereafter. *Id.* at 3176–77; Gov't Ex. 127 at 35–36. Unlike Mr. Silva's phone, however, Mr. Ott's phone continued to make outgoing calls to Mr. Nelson and other HASC members throughout that night until the early morning of the next day. Gov't Ex. 127 at 31, 38. Later, when Mr. Silva's mother was trying to find her son, Mr. Ott told her that he and Mr. Silva had been drinking at a house in Fresno when Mr. Silva took a call and never came back. *See* TT 5701–02. Nevertheless, after Mr. Silva allegedly left the house in Fresno, Mr. Ott did not attempt to contact Mr. Silva even though he was Mr. Ott's ride back to Sonoma. Gov't Ex. 127 at 39. Instead, Mr. Ott spent the night in Fresno attempting to contact Mr. Nelson for a ride home. TT 3209–11. The next day, after Mr. Ott got in touch with Mr. Nelson, cell-site data showed Mr. Nelson's phone was in the vicinity of Sacramento. *Id.* at 3210. Hours later, cell site activity indicated Mr. Nelson was with Mr. Ott moving from the Hayward-Oakland area towards Santa Rosa. *Id.* at 3212–13.

Cell data also corroborates Mr. Hardisty's testimony about the cover-up. Records showed that on the morning of July 16, 2014—the day after Mr. Silva's disappearance—Fresno charter member Merl Hefferman contacted Levi Phipps, the manager of the California Crematory associated with the Yost & Webb funeral home in Fresno. TT 3198; *see also id.* at 3453–54. Mr. Phipps testified that Merl Hefferman told him "You better be there." *Id.* at 3526. After receiving the text, two men arrived at the crematory, flashed a gun at Mr. Phipps, and moved from their vehicle what Mr. Phipps believed to be a body and placed it in the crematory incinerator. *Id.* at

United States District Court
Northern District of California

3530–32. Incinerator temperature records indicate one extra body was in fact burned that day. *Id.* at 3550. Merl Hefferman later contacted Mr. Phipps and told him to keep quiet. *Id.* at 3535. Cell-site data further showed that Mr. Huff was in the vicinity of Dos Palos on July 16, 2014, *id.* at 3195–97, where Mr. Silva's truck was found on fire later that day. *Id.* at 1922–23. The fire captain who found Mr. Silva's truck testified that he believed the fire was most likely the result of arson. *Id.*

As mentioned above, after Mr. Silva had been missing for a while, his family began to ask HASC members about his whereabouts. In one instance, Mr. Silva's wife came to Mr. Ott's apartment looking for Mr. Silva. *Id.* at 4266. Mr. Verhagen testified that when Mr. Silva's wife left, Mr. Ott stated "little does she know he's not coming back." *Id.* None of the Hells Angels approached Mr. Silva's family to offer assistance in locating him, *see id.* at 5701–04, and approximately four days after his disappearance, Mr. Silva was voted out of HASC. *Id.* at 5075. After an extended investigation, law enforcement discovered that HASC obtained possession of noteworthy items that had belonged to Mr. Silva. Mr. Verhagen testified that HASC members cleared out Mr. Silva's old tattoo shop, taking, *inter alia*, his personalized hardhat and an antique door. *Id.* at 4269–71. Law enforcement also found Mr. Silva's dog tags during a search of Mr. Lyles' residence. *Id.* at 2067–68, 2518–19. Shortly thereafter, investigators discovered that HASC member Damien Cesena was in possession of a motorcycle with multiple parts that appeared "consistent with parts that were on Mr. Silva's motorcycle before he went missing." *Id.* at 2528; *see also id.* at 5074–75. The day after Mr. Silva's disappearance, the fire department found Mr. Silva's truck in the area of Dos Palos, about an hour's drive from Fresno. *Id.* at 1922-23. It was on fire, and the fire captain suspected arson. *Id.*

b. <u>Assaults</u>

The Government presented evidence of HASC's involvement in three assaults.[2] Javad

---

[2] While assaults do not qualify as racketeering acts, *see* 18 U.S.C. § 1961(1), they can be considered as enterprise evidence and serve, in part, as a basis for the inference that a defendant who joined the enterprise engaged in criminal activity. *Cf. See United States v. Jaimez*, 45 F.4th 1118, 1122 (9th Cir. 2022) (utilizing of assaults as evidence of an enterprise), *cert. denied*, 143 S. Ct. 1038 (2023); *United States v. Fernandez*, 388 F.3d 1199 (9th Cir. 2004) (utilizing evidence of assaults to prove a defendant's participation in an enterprise).

United States District Court
Northern District of California

Trew testified that he was assaulted by Mr. Nelson and HASC member Jeremy Greer. TT 1435. Mr. Trew explained that he considered joining HASC after meeting Mr. Greer at a tattoo convention in 2015. *Id.* at 1411–18. Mr. Greer then began to ask favors of Mr. Trew. In one instance, Mr. Greer called Mr. Trew late at night asking to borrow Mr. Trew's utility trailer. *Id.* at 1421. When Mr. Trew declined, Mr. Greer became "very aggressive on the phone about it." *Id.* Next, Mr. Greer asked to borrow Mr. Trew's vehicle. *Id.* at 1422. Mr. Trew again declined, and Mr. Greer again became aggressive. *Id.* Eventually, in approximately 2016, Mr. Trew told Mariano Malvino, a member of the HASC support club Ghost Warriors, that he was uncomfortable with Mr. Greer's aggressive responses. *Id.* at 1423. As a member of an HASC support club, Mr. Malvino was expected to inform HASC of any disrespect toward HASC members. *Id.* at 1333, 1458. Accordingly, Mr. Malvino informed Mr. Greer that Mr. Trew was "talking bad about [HASC]." *Id.* at 1333.

Mr. Malvino subsequently told Mr. Trew to go to the HASC clubhouse. *Id.* at 1426. When Mr. Trew arrived, Mr. Greer and Mr. Nelson were waiting for him with a clear plastic sheet spread across the floor. *Id.* at 1434. Mr. Greer began yelling at Mr. Trew for talking about him to Mr. Malvino. *Id.* at 1435. Mr. Nelson then struck Mr. Trew in the back of his head with a baseball bat. *Id.* at 1437. Others at the clubhouse joined in and beat Mr. Trew for approximately two minutes. *Id.* Mr. Trew stated that he thought he "was going to die," *id.* at 1438, and that by the time the assault ended, he was "pouring blood everywhere[.]" *Id.* at 1437. Mr. Malvino then walked Mr. Trew to the bathroom and instructed Mr. Trew to clean himself off with a bottle of bleach, thus destroying evidence of the beating. *Id.* at 1439. After leaving the bathroom Mr. Nelson asked Mr. Trew, "What the fuck happened tonight?" *Id.* at 1440. Mr. Trew responded, "Nothing happened tonight," as he was under the impression that he would be killed if he told anyone about the assault. *Id.* On his way home after the assault, he discovered that his phone was factory reset and all his data was cleared. *Id.* at 1441.

Mr. Malvino himself was assaulted by Mr. Nelson and HASC member Russel Lyles for interacting with David Clark, a non-member in bad standing with the Hells Angels. *Id.* at 1340–1346. Mr. Lyles had previously informed HASC and Ghost Warrior members that they could not

United States District Court
Northern District of California

associate with David Clark. *Id.* at 1339. Despite Mr. Lyles' instruction, Mr. Malvino continued to do so, and was arrested after committing a robbery with David Clark. *Id.* at 1339–40. While released on bail, Mr. Malvino told the Ghost Warriors about his and David Clark's arrest. *Id.* at 1340. The Ghost Warriors told Mr. Malvino he was required to inform Mr. Lyles about the incident, and Mr. Malvino did so. *Id.* at 1340–41.

On August 3, 2017, Mr. Malvino informed Mr. Lyles and was immediately summoned to the HASC clubhouse. *Id.* at 1341; Gov't Ex. 176. When Mr. Malvino arrived, Mr. Lyles and Mr. Nelson attacked him. TT 1346. Mr. Lyles and Mr. Nelson repeatedly punched Mr. Malvino in the face. *Id.* Mr. Nelson then struck Mr. Malvino in the back of the head with what Mr. Malvino described as the teeth side of a framing hammer. *Id.* at 1346–47. When the assault ended, Mr. Malvino was on the ground and saw a pool of blood. *Id.* at 1348. Members of the Ghost Warriors then went to Mr. Malvino's house and took all his Ghost Warrior paraphernalia. *Id.* at 1350.

Lastly, former member Troy Conte was assaulted and kicked out of HASC for sleeping with the girlfriend of HASC member, and former president, Raymond Foakes. *Id.* at 5006, 5085, 5089. In November 2016, after Mr. Foakes discovered the affair, Mr. Nelson texted Mr. Conte that all HASC members needed to come to the clubhouse for a meeting. *Id.* at 5087–88. Twenty minutes after Mr. Conte arrived, Mr. Foakes walked in and struck Mr. Conte in the face. *Id.* at 5089. Mr. Conte attempted to leave, but Mr. Lyles and Mr. Foakes dragged him back inside and proceeded to beat him. *Id.* at 5090. Eventually, the assault was paused so the members could vote on Mr. Conte's membership. *Id.* at 5091. All voted to revoke Mr. Conte's membership, including Mr. Nelson and Mr. Ott. *Id.* at 5092. Mr. Conte was then intermittently beaten with a bull whip, a pistol, and a baseball bat for a period of four-and-a-half hours. *Id.* at 5093–94. Mr. Conte was also held down so Mr. Foakes could run a tattoo gun across his face. *Id.* at 5095. Mr. Conte testified that the worst part was when Mr. Nelson pistol whipped him in the face. *Id.* at 5094. Every HASC member—save Mr. Ott who left after the vote—was present for, or participated in, the post-vote assault. *Id.* at 5098.

As a result of the assault, Mr. Conte had to spend multiple days in the hospital. Gov't Exs. 11, 12. Medical records described Mr. Conte as "a risk for sudden clinical deterioration and life-

United States District Court
Northern District of California

threatening injuries." Gov't Ex. 12. He suffered facial fractures, including to the orbital walls of his left eye, had to have plastic surgery to remove the tattoos on his forehead, and still has vision problems to this day. TT 5103.

The Government also put on evidence that HASC contemplated violence, some of which could have resulted in the killing of rival OMGs. Rival OMGs—such as the Mongols, Vagos, and Wanted—were considered enemies, and Hells Angels members were expected to attack enemies on sight. *Id.* at 2706–2710. Government Witness Joseph Hardisty testified that the Hells Angels recruited him for "big game and small game hunting," *i.e.*, to hunt and kill Mongols ("big game") and Vagos ("small game"). *Id.* at 3090–91. He further testified about an incident in which he was riding with HASC members, including Mr. Silva and Mr. Ott, and observed someone he assessed to be a rival OMG member. *Id.* at 2715–16. Mr. Hardisty stated that upon seeing the rival OMG member, he took out his gun and fired several shots in the rider's direction. *Id.* After the shooting, HASC members congratulated Mr. Hardisty and told him he was "a real Hells Angels." *Id.* at 2717.

In another instance, after a member of the Mongols murdered the president of the San Francisco Hells Angels, *id.* at 5049–50, HASC members were told to look out for Mongols and attack them on sight. *Id.* Members who failed to do so lost status in HAMC. *Id.* at 5052. For example, a full-patch HASC member who failed to report seeing a Mongol license plate in HAMC territory was relegated to a prospect. *Id.*

Mr. Verhagen testified that he participated in two "runs" to Arizona in which HASC and related charters contemplated killing rivals. *Id.* at 4250. Mr. Verhagen explained that after a Phoenix Hells Angels member was killed by a Mongol, HASC travelled to Arizona in force for the funeral. *Id.* at 4246. The members chose to take a route through Mongol territory rather than the most direct route "to let them know that we wouldn't be intimidated." *Id.* at 4247–48. Before leaving, Mr. Nelson gave a speech in which he explained that they could be ambushed by other motorcycle clubs. *Id.* at 4248–49. Mr. Verhagen testified that the speech "made me feel prepared for war . . . I was getting ready to ride into battle." *Id.* at 4248. In fact, Mr. Verhagen "felt on several occasions that dying as a Hells Angel prospect would be worth it based on the emotions

that are instilled in you to become a good Hells Angel." *Id.* at 4249. While on another run to Arizona, Mr. Verhagen saw Fresno charter members pass an AR style rifle, a shotgun, and some pistols through the window of Mr. Wendt's hotel room. *Id.* at 4241–42.

c. Extortion and Robbery

The Government presented evidence demonstrating that HASC engaged in the RICO predicate acts of extortion and robbery. *See, e.g.*, *id.* at 3934, 4571–74, 4867, 5031–32. The night Mr. Conte was assaulted, HASC members went to his house and took all of his Hells Angels paraphernalia. *Id.* at 4867. One member attempted to steal the Contes' car, but it failed to start. *Id.* M.C., Mr. Conte's wife, was home at the time. *Id.* at 4868–69. M.C. testified that she allowed the members to take the items because she was fearful of what they would do if she tried to stop them. *Id.*

Mr. Conte similarly testified that when prospects get kicked out of the club, members would vote on whether to allow the prospect to keep their motorcycle. *Id.* at 5031–32. He explained that if a prospect refused to give up their motorcycle, they would get beaten up. *Id.* at 5033. Further, at least some members viewed taking prospects' motorcycles as a way to make money. *Id.* at 5033–34.

As one example, former HASC prospect Steve Verhagen was extorted by HASC members after he was told to "step back as being a prospect." *Id.* at 4285. The night he was told to "step back," Mr. Verhagen was required to turn over his motorcycle to HASC. *Id.* at 4286. Mr. Verhagen believed that if he had failed to give his motorcycle to HASC willingly, he would have been "beaten and it would be taken." *Id.* at 4287. In addition to his motorcycle, Mr. Greer and another HASC member went to Mr. Verhagen's home and took all of his Hells Angels related possessions, as well as his personal laptop and digital camera. *Id.* at 4286.

The Government also presented evidence of two robberies committed in furtherance of HASC. Nicholas Gruber and Nicholas Spencer operated a marijuana grow out of Mr. Gruber's house in Sonoma County. *Id.* at 4567. During his partnership with Mr. Gruber, Mr. Spencer lived at Mr. Gruber's house. *Id.* On January 15, 2015, HASC members Damien Cesena and Jeremy Greer showed up at Mr. Gruber's house demanding marijuana they believed Mr. Spencer had

United States District Court
Northern District of California

United States District Court
Northern District of California

stolen from an individual named Casey Jones. *Id.* at 4570–73. When Mr. Spencer declined to give them the marijuana, Mr. Greer and Mr. Cesena forced themselves in through the gate, and Mr. Cesena struck Mr. Spencer with a pistol. *Id.* at 4571–74. After he was struck, Mr. Spencer fled through the back door. *Id.* Later that night, Mr. Spencer returned home and found that Mr. Cesena and Mr. Greer had taken several marijuana plants and "a duffle bag with some pounds of weed." *Id.* at 4573. A couple of days later, while only Mr. Gruber's mother was home, Mr. Cesena returned to the house wearing his Hells Angels patch and told Mr. Gruber's mother that he wanted to speak with her son. *Id.* at 5787–88. According to testimony, the reason Mr. Cesena returned was to notice his affiliation with the Hells Angels. *Id.* at 5071.

Notably, both the robbery and Mr. Cesena's return were captured by Mr. Gruber's surveillance system. *Id.* at 5787. Mr. Gruber showed the surveillance footage to his martial arts instructor, who happened to be HASC member Herb Cody. *Id.* at 5790. Upon viewing the footage, Herb Cody asked to purchase the surveillance hard drive, and Mr. Gruber sold it to him. *Id.* At the next church, when the other HASC members learned of the robbery, Mr. Greer and Mr. Cesena were made to split the proceeds because Mr. Cesena wore his Hells Angels patch when he returned to the grow house. *Id.* at 5071.

The robbery of Eban Hale also involved members of HASC. *Id.* at 4076–77. In the spring of 2016, Mr. Hale won an auction for an abandoned storage unit and, much to his surprise, discovered around 200 pounds of packaged marijuana inside. *Id.* at 4060–4061. Eventually, word of Mr. Hale's find spread, and individuals began harassing Mr. Hale, demanding he give them some of the marijuana. *Id.* at 4066. A friend of Mr. Hale recommended that he speak with HASC member Troy Conte for protection. *Id.* at 4067. Mr. Hale took the advice—he set up a meeting with Mr. Conte at which he gave Mr. Conte 30 pounds of marijuana in exchange for his protection. *Id.* at 4069–70. After the meeting, the harassment immediately ceased. *Id.* at 4069–70.

However, in November 2016, Mr. Conte was removed from HASC, *id.* at 5091, and a few weeks later, in December 2016, HASC member Jeremy Greer showed up at Mr. Hale's home. *Id.* at 4075. When Mr. Hale saw Mr. Greer, he was already inside the house holding a gun. *Id.* at

United States District Court
Northern District of California

4075–76. Mr. Greer told Mr. Hale that the marijuana was his and demanded its return. *Id.* at 4076. When Mr. Hale explained to Mr. Greer that he had already sold the marijuana for $100,000, Mr. Greer cocked his gun and demanded the $100,000. *Id.* After Mr. Hale told Mr. Greer he didn't have the money, Mr. Greer stated "Do you know who I represent?" *Id.* at 4078. Mr. Hale understood Mr. Greer to be referencing the Hells Angels. *Id.* at 4080. Mr. Hale then gave Mr. Greer everything he had on hand: $4,000 worth of marijuana and $1,000 in cash. *Id.* at 4081.

A few days later, while driving his daughter to school, Mr. Hale noticed Mr. Greer was following him in a van. *Id.* at 4082–83. Mr. Hale was able to drop his daughter off at school, *id.* at 4085, but Mr. Greer continued to follow Mr. Hale for another 30 to 40 minutes. *Id.* at 4086–87. Eventually, Mr. Hale called the police. *Id.* The police arrested Mr. Greer and searched his van. *Id.* at 4146–48. Inside, the police found, among other things, guns, a knife, masks, zip-ties, a ballistic vest, and Hells Angels paraphernalia. *Id.* at 4146–48. After Mr. Greer was arrested, police officers saw another HASC member circling the block. *Id.* at 4162–63.

d. Witness Intimidation

The night Troy Conte was removed from HASC, Raymond Foakes sexually assaulted Mr. Conte's wife, M.C., and subjected her to witness intimidation. TT 4869–71. During the four-hour assault on Mr. Conte, M.C. testified that Mr. Foakes called her and told her to come to the HASC clubhouse. *Id.* Once she arrived, Mr. Foakes drove her to a secluded location and sexually assaulted her, forcing her to perform fellatio on him. She testified that "he told me to do whatever he says and Troy won't get hurt" and "for me not to tell anybody or else he's going to come after me." *Id.* at 4871. Mr. Foakes' command "not to tell anybody" was not explicitly limited to the sexual assault; on its face, it could have applied to Troy Conte's beating as well. M.C. then returned home. *Id.* at 4874. However, just before Mr. Conte returned from the HASC clubhouse, Mr. Foakes went to the Contes' house and attempted to assault M.C. again while she was in her bed. *Id.* HASC member Josh Johnson, who was bringing Mr. Conte home after the assault at the clubhouse, arrived before Mr. Foakes could do so and convinced Mr. Foakes to leave. *Id.* at 4874–75. M.C. then took her husband to the hospital. *Id.* at 4877. The next day, M.C. informed her husband that Mr. Foakes sexually assaulted her. *Id.* Even though the Contes typically avoided

dealing with law enforcement, Mr. Conte told M.C. that she should report the incident to the police. *Id.* at 4878–80. M.C. did so, and Mr. Foakes was arrested. *Id.*

Around one year later, M.C. encountered HASC member Brian Burke on a freeway. *Id.* 4481–82. Upon seeing M.C., Mr. Burke shaped his hand in the figure of a gun, pointed it at her, and then pointed it to his head. *Id.* at 4883. M.C. testified that she took this as a threat against her life for reporting the sexual assault to law enforcement. *Id.* at 4884.[3]

e. Drug Trafficking

Around 2008, Russel Lyles operated a marijuana grow house in Willets, California. *See* Gov't Ex. 91. Raymond Foakes' then girlfriend, M.J., testified that Mr. Foakes ordered her to move to the location of the grow house and work for Mr. Lyles without pay. TT 1782. M.J. explained that Hells Angels members would often visit the grow house, including a member of the Boston Hells Angels charter. *Id.* at 1783. Eventually, the grow house was raided, and Mr. Lyles was arrested. *Id.* at 1783–84. Law enforcement discovered Hells Angels paraphernalia and a number of firearms in the grow house. *Id.* at 1793, 1795–1800. A sign outside the property read "This Property Belongs to A Hells Angel. Fuck Around and Find Out." Gov't Ex. 87. As a result of his arrest, Mr. Lyles was convicted of possession of marijuana with the intent to distribute, as well as maintaining a premises for the manufacture/use of controlled substances. Gov't Ex. 91.

## IV. ANALYSIS

### A. Sufficiency of the Evidence

Although a district court assessing a Rule 33 motion "need not view the evidence in the light most favorable to the verdict [and] may . . . evaluate for itself the credibility of the witnesses[,]" *United States v. Kellington*, 217 F.3d 1084, 1095 (9th Cir. 2000) (quotation marks and citations omitted), courts disfavor new trial motions based on the sufficiency of the evidence. *See United States v. Del Toro–Barboza*, 673 F.3d 1136, 1153 (9th Cir. 2012); *see also United*

[3] In the Group Two trial with defendants Christopher Ranieri, Raymond Foakes, and Brian Burke, the jury considered similar evidence from M.C.'s testimony but acquitted Burke of the count of witness intimidation. Docket No. 3493 (Group Two Jury Verdict). However, because the Group Two trial took place almost a year after the Group One Trial, the jury in Group One was permitted to consider this evidence.

United States District Court
Northern District of California

*States v. Camacho*, 555 F.3d 695, 705 (8th Cir. 2009) ("New trial motions based on the weight of the evidence are generally disfavored[.]"). Where the court concludes that, "despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." *Kellington*, 217 F.3d at 1097 (quotation marks and citations omitted).

1. Jonathan Nelson and Russel Ott

Mr. Nelson and Mr. Ott argue that the evidence was insufficient to support their convictions. *See* Nelson-Ott Motion at 2. They incorporate their statement of facts and argument set out in their motions for acquittal under Federal Rule of Criminal Procedure 29. *Id.*; *see* Docket No. 3031 ("Nelson R29 Motion"); Docket No. 3032 ("Ott R29 Motion"). The Court rejected these arguments in its order denying Mr. Nelson's and Mr. Ott's motions for acquittal, *see* Docket No. 3494 ("R29 Order"). The Court extensively detailed why the evidence supported Mr. Nelson's and Mr. Ott's convictions for RICO conspiracy, *id.* at 17–27 (Ott), 29–31 (Nelson), and VICAR murder, *id.* at 32–33 (Ott), 39–42 (Nelson), as well as Mr. Nelson's conviction for assault with a dangerous weapon in aid of racketeering. *Id.* at 42–43. Even under the less rigorous Rule 33 standard, Mr. Nelson and Mr. Ott fail to demonstrate how the "evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred[.]" *Kellington*, 217 F.3d at 1097 (quotation marks and citations omitted).

There was sufficient evidence to convict Mr. Nelson and Mr. Ott of conspiracy in violation of RICO, 18 U.S.C. § 1962(d). As discussed, below, the Court finds the key prosecution witnesses who testified at trial about their involvement in the murder were credible and credits their testimony. The Government was required to show that Mr. Nelson and Mr. Ott knowingly agreed "to participate, directly or indirectly, in the conduct of the [enterprise's] affairs through a pattern of racketeering." *United States v. Jaimez*, 45 F.4th 1118, 1129 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 1038 (2023) (quoting *United States v. Fernandez*, 388 F.3d 1199, 1226 n.18 (9th Cir. 2004)). The Government presented evidence of specific racketeering acts in which HASC engaged. *E.g.*, TT 4285–87, 4867–69, 5031–33 (extortion); *id.* at 4567–73, 5787–90,

United States District Court
Northern District of California

4060–4163 (robbery); *id.* at 4869–84 (witness intimidation); *id.* at 2706–17, 3090–91, 4246–50 (assault on rivals); *id.* at 1782–97 (drug trafficking).[4] As the facts described herein establish, the Government then demonstrated that Mr. Nelson and Mr. Ott either directly participated in these activities, or that members having the same status and tenure as Mr. Nelson and Mr. Ott would have known and agreed with the acts. *See generally* R29 Order 17–23, 29–31. Most importantly, there was substantial and sufficient evidence to convict Mr. Nelson and Mr. Ott for the murder of Mr. Silva. *See*, *e.g.*, Gov't Ex. 127; TT 2730–52. Their participation in Mr. Silva's murder is by itself sufficient to support their convictions for RICO conspiracy in view of the numerous predicate acts that arose from it, including murder, arson, and obstruction of justice. *See* 18 U.S.C. § 1961(1). *See United States v. Freeman*, 6 F.3d 586, 595–96 (9th Cir. 1993) (concluding that continuous predicate acts related to a single scheme may constitute a pattern of racketeering); *United States v. Kirk*, 844 F.2d 660, 664 (9th Cir. 1988) ("[P]redicate acts may constitute a pattern of activity under RICO even though only a single scheme is involved.").

There was sufficient evidence to convict Mr. Nelson and Mr. Ott of conspiracy to commit murder in violation of VICAR, 18 U.S.C. § 1959(a)(5), and murder in violation of VICAR, 18 U.S.C. § 1959(a)(1). The Government was required to show: "(1) that the criminal organization exists; (2) that the organization is a racketeering enterprise; (3) that the defendants committed [or attempted or conspired to commit] a violent crime; and (4) that they acted for the purpose of promoting their position in [or gaining entrance to] the racketeering enterprise." *United States v. Rodriguez*, 971 F.3d 1005, 1009 (9th Cir. 2020) (quoting *United States v. Bracy*, 67 F.3d 1421, 1429 (9th Cir. 1995)). Notably, VICAR liability only requires that a defendant had a substantial

---

[4] There was substantial evidence from multiple witnesses about the criminal nature of the HASC enterprise. For instance, Officer Harm testified about his knowledge of Outlaw Motorcycle Gangs (OMGs), including the HASC, and his investigations into HASC gang activity. TT 5541-48. Mr. Hardisty testified that the Hells Angels were an outlaw motorcycle club and the "one percent" of motorcycle riders. *Id.* at 2705. He also explained the hierarchy of Hells Angels, puppet clubs, rivalries with other motorcycle gangs like the Mongols, 2706-07, and described the Defendants as members of HASC. *Id.* at 2723-26. M.J. testified about the process of joining HASC starting as a "hangaround" to becoming a "prospect," and their respective roles in the club and HASC. *See* TT 1755–1758. Brittany Tolman testified about how Mr. Lyles had the role in HASC as the "enforcer" and the "sergeant at arms." *Id.* at 1995-96. She testified that in his role, "things would happen to people that did not oblige" "in order to obtain respect for either himself or the club or any of the brothers." *Id.* at 1996.

United States District Court
Northern District of California

purpose of *maintaining* one's position in an enterprise. *See* 18 U.S.C. § 1959 (emphasis added). As noted above, the Government established that HASC was a racketeering enterprise and that Mr. Nelson and Mr. Ott conspired to murder Mr. Silva. The Government then presented evidence of Mr. Nelson's and Mr. Ott's status within HASC, *see, e.g.*, TT 4195-96 (Nelson); *id.* at 2023–24, 2725, 4220 (Ott), and evidence that a failure to carry out the murder of Mr. Silva would negatively impact that status. *See, e.g.*, *id.* at 1340–46, 2737, 4217, 4282, 5052, 5073–74. The evidence supported the conclusion that maintaining status in HASC was a substantial purpose of Mr. Ott and Mr. Nelson and motivated their participation in the commission of Mr. Silva's murder. The evidence supporting the conviction of Mr. Nelson and Mr. Ott of the VICAR violation was substantial and the jury's verdict did not constitute a miscarriage of justice.

There was sufficient evidence to convict Mr. Nelson of assault with a dangerous weapon in aid of racketeering in violation of 18 U.S.C. § 1959(a)(3), and use of a firearm during a crime of violence in violation of 18 U.S.C. § 941(c). The victim, Troy Conte, testified that he was struck with a firearm. *See* TT 5093, 5183. The Government's expert witness testified that Mr. Conte's injuries were entirely consistent with being struck by a gun, *id.* at 4657, 4644, and likely not a result of being struck by a human fist, as Mr. Nelson argued. *Id.* at 4681–82. It is not a serious miscarriage of justice to maintain a conviction based on such testimony.

Contrary to Defendants' challenge, the Court finds Mr. Hardisty and Mr. Verhagen credible witnesses. Neither witness had an obvious motive for either Mr. Hardisty or Verhagen to give false testimony at trial. Both risked their personal safety in testifying against the leaders of the HASC and the Fresno Charter of the Hells Angels. Neither received any substantial benefit in testifying at trial. Although each may have sought some benefit at the outset of their cooperation, by the time of trial, neither were obligated by *e.g.* a cooperation agreement to testify and had little to gain. Moreover, having closely observed their demeanor on the witness stand, the court finds both witnesses' testimonies credible. As for Mr. Hardisty, his testimony was substantially corroborated by, *inter alia*, call records and cell-site data. *See* Gov't Ex. 127. This corroboration is more than sufficient to overcome Mr. Nelson's and Mr. Ott's challenge. As for Mr. Verhagen, the Defendants had ample opportunity to cross-examine him and impeach his credibility but did

not uncover any inconsistencies so powerful as to render him "totally incredible." *Cf. United States v. Davis*, 960 F.2d 820, 825 (9th Cir. 1992) (suggesting a new trial based on witness credibility should only be granted where inconsistency is "so powerful that, if it were to be believed by the trier of fact, it could render the witness' testimony totally incredible"). For the reasons stated above, the Court finds both witnesses were credible and the jury could reasonably have so concluded as well.

Therefore, with respect to sufficiency of the evidence, the Court **DENIES** Mr. Nelson's and Mr. Ott's motions for new trial.

2. Brian Wendt

Mr. Wendt argues the evidence was insufficient to establish the "purpose" element necessary to convict him of conspiracy to commit murder in violation of the Violent Crimes in Aid of Racketeering Activity ("VICAR"), 18 U.S.C. § 1959(a)(5); and murder in violation of VICAR, 18 U.S.C. § 1959(a)(1). *See* Wendt Motion at 95–99. Specifically, Mr. Wendt argues that he was not a member of HASC, that any agreement to murder Mr. Silva was contrary to Hells Angels rules, and therefore that his involvement in the murder of Mr. Silva could not have served to "achieve, maintain, or increase" his status in HASC. *Id.* at 98 (quoting *Fernandez*, 388 F.3d at 1232). The Government responds that Mr. Wendt's "reliance on the fact that he was not a member of HASC is misplaced, and it serves as no defense to Counts Two and Three because membership in the enterprise is not required to commit a VICAR crime." *See* Docket No. 3507 ("Opposition") at 4 (citing *United States v. Rodriguez*, 971 F.3d 1005, 1011 (9th Cir. 2020); *Fernandez*, 388 F.3d at 1231).

The Government is correct. A defendant need not be considered an official member of a criminal enterprise to be convicted under the VICAR statute. *Rodriguez*, 971 F.3d at 1011; *see also United States v. Manning*, No. CR 19-00313 WHA, 2022 WL 4241658 (N.D. Cal. Sept. 14, 2022) ("Even accepting defendant Manning's argument that Sean Harrison was not a 'made member' of Mac Block, it was reasonable to conclude that he was associated with the Mac Block gang."). "The VICAR statute speaks of maintaining or increasing one's 'position' within the enterprise—a broad term that encompasses the ringleader of an [enterprise] as well as [] less

formalized roles[.]" *Id.* (citing *United States v. Brady*, 26 F.3d 282, 289–90 (2d Cir. 1994) ("[A]ssociates are considered to be members of the enterprise, even though they are not 'made members' of the [enterprise].")). To that end, so long as the Government was able to prove that Mr. Wendt had status with the HASC enterprise and that a substantial purpose of the murder of Mr. Silva was to maintain that status, his formal membership in the HASC is of little relevance.

Here, the Government established that Mr. Wendt had status with HASC based on (1) his role as West Coast Sergeant-at-Arms, TT 1996, 2275; (2) his general association with HASC, *id.* at 1994, 4235–36; and (3) his close personal association with Mr. Nelson, *id.* at 4236. First, in his role as West Coast Sergeant-at-Arms, Mr. Wendt was expected to use violence to maintain respect for West Coast charters and to discipline West Coast charter members who failed to follow rules. TT 1996, 2275. Mr. Silva had broken HAMC rules, *id.* at 2739–40, and multiple HAMC leaders agreed the proper response was to murder him, *id.* 2740–41. *See United States v. DeSilva*, 505 F.3d 711, 715 (7th Cir. 2007) (stating that VICAR liability can be found based on actions taken as part of a "regional enforcer" role); *see also Fernandez*, 388 F.3d at 1222. As such, the evidence sufficiently demonstrated that if Mr. Wendt failed to discipline Mr. Silva in the agreed upon manner, he would have been seen as an ineffective West Coast Sergeant-at-Arms and lost status with west coast charters, including HASC.

Second, Mr. Wendt had status with HASC based on a general close relationship. TT 4235. Testimony established that HASC members were afraid to bring their friends around the clubhouse because Mr. Silva's behavior was so outrageous. *Id.* at 2739–40. As such, the evidence was sufficient to demonstrate that a reason Mr. Wendt murdered Mr. Silva was to resolve an internal HASC issue, thereby raising his status with HASC.

Third, Mr. Wendt had status with Mr. Nelson, the president of HASC who had personal animosity towards Mr. Silva beyond the general issues Mr. Silva created. Troy Conte testified that he had a conversation with Mr. Nelson in the summer of 2014 about Mr. Silva. Mr. Nelson "didn't like the way [Mr. Silva] was badmouthing him; that [Mr. Silva] went back East and said some stuff about him about being president." *Id.* at 5073-74. Then, Mr. Nelson said "I'll have that guy killed." *Id.* at 5074. As such, the evidence was sufficient to demonstrate that a

substantial reason Mr. Wendt murdered Mr. Silva was to maintain or increase his status with Mr. Nelson, who had issues with Mr. Silva. *See Fernandez*, 388 F.3d at 1232–33 (stating that an action that maintains or increases "one's status in the eyes of certain individuals, especially if they are in leadership roles within the group," is a sufficient VICAR purpose).

As to Mr. Wendt's argument that murdering another member is against Hells Angels rules, just because a club rule prohibits certain conduct does not mean the defendant complied with that rule. *See United States v. Vernace*, 811 F.3d 609, 618 (2d Cir. 2016) ("The Gambino crime family could have, by its internal rules, discouraged drug dealing, and still, as a factual matter, been engaged in it as part of its racketeering activities."); *United States v. Pimentel*, 346 F.3d 285, 301 (2d Cir. 2003) (concluding a rational jury could find a racketeering enterprise engaged in drug trafficking despite the enterprise's official policy prohibiting its members from using and selling narcotics).

Therefore, with respect to sufficiency of the evidence, the Court **DENIES** Mr. Wendt's motion for a new trial.

B. Severance

"Defendants jointly indicted ordinarily should be jointly tried . . . The burden is on the defendant to show clear, manifest, or undue prejudice from a joint trial." *United States v. Mikhel*, 889 F.3d 1003, 1046 (9th Cir. 2018) (quotation marks and citation omitted). "Severance should be granted 'only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" *Id.* at 1046 (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)). Even if there is risk of prejudice, Rule 14 does not require severance. "[R]ather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro*, 506 U.S. at 539 ("[L]ess drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice.").

The Ninth Circuit has outlined several factors that a court may consider in inquiring into the prejudicial effect of a joint trial, including: (1) the jury's ability to "collate and appraise the individual evidence against each defendant"; (2) the judge's diligence in providing limiting

instructions to the jury; (3) "whether the nature of the evidence and the legal concepts involved are within the competence of the ordinary juror"; and (4) whether "joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *United States v. Fernandez*, 388 F.3d 1199, 1241 (9th Cir. 2004). The *Fernandez* court stated that "[t]he first two factors are the most important in this inquiry." *Id.* And with respect to the first factor, the court observed "that a joint trial is particularly appropriate where the co-defendants are charged with conspiracy, because the concern for judicial efficiency is less likely to be outweighed by possible prejudice to the defendants when much of the same evidence would be admissible against each of them in separate trials." *Id.* at 1242. Finally, "neither a better chance of acquittal in a separate trial nor the mere fact of joint trial with a more culpable defendant is sufficient in itself to require severance." *Id.* at 1241 (citing *United States v. Baker*, 10 F.3d 1374, 1388 (9th Cir. 1993), overruled on other grounds by *United States v. Nordby*, 225 F.3d 1053 (9th Cir. 2000)).

1. Russel Ott – Nelson & Wendt

Mr. Ott asserts that his joint trial curtailed his rights to full and fair cross-examination, effective assistance of counsel, and presentation of an individual defense. Nelson-Ott Mot. at 40. However, the Government points out that "the arguments that follow largely do not address these issues at all and instead argue insufficiency of the evidence." Opposition at 15. Indeed, Mr. Ott's argument begins by summarizing the evidence presented at trial, and then concludes, "The point of the above summary of facts is that the government did not present evidence of *any* criminal conduct by *any* member or associate of HASC—including Mr. Ott—that pre-dated Raymond Foakes' becoming president." Nelson-Ott Motion at 44. Why this is relevant is not clear. Mr. Ott remained a member in good standing after Mr. Foakes became president, and as discussed above, the evidence was sufficient to show that during that time Mr. Ott knowingly agreed "to participate, directly or indirectly, in the conduct of the [enterprise's] affairs through a pattern of racketeering." *Jaimez*, 45 F.4th at 1129. To that end, a RICO conspiracy conviction does not require the commission of an overt act. *See Salinas v. United States*, 522 U.S. 52, 63 (1997).

Mr. Ott argues he would have presented evidence of the "Laughlin incident," which was a

riot between the Hells Angels and the Mongols in 2002 that left two Hells Angels and one Mongol dead, and dozens others injured. Nelson-Ott Motion at 44; Docket No. 1122 at 1. This evidence would have bolstered Mr. Ott's defense because the incident enabled Mr. Foakes to "wrest control of HASC" from Mr. Ott, who was not involved in the incident. Nelson-Ott Motion at 46. The evidence would have supported Mr. Ott's claim that under Mr. Foakes, HASC leadership "shifted to a violent, fear-based mode" which Mr. Foakes ran "with an iron first that tolerated—indeed, encouraged—aggression and lawlessness." *Id.* at 47. However, evidence of HASC's shift to violence and lawlessness under Mr. Foakes' leadership is irrelevant to Mr. Ott's conviction, because it in no way negates the evidence of his continued involvement in the HASC, his command of respect within the HASC, and his participation in the Silva murder. And as the Government correctly notes, evidence of the Laughlin incident does not exculpate Ott because it predates the charges in the Indictment. Even if Mr. Ott "presided over a kinder gentler HASC," Opposition at 16, the fact that he *remained* a member in good standing post-presidency supports the charge that he conspired to conduct the affairs of a racketeering enterprise. Additionally, Mr. Foakes was not involved in the murder of Mr. Silva, which was the most significant incident underlying Mr. Ott's conviction. Moreover, evidence of the Laughlin incident may have in fact prejudiced Mr. Ott more than it helped. A jury could easily have found that the Laughlin incident showed that violence and mayhem by HASC members went as far back as 2002 and was tolerated under Mr. Ott's leadership.

Notwithstanding the fact that the Laughlin incident is unlikely to have helped Mr. Ott's defense in any way, he argues that he declined to present it due to the spillover effect it would have had on Mr. Wendt and Mr. Nelson. As to Mr. Wendt, Mr. Ott argues that evidence of the Laughlin incident would have prejudiced Mr. Wendt because Mr. Wendt "was one of 42 persons inducted in the District of Nevada for [VICAR], Conspiracy to Assault with a Dangerous Weapon and Assault Resulting in Serious Bodily injury based on what occurred in Laughlin." Nelson-Ott Motion at 46 (citing *United States v. Charles Acosta, et al.*, No. CR-S-03-00542-JCM (PAL)). Mr. Ott's argument is unpersuasive: had he sought to introduce evidence of the Laughlin incident, the Court could have tailored relief to Mr. Wendt by excluding evidence of Mr. Wendt's

involvement or providing a limiting instruction. *See Zafiro*, 506 U.S. at 539; *see also* Opposition at 16.

As to Mr. Nelson, Mr. Ott argues evidence of the Laughlin incident would have prejudiced Mr. Nelson because after he assumed the presidency, Mr. Nelson ran HASC in the same violent and lawless manner as Mr. Foakes. Nelson-Ott Motion at 47. The Government counters that "[t]he violence that occurred under Nelson's leadership stands on its own and would be made neither better nor worse by evidence that—as Ott tells it—he had run HASC differently." Opposition at 16 n. 4. Even assuming evidence of the Laughlin incident could be said to have some negative effect on Mr. Nelson, "to be entitled to severance on the basis of mutually antagonistic defenses, a defendant must show that the core of the codefendant's defense is so irreconcilable with the core of his own defense that the acceptance of the codefendant's theory by the jury precludes acquittal of the defendant." *United States v. Throckmorton*, 87 F.3d 1069, 1072 (9th Cir. 1996). The comparison in leadership styles between Mr. Ott, Mr. Foakes, and Mr. Nelson can only be described, as the Government puts it, "peripheral" to each of their defenses. That HASC became progressively more violent under different leadership does not undermine the evidence of an agreement to conduct the affairs of racketeering enterprise or the murder of Mr. Silva. No irreconcilable inconsistency existed.

Finally, it was clear that the Laughlin incident was to be excluded regardless. The Court prohibited Mr. Scheetz from testifying about the incident. Docket 1403 at 20. And in response to the Court's unwillingness to permit evidence of that incident, the Government withdrew its intent to present evidence on the Laughlin riot. Docket No. 2275 at 2. Whether the trial was severed or not, the Laughlin incident was remote in time and peripheral and was subject to exclusion under Fed. R. of Evid. 403.

Mr. Ott's remaining severance arguments focus exclusively on the sufficiency of the evidence and do not mention how the joint trial impacted a specific trial right in any manner whatsoever. The evidentiary issues discussed are: (1) there was no evidence Mr. Ott was aware Mr. Silva was a problem, (2) there was no evidence Mr. Ott participated in planning the murder of Mr. Silva, (3) Mr. Ott's phone records are exonerating, and (4), had Mr. Ott been a knowing

United States District Court
Northern District of California

participant in the killing of Mr. Silva, he would not have been stranded in Fresno with no means to return home. Nelson-Ott Motion 47–49. The Court already rejected these arguments, and they fare no better in the context of severance.

2. Jonathan Nelson – Brian Wendt

Mr. Nelson argues that "a joint trial impeded [his] right to present a fulsome defense, which would be the presentation of the combination of (1) the actions of Nelson to rush to pick up and retrieve Ott from Fresno, creating a strong exculpatory inference regarding their knowledge of a plan or conspiracy to murder Silva, and (2) the lack of involvement of Nelson or Ott in the disappearance and disposal of Huff and Carasis." Nelson-Ott Motion at 54. The Court excluded evidence that Mr. Huff and Art Carasis were killed and then incinerated at a crematory in Fresno.

Mr. Nelson presented this first argument throughout trial. In fact, Mr. Nelson quotes Government witness Agent Sparano-Stanger's cross-examination to emphasize that the "rush to pick up Mr. Ott from Fresno in the middle of the night is flatly inconsistent with knowledge, planning and premeditation as to the death of Silva":

> Q: So it appears that the device associated with Mr. Nelson after a phone call at 10:56 p.m. pretty much lickety-split drove down to the Sacramento area; correct?
>
> A: It's consistent with that.
>
> Q: Okay. And that was not your presentation on direct examination; correct?
>
> A: That one slide was not, no.

*E.g.*, *id.* at 53 (quoting TT 3405). Mr. Nelson also made the same argument in closing:

> If this was so diabolically planned, like the Government claims it was, so well thought out by these chapter presidents, with bicoastal meetings, and calls, and a pattern of communication, why would they—would Mr. Nelson rush, in the middle of the night, to go pick up Mr. Ott? . . . The Actions of Ott and Nelson show there was no plan to kill Silva, and are proven by the Government's cell tower evidence.

Opposition at 17 (quoting TT 7086, 7089). Mr. Nelson's first argument fails because he was not prevented from presenting evidence of his rush to pick up Mr. Ott the night of the murder.

Nevertheless, Mr. Nelson argues the "exculpatory circumstantial inference from the actions

for Jonathan Nelson to rush and retrieve Russell Ott from Fresno after Joel Silva disappears is bolstered significantly by evidence that Huff and Carasis disappeared, and their bodies are disposed of in a similar manner as Joel Silva." Nelson-Ott Motion at 54. According to Mr. Nelson, the evidence of Mr. Huff's and Mr. Carasis' cremations "creates a strong inference that the only conspiracy to murder in this case exists not within the membership of the Sonoma HAMC, including Nelson and Ott, but rather between the original participants in the plot to kill Silva that began with Wendt, Rainieri [sic] and Joseph Hardisty." *Id.*

That Mr. Nelson did not know about Mr. Huff's and Mr. Carasis' cremations matters little to his participation in Mr. Silva's murder. As the Government notes, Mr. Nelson's lack of involvement in murders that did not concern him does not exculpate him from a murder that did concern him. Even accepting the argument that Mr. Nelson was not aware of Mr. Silva's cremation, that lack of knowledge would not necessarily exculpate him from the murder itself. Mr. Nelson could have planned and participated in Mr. Silva's murder without being involved in the disposal of Mr. Silva's body afterward. Finally, as the Government argues:

> [I]t is highly doubtful that it would have helped Nelson for the jury to hear evidence of additional murders committed by a Hells Angels charter to which he had close ties. That is particularly the case when the remains of those victims were disposed of in the exact same way the conspirators dealt with Silva's body and when one of the victims—Huff—played a role in Silva's killing.

Opposition at 17. In sum, Mr. Nelson fails to establish that his joint trial with Mr. Wendt compromised one of his specific trial rights "or prevent[ed] the jury from making a reliable judgment about guilt or innocence." *Fernandez*, 388 F.3d at 1241.

3. Brian Wendt – Ott & Nelson

Mr. Wendt argues the Court erred by failing to sever his trial from that of Mr. Ott's and Mr. Nelson's. *See* Wendt Motion at 8. First, Mr. Wendt briefly recounts his pre-trial motion to sever, *id.* at 9, and then, noting that "'the trial judge has a continuing duty at all stages of the trial to grant a severance if prejudice' appears[,]" *Schaffer v. United States*, 362 U.S. 511, 516 (1960), he implies developments during the trial required severance. *Id.* at 11 (citing *United States v. Mayfield*, 189 F.3d 895, 900 (9th Cir. 1999)). Yet, as the Government explains, Mr. Wendt "does

United States District Court
Northern District of California

not explain what developments during trial caused him prejudice that were not anticipated at the time the Court denied his motion to sever[,]" nor does he "meaningfully engage with the *Fernandez* factors or explain what manifest prejudice he suffered that would overcome the clear preference for a joint trial among co-conspirators charged in a single indictment."  Opposition at 18.

In addition to the insufficiency of Mr. Wendt's briefing, nothing in the trial required severance here. Mr. Wendt made two principal arguments in his pre-trial motion to sever.  *See* Docket No. 1684-12 ("Pre-trial Severance Motion") (SEALED).  First, Mr. Wendt argued he should be severed because he was charged in the Indictment as an associate, not a member, of HASC.  *See id.* at 4–10.  Second, Mr. Wendt argued he and his codefendants sought to introduce "mutually antagonistic defenses[.]"  *See id.* at 10–20.

Mr. Wendt's charge as an associate of HASC was legally sufficient and proper, and the Court already addressed this same argument in Mr. Wendt's pre-trial motion to sever:

> The indictment defines the HASC enterprise as "including its leadership, members, and associates," SI ¶ 11 (emphasis added), and identifies HASC associates as including "members of the Fresno . . . chapter[] of the Hells Angels" such as Mr. Wendt, *id.* ¶ 1. The indictment further states, at multiple points, that both "members and associates" share a common purpose, means, and method in carrying out the enterprise's criminal affairs. *Id.* ¶¶ 12-17.

And further:

> Mr. Wendt fails to explain why these allegations are insufficient to plead his affiliation with the HASC enterprise, especially given that the RICO Act defines an "enterprise" as encompassing "any union or group of individuals associated in fact" and contains no formal membership requirement.  *See* 18 U.S.C. § 1961(4); *see also Boyle v. United States*, 556 U.S. 938, 946 (2009) (holding that an association-in-fact enterprise need only possess "three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose").

*See* Docket No. 1878 ("Severance Order").  Similarly, the Ninth Circuit has held that racketeering enterprises may include both members and associates, and that enterprise members and associates need not be tried separately from one another.  *See United States v. Rodriguez*, 971 F.3d 1005, 1011–12 (9th Cir. 2020) (stating that "the government did not need to prove that [the defendant]

United States District Court
Northern District of California

was considered an official member" of the charged enterprise to satisfy the VICAR statute where the indictment identified the enterprise as including its "leadership, membership, and associates"). Here, it was clear to the jury that Mr. Wendt, unlike Mr. Nelson and Mr. Ott, was not a member of the HASC – he was president of the Fresno Charter. But there was also substantial evidence of his close association with the HASC. Nothing suggests the jury was confused by this distinction.

Furthermore, the Count One charge of conspiracy to violate § 1962(c), as opposed to a substantive RICO offense, did not require the Government to prove that Mr. Wendt actually participated in the conduct of the HASC enterprise. *See* SI ¶¶ 19-21; *see also Salinas*, 522 U.S. at 65 (1997) ("It is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues, for the conspiracy is a distinct evil, dangerous to the public, and so punishable in itself."). The fact Mr. Wendt is not charged with many of the crimes constituting a substantive RICO offense did not defeat the RICO conspiracy charge and did not mandate severance. Evidence of other HASC members' and associates' unlawful conduct is admissible against all alleged conspirators to prove the existence and scope of the racketeering enterprise, as well as the conspirators' agreement to further the objectives of that enterprise. *See United States v. Cardascia*, 951 F.2d 474, 483 (2d Cir. 1991) (rejecting the argument that defendants with only "minor roles in [a] joint venture conspiracy" should have been severed from "co-conspirators who played more significant roles" because "most of the evidence" relating to the conspiracy "would have been admissible had each of these [defendants] been tried separately"). Mr. Wendt could have agreed with the conspiracy as an associate without being a member or committing predicate acts. Of course, as noted above, the evidence at trial established that Mr. Wendt did commit the RICO predicate acts of murder and other acts on connection therewith.

Nor were the defenses "mutually antagonistic." Mr. Wendt claims "a severance was required because of his concern that Mr. Nelson and Mr. Ott would make good on their attempts to seek to introduce evidence of uncharged cremations and killings that allegedly took place in Fresno County[.]" Wendt Motion at 9. In his pretrial severance motion, Mr. Wendt also argued that a joint trial would prevent him from introducing evidence that an informant stated Mr. Nelson carried out the murder of Mr. Silva. Pre-trial Severance Motion at 15–16. Ninth Circuit law

generally provides that mere "[a]ntagonism between defenses is insufficient" to warrant severance; rather, a defendant seeking to sever on these grounds "must show that 'the acceptance of one party's defense will preclude the acquittal of the other party.'" *United States v. Sherlock*, 962 F.2d 1349, 1362–63 (9th Cir. 1992) (quoting *United States v. Ramirez,* 710 F.2d 535, 546 (9th Cir. 1983)).

That is not the case here. Even if evidence relating to uncharged cremations and killings that would inculpate Mr. Nelson in the murder of Mr. Silva were admitted, the jury could still find that Mr. Wendt conspired with Mr. Nelson and Mr. Ott to murder Mr. Silva. One does not preclude the other. In any event, the Court excluded evidence of the uncharged cremations, and explained that it would have done the same regardless of whether Mr. Wendt was tried together with Mr. Ott and Mr. Nelson or separately. Severance Order at 24-27 (concluding evidence of uncharged cremations and killings should be excluded as against Mr. Wendt under Fed. R. Evid. 404(b), and as against Mr. Ott and Mr. Nelson under Fed. R. Evid. 403).

Also, if Mr. Wendt introduced evidence that an informant claimed Mr. Nelson actually carried out the murder of Mr. Silva, the jury could still determine Mr. Wendt conspired to murder Mr. Silva, or that the informant's statement was not credible. While accusation by one defendant against another could have the effect of a second prosecutor, *see United States v. Tootick*, 952 F.2d 1078, 1082 (9th Cir. 1991), here, the Government's theory contradicted the claims of all three codefendants. This Court explained, "'If Wendt seeks to blame Nelson for shooting Silva, the United States will present contrary evidence' that 'Wendt was the shooter[,]' [. . .] 'Likewise, the United States' evidence will contradict any suggestion that Wendt acted alone, without the aid of Nelson and Ott.'" Severance Order (quoting Docket No. 1726-3 (Severance Opposition) at 11). In sum, Mr. Wendt failed to prove that his and his codefendants' defenses were irreconcilable.

Finally, Mr. Wendt offers the conclusory argument that the Court inconsistently instructed the jury about evidence that was admissible against Mr. Wendt for limited purposes. Wendt Motion at 11. Mr. Wendt does not specify which evidence he is referring to or what limiting instruction the Court should have given. The Court did instruct the jury multiple times that evidence of crimes committed by HASC members other than the Defendants was only admissible

United States District Court
Northern District of California

to establish that HASC was an enterprise. *See e.g.* TT 1600-01 (deciding to periodically give the limiting instruction to the jury that overt racketeering acts by non-Defendants are admissible to show the existence of the enterprise). Moreover, Mr. Wendt had plenty of room to argue he was not involved in all the other HASC crimes.[5]

C. Juror Issues

Defendants argue that the Court's handling of jury selection prejudiced their rights to trial by a fair and impartial jury. Mr. Nelson and Mr. Ott challenge (1) the denial of the defense motion to strike the entire panel of jurors from April 11, 2022; and (2) the denial of the defense challenges for cause to eight prospective jurors (specifically, Juror Nos. 33, 55, 86, 175, 185, 189, 231, 299). *See* Nelson-Ott Motion at 5–26. Mr. Wendt challenges that the Court's order restricting post-verdict juror contact was prejudicial. Wendt Motion at 54.

1. Denial of Motion to Strike April 11, 2022, Panel of Jurors

The Sixth Amendment guarantees a fair trial by a panel of impartial jurors. U.S. Const. amend. VI. "A potential juror can taint the rest of the venire by making "expert-like statements" that bolster the evidence against the defendant, [. . .] or by mentioning "extrinsic evidence [that is] highly inflammatory and directly connected to [the defendant's] guilt." *United States v. Ortiz-Martinez*, 593 F. App'x 649, 650 (9th Cir. 2015) (quoting *Mach*, 137 F.3d at 633–34).

Defendants argue the Court erred in denying their motion to strike the entire panel of jurors from April 11, 2022 because it "had been exposed to, and tainted by, statements by Potential Juror No. 86 about fear for his safety and that of his family if he were to serve as a juror in this case." Nelson-Ott Motion at 3–5. In his Juror Questionnaire, Juror No. 86 noted his safety as a juror was a matter he sought to speak about privately. *See id.*, Ex. 1. Nevertheless, the following exchange between AUSA Barry and Juror No. 86 occurred before the entire panel:

**AUSA Barry**: So you feel that you could judge defendants based on

---

[5] Mr. Wendt explains that his pretrial severance motion complained of evidence including, (1) the assault at McNear's; (2) Mr. Lyles' possession of weapons; (3) the home-invasion committed by Mr. Cesena and Mr. Greer; (4) the assault of Troy Conte; (5) the sexual assault of M.C.; (6) the robbery of Eban Hale; and (7) witness intimidation of M.C.. Wendt Motion at 9. As explained above, introduction of this evidence was appropriate in view of the fact that it constituted, *inter alia*, the HASC enterprise.

> the evidence that's in front of you?
>
> **Juror No. 86**: Yes, unbiasedly.
>
> **AUSA Barry**: Unbiased. Do you have any concerns in serving as a juror—and this is based on your survey responses. Do you have any concerns serving as a juror in this particular case?
>
> **Juror No. 86**: [. . .] I do. My safety and my family's safety.
>
> **AUSA Barry**: What do you mean?
>
> **Juror No. 86**: What's the guarantee that—you know, how do you protect us physically?
>
> **Court**: All right. This may be a proper subject of proper interrogation.

TT 270:23–271:23. Counsel for Mr. Wendt then asked Juror No. 86:

> **Mr. Wendt:** You indicated that you participate in the Chief Advisory Committee for the Hercules PD." *Id.* at 272.
>
> **Juror No.** 86: I would have liked to have kept that quiet, but yes.

*Id.* at 272. Public discussion with Juror No. 86 then ceased. Defendants then moved to strike the entire April 11 panel, claiming it was tainted by this line of questioning. While the Court agreed that AUSA Barry's follow-up question "What do you mean?" was not proper, *id.* at 307, the Court denied the motion because it was a single comment with no substance and was "stopped in time and in such a way that it did not infect the jury panel[.]" *Id.* at 307-08. The Court correctly concluded so at trial, and the Defendants have not shown anything to the contrary.

Defendants also assert that because Juror No. 86 was on the Hercules Police Department advisory committee, other jurors may have credited his remarks as an "expert opinion." *Id.* at 5 (citing *Mach v. Stewart*, 137 F.3d 630, 632–33 (9th Cir. 1997)). In *Mach v. Stewart*, 137 F.3d 630, 630 (9th Cir. 1998), a prisoner petitioned for habeas corpus following his conviction for sexual conduct with an eight-year-old girl. He asserted a violation of his rights to an impartial jury and due process. *Id.* at 631. During jury selection, a social worker on the jury panel stated that in her experience, children don't lie about sexual abuse. *Id.* at 631-32. She stated she was a social worker with the State of Arizona Child Protective Services and that she had taken child psychology courses and worked extensively with psychologists and psychiatrists. *Id.* at

United States District Court
Northern District of California

United States District Court
Northern District of California

632. Further, she stated that "she had never, in three years in her position, become aware of a case in which a child had lied about being sexually assaulted." *Id.* Although she was excused, the defendant's motion for a mistrial was denied and he was subsequently convicted. *Id.* at 630. The Ninth Circuit held that "at least one juror was tainted and entered into jury deliberations with the conviction that children simply never lie about being sexually abused." *Id.* at 633. Such bias violated the defendant's right to an impartial jury. *Id.* The court reversed the district court's dismissal of the defendant's petition for writ of habeas corpus. *Id.* at 630.

This case is easily distinguishable from *Mach* because here, Juror No. 86's comments did not come close to "expert-like" statements. In contrast to the social worker's opinions which were drawn from her professional experience, here, Juror No. 86 did not tie his experience in the advisory committee to his fears for his and his family's safety. Juror No. 86 did not even explain what the Chief Advisory Committee does, let alone what his specific participation entailed.

Second, the "doctrine of invited error prevents a defendant from complaining of an error that was his own fault." *United States v. Myers*, 804 F.3d 1246, 1254 (9th Cir. 2015) (internal citation omitted). Juror No. 86's participation in the Committee was revealed to the venire only because of Defendants' own questioning; it was Defendants who brought up that the juror "indicated that you participate in the Chief Advisory Committee for the Hercules PD." TT at 272. Defendants therefore cannot now claim that the Court erred in admitting Juror No. 86's statements.

Third, Juror No. 86 did not mention "extrinsic evidence [that was] highly inflammatory and directly connected to [Defendants'] guilt." *Ortiz-Martinez*, 593 F. App'x at 650. In fact, Juror No. 86 did not mention extrinsic evidence at all. Nor were any of his statements directly connected to Defendants' guilt; the statements did not specifically reference Defendants at all. Finally, the Court's instruction was sufficient to cure any taint from extrinsic evidence because it instructed the jury to presume the Defendants' innocence and that all conclusions had to be drawn from the evidence at trial. *See id.* at 944 (noting that the district court instructed the selected jurors at the outset of trial that the defendant must be presumed innocent and that all conclusions had to be drawn from "the testimony of witnesses, documents, and other things received as exhibits, any

facts that have been stipulated.”). Juries are presumed to follow a court’s instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000). Nor have Defendants proffered any evidence to show that the jury failed to follow the instructions.

2. Loss of Peremptory Challenges

Defendants argue the Court’s denial of cause challenges to eight prospective jurors “significantly and prejudicially altered the ability of the defense vis-à-vis the government to exercise of peremptory challenges, in violation of Fifth Amendment due process and the Sixth Amendment right to a fair trial by an impartial jury.” Nelson-Ott Motion at 9. Defendants list the following prospective jurors: Juror 33, Juror 55, Juror 86, Juror 175, Juror 185, Juror 189, Juror 231, Juror 299.

Peremptory strikes do not have a constitutional basis. *See Ross*, 487 U.S. at 82 (“We have long recognized that peremptory challenges are not of constitutional dimension but are merely a means to achieve the end of an impartial jury.”); *United States v. Martinez-Salazar*, 528 U.S. 304, 307 (2000) (same); *Rivera v. Illinois*, 556 U.S. 148, 152 (2009) (“This Court has ‘long recognized’ that ‘peremptory challenges are not of federal constitutional dimension.’” (internal citation omitted)). In *Ross*, the Supreme Court found no Sixth Amendment violation from the fact that the defendant had to use a peremptory challenge. *Ross*, 487 U.S. at 88. Nor can a defendant “tenably assert any violation of his Fifth Amendment right to due process” so long as he is accorded peremptory strikes in line with Federal Rules of Criminal Procedure 24(b) and (c). *Martinez-Salazar*, 528 U.S. at 317 (citing *Ross*, 487 U.S. at 91). Here, the Court also gave Defendants 14 peremptory strikes, all of which they exercised. RT 1068. The Court also gave each side four additional peremptory strikes for alternate jurors. *Id.*

Defendants attempt to distinguish this precedent by claiming that “[i]n each of those cases, the Supreme Court considered a single erroneous of a cause challenge[,]” whereas “[i]n this case, the Court erred in denying . . . five (5) cause challenges to the panel of twelve jurors and two (2) cause challenges to alternates.” Nelson-Ott Motion at 9. But the reasoning of *Ross*, *Martinez-Salazar*, and *Rivera* is not so limited. The holdings were not predicated on finding a *de minimis* prejudice. Rather, these cases held that peremptory challenges, and hence their diminishment, do

United States District Court
Northern District of California

not implicate the constitution. *See Ross*, 487 U.S. at 82. Nor do Defendants cite any case law establishing that multiple denials of cause challenges, leading to a loss of multiple peremptory challenges, violates the Sixth Amendment. Defendants' argument is especially weak given the significant number of peremptory challenges afforded to them, a number which far exceeded the number of objected-to denials based on cause.

Finally, none of the challenged prospective jurors were empaneled. Juror 299 was an alternate juror but did not participate in the deliberations. TT 7308-89. Therefore, Defendants were not prejudiced by the empaneled jury, and so no constitutional error occurred.

3. Post-Verdict Juror Contact

Mr. Wendt argues the Court's order limiting Defendants' post-verdict contact with jurors was in error. Wendt Motion at 54–58.

Immediately after the trial, the Court permitted willing jurors to speak with counsel for all the parties in the courtroom. Defense counsel interviewed several jurors. On August 24, 2022, approximately two months after the jury verdict was entered, several jurors informed the Court that they were contacted at their homes by private investigators employed by the Defense. These jurors expressed concern regarding the propriety of such post-verdict contact and as to how the investigators obtained their addresses.

On August 25, 2022, the Court requested legal briefing from the parties on the question of the propriety of conducting post-verdict jury interviews. On August 26, 2022, Defense Counsel Alexandra McClure filed an *ex parte* declaration including the reasons post-verdict juror interviews were sought, the specific circumstances of each attempted contact, and a request to conduct further post-verdict juror interviews. *See* Docket No. 2922 ("McClure Declaration"). On September 1, 2022, the Court entered an order restricting post-verdict juror interviews to those jurors who notified the Court of their consent. *See* Docket No. 2930 ("Juror Contact Order"). The Court communicated with each juror and informed them of the opportunity to interview with defense counsel, setting forth permissible areas of inquiry under Fed. R. Evid. 606(b). The Court ensured each juror would have an opportunity to consent by sending an "opt-in" email back to the Court. *Id.* at 4. Ultimately, no juror consented to contact. *See* Docket No. 2961 ("Status of Juror

Contact Order”).

In general, “post-verdict jury interrogation may be appropriate to determine whether (1) extraneous prejudicial information was improperly brought to the jury’s attention or (2) whether any outside influence was improperly brought to bear upon any juror,” consistent with Rule 606(b), *Economou v. Little*, 850 F. Supp. 849, 851 (N.D. Cal. 1994), or juror racial animus under *Peña -Rodriguez*.

Nothing in the McClure Declaration about counsel’s post-trial courtroom interviews suggested that extraneous prejudicial information, outside influence, or racial animus impacted the Jury’s deliberations. While the Declaration noted that a juror claimed she went to high school with a Government witness, Nicholas Gruber, and recognized the name of another witness who did not testify, the personal life experiences of a juror do not constitute an “extraneous matter” upon which a defendant can impeach a verdict. *United States v. Budziak*, 697 F.3d 1105, 1111 (9th Cir. 2012). That contact was explored in open court during voir dire. That juror stated that the last time she had contact with Gruber was 12 years ago and affirmed that she could serve as an impartial juror. *See* Docket No. 2576 at 33-36.

In any event, the Court has discretion to limit post-verdict juror contact in a manner that ensures jurors’ consent. *See Mitchell*, 958 F.3d at 787; *Martinez*, 2020 WL 3574594, at *2 (“[D]istrict courts have wide discretion to restrict contact with jurors to protect jurors from ‘fishing expeditions’ by losing attorneys.” (citing *United States v. Wright*, 506 F.3d 1293, 1303 (10th Cir. 2007)). It did so here when it denied the Defendants’ request to continue direct, unsupervised, and apparently unwanted post-verdict juror interviews. Instead, although post-verdict interviews are not looked on favorably, Juror Contact Order at 2 (citing *Martinez v. Shinn*, No. CV-20-00517-PHX-DJH, 2020 WL 3574594, at *2 (D. Ariz. July 1, 2020) (citing *Hard v. Burlington Northern R.R.*, 812 F.2d 482, 485 (9th Cir. 1987)), the Court facilitated such contact by sending an email to jurors asking if they consent to being interviewed by investigators for defense counsel. *See* Juror Contact Order. As this Court noted:

> As recognized by the Supreme Court’s decisions on Federal Rule of Evidence 606(b), “long-standing and very substantial concerns support the protection of jury deliberations from intrusive inquiry.”

> *Tanner v. United States*, 483 U.S. 107, 127 (1987); *see also Peña-Rodriguez v. Colorado*, 137 S. Ct. 855, 866 (2017). This evidentiary "no-impeachment rule" "promotes full and vigorous discussion by providing jurors with considerable assurance that after being discharged they will not be summoned to recount their deliberations, and they will not otherwise be harassed or annoyed by litigants seeking to challenge the verdict." *Mitchell v. United States*, 958 F.3d 775, 788 (9th Cir. 2020) (quoting *Peña-Rodriguez*, 137 S. Ct. at 865).

Juror Contact Order at 2. Therefore, the Court's order limiting post-verdict juror contact and requiring juror consent was appropriate here, as it balanced the defendants' interest in interviewing jurors and the jurors' privacy rights while respecting the framework of FRE 606(b).

D. COVID-19 Procedures

The Group One trial took place in the context of the COVID-19 pandemic. To reduce the risk of infection, the Court instituted certain protocols. First, the Court required that jurors be seated 6-feet from one another. Since they could not all fit in the jury box, the Court established a rotation of jurors seated in the box and those seated in the audience section. TT 2218–19. Second, the Court required trial participants—unless speaking—and members of the audience to wear masks.

Group One Defendants argue these protocols generally violated their Fifth and Sixth Amendment rights, though they do not identify what specific rights were violated. First, as to juror distancing seating, Defendants assert that "Jurors who were in the audience, and especially those at the back of the audience seating section, felt that counsel ignored them. The attorneys did not make eye contact with them[,]" or "speak in their direction." *Id.* Second, as to masking, Defendants argue the masking protocol "had implications for how the jury viewed the accused, their supporters in the courtroom and their counsel." Nelson-Ott Motion at 29. This is due to the "deeply ingrained bias against masks," which "connote criminals, shady individuals, persons up to no good, who disguise their identity to carry out nefarious deeds," *Id.* at 33, as well as research that shows that masks conceal "critical parts of the face[,]" and "significantly impairs recognition of facial emotions." *Id.* at 31. Defendants argue that Jurors were therefore deprived of the means to accurately identify emotions when the parties are wearing masks." *Id.* Importantly, the witnesses and examiner were not masked under the protocol.

As an initial matter, the Court set forth its COVID-19 protocols in the pretrial conference

United States District Court
Northern District of California

United States District Court
Northern District of California

order filed on March 22, 2022, *see* Docket No. 2498, and jury selection did not begin until April 12, 2022. Defendants had ample time to object and propose an alternative plan before trial and during trial, but they failed to do so.[6] As such, the Court considers the issues waived. Even if the issues were not waived, the Court concludes the defendants' objections are meritless for the following reasons.

First, the Court's COVID-19 policies did not unconstitutionally deprive Defendants of any identifiable right. Witnesses' voices were amplified throughout the courtroom. The Court arranged to have witnesses and exhibits published to the jury displayed on large television screens for the rear of the courtroom. And the Court gave jurors an opportunity to rotate, TT 925; the jurors did not request to do so, *id.* at 885-86. None complained about an inability to see or hear the witness. In *United States v. Tagliaferro*, 531 F. Supp. 3d 844, 850 (S.D.N.Y. 2021), the defendant argued that the district's social distancing policy violated his Sixth Amendment right to cross-examination by requiring members of the jury to sit in the public gallery as opposed to the jury box. *Id.* at 850. The court disagreed with the defendant's argument that jurors could not fully "observe the witness's demeanor" at trial. *Id.* Rather, the facts that the testifying witness remained unmasked while on the stand and testified using a microphone gave the jury the "full opportunity" to assess witness "demeanor" and the substance of the testimony. *Id.*

Similarly here, witnesses and counsel who were questioning the witnesses could remain unmasked when speaking, and parties used microphones to speak so that the jury could hear. Just like in *Tagliaferro*, the jury had a full opportunity to observe the witnesses and parties that were speaking and the substance of the evidence at trial. The juror seating arrangement across both the juror box and the audience seating section was also proper. *See also People v. Cuadras*, No. C093607, 2023 WL 2820216, at *6 (Cal. Ct. App. Apr. 7, 2023), *review denied* (June 21, 2023) (unpublished) ("Defendant has not cited any authority, and we have found none, holding that jurors must be seated in the jury box or within a certain distance of the witness stand.").

Additionally, Courts have previously ruled that reasonable COVID-19 safety precautions

[6] Defendants could have, for example, requested to use the wireless microphones that are available in each courtroom.

that may impair some minor aspect of the jury trial right are within the trial court's discretion. In *United States v. Thompson*, 543 F. Supp. 3d 1156, 1164 (D.N.M. 2021), the court held that there was no authority, nor had defendant cited any, holding that the Sixth Amendment right to an impartial jury demands that the defendant have "unimpeded visual access to prospective jurors' facial expressions during jury selection," unlike the Confrontation Clause issue with masked witnesses. *Id.* The court elaborated, "[Defendant]'s ability to ask questions during voir dire and to see the upper half of prospective jurors' faces is enough to satisfy his constitutional rights during jury selection, at least during an ongoing [] global pandemic." *Id.* The same reasoning applies identically here, where there is no Confrontation Clause issue with prospective juror's wearing of masks. Defendants' ability to ask questions during voir dire to masked jurors satisfied his constitutional rights during the same global pandemic that occurred in *Thompson.*

Furthermore, the Ninth Circuit has upheld convictions in the face of similar challenges to COVID protocols. For instance, in *United States v. Knight*, 56 F.4th 1231, 1235 (9th Cir. 2023), *cert. denied*, 143 S. Ct. 2478 (2023), *and cert. denied*, 143 S. Ct. 2478 (2023), the defendant asserted that permitting a juror to participate remotely via Zoom in a criminal trial violated his Fifth and Sixth Amendment rights including those to: a jury trial, a fair and impartial jury, a representative jury, and his right to confront witnesses. *Id.* at 1236. The court explained:

> Unlike a deprivation of counsel, a biased adjudicator, or the failure to ensure that the jurors are instructed on the law, allowing remote juror participation does not impact the entire framework of the trial in ways that cannot be accurately measured on review. Rather, it merely creates room for the types of problems and errors identified by Knight, such as difficulties in seeing exhibits, hearing testimony, and/or viewing witnesses. But none of those errors will necessarily arise simply because a juror is participating remotely.

*Id.* The instant case is even easier. All jurors who participated in deliberations were present in the courtroom. Witness testimony and cross-examination took place in the courtroom. There is no evidence that the seating arrangement "impact[ed] the entire framework of the trial in ways that cannot be accurately measured on review." *Id.*

The COVID pandemic greatly reduced any negative connotations associated with mask wearing. At the time of trial, which was the height of the pandemic, mask wearing connoted

United States District Court
Northern District of California

responsible compliance with CDC guidance. The requirement that Defendants wear masks also extended to everyone on the prosecution team, the judge, marshals, court security officers, court staff and court reporter, and the jurors. The jurors did not likely see any of the people in the courtroom as "shady individuals . . . disguis[ing] their identity to carry out nefarious deeds." *Id.* True, defendants that are forced to wear items that imply culpability, such as prison clothing, shackles, and restraints, may prejudice a defendant, *see, e.g.*, *Estelle v. Williams*, 425 U.S. 501, 512–13 (1976), but, especially in the COVID context, masks did not have that effect.

E. Prosecutorial Misconduct

1. Opening Statement

Defendants argue that the Government made improper remarks during its opening statement by alluding to the "disappearance, killing, and cremation of Art Carasis, Robbie Huff, or any other individuals by Hells Angels." Nelson-Ott Motion at 73. The relevant portion of Ms. Peng's opening argument is as follows:

> You'll hear evidence about how Silva's body was burned. You'll hear from Levi Phipps, the manager of the crematory who witnessed the illegal burning of Silva's body. Levi Phipps was a manager of a family funeral home which also provided cremation services, a California Crematory. The crematory is about ten minutes away from the Fresno clubhouse. Prior to 2014, Phipps had met Merl Hefferman, a member of the Fresno Hells Angels, and did a few legitimate funerals for the Hells Angels. Hefferman then started to contact Phipps, trying to get Phipps *to burn bodies*. Hefferman also asked for a key to the crematory multiple times, and Phipps had refused. Then that morning, Phipps would see the two men, one with the gun, put the wrapped body inside this incinerator with another body already inside. Hefferman then called Phipps and threatened him to be quiet or else.

TT 1200–01 (emphasis added).

Nowhere did the Government reference Art Carasis, Robbie Huff, or even any other specific body other than the single "wrapped body" that was admissible evidence as it related to the murder of Joel Silva. It is true that Ms. Peng referenced "bodies" plural, and contrary to what the Government argues, this reference is inconsistent with Phipps' testimony. Phipps testified that Hefferman "jokingly at first would say stuff like… in terms of someday making something disappear" and that "he wanted to make someone disappear." TT 3485-86. Phipps did not

reference multiple bodies in his testimony.

However, this singular reference to "bodies" plural in the Government's opening statement was not prejudicial to Defendants. In *Bruce v. Kramer*, No. CV 05-867 GAF (JC), 2009 U.S. Dist. LEXIS 124286, at *55 (C.D. Cal. Dec. 15, 2009), the petitioner failed to show he was prejudiced by an improper opening statement because immediately before opening statements, the trial court advised the jury that "[a]n opening statement is not evidence." *Id.* at 55. Similarly, here, the Court instructed the jury that "what the lawyers have said in their opening statements… is intended to help you interpret the evidence, but it is not evidence." Docket No. 3444 at 4 (Jury Instruction No. 27). Therefore, any potential prejudice was cured by the court's instructions to the jury. *See United States v. Maurice*, 416 F.2d 234, 237 (9th Cir. 1969) (finding no prejudice from comments made during opening statement where the trial judge, "more than once, instructed the jury that any comments made by counsel were not to be construed as evidence"); *see also United States v. Hoelker*, 765 F.2d, 1422 1427 (9th Cir. 1985) (where the prosecutor's comments pressed permissible limits, the court's instruction that arguments of counsel are not evidence cured any prejudice arising therefrom).

There was no further reference to bodies and no evidence was admitted at trial of such other than Mr. Silva's cremation.

2. Evidence of Shooting Death of Mongol

Next, Defendants argue that the Government improperly elicited witness testimony about the shooting death of a Mongol. Nelson-Ott Motion at 73. Sergeant William Harm testified about a Mongol who was murdered on Highway 580 riding his motorcycle in a known Hells Angels territory. RT 5321. However, the Court sustained the Defendants' objection to this statement, and instructed the jury to disregard the comment when it said:

> Members of the jury, you have heard testimony from the witness William Harm about an unproven incident that allegedly occurred on Highway 580 freeway. That testimony has been stricken. You are not to consider it for any purpose. The incident has nothing to do with this case or any of the defendants charged in this case or the alleged enterprise. The inquiry and the testimony were improper and should not be considered by you for any purpose. TT 5396.

Again, here, any potential prejudice here was cured by the Court's thorough instruction to the jury

United States District Court
Northern District of California

to not consider the inadmissible evidence. A jury is presumed to follow the trial court's instructions, *Weeks v. Angelone*, 528 U.S. 225, 234 (2000). Defendants have not asserted evidence to overcome this presumption.

F. Evidentiary Error

"Determining the admissibility of evidence 'is a matter first for the district court's sound judgment[.]" *United States v. Shih*, 73 F.4th 1077, 1096 (9th Cir. 2023) (quoting *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 384 (2008)). A district court's evidentiary rulings are thus reviewed for abuse of discretion. *Id.* A "district court abuses its discretion when its evidentiary rulings are based on 'an erroneous view of the law or a clearly erroneous assessment of the facts.'" *United States v. Nguyen*, 465 F.3d 1128, 1130 (9th Cir. 2006) (quoting *United States v. Morales*, 108 F.3d 1031, 1035 (9th Cir. 1997)). "Harmless errors do not warrant reversal." *United States v. Cherer*, 513 F.3d 1150, 1157 (9th Cir. 2008).

If a defendant fails to interpose an objection at trial, however, evidentiary decisions are reviewed for plain error. *United States v. Lindsey*, 634 F.3d 541, 550 (9th Cir. 2011). "To establish plain error, [the defendant] must show that (1) there was an error, (2) the error is clear or obvious, (3) the error affected his substantial rights, and (4) the error seriously affected the fairness, integrity, or public reputation of judicial proceedings." *United States v. Johnson*, 979 F.3d 632, 636 (9th Cir. 2020) (citing *United States v. Benamor*, 937 F.3d 1182, 1188 (9th Cir. 2019)). An error is "plain" when it is "'clear' or 'obvious' under the law." *United States v. Teague*, 722 F.3d 1187, 1192 (9th Cir. 2013). An error affects substantial rights when it has "prejudiced in some substantial manner [the defendant's] right to a fair trial." *Tirouda*, 394 F.3d at 688. Stated another way, this requirement means the defendant must show that the error "affected the outcome of the district court proceedings." *United States v. Chi Mak*, 683 F.3d 1126, 1133 (9th Cir. 2012) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)).

1. Testimony of M.C.

Defendants argue the Court erred by admitting testimony about the sexual assault of M.C. by Raymond Foakes. *See* Nelson-Ott Motion at 55. Notably, Defendants do not take issue with the Court's pretrial ruling that such evidence was admissible as a predicate fact necessary to

United States District Court
Northern District of California

explain the witness intimidation charges against Brian Burke. *See* Docket No. 2515 at 3–4. Instead, Defendants assert that the Government inappropriately characterized the assault as a racketeering act in its opening, and the Court failed to cure the prejudice. *See* Nelson-Ott Motion at 55–56.

During her opening, Ms. Peng stated:

> You'll hear about Foakes' involvement in the assault of Troy and [M.C.].

TT 1184. She also stated:

> [T]hese men at the top of the hierarchy got there because they were the most capable of violence. And they were at the center of two of the most violent incidents you'll hear about: the assault on Troy and [M.C.] and the murder of Joel Silva.

*Id.* at 1187. Ms. Peng would then describe the specific sequence of events that led to M.C.'s assault. *Id.* at 1193–94. At the next break, Defendants moved for a mistrial because Ms. Peng's comments created the impression that M.C.'s assault "was part of the activities of the racketeering conspiracy, and that [was] directly contrary to what the Court said it was admissible for." *Id.* at 1212–18. The Court denied Defendants' motion but clarified the instruction to the jury:

> I just want to make sure you understand that, number one, [the sexual assault of M.C.]—I have found that act was committed by Mr. Foakes alone, not with any of the Defendants here. And, number two, that that conduct was not on behalf of the enterprise or the Hells Angels Sonoma County, that that was his own act, but you will hear evidence of that…in terms of the actual assault, that was conduct that was done by Mr. Foakes and Mr. Foakes alone. TT 1220–21.

To be sure, Ms. Peng arguably could have complied more faithfully with the Court's pretrial ruling by clearly delineating the assault of M.C. from the general events that occurred when Mr. Conte was removed from HASC. However, her failure to explicitly delineate was cured by the Court's subsequent instruction. A jury is presumed to follow the trial court's instructions, *Weeks v. Angelone*, 528 U.S. 225, 234 (2000), and there is no reason why this presumption should not obtain here. Defendants assert that the instruction was not sufficient to overcome the prejudicial effect because the evidence was "so inflammatory." Nelson-Ott Motion At 57. But they do not meet their burden to show that the jury failed to follow the trial court's instruction that the evidence of sexual assault was Mr. Foakes' own act and was not related to the HASC enterprise.

Defendants also point to the Government's closing that mentioned M.C.'s sexual assault. Specifically, Mr. Barry argued that this case was "also trying to address some justice for Troy Conte and M.C., a Hells Angels member and his old lady." TT 7216. This statement does not characterize the sexual assault of M.C. as a racketeering act. And when Mr. Barry also said that M.C. "is a victim of sexual assault who was threatened when she had the courage to report that assault," TT 7219, he immediately added: "And what was her lie? Her lie was that Brian Burke threatened her. Why is she framing Brian Burke? What have you heard about Brian Burke other than that he is a Sonoma County Hells Angel?" TT 7219. This statement in context did not improperly characterize the sexual assault of M.C. as a racketeering act, but rather properly characterized the sexual assault only as a *predicate* fact necessary to explain the witness intimidation charges against Brian Burke. *See* Docket No. 2515 at 3–4.

Defendants argue the Court erred by failing to declare a mistrial after Troy Conte testified that HASC monitored members' criminal cases to, among other things, avoid RICO charges. Nelson-Ott Motion at 57–60. During his direct examination, the Government asked Mr. Conte why HASC monitored its members' criminal cases. TT 5041. Mr. Conte responded that the purpose was "[t]o make sure nobody was pleading guilty to certain stuff that would affect the club as a whole." *Id.* When asked to further explain his answer, Mr. Conte stated, "[y]ou know, certain things, the RICO act, anything like that." *Id.* The Government then asked why a RICO charge could impact HASC as a whole, at which point Defendants objected on grounds that the question called for a legal conclusion. *Id.* The Court overruled the objection, and Mr. Conte responded, "[i]t could dismantle a lot of stuff throughout the club." *Id.* The Government then asked Mr. Conte whether he was aware of resolutions to members' criminal cases "that were good for a member but bad for HASC[,]" to which Mr. Conte stated, "Yes." *Id.* at 5042–43.

During the next break, Defendants objected to the Government's questioning with respect to RICO, arguing it misleadingly insinuated HASC had been subject to a RICO charge in the past. Defendants stated "[t]here's never been a RICO trial involving the Sonoma Hells Angels before. Counsel knows that. That's totally misleading the jury. He should have corrected that." *Id.* at 5064. The Government countered that Mr. Conte does not understand what RICO means and was

generally referring to "things like gang enhancements[,]" but the Court disagreed, stating "the way you elicited it, it didn't come out that way." *Id.* at 5065. In the end, the Court ordered the Government to clarify through leading questions on direct that the charges Mr. Conte was referring to were not RICO and that he has "not been party to any discussions that might involve this particular case." *Id.* at 5066–67.

After the break, the Government attempted its correction:

> Q: Other than this case, are you aware of any RICO case specifically targeting the Sonoma County Hells Angels?
>
> A: I don't think it would be—I'm not sure.
>
> Q: . . . Were you a member of [HASC] when this case started?
>
> A: Yes.
>
> Q: You were?
>
> A: Oh, this case here? No.
>
> Q: Are you familiar with the term "Gang Enhancement?"
>
> A: Yes.
>
> Q: What does that mean to you?
>
> A: Where it's other organizations are involved in a—not organizations but other people could be involved in crimes or something, crimes and stuff.
>
> Q: Is that something that applies in state court prosecutions?
>
> A: Applies? Like—
>
> Q: When do gang enhancements apply?
>
> A: Oh, shoot, I have never had one so I couldn't tell you.

*Id.* at 5069.

Per Defendants, the Government's correction was inadequate and damaging because Mr. Conte merely "testified that he was 'not sure' there was any other RICO case targeting [HASC]," and the testimony "emphasized Conte's prior testimony that there may have been a prior RICO prosecution of the charter." Nelson-Ott Motion at 60. Further, Defendants assert the Government muddled the issue by eliciting "testimony about 'gang enhancements' despite the fact that it was

United States District Court
Northern District of California

clear Conte had minimal knowledge of the term." *Id.*

Contrary to Defendants' argument, the Government's correction was adequate because it established that Mr. Conte's awareness of resolutions of members' criminal cases "that were good for a member but bad for the charter" was limited to vague concepts rather than concrete events. Although not an unequivocal "no," Mr. Conte's testimony of "I don't think it would be—I'm not sure," in response to the question about whether HASC had ever been targeted with a RICO charge, established that he had no direct knowledge of any such charge. Mr. Conte's uncertainty does not equate to misleading testimony and clarifies any previous insinuation that he knew of a specific RICO charge.

Mr. Conte's response to the Government's gang enhancement question unequivocally demonstrated that he did not understand what a gang enhancement is, and therefore it was unlikely that the jury inferred that he was familiar of a specific instance in which one was brought against an HASC member. In any event, in view of all the evidence, there was not substantial prejudice from this testimony.

2. Domestic Violence

The Defense argues that the evidence of domestic violence during the examinations of Brittany Tolman, William Harm, and M.J. were in error and require a new trial. Nelson-Ott Motion at 61. The Court denied the Government's motion in limine to admit testimony of M.J. and Brittany Tolman regarding evidence of sexual assaults and domestic violence by Mr. Foakes and Mr. Lyles respectively. Docket No. 2513 at 5-9 (Order Re Parties' Motions in Limine). It noted that the probative value to the guilt of the Defendants was "incremental and marginal." *Id.* at 8.

a. Brittany Tolman

The Court however noted that its ruling did not preclude the possibility that the cross-examination of Ms. Tolman could "open the door" to such evidence under Fed. R. Ev. 403. *Id.* at 8-9. That is precisely what happened. On cross-examination, Mr. Nelson asked Ms. Tolman about why she took her children to Idaho after her relationship with Mr. Lyles ended, and whether Mr. Lyles filed for custody rights. TT 2091-93. At that point, the Government even put the Defense

United States District Court
Northern District of California

on notice multiple times that they were about to open the door and had opened it. TT 2093. ("counsel is… very close to opening a door of Your Honor's prior rulings about what can and cannot come in from this witness.") ("I think the door is fully open at this point. So I'm just putting defense on notice."). The Court then held that the door was opened to the issue of domestic violence. TT 2153. Then, Ms. Tolman testified that Mr. Lyles tried to kill her and knocked her unconscious, which ultimately led to her contacting law enforcement, attempting to relocate to Idaho, and Mr. Lyles filing for custody rights. *See* TT 2152-3; 2091-93. Ms. Tolman's testimony of domestic violence was admissible because the Defendants opened the door to it when they introduced a line of questioning that would have elicited testimony on the issue. *United States v. Mendoza-Prado*, 314 F.3d 1099, 1105 (9th Cir. 2002).

The Defense also points to Sergeant Harm's testimony that Ms. Tolman came to his attention after a domestic violence incident involving her and Mr. Lyles. TT 5342-44. For the same reasons as stated, this testimony was admissible because Defendants opened the door to evidence of Mr. Lyles' domestic violence against Ms. Tolman.

The Defense also points to the Government's question that "JR was arrested at some point?" TT 2008. But this was admissible, as the Government specifically qualified the question by saying "So JR was – without telling me what the arrest was for, JR was arrested at some point?" TT 2008. There was no introduction of inadmissible evidence of domestic violence from this line of questioning.

The Defense points to Ms. Tolman's statement that she had seen a specific gun "because it was held to my head," TT 2000-01, and the Government's line of questioning after that statement. However, the Court explicitly struck these specific statements from the record. TT 2001. The jury is presumed to follow the Court's instruction to disregard stricken testimony. *See United States v. Christensen*, 624 F. App'x 466, 484 (9th Cir. 2015) (absent reason to believe otherwise, jurors are presumed to follow instructions). In any event, evidence of Mr. Lyles' conduct was presented as a personal matter between Mr. Lyles and Ms. Tolman. It was peripheral to the three defendants on trial. Therefore, no prejudicial error occurred to Defendants.

b. <u>M.J.</u>

United States District Court
Northern District of California

The Court excluded testimony of Mr. Foakes' sexual assaults against M.J., but not physical assaults. Docket No. 2513 at 8 (Order on Motions in Limine). The Defendants claim that the evidence at trial "clearly conveyed to the jury that she was a victim of domestic violence." Nelson-Ott Motion at 67. They point to evidence that the Government elicited testimony that Mr. Foakes made M.J. fear that she was in danger of physical injury, was subject to stalking, and coercive control during their relationship. But this evidence was admitted because it was relevant to his control over her and the use of HASC power in controlling her.

Furthermore, Defendants did not object to, nor do they argue that they did, the testimony of M.J. that related to physical assault. Any objection not previously raised is subject to plain error review. *See United States v. Atcheson*, 94 F.3d 1237, 1244 (9th Cir. 1996) (denial of motion for new trial due to alleged prosecutorial misconduct reviewed for plain error). Here, there was no plain error because the testimony was admissible, and neither do Defendants assert plain error.

The Court found the assaults were relevant "to establish the criminal enterprise." Docket No. 2513 at 8. The evidence that M.J. grew marijuana at Mr. Foakes' insistence, TT 1782, and that she assaulted other women who disrespected the enterprise, TT 1811-12, was relevant to show the workings of the enterprise and therefore was admissible.

3. <u>Evidence of Defense Fund Parties and House Counsel</u>

Defendants assert that there was erroneous introduction of "Defense Fund Parties" and "House Counsel" evidence because it "painted an unfair, decidedly negative picture of HASC." Nelson-Ott Motion at 72. For example, Ms. Tolman described a defense fund party as a "fundraiser in order to obtain attorney fees" for criminal cases involving HASC members. TT 2017. Troy Conte testified that a criminal defense attorney spoke with members about how to "beat" a gun possession case, TT 4276-77, that members regularly spoke about members who were charged with crimes, TT 5041, and counsel for members charged with crimes would provide case updates at meetings. TT 5046-47.

As to the "Defense Fund Parties," the Court admitted such evidence "so long as no names of counsel are involved." Docket No. 2513 at 25. The Court appropriately admitted the evidence for the relevance of showing the existence of an enterprise. Docket No. 2513 at 24-25.

Defendants argue that the Court's instruction that Defendants' counsel were court-appointed was insufficient, because in a post-trial jury interview, at least four jurors did not remember the instruction and some still believed HASC paid for defense counsel. Nelson-Ott Motion at 72. But "A juror's mental processes concerning the verdict" is prohibited during an inquiry into the validity of the verdict. Fed. R. Evid. 606(b)(1). A juror may testify only as to extraneous prejudicial information, outside influence, or a mistake in entering the verdict. *See* Fed. R. Evid. 606(b)(2). None of the listed exceptions apply here. Further, the evidence presented by Defendants of what jurors purportedly said is hearsay.

Defendants also argue that the Court's instruction failed to address the fact that the evidence impliedly suggests the activity was unethical or illegal. Nelson-Ott Motion at 72. But Defendants fail to show that such evidence, *e.g.* about counsel, suggests the activity was unethical or illegal, nor did the Government ever suggest so. Instead, the evidence was appropriate to suggest the existence of an enterprise—i.e. group knowledge and involvement in HASC members and their activities. Docket No. 2513 at 24-25.

4. Evidence of Prison Culture

Defendants argue that Mr. Verhagen's testimony about prison culture and the roles Hells Angels play within it was irrelevant and prejudicial because it inferred that Mr. Ott was guilty for being a Hells Angel. Nelson-Ott Motion at 80-81. The Defendants assert that Mr. Ott has never been convicted of a felony nor served time in prison. Nelson-Ott Motion at 80. The Government argues that the prison culture evidence was relevant to show the existence of an enterprise, and it was not prejudicial. Opposition at 35.

At trial, Mr. Verhagen described his understanding of the HASC organization and how it operated in prison when he testified about his time in San Quentin prison in the late 2000s. *Id.* at 4177. He stated that members of the Hells Angels were respected in the prison and that they "didn't follow the same guidelines and principles as the other white organizations in prison. They had their own little organization, and they kind of answered just to themselves, and the other inmates paid homage to them more so than the other groups." *Id.* at 4178. He described how Mr. Foakes appeared to have respect within the prison, *id.* at 4179, and was "towards the top of the

United States District Court
Northern District of California

food chain" of the prison hierarchy. *Id.* at 4180. He also explained that he wanted to meet Mr. Foakes when they were both in the prison "to align myself with safety and security of an organization that is not victimized or that falls prey in prison." *Id.* The Government is correct that Mr. Verhagen's descriptions of HASC's presence in San Quentin prison was relevant to show the existence of the HASC enterprise, and one that was respected within the prison hierarchy. The testimony about prison culture was admitted because it was relevant to establish the existence of a criminal enterprise. Further evidence of Hells Angels being incarcerated, the term "Big House Crew" (BHC) for incarcerated members, and the fact members would donate money to BHC members, TT 2517, 3874, 3995, were all relevant to the existence of an enterprise in violation of RICO. Further, any inference that Mr. Ott was guilty just for being a member of the enterprise was addressed by the jury instruction that mere association with a criminal enterprise was not enough to convict a person of RICO conspiracy. Docket No. 3444 at 23. There was no real prejudice to Mr. Ott.

5. Evidence of Other Acts

Defendants also argue that evidence of several other crimes from Mr. Verhagen's testimony were inadmissible and therefore prejudicial. These include: (1) the funeral of Hells Angels member Jeffrey Pettigrew and related shooting, (2) Mr. Verhagen's money laundering for a Hells Angels Nomad charter, and (3) Mr. Verhagen's robbery with Hells Angels members in the 1990s. Defendants assert that the Government failed to provide notice of introducing these pieces of evidence, depriving them of the opportunity to object to their admissibility, and violating the Court order requiring notice. Nelson-Ott Motion at 83-84.

None of these were inadmissible nor prejudicial so as to warrant Defendants a new trial. First, as to the evidence of the shooting at the funeral of Hells Angels member Jeffrey Pettigrew, it was not unfairly prejudicial because it was neither related to HASC nor any of the Defendants. Therefore, it was an inconsequential exchange. Second, as to Mr. Verhagen's statement of money laundering, no prejudice is evident as again it was not related to HASC nor any of the Defendants. Third, as to the evidence of the robbery Mr. Verhagen committed with other Hells Angels members, the testimony was proper because it laid the foundation for Mr. Verhagen's knowledge

of the Hells Angels. Mr. Verhagen testified that he first became familiar with the Hells Angels in the early 1990s and committed a robbery with several charter members. TT 4172. The robbery had no relation to the Defendants and therefore could not have prejudiced them. Contrary to Defendants' argument, it did not prove Defendants' character to show action in conformity with that character trait, and therefore did not violate Fed. R. Evid. 404(b).

The Court properly admitted Mr. Verhagen's testimony about committing the robbery with members of Hells Angels under Fed. R. Evid. 403 as relevant to show that Mr. Verhagen was involved with and therefore had knowledge of the Hells Angels. Any prejudicial value did not substantially outweigh its probative value.

6. Disclosure of Silva Statement

Under Rule 16 of the Federal Rules of Criminal Procedure, the prosecution is required to provide the defense with certain evidence, including any statements made by the defendant. Here, Mr. Verhagen testified at trial that he had a conversation with Mr. Ott where Mr. Ott said "little does [Stacy Silva] know [Joel Silva's] not coming back" TT 4266-69:

> Q: Were there times that Mr. Silva's name came up in conversation with other Hells Angels members or hangarounds or prospects?
> A: Only once that I recall.
>
> Q: And what was that time?
> A: I was talking to Rusty [Ott], and he was telling me that Joel Silva – Joel Silva's wife came by our apartment complex looking for him one night. And Rusty had made the comment that "Little does she know he's not coming back," or something like that. That's the only time that that name was ever brought up or said."
> And further,
>
> Q: Did you say anything in response to Mr. Ott?
> A: I had asked him based on – based on the reputation that I heard about Silva in the jail, I asked Rusty if he was really that much of a badass?
> And Rusty got mad at me for using the word "was." "What do you mean 'was'?" Like, meaning, how do I know that he was not still around.
>
> Q: But earlier you just mentioned that Mr. Ott told you that he's never coming back.
> A: Correct.
>
> Q: And so why did Mr. Ott say – based on the context of the conversation, what was your impression of why Mr. Ott said – reacted to you saying "was"?

United States District Court
Northern District of California

> A: It was my impression at the time that Rusty realized he may have disclosed too much with me and was cleaning it back up by making an emphasis on the word "was," how do I know that he's not coming around.
> TT 4266-68.

Mr. Ott objected to evidence of his statement "Little does she know he's not coming back" and moved for a mistrial. TT 4315. The Court denied the motion because even though the disclosure did not have the "precise questioning and answer and the eliciting of the testimony that was here," the Government disclosed the general topic of the statement in the list of co-conspirator statements. TT 4318. In statement 8 in the list of co-conspirator statements, the source/witness was Steve Verhagen and the declarant was Mr. Ott, the summary of the statement being "Ott told Verhagen that Silva was still around, and had disappeared before." Docket No. 2514-1 at 1. The Defense made no objections to that statement. *Id.* The Court explained that the "gist of it was there" so as to find no basis to grant a motion for mistrial. TT 4317-18. The Court also deemed this statement admissible both as a co-conspirator statement and a statement of a party opponent. *Id.* at 4317-18. A statement by a party opponent need not be disclosed unless required by Fed. R. Crim. P. 16(a), which is not applicable here because this was not a statement made to someone whom the defendant knew was a government agent. Rule 16(a)(1)(A). In any event, even if the government's pre-trial disclosure of the statement was required but was insufficiently specific, as the Court noted in denying the motion for mistrial, the Defense still had ample opportunity to cross-examine Mr. Verhagen. TT at 4318. The Defense pointed to nothing else they would have done differently had the statement been more fully disclosed before trial.

Mr. Ott again now argues that the lack of notice of this statement violated his rights to a fair trial, confrontation, and due process. Nelson-Ott Motion at 98. The Court denies Mr. Ott's revival of the same argument. The Court correctly determined the statement was admissible as a statement of a party opponent, and therefore did not need to disclose that statement in the pretrial list of co-conspirator statements. Additionally, the Government turned over all reports of statements they had from Mr. Verhagen; this particular statement was not contained in reports of his statements. Finally, even if there was a Rule 16 violation (which the Court finds was not as noted above), the Defendants were not prejudiced because they had the opportunity to address the

statement during the trial. Mr. Ott had the opportunity to and did cross-examine Mr. Verhagen. TT 4318. He also cross-examined Mr. Verhagen's police handler Sergeant Bill Harm and direct examined another police handler Kyle Philp about the specific testimony at issue. TT 4463-68; TT 5988; TT 6437. Mr. Ott had ample opportunity to respond to the "little does she know" statement and did so. Because Mr. Ott had sufficient opportunity to question witnesses about the allegedly prejudicial statement, his trial rights were not violated in a way that caused him prejudice.

7. Scheetz Testimony

Defendants argue that the Court erred in allowing Mr. Sheetz, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Government Expert, to testify about violent acts involving Hells Angels and rival Outlaw groups. Nelson-Ott Motion at 87. The Court issued a pre-trial *Daubert* order after a multi-day hearing about this evidence. Docket No. 1403. Mr. Scheetz's testimony about specific acts of violence was admissible expert opinion about the rivalry between the Hells Angels and Outlaws. *Id.* at 22. The Court also excluded testimony that "the Death Head represents violence" because it suggests HAMC as a whole is a violent organization. *Id.* at 20-21. The Court also excluded a substantial number of instances of rivalry encounters on various grounds, including lack of probative value, undue delay, waste of time, or needless presentation of cumulative evidence. *Id.* at 24-25.

Defendants argue that the Government violated the Court's *Daubert* ruling by intentionally eliciting opinion that Outlaws were an enemy of Hells Angels. Nelson-Ott Motion at 92. However, the Court's order permitted Mr. Scheetz to state his expert opinion of the rivalry between the two groups. Docket No. 1403. The Defendants also argue that the Government failed to provide a theory of relevance of Scheetz testimony, but this directly contravenes the record. *See* Nelson-Ott Motion at 92. The Government established sufficient relevance when it explained that Mr. Scheetz' testimony about historical rivalry shows that "charters believe themselves to be bound together in one organization because there were charters who have no Outlaw presence in their area who still consider the Outlaws to be their rivals." TT 3501. Finally, Defendants fail to meet their burden to show how any part of Scheetz testimony was unfairly prejudicial so as to

United States District Court
Northern District of California

require a new trial. They do not explain how this specific testimony affected the verdict.

8. Denial of MIL to Preclude Reference to Hells Angels as Gang, Motorcycle Gang, or OMG

The Defendants argue that the use of the word "gang" throughout trial was prejudicial, Nelson-Ott Motion at 93-94, because it suggested that mere association with HASC was sufficient for conviction. *Id.* at 94. There are two issues with this argument. First, the Court permitted reference to "gangs" in pretrial orders, finding that the terms were not prejudicial. Docket No. 1403 at 36, 2513 at 31-32. Defendants exaggerate the use of that term by witnesses at trial. The primary witness who employed the terms as part of his testimony was the expert Mr. Scheetz who of course was subject to vigorous cross-examination. Secondly, the Court specifically instructed the jury that mere association was insufficient to find that the Defendants were guilty. The Court instructed the jury that "for a conspiracy to have existed… it is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another" and "a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists." Docket No. 3444 at 23. Nor did the Government argue that membership alone was sufficient for conviction. In the context of the extensive evidence of violence and criminal wrongdoing by members and leaders of the HASC, the government's witnesses' occasional reference to the word "gang" was not prejudicial.

9. Cross-Examination of Levi Phipps

Defendants argue that the admission of evidence of cremations other than that of Joel Silva impermissibly chilled their constitutional rights. Nelson-Ott Motion at 97. The Court permitted Phipps to testify only as to the Silva cremation. Docket No. 2513 at 10, 57. As to whether Phipps could testify about three other illegal cremations, the Court reserved judgment, indicating it would address the issue if the Defendants' questions on cross-examination were suggestive enough to open the door to them. TT 3307.

Defendants assert that this was error because it forced them to either exercise their right to confrontation and risk opening the door to prejudicial evidence or forego cross-examination

entirely. Nelson-Ott Motion at 96. There is no precedent for finding that the possibility of opening the door during a cross-examination unfairly prejudices the Defendants' right to cross-examine an adverse witness. Furthermore, Defendants exercised their right to confrontation by cross-examining Phipps. Defendants do not identify what they would have otherwise asked Mr. Phipps on cross-examination in the absence of the specter of opening the door to the other cremations.

Defendants' cite to *Hemphill v. New York*, 142 S. Ct. 681 (2022) is unsupportive. In that case, a stray bullet killed a 2-year-old child in the Bronx. *Id.* at 683. Defendant Hemphill suggested that another person, Morris, was the shooter, but Morris could not testify because he was outside of the United States. *Id.* at 684. To counter Hemphill's argument, the prosecution introduced a transcript of Morris' plea allocution (where Morris admitted to possessing a different firearm than the one used in the murder), to suggest Hemphill's theory was misleading. *Id.* The Supreme Court ruled that the admission of the plea allocation violated the confrontation clause, reasoning that "the Court has not held that defendants can 'open the door' to violations of constitutional requirements merely by making evidence relevant to contradict their defense." *Id.* at 692. But this case fundamentally differs from *Hemphill* because unlike the plea allocution, here, Phipps' testimony was subject to cross-examination by Defendants. Whereas the plea allocation violated the confrontation clause, here, Defendants were able to fully exercise their constitutional right to confrontation. If Defendants opened the door to the other cremations, they could have fully cross-examined Mr. Phipps on that topic. The Supreme Court's holding in *Hemphill* is inapposite.

10. Admission of CAST Report

Defendants argue that the admission of Government Exhibit 127, a summary chart of Defendants' phone call records and CSLI information, was unprecedented and prejudicial because it had "negative inferences." Nelson-Ott Motion at 99. Summary charts are not unprecedented evidence at trial. Summary charts are admissible when "(1) they are based on competent evidence already before the jury, (2) the primary evidence used to construct the charts is available to the other side for comparison so that the correctness of the summary may be tested, (3) the chart

preparer is available for cross-examination, and (4) the jury is properly instructed concerning use of the charts." *United States v. Bishop*, 264 F.3d 535, 547 (5th Cir. 2001). *See* Fed. R. Evid. 1006. Defendants do not contest any of the elements of admissibility of the summary chart.

Nor do they cite to any other authority or explain why the summary chart was inadmissible by the mere fact that it creates inferences. The Court established that summaries not only can contain inferences from the records, but "inherently contain at least some implicit inferences." Docket No. 2682 at 1. Defense also argues that the exhibit should only have been allowed as a demonstrative aid to Agent Sparano-Stanger's testimony, but again cites to no authority showing why it could not be standalone evidence. Therefore, the admission of Government Exhibit 127 was proper.

11. Introduction of Hundreds of Photographs

Defendants re-raise their objection to the introduction of evidence with "absolutely minimal foundation" and explicitly state that they rely on their same arguments in the prior filing. Nelson-Ott Motion at 100. However, in response to the prior filing, the Court held that the Defendants' evidentiary objections based on authenticity were unfounded and overruled them. TT 5495-96. Defendants fail to explain why the Court's prior ruling on those arguments was in error. Nor have they established substantial prejudice in the context of all the other evidence.

12. Limiting Instructions

Defendants argue that the Court erred by failing to provide the jury with certain requested instructions. *See* Wendt Motion 49–52.

First, Mr. Wendt argues that the Court "ceased instructing the jurors on the extent to which they could consider evidence of charged and uncharged conspiratorial activity that did not involve Mr. Wendt and was admitted as related to Count One (RICO Conspiracy) from evidence that could be considered by the jurors as to Count Two (VICAR Murder)." *Id.* at 52. As noted below, the Court gave the limiting instruction numerous times.

This argument ignores the fact that the elements of RICO and VICAR overlap, and under both charges, the Government must prove the existence and nature of the enterprise. *Compare* Ninth Circuit Model Crim. Jury Inst. 18.8 (VICAR), *with* Ninth Circuit Model Crim. Jury Inst.

18.18 (RICO). Thus, the categories of evidence Mr. Wendt argues were inadequately delineated—*i.e.*, charged overt acts, the pattern of racketeering, and uncharged bad acts—were just as relevant to Count Two as Count One insofar as they established the existence and nature of the enterprise.

Second, Mr. Wendt argues the Court allowed "essentially any evidence that fell within the frame of the charge of Count One" to apply against Mr. Wendt "without regard to the fact that Mr. Wendt's involvement in the conspiracy charged in Count One was necessarily limited by his status as a member of the Fresno chapter of the Hells Angels[.]" *Id.*

This argument fails because Mr. Wendt's status as a member of the Fresno chapter does not undermine the RICO and VICAR charges because the Government proved Mr. Wendt was an associate of HASC. *Rodriguez,* 971 F.3d at 1011; *see also Fernandez,* 388 F.3d at 1231. The Superseding Indictment in this case alleged that the enterprise included HASC's "leadership, members, and *associates*." *See* Docket No. 374 at 5 ("Superseding Indictment") (emphasis added). Thus, while Mr. Wendt was not a formal HASC member, he could qualify as an HASC "associate" for the purpose of VICAR and RICO.

Third, Mr. Wendt argues that the Court erred by failing to provide a limiting instruction each time evidence of acts that did not directly involve Group One Defendants was presented. Wendt Motion at 53. The Court disagrees. Upon Mr. Wendt's request for a limiting instruction regarding acts in which Group One Defendants were not involved, the Court ordered the parties to meet and confer and craft an appropriate jury instruction. *See* TT 1526–37, 1599–1603, 1711–12, 1718–21, 1734–42, 1889. After meet and confer, the parties agreed on the following instruction:

> To the extent you have heard and will hear about incidents which do not involve any of the three defendants directly, this evidence is admitted for the limited purpose of establishing the existence and nature of the racketeering conspiracy.

*Id.* at 1897. Although Mr. Wendt requested the instruction be read after each incident in which Group One Defendants were not directly involved, the Court declined to take a "granular approach" and opted instead to provide the instruction periodically. *See id.* at 1719. The Court then provided this instruction in relation to evidence of Mr. Foakes' mortgage fraud, *id.* at 1901,

United States District Court
Northern District of California

the robbery of Eban Hale, *id.* at 3837, and the robbery of Nicholas Spencer and Nicholas Gruber. *Id.* at 4608. The Court was therefore appropriately "diligen[t] in instructing the jury on the limited purposes for which certain evidence may be used[.]" *Fernandez*, 388 F.3d at 1241. Mr. Wendt provides little more than his own belief to support his contention that the Court's instructions were inadequate.

Finally, Mr. Wendt argues that the Court erred by failing to instruct the jury that membership in the Hells Angels is not a crime. Wendt Motion at 92–93. This argument fails because the jury was instructed on what the Government needed to prove with respect to the enterprise in which the Defendants agreed to participate, and it was clear from those instructions that membership in the Hells Angels alone was insufficient. In addition, the cases Mr. Wendt cites to the contrary do not suggest otherwise. *United States v. Abel*, 469 U.S. 45, 48–49 (1984) and *Scales v. United States*, 367 U.S. 203, 219–22 (1961) did not involve RICO. In *United States v. Cervantes*, 12-cr-0792-YGR, Docket No. 1437, the instruction on gang membership provided:

> It is not a crime simply to be a member of a gang. Rather, as I will describe, the crimes charged in this case allege specific federal crimes. In deciding whether the government has proven the required elements of the crimes charged, you may consider the fact of gang membership, if proven, and give it such weight as you think it deserves in deciding whether the required elements have been proven for the crimes charged.

This instruction explained that gang membership may be considered in establishing the elements of the charged crimes but was not conclusive. Mr. Wendt's proposed instruction was broader, providing "It is not a crime simply to be a member of a group, organization, or gang that advocates illegal activity." Docket No. 2461 at 3. To that end, Mr. Wendt's instruction would likely have confused the jury in that it suggests membership may not be considered at all in establishing the charged crime.

13. Joseph Hardisty

Defendants assert that the Government violated its *Brady* obligations by not timely disclosing information regarding the following instances of Hardisty's post-testimony conduct: (1) his involvement in a May 5, 2022 fight, (2) a steroid trafficking investigation, and (3) a series of text messages to FBI Special Agent (SA) Kassandra Lane in which Hardisty believed he was

promised WITSEC entry, threatened to recant his testimony, and stated his use of Xanax and mental health issues.

a. Brady/Giglio

In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. In *Giglio*, the Supreme Court extended this principle to include suppression of evidence that impeaches a witness's credibility. 405 U.S. at 154. These cases combined create a *Brady/Giglio* standard that obligates the prosecution to disclose evidence that may be material to the outcome of a trial.

A defendant must establish three elements to prevail on a *Brady/Giglio* claim: "(1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued." *United States v. Williams*, 547 F.3d 1187, 1202 (9th Cir. 2008) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

As to the first element, evidence is favorable if it is exculpatory or impeaches a government witness. *Amado v. Gonzalez*, 758 F.3d 1119, 1134 (9th Cir. 2014). As to the second element, a "*Brady* analysis [is] limited to the evidence known at the time of the trial." *United States v. Veras*, 51 F.3d 1365, 1375 (7th Cir. 1995). "Any knowledge gained by the prosecution after the trial is irrelevant to a *Brady* claim." *United States v. Rouse*, 410 F.3d 1005, 1010 (8th Cir. 2005). As to the third element, evidence is prejudicial or material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). There is a "reasonable probability" of prejudice when suppression of evidence "undermines confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (citing *Bagley*, 473 U.S. at 678). However, if suppressed evidence is "merely cumulative," then the failure to disclose is not a violation. *Morris v. Ylst*, 447 F.3d 735, 741 (9th Cir. 2006). Additionally, the evidence "must be admissible or capable of being used to impeach a government witness." *United States v.*

United States District Court
Northern District of California

*Kohring*, 637 F.3d 895, 903 (9th Cir. 2011) (quotation marks and citations omitted).

b. May 5, 2022 Fight

The Defense argues that had the Government disclosed evidence that Mr. Hardisty was involved in a stabbing and his inconsistent recounting of the stabbing, they would have been able to undermine Mr. Hardisty's credibility at trial. Wendt Motion at 18-19. A police report describing Mr. Hardisty's role in a stabbing on May 5, 2022 (which took place during the trial) was part of a Government disclosure on June 27, 2022 (which was after the trial). Docket No. 3509 Exhibit G (Peng Decl.). The police report recounted Mr. Hardisty saying that he "cut one person on the arm to defend himself and did not hit anyone else with his knife." Docket No. 3251. The FBI report by Mr. Hardisty's handler, Special Agent Lane, also states similarly. However, witness statements from October 2022 and January 2023 indicate that Mr. Hardisty stabbed two people, resulting in serious injuries.

Defendants' *Brady* claim is meritless for several reasons. First, evidence of Mr. Hardisty's involvement in the stabbing is inadmissible impeachment evidence under the Federal Rules of Evidence, specifically 609, 404(b), and 608(b). Under Rule 609, a witness's purported bad acts cannot be used for impeachment unless they have resulted in a criminal conviction. Fed. R. Evid. 609. Here, evidence of Mr. Hardisty's involvement in the stabbing did not result in a criminal conviction, so it is inadmissible under this rule. Under Rule 404(b), a witness's other bad acts cannot be used to prove a person's character to show that on a particular occasion they acted in accordance with the character. Fed. R. Evid. 404(b). Therefore, the evidence of Mr. Hardisty's involvement in the stabbing is inadmissible for impeachment by character evidence under this rule.

Under Rule 608(b), counsel may cross-examine a witness about specific instances of conduct that are probative of his character for truthfulness or untruthfulness. Fed. R. Evid. 608(b). For example, instances of misconduct that are clearly probative of the character for truthfulness or untruthfulness include perjury, fraud, swindling, forgery, bribery, and embezzlement. 3 Federal Evidence Practice Guide § 15.04; *see e.g. United States v. Rojas*, 826 F.3d 1126, 1131 (8th Cir. 2016) (finding no abuse of discretion under Rule 608(b) in allowing the government to impeach a

United States District Court
Northern District of California

defendant's testimony with credit cards and debit cards in his wallet in prosecution for use of counterfeit access devices, money laundering, and aggravated identity theft). But generally an act of violence, as here, is not probative of truthfulness. *See United States v. Flaharty*, 295 F.3d 182, 190-91 (2d Cir. 2002) ("[m]urder generally is not a crime of dishonesty," and noting that nothing about the murder in question "suggested that it would in any way reflect on [the cooperating witness's] truthfulness"); *United States v. Meserve*, 271 F.3d 314 (1st Cir. 2001) (convictions of disorderly conduct and assault did not involve elements of deceit, untruthfulness, or falsification so as to be admissible for impeachment purposes); *United States v. Belt*, 514 F.2d 837, 845 (D.C. Cir. 1975) (en banc) (assaultive crimes generally do not involve dishonesty or false statement). Therefore, the evidence is inadmissible under this rule as well.

To the extent Mr. Hardisty may have been untruthful in his statement to law enforcement about the stabbing incident, that would not constitute *Brady* material because it only came to light after the trial. At the time of the trial, Mr. Hardisty's report to the FBI was consistent with police reports of the incident, and the Government was not aware that Mr. Hardisty lied. Defendants procured contradictory witness accounts four and six months after the trial, in October 2022 and January 2023. Wendt Exhibit G (Patel Decl.), F (Report of Mr. Fechheimer's interview with Marcus Bailey). *See United States v. Veras*, 51 F.3d 1365, 1375 (7th Cir. 1995) ("*Brady* analysis [is] limited to the evidence known at the time of the trial."). "Any knowledge gained by the prosecution after the trial is irrelevant to a *Brady* claim." *United States v. Rouse*, 410 F.3d 1005, 1010 (8th Cir. 2005).

Furthermore, Mr. Hardisty was no longer a Government witness by the time of the stabbing, so the *Giglio* obligation did not extend to him. "[S]everal circuit courts have held that the *Giglio* obligation to disclose impeachment materials does not extend to defense witnesses, apart from the *Brady* obligation to disclose exculpatory evidence." *United States v. Felix*, No. CR 13-633-PJH, 2014 WL 5872824, at *4 (N.D. Cal. 2014). Instead, evidence is only subject to *Giglio* if it "might have been used to impeach a *government* witness." *United States v. Price*, 566 F.3d 900, 912 (9th Cir. 2009). By the time of the stabbing incident, Mr. Hardisty had already testified on direct for the Government, been cross-examined by Defendants, and had been excused.

United States District Court
Northern District of California

*See* TT 3096. Thus, he was no longer a Government witness when the stabbing incident occurred and the Government was under no obligation to disclose evidence of the incident.

Even if the evidence of the stabbing and Mr. Hardisty's statement to law enforcement had come to light before his trial testimony herein, there would have been severe strictures on what the Court would have allowed for admission. As noted above, the stabbing itself was not admissible since it did not bear on Mr. Hardisty's truthfulness. If evidence of the stabbing were excluded, it is difficult to see how evidence of his statements about the stabbing would be admitted. Even if the Court had permitted Mr. Hardisty to be cross-examined on his statements to law enforcement, evidence of contradictory witness testimony to impeach him would have been barred as inadmissible extrinsic evidence under Fed. R. Evid. 608(b).

Defendants also argue that evidence of the fight is admissible impeachment evidence because it rebuts Mr. Hardisty's claims that he was reformed. However, this is a mischaracterization of Mr. Hardisty's narrative, which never included claims of becoming reformed. Mr. Hardisty testified that after three months in jail, he was "figuring out…how to be in the real world after being a Hells Angel for so long." *Id.* at 2863-64. And after he was beaten out of HASC, he described his time recovering as "learning to become a human being" and that he was "still trying" and "definitely was learning." *Id.* at 6371. He also admitted to not handling a breakup with his girlfriend well and that he "100 percent" regretted how he ended things with her. *Id.* at 6371-72. The statements show that Mr. Hardisty was trying to be a better person than he was before at the most, and in no way suggest that he was completely reformed.

c. Steroid trafficking investigation

Defendants fail to show how evidence that Mr. Hardisty was the subject of a steroid trafficking investigation materially affects the verdict. Further, the Government did not suppress the evidence because it was not known at the time of trial. A "*Brady* analysis [is] limited to the evidence known at the time of the trial." *United States v. Veras, supra,* 51 F.3d at 1375. *See Rouse, supra*, 410 F.3d at 1010 ("Any knowledge gained by the prosecution after the trial is irrelevant to a *Brady* claim."). The investigation into Hardisty's possible distribution of steroids took place on July 11, 2022, after the end of the jury trial. Docket No. 3170 at 2.

d. Text messages to SA Kassandra Lane

Mr. Hardisty sent three series of text messages to SA Kassandra Lane that the Defense argues show that Mr. Hardisty is an unreliable witness. First, in April 2023, the Government disclosed Mr. Hardisty's statements about the use of Xanax. The evidentiary hearing on November 27, 2023, in which SA Lane and Mr. Hardisty testified also included evidence that Mr. Hardisty took Xanax. HT 29:7-11. The hearing further revealed that Mr. Hardisty has "anxiety-type spirals[,]" HT at 21, and Mr. Hardisty testified that "I get angry and anxiety, and I don't remember everything, and I say stupid things." HT at 106. Defendants argue that all three of these series of text messages show that Mr. Hardisty is an unreliable witness who lies. Docket No. 3667-1 at 26, 37.

Second, on May 8, 2023, Mr. Hardisty explained that he wanted to talk about witness protection. HA-150116. He followed up that same day asking, "can i call you tomorrow about [Witness Protection]." After SA Kassandra Lane explained there was a selection process for the program and that she would obtain more information about it, Hardisty said "thanks…i mean, that's something that was always on the table from when i understood." HA 150117. On May 18, after the jury returned a verdict of guilty on all counts for Mr. Ranieri and Mr. Foakes, Mr. Hardisty wrote: "… you think i can get the witness protection information and the reimbursements[,]" HA 150119, and "I'm getting a feeling im losing my witness protection promise which was promised in front of my lawyer if I choose I really hope thats not the case because it would be very sad." HA-150119.

Third, on August 14, 2023, Mr. Hardisty sent a text message to SA Lane that said "Such Bullshit im contacting the defense layer and telling them rainman wasnt involved i cant say he was you guys forced me." HA-150102 – HA-150103. The Court held an evidentiary hearing about this statement, which ultimately expanded to include the first two statements from April and May 2023. There, Mr. Hardisty testified that his testimony in the Group One and Group Two Trials was truthful, saying "When I was under oath, I told the truth. When I sent the text messages, I wasn't." November 27 Hearing Transcript ("HT") at 89, 98. He also denied that anyone from the Government forced him to implicate Mr. Ranieri in his testimony about the murder of Joel Silva.

United States District Court
Northern District of California

United States District Court
Northern District of California

HT at 90.

i. Xanax

Evidence that Mr. Hardisty took Xanax for anxiety, which made him erratic and forgetful, could be favorable to Defendants because it could challenge Mr. Hardisty's credibility. However, general evidence of Mr. Hardisty's mental state and use of Xanax was not suppressed. To the contrary, such evidence was extensively litigated throughout trial. *See, e.g.* TT 2604-2625. The Court permitted Defense to question Mr. Hardisty about his mental health, specifically asserting "Xanax or anxiety, change of mind, whatever it is, that goes to JH's credibility, that is a proper subject of cross-examination." TT 2632-33. Therefore, the April 2023 text messages about Mr. Hardisty's use of Xanax is not new evidence that the Government erroneously suppressed.

ii. WITSEC

Defendants contend that Mr. Hardisty's statements about WITSEC could be favorable impeachment evidence because they show that Mr. Hardisty believed he was promised entry into WITSEC, and thus he was willing to testify falsely knowing that he would receive WITSEC protection. The government contends that while the issue of Mr. Hardisty's protection and safety as a witness was a topic of frequent discussion, and the Government did offer to look into WITSEC, there is no evidence that WITSEC was guaranteed or promised.

Defendants' argument is without merit. First, there is no evidence that a WITSEC promise was made. The text exchange clearly indicates no promise or guarantee was made. As to Mr. Hardisty's stated belief that WITSEC was an option, that evidence was not "suppressed" because the Government disclosed it immediately upon discovering that Mr. Hardisty indicated he held such a belief. Further, the Government had previously disclosed its relocation funds paid to Mr. Hardisty. Docket No. 3653 (Barry Decl. Ex. 2).

Lastly, Mr. Hardisty's belief that the Government promised him WITSEC entry did not prejudice the Defendants. The subject of his fear of the HASC and his wanted protection was disclosed prior to trial. So was the fact that he sought favors from his government handler, Docket No. 3577 at HA-00149840 (Barry Decl. Ex. D) (February 2023 disclosure referring to Mr. Hardisty's request for a trained protection canine, a name change, and a CCW permit), and had

United States District Court
Northern District of California

received some relocation money prior to trial, Docket No. 3653 at 10 (Barry Decl. Exhibit 2) (March 2022 disclosure of relocation benefits). Moreover, it seems highly unlikely that Defendants would have vigorously sought to elicit the fact of his seeking WITSEC because this would only underscore his stated fear of retaliation from the HASC and thus their potential for violence. Indeed, at trial Defendant tried to portray any threat and fear of threat as non-existent. TT 3044 ("Q: Between now and then, is it fair to say that if anybody went looking for you on social media, you were pretty easy to find? . . . Q: In any event, during the 5 years and 10 months that your picture has appeared on Instagram, you made it here safely today, correct?"). WITSEC would also have emphasized the apparent truthfulness of Mr. Hardisty's testimony given the fact that he was willing to testify in the face of a perceived threat, a threat so real and ominous that he would take the extreme step of entering into a witness protection program which would transform his life and the life of his family. Indeed, in cross-examination, as noted, Defendants thus took a different tact. They tried to show that Mr. Hardisty was in fact easy to find on social media and made it safely to the courtroom to testify and thus was not facing any real or perceived risk. *Id.* at 3044.

Furthermore, Defendants had plenty of other grounds to impeach Mr. Hardisty: he admitted he lied to the FBI about his whereabouts during the murder of Joel Silva. *Id.* at 2930-31. As to his willingness to testify against the Defendants in relation to the murder of Joel Silva, *id.* at 2946, Mr. Hardisty was asked whether he believed he would get a free pass from the prosecution despite his involvement in the conspiracy, and about his repeated requests to the Government for witness assistance, including financial assistance. *Id.* at 2948-49.

In sum, Mr. Hardisty's post-trial statements did not prejudice the Defendants and do not warrant a new trial.

iii. Threat to contact the Defense

Mr. Hardisty's threat to contact the Defense lawyers and tell them that Mr. Ranieri was not involved in the murder of Joel Silva, and that the Government forced him to testify, could be favorable to the Defendants. If true, it would effectively recant his testimony at trial. Mr. Hardisty was the sole witness for key evidence at trial that implicated Mr. Wendt and Mr. Nelson

in the murder of Joel Silva. He testified that Mr. Wendt and Mr. Ranieri had a private conversation and returned to the larger group to discuss how Joel Silva "had to go." Therefore, a recantation of his testimony could "undermine[] confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

There is no *Brady* violation here because Mr. Hardisty's statement was made after trial. There was no governmental suppression of evidence. Nor does the statement warrant a new trial under Rule 33. The statement was not prejudicial to the Defendants because it was consistent within a known pattern of Mr. Hardisty's earlier recantation of threats, and the jury heard evidence of Mr. Hardisty making false statements. The Government previously produced evidence showing Mr. Hardisty asserted vague threats to cease cooperation with the Government and speak with the Defense. *See* Docket No. 3577 at HA-00149471, HA-00149479 (Barry Decl. Ex. B) ("I'm ready for war…," and "I think my next phone call will be to the defense attorney and wont speak to Kevin again"). SA Lane testified that each time that Mr. Hardisty threatened to switch sides, he followed up with an apology. HT 46. Additionally, Defendants emphasized throughout trial Mr. Hardisty's previous false statements and cross-examined him about them, including a false statement he made to FBI agents that he was outside the Fresno clubhouse when Joel Silva was murdered. *See e.g.* TT 2930-36. Yet, the jury still found Mr. Hardisty's testimony credible in returning a verdict against Defendants on all counts. Having observed his demeanor and considering the circumstances of his testimony, as well as the consistency of that testimony with other evidence, the Court also credits his testimony.

Finally, at the November 27 evidentiary hearing, Mr. Hardisty stated that he testified truthfully at trial and that the text message statements to SA Lane were not accurate. There, Mr. Hardisty testified that his testimony in the Group One and Group Two Trials was truthful, saying "When I was under oath, I told the truth. When I sent the text messages, I wasn't." HT at 89, 98. He also denied that anyone from the Government forced him to implicate Mr. Ranieri in his testimony about the murder of Joel Silva. HT at 90. Defendants cross-examined Mr. Hardisty about his statements. Therefore, the statement that Mr. Hardisty would go to the Defense lawyers and say Mr. Ranieri was not involved did not prejudice the Defendants because it was in fact false

United States District Court
Northern District of California

as the Court so finds. Having observed his testimony at trial and at the post-trial hearing, the Court finds Mr. Hardisty's post-trial testimony credible.

14. Newly Discovered Evidence

Defendants assert that the newly discovered evidence of the May 5, 2022 fight and the steroid trafficking investigation are newly discovered evidence that warrant a new trial. Wendt Motion at 38-39. A defendant seeking a new trial based on newly discovered evidence must prove each of the five *Harrington* factors: "(1) the evidence must be newly discovered; (2) the failure to discover the evidence sooner must not be the result of a lack of diligence on the defendant's part; (3) the evidence must be material to the issues at trial; (4) the evidence must be neither cumulative nor merely impeaching; and (5) the evidence must indicate that a new trial would probably result in acquittal." *United States v. Harrington*, 410 F.3d 598, 601 (9th Cir. 2005). Newly discovered evidence is merely impeaching unless it is "so powerful that, if it were to be believed by the trier of fact, it could render the witness' testimony totally incredible." *United States v. Davis*, 960 F.2d 820, 825 (9th Cir. 1992).

a. May 5, 2022 fight and steroid trafficking investigation

The newly discovered evidence of the May 5, 2022 fight and the steroid trafficking investigation do not meet all of the five *Harrington* factors so as to warrant a new trial. First, the evidence was newly discovered after trial. Second, the failure to discover the evidence sooner was not a result of a lack of diligence on the defendants' part, nor does the Government claim so. Third, the evidence was not material to the issues at trial for the reasons stated in the *Brady/Giglio* analysis. The fight was inadmissible evidence under the Federal Rules of Evidence, and the steroid trafficking investigation is not material as Defendants failed adequately to explain how it could be. Fourth, the evidence was not even impeaching, and would at most be merely impeaching because Defendants assert the evidence is specifically impeachment evidence. Fifth, the evidence was not sufficiently central, and a new trial would not result in acquittal given the strength and volume of the evidence of guilt in contrast to the peripheral nature of this evidence.

In *United States v. Singh*, Case No. 2:14cr–00648–CAS–9, 2018 WL 1662483, at *5-6 (C.D. Cal. April 2, 2018), the court denied a motion for new trial despite a post-verdict allegation

United States District Court
Northern District of California

that one cooperator witness participated in a murder-for-hire plot against another cooperator. There, the defendants argued that the alleged criminal conduct, the "murder-for-hire" plot, went to the witness cooperator's willingness to lie. *Id.* The Court held that even without the evidence, the jury had sufficient information to assess the credibility of the witness, including evidence of a guilty plea agreement. *Id.* at 12-13. Further, the evidence did not present a "substantial issue" for appeal that was likely to result in reversal or a new trial. *Id.* at 13. Similarly here, Defendants argue that the evidence of the May 5, 2022 fight and the steroid trafficking investigation went to Mr. Hardisty's willingness to lie. And just like in *Singh*, here, the jury had sufficient information to assess Mr. Hardisty's credibility, including actual impeachment evidence that he lied to the FBI about his whereabouts during the murder of Joel Silva. TT 2930-31. Additionally, like in *Singh*, evidence here of a fight after the trial ended and a steroid trafficking investigation is not likely to result in a reversal or a new trial. Nor do Defendants convincingly assert otherwise.[7]

15. Post-Trial Discovery Litigation

Defendants argue that the Government committed *Brady* and *Napue* violations because the Defendants had to engage in multiple rounds of post-trial discovery litigation. There is no merit to this argument. While post-trial discovery litigation concerned potential *Brady* issues, that does not *per se* establish a *Brady* violation. Also, a significant amount of the post-trial discovery litigation concerned production of unredacted materials and other materials that did not involve *Brady* issues.

16. Sam Holguin

Defendants argue that the Court erred by failing to give Sam Holguin immunity after the Government threatened to prosecute Mr. Holguin for intimidating Joseph Hardisty. Wendt Motion at 44. Mr. Holguin was a former friend of Mr. Hardisty whom Defendants sought to call to impeach Mr. Hardisty's credibility. *Id.* at 41. Specifically, Mr. Holguin "professed that Joseph Hardisty had told him during the course of their friendship that Hardisty had killed Joel Silva and

[7] Defendants do not assert that the text messages to SA Kassandra Lane are newly discovered evidence that meet the *Harrington* factors. *See* Docket No. 3667 (Group One D's Supplemental Memo to R33 Motion for New Trial).

United States District Court
Northern District of California

that in 2014 Hardisty was a volatile methamphetamine and steroid user." *Id.* This testimony was to be coupled with that of Margaret Chin, Mr. Hardisty's former girlfriend, who also stated that Mr. Hardisty confessed to the murder of Joel Silva. Docket No. 3509-6 at 3 (Peng Decl.). However, during Mr. Hardisty's testimony for the Government, Defendants failed to lay a predicate for Mr. Holguin's impeaching statements as required by Federal Rule of Evidence 613. TT 2702-3095. Defendants also failed to object when Mr. Hardisty was excused after testifying for the Government. Due to these failures, Mr. Hardisty was technically unavailable to testify, and Defendants were therefore precluded from introducing the testimony of Ms. Chin and Mr. Holguin. Nevertheless, to avoid a potential claim for ineffective assistance of counsel, the Court allowed Defendants to re-call Mr. Hardisty "as a favor" so they could present said testimony. TT 6354. The Court explained that Ms. Chin's and Mr. Holguin's testimony would have to be narrow, dealing only with Mr. Hardisty's alleged confessions about killing Joel Silva. TT 6360.

However, before Mr. Hardisty was re-called and Mr. Holguin could testify, Mr. Holguin sent Mr. Hardisty multiple text messages that the Government assessed as an attempt at witness intimidation. TT 5940. As a result, when Defendants called Mr. Holguin to testify, the Court provided him with counsel, and Mr. Holguin invoked his Fifth Amendment right against self-incrimination. TT 5939. Defendants then asked the Court to provide Mr. Holguin with immunity and compel his testimony, but after an *ex parte* hearing with Mr. Holguin and his counsel, the Court declined to do so. TT 5939.

In declining to provide Mr. Holguin with court-ordered immunity, the Court relied on *United States v. Straub*, 538 F.3d 1147 (9th Cir. 2008). TT 5939. In *Straub*, the Ninth Circuit explained that a trial court must provide immunity to a defense witness if (1) the witness's testimony is relevant; and (2) either "the prosecution intentionally caused a defense witness to invoke the Fifth Amendment right against self-incrimination" in a manner that rises to the level of prosecutorial misconduct, or "the prosecution granted immunity to a government witness in order to obtain that witness's testimony but denied immunity to a defense witness whose testimony would have directly contradicted that of the government witness." *Straub*, 538 F.3d at 1157–58 (citation and quotation marks omitted). Focusing on the second prong, the Court noted that the

Government did not intimidate Mr. Holguin in a way that purposely precipitated his invocation of the Fifth Amendment, as a review of the text messages at issue showed a "valid and good faith concern . . . of an attempt at witness intimidation." TT 5939–40. Mr. Holguin's texts potentially violated 18 U.S.C. §§ 1512(b) & 1513(e), which prohibit tampering with and retaliating against a witness, and the Government's ultimate decision on whether to bring charges based on them was entirely within their discretion. *See United States v. F.S.J.*, 265 F.3d 764, 768–69 (9th Cir. 2001).[8]

Nor did the Government grant immunity to Mr. Hardisty and thereby put the Defendants at a disadvantage by denying Mr. Holguin immunity. TT 5940. Defendants' assertion that Mr. Hardisty was in fact granted immunity is erroneous. Wendt Reply at 24–25. The Court recognizes that the Government offered Mr. Hardisty immunity and Mr. Hardisty requested immunity from the Government, TT 5940, but the Government never ultimately conferred immunity. TT 5940. Offers of and requests for immunity do not equate to immunity; Mr. Hardisty could have been, and still can be, prosecuted in relation to the charged crimes at any time. As such, there is no basis for Defendants' claim that the Court erred by failing to compel Mr. Holguin's testimony through the provision of court-ordered immunity.

In any event, Mr. Holguin's testimony that Mr. Hardisty confessed is hearsay that only would have been admissible as a prior inconsistent statement, and therefore, Mr. Holguin would not have been able to substantiate his statement with extrinsic evidence. Thus, his testimony would have been cumulative of Ms. Chin's, who upon Mr. Hardisty's re-call, ultimately testified to the alleged confession.

G. Cumulative Error

Finally, Defendants maintain that the "errors of constitutional dimension" caused cumulative error. Nelson-Ott Motion at 101. "In some cases, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant." *United States v. Wilkes*, 662 F.3d 524, 542 (9th Cir. 2011).

[8] Mr. Holguin later pled guilty to witness intimidation in 2024. *See USA v. Samuel Holquin*, 3:22-cr-00463-EMC, Docket No. 36 (Judgment) (The case name is a misspelling of "Holguin.").

Here, for all of the reasons discussed above, no underlying errors exist to establish a basis for cumulative error. *See United States v. Spangler*, 810 F.3d 702, 711 (9th Cir. 2016) (finding no cumulative error because the defendant "has not demonstrated any errors by the district court."). And as discussed above, the evidence supporting the guilty verdicts herein was substantial and voluminous. Therefore, the cumulative error doctrine does not warrant relief.

## V. CONCLUSION

The Court DENIES Group One Defendants' (Mr. Nelson, Mr. Ott, Mr. Wendt) Rule 33 Motion for New Trial.

This Order disposes of Docket Nos. 3240, 3251.

**IT IS SO ORDERED**.

Dated: March 11, 2024

EDWARD M. CHEN
United States District Judge